15-15712

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**MICHELLE-LAEL B. NORSWORTHY**,

Plaintiff-Appellee,

v.

**JEFFREY BEARD, et al.,**

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

No. C 14-00695 JST (PR)

The Honorable Jon S. Tigar, Judge

**DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD**

**VOLUME 2 OF 3**

KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
THOMAS S. PATTERSON
Supervising Deputy Attorney General
JOSE A. ZELIDON-ZEPEDA
Deputy Attorney General
State Bar No. 227108
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5781
Fax: (415) 703-5843
Email: Jose.ZelidonZepeda@doj.ca.gov
*Attorneys for Defendants-Appellants
Beard, Spearman, Coffin, Lozano,
Adams, Newton, Van Leer, and Zamora*

15-15712

## INDEX TO DEFENDANTS-APPELLANT'S EXCEPTS OF RECORD

### Volume 2 of 3

| Docket No. | Description | Date | Pages |
|---|---|---|---|
| 98 | Defendants' Notice of Appeal | 4/10/2015 | ER 49 - 51 |
| 92 | Proceeding Transcript of Plaintiff's Motion for Preliminary Injunction | 4/1/2015 | ER 51.1 – 51.14 |
| 79 | Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction | 3/19/2015 | ER 51.15 – 51.18 |
| 77 | Defendants' Request for Judicial Notice [Excerpts] | 3/12/2015 | ER 52 - 94 |
| 76 | Exhs. to Declaration of P. Bajwa Opposing Motion for Preliminary Injunction [Excerpts] | 3/12/2015 | ER 95 - 132 |
| 75 | Declaration of K. Harrington Opposing Preliminary Injunction | 3/12/2015 | ER 133 - 136 |
| 74 | Declaration of Dr. I. Munir Opposing Motion for Preliminary Injunction | 3/12/2015 | ER 136.1 – 136.2 |
| 73 | Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction | 3/12/2015 | ER 136.3 – 136.7 |
| 68 | Exh. H to Declaration of H. Hoying Supporting Motion for Preliminary Injunction (Reese Notes) | 2/26/2015 | ER 137 - 157 |
| 66 | Exh. A to Declaration of H. Hoying Supporting Motion for Preliminary Injunction (Coffin Report) | 2/26/2015 | ER 158 – 184 |

| Docket No. | Description | Date | Pages |
|---|---|---|---|
| 65 | Declaration of M. Bowers Supporting Motion for Preliminary Injunction [Excerpts] | 2/26/2015 | ER 185 - 189 |
| 64 | Declaration of N. Gorton Supporting Motion for Preliminary Injunction [Excerpts] | 2/26/2015 | ER 190 - 200 |
| 63 | Declaration R. Ettner Supporting Motion for Preliminary Injunction[Excerpts] | 2/26/2015 | ER 201 - 223 |
| 62 | Plaintiff's Motion for Preliminary Injunction [Excerpts] | 2/26/2015 | ER 224 - 245 |
| 10 | First Amended Complaint [Excerpts] | 7/2/2014 | ER 246 - 271 |
| -- | District Court Docket Sheet | -- | ER 272 - 287 |

SF2015401239
20728304.docx

2

1   KAMALA D. HARRIS
    Attorney General of California
2   JAY C. RUSSELL
    Supervising Deputy Attorney General
3   PREETI K. BAJWA
    Deputy Attorney General
4   JOSE ZELIDON-ZEPEDA
    Deputy Attorney General
5   State Bar No. 227108
      455 Golden Gate Ave., Ste. 11000
6     San Francisco, CA 94102
      Telephone:  (415) 703-5781
7     Fax:  (415) 703-5843
      E-mail:  Jose.ZelidonZepeda@doj.ca.gov
8   *Attorneys for Defendants J. Beard, M. Spearman, R.*
    *Coffin, J. Lozano, A. Adams, A. Newton, D. Van*
9   *Leer, and L. Zamora*

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  **MICHELLE-LAEL B. NORSWORTHY,**          C 14-00695 JST (PR)

15                           Plaintiff,       **DEFENDANTS' NOTICE OF APPEAL**

16       **v.**

17

18  **JEFFREY BEARD, et al.,**

19                           Defendants.

20

21          PLEASE TAKE NOTICE that Defendants J. Beard, M. Spearman, R. Coffin, J. Lozano, A.

22  Adams, A. Newton, D. Van Leer, and L. Zamora (Defendants) appeal to the Ninth Circuit Court

23  of Appeals from the Order Granting Motion for Preliminary Injunction, Granting Request for

24  Judicial Notice, and Denying Motion to Strike, entered in this case on April 2, 2015 and attached

25  to this Notice.

26          The order granted a preliminary injunction and is therefore immediately appealable.  28

27  U.S.C. § 1292(a)(1); *Paige v. State of Calif.,* 102 F.3d 1035, 1038 (9th Cir. 1996).

28

                                        1

**ER 49**

1    Dated:  April 10, 2015                          Respectfully submitted,

2                                                    KAMALA D. HARRIS
                                                     Attorney General of California
3                                                    JAY C. RUSSELL
                                                     Supervising Deputy Attorney General
4

5                                                    */s/ Jose Zelidon-Zepeda*
6                                                    JOSE ZELIDON-ZEPEDA
                                                     Deputy Attorney General
7                                                    *Attorneys for Defendants J. Beard,*
                                                     *M. Spearman, R. Coffin, J. Lozano, A.*
8                                                    *Adams, A. Newton, D. Van Leer, and L.*
                                                     *Zamora*
9

10   SF2014409242
     41272433.doc
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         2

Defs.' Not. of Appeal  (C 14-00695 JST (PR))

ER 50

# CERTIFICATE OF SERVICE

Case Name: **Michelle-Lael B. Norsworthy v.**  No.  **C 14-00695 JST (PR)**
**J. Beard, et al.**

I hereby certify that on April 10, 2015, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF APPEAL.**


I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on April 10, 2015, at San Francisco, California.


C. Look                                        /s/ C. Look
Declarant                                      Signature

SF2014409242
41272451.doc

**ER 51**

Pages 1 - 69

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

MICHELLE-LAEL B. NORSWORTHY,      )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )      **No. C 14-0695 JST**
                                  )
JEFFREY BEARD, A. NEWTON,         )
A. ADAMS, LORI ZAMORA,            )
RAYMOND J. COFFIN, MARION         )
SPEARMAN, DAVID VAN LEER,         )
JARED LOZANO, and DOES 1-30,      )
                                  )
          Defendants.             )      San Francisco, California
_____)      Wednesday, April 1, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          MORGAN, LEWIS & BOCKIUS LLP
                        One Market, Spear Street Tower
                        San Francisco, California 94105-1126
                   BY:  **HERMAN J. HOYING, ESQUIRE**
                        **MEGAN DY LIN, ESQUIRE**
                        **C. ROBERT HARRINGTON, ESQUIRE**
                        **STEVEN ERKEL, ESQUIRE**

                        TRANSGENDER LAW CENTER
                        1629 Telegraph Avenue, Suite 400
                        Oakland, California 94612
                   BY:  **ILONA TURNER, LEGAL DIRECTOR**

For Defendants:         KAMALA D. HARRIS
                        Attorney General of California
                        455 Golden Gate Avenue, Suite 11000
                        San Francisco, CA 94102-7004
                   BY:  **JAY C. RUSSELL, SUPERVISING DEPUTY A.G.**
                        **PREETI K. BAJWA, DEPUTY A.G.**
                        **EDWARD R. FLUET, DEPUTY A.G.**

**Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR**

ER 51.1

| | |
|---|---|
| 1 | **Wednesday - April 1, 2015**                                    **2:00 p.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling civil case 14-695, Michelle-Lael |
| 5 | B. Norsworthy versus Jeffrey Beard, et al. |
| 6 |     Counsel, will you please stand and make your appearances |
| 7 | for the record. |
| 8 | **MR. HOYING:**  Herman Hoying, of Morgan Lewis, on behalf |
| 9 | of the plaintiff. |
| 10 | **MR. ERKEL:**  Steven Erkel on behalf of the plaintiff, |
| 11 | of Morgan, Lewis & Bockius. |
| 12 | **MS. LIN:**  Megan Lin, Morgan Lewis, on behalf of |
| 13 | plaintiff. |
| 14 | **MR. HARRINGTON:**  Rob Herrington, Morgan Lewis, on |
| 15 | behalf of the plaintiff. |
| 16 | **MR. TURNER:**  Ilona Turner, with Transgender Law |
| 17 | Center, on behalf of the plaintiff. |
| 18 | **MS. BAJWA:**  Preeti Bajwa, with the Attorney General's |
| 19 | Office, on behalf of the defendants. |
| 20 | **MR. RUSSELL:**  Jay Russell, with the Attorneys |
| 21 | General's Office, on behalf of defendants. |
| 22 | **MR. FLUET:**  Edward Fluet, with the Attorneys General's |
| 23 | Office, on behalf of the defendants. |
| 24 | **THE COURT:**  Welcome.  The matter is on calendar for a |
| 25 | hearing on plaintiff's motion for preliminary injunction. |

**ER 51.2**

1      Similarly, the balance of hardships and public interests

2  favor ordering sex reassignment surgery where, as here, there's

3  a constitutional violation.

4      I will reserve whatever time I have left for rebuttal.

5  Thank you.

6         **THE COURT:**  Thank you.

7      And for Mr. Hoying's benefit, Mr. Noble, would you say how

8  much time that is, please.

9         **THE CLERK:**  Nine minutes, Your Honor.

10        **THE COURT:**  Thank you.

11     Ms. Bajwa, who will argue for the State?

12        **MS. BAJWA:**  I will, Your Honor.

13        **THE COURT:**  Very good.

14        **MS. BAJWA:**  May it please the Court, Counsel, my name

15  is Preeti Bajwa, and I represent the defendants in this matter.

16     Pending before this Court is plaintiff Michelle

17  Norsworthy's motion for a preliminary injunction.  The burden

18  falls on Ms. Norsworthy to show that injunctive relief is

19  necessary.

20     Although, in her moving papers and in her reply

21  Ms. Norsworthy has contended that this is not a mandatory

22  injunction, defendants' position is that Ms. Norsworthy is, in

23  fact, seeking a preliminary injunction.

24        **THE COURT:**  Let's start there.

25     So in defendants' brief, on page 1, they say:

29

1          "The record has not been sufficiently well-developed

2       to address complex factual and medical questions as well

3       as reasonable safety concerns."

4       How does the record need further development?

5          **MS. BAJWA:**  I think the best place to start with that

6   would be the competing expert opinions that we have in this

7   case.

8          Plaintiff's expert, Dr. Ettner, who was retained

9   specifically for this litigation, has stated that, in her

10  opinion, this surgery is medically necessary for

11  Ms. Norsworthy.

12         However, defendants have presented opinions by Dr. Coffin,

13  as well as Dr. Levine, who is a recognized expert in the field

14  of gender dysphoria, that it is not -- that for

15  Ms. Norsworthy -- we can't speak for any other inmates, but

16  specifically Ms. Norsworthy, there are other factors in her

17  life that affect the medical necessity of sex reassignment

18  surgery at this time.  There is no immediate need for her to

19  have sex reassignment surgery.

20         **THE COURT:**  Well, that's a different issue.  And maybe

21  my question wasn't clear.

22         I take defendants' point, the one I just quoted, to be

23  that it's too soon in the progress -- let me back up.

24         The defendants' point is, essentially, that if this motion

25  is granted, that save and except for her name change,

1   Ms. Norsworthy will have received, at the preliminary

2   injunction stage, all of the relief that she's seeking in the

3   lawsuit without the benefit of a trial; and that that would be

4   somehow -- and that -- going back to my quote from your

5   brief -- the record hasn't been developed enough, yet, for the

6   Court to reliably reach that conclusion one way or the other.

7        And so Ms. Norsworthy's deposition has been taken.  The

8   parties have hired qualified -- have hired experts that they

9   felt were qualified, on both sides.  There has been, as far as

10  I can tell, a tremendous amount of discovery that's been

11  produced.  All of Ms. Norsworthy's medical records have been

12  closely examined by both sides.

13       So my question is a very on-the-ground question.  What

14  procedural or factual development steps does the State contend

15  need to be taken before the record is sufficiently

16  well-developed that you would no longer have the concern that I

17  quoted?

18       **MS. BAJWA:**  I think the main one would be the

19  deposition or some sort of explanation of Dr. Reese.

20       Ms. Norsworthy relies heavily on three or four medical

21  records that Dr. Reese prepared in conjunction with her care.

22  However, as noted by both Dr. Coffin and Dr. Levine,

23  Dr. Reese's medical records do not provide any psychological --

24  any explanation as to why the surgery is necessary, nor provide

25  a nexus to why he believes the surgery is necessary.

```
 1          We do know that Dr. Reese is represented.  I do not know
 2    what efforts plaintiff has taken to try to secure Dr. Reese,
 3    take his deposition.  However, if they're going to rely
 4    completely on his records --
 5          THE COURT:  I'm sorry to interrupt you.
 6          Did the defendants make any such efforts?  I don't think
 7    it would be glib for me to observe that the plaintiffs are
 8    pretty happy with Dr. Reese's written opinion.  And they don't
 9    have a lot of motive -- is Dr. Reese a man?
10          MS. BAJWA:  Dr. Reese is a man.
11          THE COURT:  -- to take Dr. Reese -- to take his
12    deposition.
13          MS. BAJWA:  Your Honor, we have reached out to
14    Dr. Reese's counsel.  All we know is that he is somewhere in
15    the Great Plains.  We have -- in the limited time that we had
16    to conduct discovery, we were not able to ascertain his exact
17    whereabouts.
18          I am not sure about the exact communications between
19    Dr. Reese and his attorney, of course.  But I can tell you that
20    at this time we have not yet secured his testimony and an
21    explanation as to why he stated what he wrote in his papers,
22    which is exactly what the plaintiffs are relying on.
23          And it is this particular opinion that both Dr. Coffin and
24    Dr. Levine contend is inadequate.  And from there they
25    presented their well-reasoned and thorough reports.
```

**ER 51.6**

1   point that the fact that someone has been suffering for a long

2   time doesn't mean that they're not really suffering?

3        I'm not saying this in a very clear or eloquent way, but

4   somebody -- let's say, hypothetically, that someone had

5   achieved whatever the requisite level of suffering was on day

6   one, and we would all agree that they would be entitled to

7   relief.  The fact that they're still in that place of suffering

8   a hundred days later, seems to me, exacerbates rather than

9   diminishes their right to relief, if they meet the standard.

10        **MS. BAJWA:**  Well, as the evidence stands, we seem to

11  have a disagreement between the plaintiff and defendants'

12  expert witnesses as to whether her suffering -- her suffering

13  is being alleviated by the therapeutic methods that have been

14  provided to her.

15        The plaintiffs argue strenuously that she has severe

16  anxiety.  However, our experts, Dr. Coffin and Dr. Levine, both

17  of whom reviewed Ms. Norsworthy's medical history, her medical

18  records, her case factors, and have also met with her and

19  conducted lengthy interviews with her, have opined that as --

20  as to where she is right now she is not at any risk for any

21  psychological or medical decompensation should she not receive

22  the surgery, and she doesn't have a disability due to her

23  gender dysphoria.

24        To the contrary -- I'm sorry.

25        **THE COURT:**  The things that -- or the medical -- some

1  basis.

2      That was a much longer question than I thought it was

3  going to be when I started.

4      But when I'm addressing the alternatives that are

5  available to the Court, don't I need to look at this most

6  recent set of circumstances, and make my determination on that

7  basis, as opposed to the historical record?

8      **MS. BAJWA:**  I'll try to address the Court's points in

9  turn.

10     First, I would like to address the liver issue.  As

11 Dr. Levine pointed out, yes, Ms. Norsworthy does have hepatitis

12 C.  However, the record is not clear as to what is causing the

13 changes in her liver enzyme levels; whether it is due strictly

14 to the estrogen, or whether it is due to some of the

15 complications from hepatitis C or other viruses that may attack

16 the liver.  It is unclear.

17     What is before the Court is that her current treating

18 endocrinologist at CDCR continue to test her and monitor her

19 liver enzyme levels, to ensure that they are within safe

20 parameters.

21     However, if the concern for the Court is liver damage,

22 then the treatment is not sex reassignment surgery.  The

23 treatment would be --

24     **THE COURT:**  No, no.  The concern is, the concern is,

25 to be clear, I am worried about her liver.  To the extent I'm

**ER 51.8**

1    And in this case, Dr. Coffin and Dr. Levine explored not
2  just Ms. Norsworthy's desire for sex reassignment surgery, but
3  they also explored the other situations surrounding --
4  surroundings her.  Specifically, that she has had impending
5  parole hearings.
6    Both doctors opined that she's in the position of
7  potentially being released from incarceration after being
8  incarcerated for 30 years.  Her focus should be on reentry and
9  re-acclimation into a society that is markedly different from
10 the one that she left.  She should work to secure a place to
11 live.  She should secure to make sure that she can provide
12 adequate food, nutrition, shelter for herself before
13 embarking --
14        **THE COURT:**  In the absence of a decision by the State
15 actually to release Ms. Norsworthy, and a fixed release date,
16 why are those things mutually exclusive?  Why couldn't you get
17 sex reassignment surgery and focus on vocational training and
18 getting a place to live and everything else?
19        **MS. BAJWA:**  Well, first off, Ms. Norsworthy is
20 presently scheduled for a parole hearing on May 20th, 2015.
21 That's within -- I think it's about -- 50 days.  She was --
22        **THE COURT:**  Wasn't the date in the record March 25th?
23        **MS. BAJWA:**  Yes.  She did go -- she was scheduled for
24 a parole hearing on March 25th, 2015.  However, her parole
25 attorney, on procedural grounds, refused to go forward with the

49

1    hearing, even though she had previously certified to the Board

2    that she would be prepared and ready to go forward.

3         Because of that refusal, we were not able to go forward

4    with it.  And that has -- that hearing has been moved to

5    May 20th, 2015.

6              THE COURT:  I see.

7         MS. BAJWA:  Moving to your question as to why they are

8    not mutually exclusive, this surgery is not one that is a

9    simple appendectomy, for example.

10        This is -- there's serious physical altercations are going

11   to take place to Ms. Norsworthy's body.  She will have to

12   recover not just physically from the surgery but also mentally

13   from the surgery.  She will have to come to terms with her new

14   body.  Those are all explained by Dr. Levine, in his report,

15   that these are all considerations that -- that have to be

16   entertained.

17        It would -- so for her to adapt to a physically rigorous

18   surgery, the mental tension that comes with the surgery, and

19   have to cope with being released into a society that she has

20   not lived in for 30 years, and have to be -- figure out how

21   she's going to provide for herself when that has always been

22   provided, those can and, Dr. Levine fears, will cause further

23   deterioration to her mental state.

24             THE COURT:  I think there's evidence in the record

25   regarding the number of times Ms. Norsworthy has had a parole

54

1    These would be persons who have been studied who have

2    undergone sex reassignment surgery as part of the

3    non-incarcerated population, not the incarcerated population.

4         **THE COURT:**  So then he must be opining that getting

5    sex reassignment surgery actually dramatically --

6    "dramatically" would be an understatement -- increases your

7    risk of killing yourself.

8         If that's true, then it's difficult for me to understand

9    why any respectable medical organization would ever recommend

10   sex reassignment surgery, if it increases by 19 times your risk

11   of killing yourself.

12        **MS. BAJWA:**  Dr. Levine did not further opine on that.

13   And that would possibly be a question for Dr. Levine, either in

14   deposition or trial setting, for this Court to assess

15   credibility.  And it's part of the record that -- coming back

16   to one of the Court's original questions, which is part of the

17   record which has not been fully developed yet.

18        You know, Defendants have not had an opportunity to depose

19   plaintiff's expert witnesses, in addition to Dr. Reese.  And,

20   similarly, the Court has not had an opportunity to question

21   Dr. Levine and Dr. Coffin more deeply on some of the questions

22   that the Court has for me today, which would probably be better

23   answered by Dr. Coffin and Dr. Levine.  That just points to the

24   undeveloped record at this point.

25        **THE COURT:**  I'll reread Dr. Levine's report.

**ER 51.11**

1   of the preliminary injunction standard.

2      And my first question was rhetorical.  I know the CDCR

3   doesn't use death within two days as a barometer of medical

4   need.  So my question is:  If that's the appropriate standard

5   in this case, why is it?  What is it about SRS?  And I'm not

6   asking you -- although, you're welcome to tell me if you have

7   an opinion.  I mean, what is it that Dr. Levine would say makes

8   that the right standard, if that's -- if it is?

9      **MS. BAJWA:**  Again, all I can do is direct the Court

10  back to Dr. Levine's report and again point to the undeveloped

11  record in this case.

12     That's certainly a question better suited for Dr. Levine,

13  that the Court may want to pose at a trial or at another

14  evidentiary hearing.  And that, again, points to the

15  undeveloped record in this case.  That was again -- I'm coming

16  back to the Court's initial questions to me.

17     **THE COURT:**  Thank you.

18  Ms. Bajwa, you have approximately ten minutes remaining.

19     **MS. BAJWA:**  Just briefly, I just wanted to briefly

20  address the equal protection argument.

21     As our moving papers have stated, we do not believe that

22  there is any blanket policy, nor is there any evidence of a

23  blanket policy against sex reassignment surgery.

24     To the contrary, the Court-approved procedures in *Plata v.*

25  *Schwarzenegger* govern this case.  They govern the medical

1      **THE COURT:**  And the ancillary care is also better.

2      Presumably, these are persons who are receiving additional

3  medical treatment beyond simply surgery.  But I don't know

4  that.

5      Anyway, it sounds like I should read the study more

6  closely.

7      Mr. Hoying, you have time for only a couple more

8  sentences, because the clock has run out.

9      **MR. HOYING:**  Okay.  I would just conclude by saying

10  that the idea she needs to wait for parole and she can't pursue

11  both is a false choice.  And she's actively preparing for both,

12  and she deserves the surgery.

13      **THE COURT:**  Thank you.

14      Thank you, both, for the very good quality of your

15  briefing and the arguments in this case.

16      The Court will take this motion under submission.  I would

17  expect to issue an order shortly.

18      Thank you.

19      (At 4:13 p.m. the proceedings were adjourned.)

20                          - - - -

21

22

23

24

25

**ER 51.13**

**CERTIFICATE OF REPORTER**

   I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE: Sunday, April 5, 2015




*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter

1    CHRISTOPHER J. BANKS (Bar No. 218779)
     HERMAN J. HOYING (Bar. No. 257495)
2    MORGAN, LEWIS & BOCKIUS LLP
     One Market, Spear Street Tower
3    San Francisco, California  94105-1126
     Telephone:  415.442.1000
4    Facsimile:  415.442.1001
     cbanks@morganlewis.com
5    hhoying@morganlewis.com

6    ILONA M. TURNER (Bar No. 256219)
     JENNIFER ORTHWEIN (Bar No. 255196)
7    SHAWN THOMAS MEERKAMPER (Bar No. 296964)
     TRANSGENDER LAW CENTER
8    1629 Telegraph Avenue, Suite 400
     Oakland, California  94612
9    Telephone:  415.865.0176
     Facsimile:  877.847.1278
10   ilona@transgenderlawcenter.org
     jen@transgenderlawcenter.org
11   shawn@transgenderlawcenter.org

12   *Attorneys for Plaintiff,*
     MICHELLE-LAEL B. NORSWORTHY

13

14

15                        UNITED STATES DISTRICT COURT

16                      NORTHERN DISTRICT OF CALIFORNIA

17

18   MICHELLE-LAEL B. NORSWORTHY,        Case No. 3:14-cv-00695-JST

19                  Plaintiff,            **PLAINTIFF'S REPLY MEMORANDUM
                                          IN SUPPORT OF MOTION FOR
20          v.                            PRELIMINARY INJUNCTION**

21   JEFFREY BEARD, A. NEWTON,            Hearing Date:    April 1, 2015
     A. ADAMS, LORI ZAMORA,
22   RAYMOND J. COFFIN, MARION            Time:            2:00 PM
     SPEARMAN, DAVID VAN LEER,
23   JARED LOZANO, and DOES 1-30,         Judge Jon S. Tigar

24                  Defendants.           Courtroom 9

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25793839.4

                                                    REPLY ISO MOT. FOR PRELIM. INJ
                                                            3:14-cv-00695-JST

                                                              ER 51.15

1    stereotypes and bias.  For instance, Ms. Harrington's argument is premised upon the unsupported

2    premise that a transgender female inmate who has received SRS will be recognized as different

3    from – and act differently toward – cisgender female inmates.  Ms. Harrington's suggestion that

4    there is no place in a female institution for an inmate who has committed domestic violence

5    against women is absurd as there clearly also are cisgender females who have committed

6    domestic violence against their same-sex partners.

7           As such, Defendants' unsupported, after-the-fact safety concerns should be disregarded

8    entirely, but, at any rate, are not sufficient to justify the imposition of the discriminatory policies

9    against SRS or the denial of a medically necessary treatment.

10   **IV.    PLAINTIFF IS SUFFERING IRREPARABLE HARM**

11          Contrary to Defendants' contention, Plaintiff's "sole argument" for irreparable injury is

12   not the deprivation of her constitutional rights.  (Opp'n at 25.)  As the record clearly reflects,

13   Plaintiff is suffering significant pain and distress as a result of her gender dysphoria, which pain

14   and distress Defendants concede would be effectively treated by SRS.  Defendants misstate the

15   holding of *Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988)

16   to argue that "emotional distress in conjunction with other factors may be relevant to – but not

17   dispositive of – the irreparable injury analysis."  (Opp'n at 26.)  In fact, the Ninth Circuit has

18   made clear that, under its holding in *Chalk*, "emotional distress, depression, and anxiety may

19   constitute irreparable injury." *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1324 n.5 (9th Cir.

20   1994).

21          Defendants further argue that a preliminary injunction is not justified because SRS is not

22   "suddenly urgent" (Opp'n at 25, 26), but sudden urgency is not a requirement for obtaining

23   injunctive relief.[14]  The fact that Plaintiff has been suffering severe mental distress for a long time

24   as a result of Defendants' deliberate indifference does not justify requiring Plaintiff to continue to

---

[14]    *Soneeya v. Spencer*, 851 F.Supp.2d 228, 252 (D. Mass. 2012) (granting preliminary injunction
for additional treatment of plaintiff's gender dysphoria); *McNearney v. Washington Dep't of
Corr.*, No. C11-5930 RBL/KLS, 2012 WL 3545267, at *1 (W.D. Wash. June 15, 2012) *adopted*,
No. 11-CV-5930-RBL/KLS, 2012 WL 3545218 (W.D. Wash. Aug. 16, 2012) *and modified*, No.
C11-5930 RBL/KLS, 2013 WL 392489 (W.D. Wash. Jan. 31, 2013) (finding irreparable injury
where plaintiff "continues to suffer unnecessary pain despite [current treatment]" even though
condition was not new, went untreated for years prior to her incarceration, and no evidence that
condition had worsened).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25793839.4                                    14                    REPLY ISO MOT. FOR PRELIM. INJ
                                                                        3:14-cv-00695-JST

ER 51.16

1   endure that distress.  Plaintiff's treating mental health provider recommended SRS as a medically

2   necessary treatment over two years ago and despite Plaintiff's persistent efforts Defendants still

3   have not provided Plaintiff with SRS or any other treatment for the enduring symptoms of her

4   gender dysphoria.

5         Moreover, there has been a change in Plaintiff's health that further necessitates the timely

6   provision of SRS.  For several months at the end of 2014, Plaintiff was removed from hormone

7   therapy entirely because it was interfering with Plaintiff's liver function, which already is

8   impaired as a result of Plaintiff's hepatitis C.  (Gorton Decl. at ¶¶ 19-28.)  Although Plaintiff has

9   resumed hormone therapy, she is on a much lower dose and is being forced to take the "last

10   resort" oral application, which threatens to cause the liver condition to return such that Plaintiff

11   will again have to be removed from the hormone therapy.  (*Id.*)  As a result of the low dosage of

12   hormone therapy Plaintiff is receiving, her hormone levels are very low, which places her at risk

13   for remasculinizing (which can have severe mental health implications) (Gorton Decl. at ¶ 28)

14   and, as Defendants' own expert acknowledged, places her at significant risk for osteoporosis

15   (Levine Decl. at 18).  Thus, in addition to the primary concern of addressing the severe mental

16   distress Plaintiff suffers as a result of her gender dysphoria, SRS also would provide Plaintiff

17   significant physical health benefits.

18         The constitutional deprivations under the Eighth and Fourteenth Amendments that

19   Plaintiff suffers as a result of Defendants' failure to provide SRS also constitute irreparable harm

20   that justifies the requested preliminary injunction, favors the public interest and tips the balance

21   of hardships in Plaintiff's favor.  Defendants' arguments against all are premised upon an

22   assumption that the Court fails to find a constitutional violation.  (Opp'n at 25-28.)  The law is

23   clear, however, that where, as here, constitutional violations have been proven, a preliminary

24   injunction should be granted.  (Motion at 32-35.)

25   **V.**      **CONCLUSION**

26         For the foregoing reasons, the Court should grant Plaintiff's Motion in its entirety.

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB2/ 25793839.4

15

REPLY ISO MOT. FOR PRELIM. INJ
3:14-cv-00695-JST

ER 51.17

1

2     Dated:  March 19, 2015                MORGAN, LEWIS & BOCKIUS LLP

3

4                                           By _____/s/ Herman J. Hoying_____
                                                     HERMAN J. HOYING
5
                                            MORGAN, LEWIS & BOCKIUS LLP
6                                           One Market, Spear Street Tower
                                            San Francisco, California  94105-1126
7                                           Telephone:  415.442.1000
                                            Facsimile:   415.442.1001
8                                           hhoying@morganlewis.com
                                            *Attorney for Plaintiff,*
9                                           MICHELLE-LAEL B. NORSWORTHY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO          DB2/ 25793839.4                    16                    REPLY ISO MOT. FOR PRELIM. INJ
                                                                                3:14-cv-00695-JST

ER 51.18

1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   Supervising Deputy Attorney General
3  JOSE ZELIDON-ZEPEDA
   Deputy Attorney General
4  PREETI K. BAJWA
   Deputy Attorney General
5  State Bar No. 232484
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 703-1621
7    Fax:  (415) 703-5843
     E-mail:  Preeti.Bajwa@doj.ca.gov
8  *Attorneys for Defendants J. Beard, M. Spearman,*
   *R. Coffin, J. Lozano, A. Adams, A. Newton, D. Van*
9  *Leer, and L. Zamora*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

| | |
|---|---|
| 14 **JEFFREY B. NORSWORTHY,** | C 14-00695 JST (PR) |
| 15                         Plaintiff, | **DEFENDANTS' REQUEST FOR** |
| 16        **v.** | **JUDICIAL NOTICE IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY** |
| 17 | **INJUNCTION** |
| 18 **JEFFREY BEARD, et al.,** | |
| 19                        Defendants. | Judge:        The Honorable Jon S. Tigar |
| | Action Filed:  February 14, 2014 |

20       Defendants Beard, Spearman, Coffin, Lozano, Adams, Newton, Van Leer and Zamora

21 (Defendants) respectfully request that the Court take judicial notice of the following documents

22 under Federal Rule of Evidence 201, in support of Defendants' opposition to Plaintiff's motion

23 for preliminary injunction.  Under Federal Rule of Evidence 201(b), this Court can take judicial

24 notice of facts that are "capable of accurate and ready determination by resort to sources whose

25 accuracy cannot reasonably be questioned."  *Jespersen v. Harrah's Operating Co., Inc.,* 444

26 F.3d 1104, 1110 (9th Cir. 2006) (en banc).  And judicial notice by a court is mandatory if

27 requested by a party "and the court is supplied with the necessary information."  Fed. R. Evid.

28

                                      1

Defs.' Req. for Jud. Not.   (C 14-00695 JST (PR))

**ER 52**

1   201(c)(2).  The Court may properly take judicial notice of public records, including its own

2   records and the records of other courts.  *U.S. v. Wilson,* 631 F.2d 118, 119 (9th Cir. 1980);

3   *Pavone v. Citicorp Credit Servs., Inc.,* 60 F. Supp. 2d 1040, 1045 (S.D. Cal. 1997).  Courts may

4   also take judicial notice of administrative records including "records and reports of

5   administrative bodies."  *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (1986).

6   Judicial notice is also appropriately taken of the official records of the California Department of

7   Corrections and Rehabilitation.  *Brown v. Valoff,* 422 F.3d 926, 931 n.7. (9th Cir. 2004).

8           In this case, Defendants request that the Court take judicial notice of the following records

9   and documents:

10          **Exhibit A:**  An authenticated copy of the Court Order Appointing the Receiver.

11          **Exhibit B:**  An authenticated copy of the California Department of Corrections and

12   Rehabilitation's Regulatory File pertaining to revisions to California Code of Regulations, Title

13   15, § 3350.1.  The regulatory file is available for public viewing.

14   Dated:  March 12, 2015                    Respectfully submitted,

15                                             KAMALA D. HARRIS
                                               Attorney General of California
16                                             JAY C. RUSSELL
                                               Supervising Deputy Attorney General
17

18

19                                             */s/ Preeti K. Bajwa*
                                               PREETI K. BAJWA
20                                             Deputy Attorney General
                                               *Attorneys for Defendants J. Beard, M.*
21                                             *Spearman, R. Coffin, J. Lozano, A. Adams, A.*
                                               *Newton, D. Van Leer, and L. Zamora*
22   SF2014409242
     41228791.doc
23

24

25

26

27

28

                                               2

Defs.' Req. for Jud. Not.   (C 14-00695 JST (PR))

ER 53



**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7         IN THE UNITED STATES DISTRICT COURT
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10
11 MARCIANO PLATA, et al.,
12           Plaintiffs,        NO. C01-1351 TEH
13       v.            CLASS ACTION
14                     ORDER APPOINTING
ARNOLD SCHWARZENEGGER,   RECEIVER
15 et al.,
16           Defendants.
17
18
19
20      On October 3, 2005, this Court issued its written Findings of Fact and Conclusions of
21 Law in support of its June 30, 2005 decision to establish a Receivership to take control of the
22 delivery of medical services to California state prisoners confined by the California
23 Department of Corrections and Rehabilitation ("CDCR").[1]  In its written ruling, the Court
24 explained that it was undertaking a national search to find a Receiver with the leadership
25 ability, experience, and vision to take on the monumental and critical task of bringing the
26
27
28     [1]  As the October 3, 2005 ruling notes, Pelican Bay State Prison is exempted from this
action and instead falls under this Court's jurisdiction in the separate case of *Madrid v.
Woodford*, C90-3094 TEH.

**ER 54**

United States District Court
For the Northern District of California

1   level of medical care provided to California's 166,000 inmates up to federal constitutional

2   standards.  Having undergone a thorough and successful search process, the Court HEREBY

3   APPOINTS Mr. Robert Sillen to serve as the Receiver in this case, at the pleasure of the

4   Court, effective Monday, April 17, 2006.  A copy of the Receiver's curriculum vitae is

5   attached to this Order.

6            In furtherance of the Receivership, the Court sets forth the Receiver's duties and

7   powers as follows:

8

9   I.  DUTIES OF THE RECEIVER

10           A.  Executive Management

11           The Receiver shall provide leadership and executive management of the California

12  prison medical health care delivery system with the goals of restructuring day-to-day

13  operations and developing, implementing, and validating a new, sustainable system that

14  provides constitutionally adequate medical care to all class members as soon as practicable.

15  To this end, the Receiver shall have the duty to control, oversee, supervise, and direct all

16  administrative, personnel, financial, accounting, contractual, legal, and other operational

17  functions of the medical delivery component of the CDCR.

18

19           B.  Plan of Action

20           The Receiver shall, within 180 - 210 calendar days of the effective date of

21  appointment, develop a detailed Plan of Action designed to effectuate the restructuring and

22  development of a constitutionally adequate medical health care delivery system.  This Plan

23  shall include recommendations to the Court of which provisions of the (1) June 13, 2002

24  Stipulation for Injunctive Relief, and (2) September 17, 2004 Stipulated Order re Quality of

25  Patient Care and Staffing Order and Injunction (and/or policies or procedures required

26  thereby), should be carried forward and which, if any, should be modified or discontinued

27  due to changed circumstances.  The Plan of Action shall also include a proposed time line for

28

**ER 55**

United States District Court

For the Northern District of California

1    all actions and a set of metrics by which to evaluate the Receiver's progress and success.

2    The Receiver shall update and/or modify this Plan as necessary throughout the Receivership.

3          Pending development of the Plan of Action, the Receiver shall undertake immediate

4    and/or short term measures designed to improve medical care and begin the process of

5    restructuring and development of a constitutionally adequate medical health care delivery

6    system.

7

8          C.  <u>Budgeting and Accounting</u>

9          The Receiver shall determine the annual CDCR medical health care budgets

10   consistent with his duties and implement an accounting system that meets professional

11   standards.  The Receiver shall develop a system for periodically reporting on the status of the

12   CDCR's medical health care budget and shall establish relations with the California Office of

13   Inspector General to ensure the transparency and accountability of budget operations.

14

15         D.  <u>Reporting</u>

16         The Receiver shall provide the Court with bimonthly progress reports.  These reports

17   shall address: (a) all tasks and metrics contained in the Plan and subsequent reports, with

18   degree of completion and date of anticipated completion for each task and metric,

19   (b) particular problems being faced by the Receiver, including any specific obstacles

20   presented by institutions or individuals, (c) particular successes achieved by the Receiver,

21   (d) an accounting of expenditures for the relevant period, and (e) all other matters deemed

22   appropriate for judicial review.

23         The Receiver shall meet with the Court on a bimonthly basis shortly following the

24   issuance of each report and shall remain in contact with the Court throughout the

25   Receivership on an informal, as needed, basis.

26

27

28   II.  <u>POWERS AND AUTHORITY OF THE RECEIVER</u>

The Receiver shall have all powers necessary to fulfill the above duties under this Order, including, but not limited to:

A. General Powers

The Receiver shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system. The Secretary's exercise of the above powers is suspended for the duration of the Receivership; it is expected, however, that the Secretary shall work closely with the Receiver to facilitate the accomplishment of his duties under this Order.

B. Personnel

The Receiver shall have the power to hire, fire, suspend, supervise, promote, transfer, discipline, and take all other personnel actions regarding CDCR employees or contract employees who perform services related to the delivery of medical health care to class members. The Receiver shall have the power to establish personnel policies and to create, abolish, or transfer positions related to the delivery of medical health care to class members. The Receiver also shall be empowered to negotiate new contracts and to renegotiate existing contracts, including contracts with labor unions, in the event that such action is necessary for the Receiver to fulfill his duties under this Order.

C. Property

The Receiver shall have the power to acquire, dispose of, modernize, repair, and lease property, equipment, and other tangible goods as necessary to carry out his duties under this Order, including but not limited to information technology and tele-medicine technology.

D. Governing State Laws, Regulations, and Contracts

4

**ER 57**

**United States District Court**
For the Northern District of California

1   The Receiver shall make all reasonable efforts to exercise his powers, as described in

2   this Order, in a manner consistent with California state laws, regulations, and contracts,

3   including labor contracts.  In the event, however, that the Receiver finds that a state law,

4   regulation, contract, or other state action or inaction is clearly preventing the Receiver from

5   developing or implementing a constitutionally adequate medical health care system, or

6   otherwise clearly preventing the Receiver from carrying out his duties as set forth in this

7   Order, and that other alternatives are inadequate, the Receiver shall request the Court to

8   waive the state or contractual requirement that is causing the impediment.  Upon receipt of

9   any such request, the Court shall determine the appropriate procedures for addressing such

10  request on a case-by-case basis.

11

12      E.  Access

13      The Receiver shall have unlimited access to all records and files (paper or electronic)

14  maintained by the CDCR, including but not limited to all institutional, personnel, financial,

15  and prisoner records, as deemed necessary by the Receiver to carry out his duties under this

16  Order.

17      The Receiver shall have unlimited access to all CDCR facilities, as deemed necessary

18  by the Receiver, to carry out his duties under this Order.  Ordinarily, the Receiver shall

19  attempt to provide reasonable notice when scheduling such visits, but this shall not preclude

20  the Receiver from making unannounced visits to facilities or offices as the Receiver deems

21  necessary to carry out his duties under this Order.

22      The Receiver shall have unlimited access to prisoners and to line and managerial staff,

23  including the authority to conduct confidential interviews with staff and prisoners.

24

25

26

27      F.  Immunity and Indemnification

28

5

**ER 58**

United States District Court
For the Northern District of California

1    The Receiver and his staff shall have the status of officers and agents of this Court,

2  and as such shall be vested with the same immunities as vest with this Court.

3    Additionally, Defendants shall indemnify the Receiver and members of his staff to

4  the same extent as Defendants are obligated to indemnify the Secretary of the CDCR.

5

6  III.  <u>OFFICE OF THE RECEIVER</u>

7    A.  The Receiver shall be paid a reasonable compensation for his services in an

8  amount to be approved by this Court.

9    B.  The Receiver shall establish an Office of the Receiver in a location to be

10 determined in consultation with the Court, with staffing necessary to fully carry out his duties

11 as set forth in this Order.  Upon approval from the Court, the Receiver shall set reasonable

12 compensation and terms of service for each member of his staff, (including employees and/or

13 consultants) and shall be authorized to enter into contracts with the employees or consultants

14 of the Office.

15    C.  Because time is of the essence, and in order to begin operations immediately,

16 Defendants shall, within 30 days of the date of this Order, establish an initial operating fund

17 with the Court in the amount of  $750,000.   The Receiver shall submit monthly requests for

18 payment from this fund to the Court.  Further funds for the Office of the Receiver shall be

19 deposited to the Receiver's Office Fund Account set forth in paragraph F below.

20    D.  Throughout the Receivership, the Receiver shall submit to the Court a monthly

21 accounting of all receipts and expenditures of the Office of the Receiver and shall arrange for

22 an independent financial audit of the Receiver's Office Fund Account on an annual basis.

23    E.  Within 45 calendar days from the date of effective appointment, the Receiver shall

24 establish an interest-bearing account, with respect to which he shall be the signatory and

25 fiduciary.  This account shall be designated as the Receiver's Office Fund Account and shall

26 be maintained solely for the reasonable and necessary expenses associated with the operation

27 of the Office of the Receiver, including but not limited to salaries, consulting fees, and the

28

**ER 59**

costs of supplies, equipment, office space, transportation,[2] and the like.  The Receiver shall arrange with Defendants a system for regularly replenishing the Receiver's Office Fund Account.

F.  Within 75 calendar days of the date of effective appointment, the Receiver shall establish a budget for the Office of the Receiver's first year of operation.  The Receiver shall also establish a budget for the Office of Receiver for each subsequent year of operation, with each such budget due 90 days in advance of each budget year.

IV.  <u>COSTS</u>

All costs incurred in the implementation of the policies, plans, and decisions of the Receiver relating to the fulfillment of his duties under this Order shall be borne by Defendants.  Defendants shall also bear all costs of establishing and maintaining the Office of Receiver, including the compensation of the Receiver and his staff.

V.  <u>LENGTH OF RECEIVERSHIP</u>

The Receivership shall remain in place no longer than the conditions which justify it make necessary, and shall cease as soon as the Court is satisfied, and so finds in consultation with the Receiver, that Defendants have the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members. The Court expects that as the Receivership progresses, the Receiver will attempt to engage Defendants in assuming responsibility over portions of the system that are within Defendants' demonstrated ability to perform, so that the ultimate transfer of power back to the State will be transitional.

---

[2]When engaged in travel, the Receiver and his staff shall use their best efforts to contain direct expenses in a cost-effective fashion.  For example, when engaged in necessary travel, the Receiver and his staff shall, when possible, utilize advanced-purchase economy airfares and reasonably priced accommodations.

United States District Court
For the Northern District of California

**ER 60**

Prior to the cessation of the Receivership, the Receiver shall develop a Plan for Post-Receivership Governance of the system, which shall include consideration of its structure, funding, and governmental responsibility for its long-term operation. The Receiver shall present this plan to the Court for approval and adoption as an order.

## VI. COOPERATION

A. All Defendants, and all agents, or persons within the employ, of any Defendant in this action (including contract employees), and all persons in concert and participation with them, and all counsel in this action, shall *fully* cooperate with the Receiver in the discharge of his duties under this Order, and shall promptly respond to all inquiries and requests related to compliance with the Court's orders in this case. Any such person who interferes with the Receiver's access, as set forth in section II.E., or otherwise thwarts or delays the Receiver's performance of his duties under this Order, shall be subject to contempt proceedings before this Court.

B. Counsel for Defendants shall ensure that the following state agencies are given prompt notice of the substance of this paragraph: the Department of Personnel Administration, the Department of Finance, the Department of General Services, the State Personnel Board, and any other state agencies that Defendants deem should be notified. Defendants shall notify the Court in writing of their compliance with this paragraph within 30 days of the date of this Order.

C. The Secretary of the CDCR shall ensure that all of the CDCR's employees and agents (including contract employees) are given prompt notice of the substance of this paragraph. Defendants shall notify the Court in writing of their compliance with this paragraph within 30 days of the date of this Order.

**ER 61**

United States District Court

For the Northern District of California

VII.  ADVISORY BOARD

The Court, in consultation with the Receiver, shall appoint an Advisory Board of no more than five members to assist and advise the Court and the Receiver with respect to achieving the goals of the Receivership.

VIII.  MODIFICATION

Given that this Receivership is unprecedented in scope and dimension, this Court finds that flexibility will be an important element in ensuring its effectiveness.  Accordingly, this Order may be modified as necessary from time to time to assure the success of this Receivership and the eventual return of the operation of the CDCR's medical health care delivery system to the State of California.

**IT IS SO ORDERED.**

Dated: February 14, 2006

_____
THELTON E. HENDERSON
UNITED STATES DISTRICT JUDGE

**ER 62**

# EXHIBIT   B

## AMENDED FINAL STATEMENT OF REASONS:

These regulations implementing the provision of medical care to inmates have been established in order to ensure the delivery of consistent and standardized health care services. These regulations allow for the allocation of resources based on medical necessity, without denying inmates access to an evaluation or diagnosis and without denying essential care to any inmate.

These regulations provide a direct benefit to inmates because implementation of a standard of care will result in uniform services throughout the State prison system. Inmates will be able to expect the same level of care from institution to institution that is supportable through reference to accepted sources of authority and practice outside the Department.

The State cannot afford to provide medical care indiscriminately. The regulations will allow the Department to only provide medical treatments that are determined to be medically necessary in order to ensure that all inmates receive essential services. This will provide the physicians with the tools to efficiently manage morbidity and mortality for their inmate patients through treatment methods that produce the most effective outcome. The Department's health care costs will be contained, and resources will be appropriately allocated.

Allowances are made within these regulations for exceptions, on an individual case basis, for otherwise excluded services when persuasive evidence supporting the appropriateness of their use is obtained.

Various technical amendments are made to existing regulations to update and utilize consistent terminology and to make appropriate distinctions between terms.

Existing Section 3016 is amended to change the title of this section, the term "medical" to "health care," and to include language related to medications controlled by an institution. The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates. The title change and the addition of language pertaining to "medication controlled by the institution" has been added to reflect that inmates may not use, possess, exchange, manufacture, or have under their control such substance except as authorized.

Existing Section 3032(a) is amended to change "facility medical officer" to "chief medical officer" and to specify that any authorization of special issue because of physical problems must be based on medical necessity. Also, language prohibiting inmates from disposing of damaged or worn personal property is now prohibited, unless authorization is obtained. The purpose of this amendment is to prohibit the disposition of property, whether personal or state-issued, without authorization; to make an editorial correction in terminology; and to stipulate that any authorized special issue be based on medical necessity as defined in these regulations. These amendments are necessary to correct the title of the officer referred to and to ensure uniform administration and equity among inmates by specifying that the authorization of a special issue must be based on medical necessity to be consistent with these new regulations adopted to govern the provision of medical services to inmates. Also, nonsubstantive language and punctuation changes have been made for clarity.

Existing Section 3043.5(c) is amended to change the term "medical" to "health." The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates.

---

000001

**ER 64**

Existing Section 3063 is amended to delete reference to tattoo removal or alteration by Department staff and to mandate that inmates not give or receive tattoos. The purpose of this amendment is to repeal reference to removal of tattoos by the Department's health care providers and to make the language regulatory by changing "may" to "shall." This amendment is necessary to eliminate an inconsistency between current regulations and these regulations which specify that the Department will only provide medically necessary services to inmates. Tattoo removal is not a medically necessary treatment. The amendment to this section is also necessary to remove the permissive verb "may" and replace it with "shall" to indicate mandatory actions.

Old Sections 3350(a), (b), and (c) is relocated to new Sections 3350.2(a), (b), and (c).

New Section 3350(a) is adopted to specify that the Department will provide medically necessary services to inmates and treatment will be based on the treating physician's judgment when outcome data is not available. Exceptions may be made to otherwise denied services based on specific criteria. The purpose of this section is to specify that inmates will be provided medically necessary services that are supported by outcome data as effective medical care. Treatment will be based on outcome data or, in the absence of outcome data, on the physician's judgment with specified constraints. This section is necessary to make specific the provisions of Penal Code (PC ) Section 5054, and to ensure uniform administration and equity among inmates.

New Section 3350(b)(1) is adopted to define the term "medically necessary." The purpose of this section is to define and make specific the term "medically necessary" as contained throughout these regulations. This section is necessary to ensure uniform application and equity among inmates statewide who receive health services. The Department has chosen to define and make specific the term "medically necessary" for the purposes of these regulations to assure consistent statewide application.

New Section 3350(b)(2) is adopted to define the term "outcome study." The purpose of this section is to define and make specific the term "outcome studies" contained throughout these regulations. This section is necessary to assure statewide uniformity. The Department has chosen to define and make specific the term "outcome studies" for purposes of these regulations to assure consistent statewide application.

New Section 3350(b)(3) is adopted to define the term "outcome data." The purpose of this section is to define and make specific the term "outcome data" contained throughout these regulations. This section is necessary to assure statewide uniformity. The Department has chosen to define and make specific the term "outcome data" for purposes of these regulations to assure consistent statewide application.

New Section 3350(b)(4) is adopted to define the term "severe pain." The purpose of this section is to define and make specific the term "severe pain" as contained within these regulations. This section is necessary to convey what the Department's intended meaning of this term is.

New Section 3350(b)(5) is adopted to define the term "significant illness and disability." The purpose of this section is to define and make specific the term "significant illness and disability" as contained within these regulations. This section is necessary to convey what the Department's intended meaning of this term is.

New Section 3350.1(a) is adopted to specify that palliative therapies will be provided while treatment for specific conditions will not be provided. The purpose of this section is to specifically list those conditions or illnesses for which treatment will not be provided and state that pain management and nutritional support will be provided. This change will ensure uniform administration and equity among inmates.

New Section 3350.1(a)(1) is adopted to specify that palliative therapies will be provided and that conditions which improve without treatment will not be provided. Examples are also provided. The purpose of this section is to

AMENDED-FSR.DOC                          June 17, 1996                          Page 2

specify that treatment will not be provided for those conditions or illnesses that are self-limiting in that the disease will resolve on its own, whether treated or not and that palliative therapies will be provided when needed. This regulation is necessary to ensure uniform administration and equity among inmates.

**New Section 3350.1(a)(2)** is adopted to specify that conditions which are not readily amenable to treatment will not be treated. Examples are also provided. The purpose of this section is to specify that treatment will not be provided for those conditions which are not responsive to treatment. Conditions not readily amenable to treatment include those that may be exacerbated by treatment with conventional medication or surgery and those that are so advanced in the disease process that the outcome would not change with treatment. This regulation is necessary to ensure uniform administration and equity among inmates.

**New Section 3350.1(a)(3)** is adopted to specify that cosmetic conditions will not be treated. Examples are also provided. The purpose of this section is to specify that treatment will not be provided for conditions where the recommended treatment would be for appearance only. Treatment of cosmetic conditions is not medically necessary. This regulation is necessary to ensure uniform administration and equity among inmates.

**New Sections 3350.1(b) is relocated from old Section 3354.1(a).** Amendments are being made to delete reference to specific elective surgeries, to make editorial changes to the text for readability and clarity, and to repeal duplicative and inconsistent provisions. Old Section 3354.1(a) is being renumbered to new Section 3350.1(b) and amended to eliminate repetition within the regulations by deleting specific elective surgeries which are addressed in previous sections and to make editorial changes to the text for consistency among the regulations. The original language in Section 3354.1(b) is being repealed to eliminate repetition within these regulations. The original language in Section 3354.1(c) is being repealed to eliminate an inconsistency with existing Sections 3354(a) and (c). Section 3354.1(c) makes provision for an inmate to request that elective surgery be provided at the inmate's own expense. Section 3354(a) stipulates that only Department personnel or contract personnel are authorized to order treatment for an inmate. Section 3354(c) stipulates that private consultants, paid for by the inmate or the person requesting the service, are not authorized to order treatment for an inmate. These amendments are necessary to assure uniformity, and eliminate repetition and inconsistency within the regulations.

**New Section 3350.1(c)** is adopted to specify other types of services which will not be provided. Examples are also provided. The purpose of this section is to specify that alternative health care modalities will not be provided. These types of services do not presently provide any clear outcomes or data on morbidity or improved mortality that the medical community agrees upon for acute medical problems. This section is necessary to make specific the provisions of PC Section 5054, and to ensure uniform administration and equity among inmates.

**New Section 3350.1(d)** is adopted to specify that otherwise excluded services may be provided when specific conditions are met. The purpose of this section is to provide a process through which exception may be made, on an individual case basis, for otherwise excluded services when specified conditions are met. This section is necessary to ensure uniform administration and equity among inmates.

**New Section 3350.2(a) is relocated from old Section 3350(a).** This section is amended to change the term "medical" to "health" and to mandate that contractual arrangements with off-site agencies be made for medically necessary services which are not provided within the facility. The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This amendment also clarifies that contractual arrangements for off-site health care treatments must be for medically necessary services as defined in these regulations. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates. Also, this amendment is necessary to ensure that the services provided are based on medical necessity which is supported by

---

000003

**ER 66**

outcome data as effective medical care which is consistent with the text of the regulations regarding the provision of medical services.

**New Section 3350.2(b) is relocated from old Section 3350(b).**  This section is amended to insert the word "medically" to define necessary specialized services.  The purpose of this amendment is to make a technical addition to the terminology.  This amendment is necessary to ensure that the services provided are based on medical necessity which is supported by outcome data as effective medical care to be consistent with the text of the regulations regarding the provision of medical services.  This amendment ensures uniform administration and equity among inmates.

**New Section 3350.2(c) is relocated from old Section 3350(c).**  This section is amended to change the term "medical" to "health care."  This section provides that in a case of extreme emergency and when there is no physician on duty or immediately available, the senior custodial officer, with assistance from the on-duty medical staff, may place an inmate in a community medical facility.  Also, this section provides that the facility's administrative and medical officers-of-the-day be notified as soon as possible of such action.

**Existing Section 3351(a)** is amended to change the term "medical" to "health care" and to provide for the use of advanced directives or durable power of attorney for health care.  The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians).  Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services.  Additionally, this amendment makes exception to necessary life-saving actions when an advanced directive has been established.  This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates. This section is also necessary to implement California Probate Code Sections 4600-4779 relating to the Durable Power of Attorney for Health Care, and California Health and Safety Code Sections 7185-7194.5 relating to the Natural Death Act.

**Existing Section 3351(b)** is amended to change the term "medical file" to "health record."  The purpose of this amendment is to make an editorial correction in terminology.  This amendment is necessary to ensure that all health related information is included in the health file.

**New Section 3352(a)(b), and (c)** is adopted to specify what makes a Medical Authorization Review Committee and under what conditions decisions shall be made.  The purpose of this amendment is to give those affected by its decisions an insight on the committee's composition and its decision making process.

**New Section 3352.1(a), (b), and (c)** is adopted to specify what makes a Health Care Review Committee and under what conditions decisions shall be made.  The purpose of this amendment is to give those affected by its decisions an insight on the committee's composition and its decision making process.

**Existing Section 3352 has been renumbered to 3353** and is amended to change the term "medical" to "health care" and to change the term "medical record" to "health record."  The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians).  The term "medical file" is generally interpreted to relate to the records of a physician.  Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services.  Therefore, "health record" is a more accurate term which includes mental health record and dental records, among others.  This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates.

**Existing Sections 3353(a), (b), and (c) has been renumbered to 3353.1** and is amended to change the term "medical" to "health care" and to replace term "medical disorder" with "physiological disorder."  The term

---

000004

**ER 67**

"medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This amendment also makes a technical correction in medical terminology by replacing "medical disorder" with "physiological disorder." This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates.

Existing Sections 3354(a), (c), and (d) is amended to change the term "medical" to "health care" and specify that a health care consultant may be permitted to diagnose within the scope of their licensure. The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This amendment clarifies that health care providers can only diagnose within the scope of their license. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates. Additionally, this amendment is necessary to ensure that these regulations are consistent with licensure requirements prescribed by statute.

Existing Section 3354(b)(6) is amended to change the term "prescribed" to "specified." This change is being made for clarity purposes.

Existing Section 3354(b)(7) is amended to change the term "medical or nursing functions" to "a health care responsibility." The terms "medical" and "nursing" are generally interpreted to relate to their specific scope of practice. Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates. Additionally, this amendment is necessary to ensure that these regulations are consistent with licensure requirements prescribed by statute.

Existing Sections 3355(b) and (d) is amended to change the term "medical records" to "health record" and to change the term "medical" to "health care." The purpose of this amendment is to provide clarification regarding the term "medical record" which is generally interpreted to relate to the records of a physician. Additionally, to replace the term "medical" with "health care." Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. Therefore, "health record" is a more accurate term which includes mental health record and dental records, among others. This amendment provides for consistent application of terms. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates.

Existing Section 3356(a) is amended to change the term "medical" to "health care." The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This is a technical amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates.

Existing Sections 3357(b) and (f) is amended to change the term "undertaker" to "funeral director." The purpose of this amendment is to make an editorial correction in terminology. This amendment is necessary to update terminology.

Existing Section 3357(c) is amended to change the term "medical" to "health care." The term "medical" is generally interpreted to only relate to the practice of medicine (e.g., physicians). Health care services includes medical, nursing, mental health, dental, pharmaceutical, diagnostic, and ancillary services. This is a technical

---

AMENDED-FSR.DOC                    June 17, 1996                         Page 5

amendment that is necessary to ensure the appropriate use and distinction of terms within the text of the regulations and to ensure uniform administration and equity among inmates.

Punctuation changes have been made under the reference citation area in existing Section 3357. The punctuation changes were to change the lowercase "s" in sections to uppercase "S" to reflect the standard style of denoting references.

**Existing Section 3358 (a)** is amended to replace reference to categories for inmate need for special appliance "based on medical necessity." The purpose of this amendment is to stipulate that a need for artificial appliances must be based on medical necessity as defined in these regulations and delete reference to other criteria on which need may be based. This amendment is necessary to ensure uniform administration and equity among inmates within the provision of medical services as provided within these regulations.

**Section 3358(c)** is amended to specify how prescribed appliances shall be purchased and by what directive. The purpose of this amendment is to provide some direction on the process for obtaining artificial appliances.

<u>ASSESSMENTS, MANDATES, AND FISCAL IMPACT:</u>
The adoption of the proposed amendments to this regulation will neither create nor eliminate jobs in the State of California nor result in the elimination of existing businesses, or create or expand businesses in the State of California.

This action imposes no mandates on local agencies or school districts; no fiscal impact on State or local government, federal funding to the State, private persons. It is also determined that the action does not affect small businesses nor have a significant adverse economic impact on businesses, small businesses, including the ability of California businesses to compete with businesses in other states, because they are not affected by the internal management of State prisons, or housing costs; and no costs or reimbursements to any local agency or school district within the meaning of Government Code (GC) Section 17561.

<u>DETERMINATION:</u>
The Department has determined that no alternative considered would be more effective in carrying out the purpose of this action or would be as effective and less burdensome to affected persons.

<u>WRITTEN COMMENTS:</u>
    Commenter #1:
    Comment A: The commenter states that he objects to the Department's medical treatment changes because they will only cause more health problems and create a legal liability issue.

    Accommodation A: None.

    Response A: Regulations promulgated by the Department are a result of extensive review by executive and medical staff with experience in every aspect of penology and health care within a penological setting. The reasoning provided in the Initial Statement of Reasons (ISR) is the result and reflection of their direct experience, education, and theoretical knowledge, i.e., their expert opinion. These regulations standardizes services and enables health care providers to make better decisions and minimize ineffective or inappropriate care. Standardization of health care policies will help ensure 1) all inmates have indiscriminate access to care, 2) that provided services are medically necessary in order to balance the availability, cost, and quality of services, 3) that physicians and administrators are better able to understand and monitor performance of health care, and 4) medical liability and litigation against the Department are minimized. These regulations will allow the Department to only provide medical treatments that are determined to be medically necessary in order to ensure that all inmates receive essential services, thereby minimizing medical liability and

---

AMENDED-FSR.DOC          June 17, 1996          Page 6

**Comment K:** The commenter states that he finds "the regulations narrow, punitive and institutionally biased. Health care rules should start first from the needs of the prisoner-patient and build a system from that starting and that ending point."

**Accommodation K:** None.

**Response K:** See written comments Commenter #1, Response A. Also, the Department is unable to formulate a meaningful response to the personal opinion of the commenter that he finds "the regulations narrow, punitive and institutionally biased."

<u>Commenter #4:</u>
**Comment A:** The commenter states "The lack of specificity regarding what is considered medically necessary services appears to stem from the near contradictory statements regarding the utilization of outcome data on the one hand vs. physician judgment, only when that judgment can be supported by consultations with appropriate specialists."

**Accommodation A:** None.

**Response A:** Medically necessary services are those services that are considered reasonable and necessary to protect life, prevent significant illness, and to prevent significant disability or to alleviate severe pain. When available, outcome data that define effective medical care will be utilized. Use of outcome data to guide daily practice is the community standard. The only reasonable benchmarks (or, expectations/goals for outcome) available in the literature are based on some kind of outcomes research. In the absence of available outcome data for a specific case, appropriate treatment will be based on the judgment of the physician that the treatment is considered effective for the purpose intended and is supported by diagnostic information and consultations with appropriate specialists.

**Comment B:** The commenter states "If cost containment is the basis for these regulations, would it not be more cost effective to adopt those aspects of successful managed care attributes by utilizing the cost effectiveness of a primary care physician gatekeeper to determine the extent of illness, disease or injury and treat according to the standard of care appropriate for those particular maladies? For osteopathic physicians, this would mean having the opportunity to treat inmates as they are trained. In the course of seeing inmates who have been injured, a D.O. might choose to treat the individual osteopathically and not seek specialty care, which all agree is a far more expensive option."

**Accommodation B:** None.

**Response B:** Cost-effective medical care in the State prison system does not differ in its essential elements from what is provided in general society. Medically necessary services are determined by the attending physician or other health care provider within the scope of their license and based on the medical needs criteria established in the regulations. Osteopathic manipulation has the same parameters as chiropractic modalities which are not within the scope of services. There are presently no clear outcomes or data on morbidity or improved mortality for consideration for inclusion in the scope of approved services. To include these manipulations within the scope would set precedent for inclusion of modalities such as chiropractic manipulation, herbal therapy, hypnosis and acupuncture and would be counter to the foundation of the scope of services which is based on medical necessity and outcome data.

000017

ER 70

**Comment C:** The commenter states that "we are concerned that treatment might be withheld based on either a lack of available outcomes material or, if available, it conflicts with the diagnosis and treatment plan of the physician, thereby hindering treatment."

**Accommodation C:** None.

**Response C:** See written comments Commenter #4, Response A. Treatment will not be withheld because of the unavailability of outcome data. Treatment is based on medical necessity. Treatment ordered by a physician will not be withheld if the treatment doesn't fit an established clinical practice guideline. The plan is to educate physicians/patients/staff so that the majority of treatments fit the majority of problems addressed by the clinical practice guideline.

**Comment D:** The commenter states that Section 3350.1(b) needs clarification because the regulations appears to say "unnecessary surgery shall not be provided as an elective, specifically castration, vaginoplasty, vasectomy and tubal ligation. Four other surgical procedures which formerly were not provided at the department's expense, i.e., liposuction, cosmetic surgery, breast implants and penile prosthesis, have been removed from the prior list. Does this mean that they would now be covered elective surgical procedures?"

**Accommodation D:** None.

**Response D:** The rules of construction for the regulations preclude comprehensive enumeration of examples. Consequently, the regulations read "Examples include, but are not limited to." Only those surgeries that meet the "medical necessity" criteria will be provided.

**Comment E:** The commenter states Section 3350.1(d) appears "to be convoluted and create so many roadblocks to the ability of an inmate's attending physician to treat, they could ultimately cause the costs about which the department is so concerned to increase because of all the regulatory hoops the treating physician must jump through in order to treat inmates."

**Accommodation E:** None.

**Response E:** Cost-effective medical care in the State prisons system will not differ in its essential elements from what is provided in general society. Successful managed care plans include an appeal process whereby services which would otherwise be denied will be re-evaluated based on specific case factors. The process outlined in Section 3350.1(d) does not differ from the practices in general society. Also, see written comments Commenter #2, Response O.

**Commenter #5:**
The comments expressed in this entire letter do not speak to the Scope of Services regulations; therefore, responses cannot be formulated. The letter appears to be complaints on the entire prison system as a whole.

**Commenter #6:**
**Comment A:** The commenter states "The Department has taken this opportunity in amending the regulations to strike the term medical staff and replace it with health care staff. We believe the intent as stated in the reason to reflect services that include medical, nursing, mental health, dental, pharmaceutical, diagnostic and ancillary would be better serviced to re-define the term medical as meaning the inclusion of these activities."

---

AMENDED-FSR.DOC                    June 17, 1996                    Page 18

000018

**ER 71**

STATE OF CALIFORNIA
OFFICE OF ADMINISTRATIVE LAW


In re:                          )
                                )
CORRECTIONS DEPT.               )       NOTICE OF APPROVAL OF
                                )       REGULATORY ACTION
REGULATORY ACTION:              )       (Gov. Code, Sec. 11349.3)
Title 15                        )
California Code of Regulations)          OAL File No.  96-0618-01 R
Adopt 3350.1, 3350.2 3352.1;  )
Amend 3016, 3032, 3043.5,      )
3063, 3350, 3351, 3352, 3353,  )
3353.1, 3354, 3355, 3356,      )
3357, 3358; Repeal 3354.1      )
                                )
_____)


SUMMARY OF REGULATORY ACTION
----------------------------
This filing is a resubmittal of a certificate of compliance for an
emergency regulatory action which revised a number of provisions that
concern inmate health care and defined the scope of health care
services for inmates as those which are medically necessary.  The
original emergency regulatory action was deemed an emergency by the
Legislature as an operational necessity pursuant to section 5058(e)
of the Penal Code.

OFFICE OF ADMINISTRATIVE LAW DECISION
-------------------------------------
OAL approves this regulatory action.

REASON FOR DECISION
-------------------
This regulatory action meets all applicable legal requirements.

Comments:


DATE: 07/09/96
                                _____
                                CRAIG S. TARPENNING
                                SENIOR COUNSEL


                        for: JOHN D. SMITH
                             DIRECTOR

Original: James H. Gomez, Director
     cc: Donna McKinney

RECEIVED
DEPT. OF CORRECTIONS

JUL 1 1 1996

REGULATION & POLICY
MANAGEMENT BRANCH

000046

ER 72

State of California                              Office of Administrative Law

# Memorandum

To       :Agency Regulation Coordinator          Date      : 8/26/96

                                                 File No.   : 96-0618-01 R ̄d

                                                 Telephone  : 96-0220-07E ̄d

                                                 Disapproved 96-0105-02C

From     :OAL Front Counter

Subject :RETURN OF APPROVED RULEMAKING MATERIALS

Oal hereby returns this approved rulemaking file your agency
submitted for our review.

Included with this approved file is a copy of the
regulation(s) stamped "ENDORSED FILED" by the Secretary of
State.

The effective date of an approved file is specified on the
Form 400 (see item B.4) Note: The 30th day after filing
with the Secretary of State is calculated from the date the
Form 400 was stamped "ENDORSED FILED" by the Secretary of
State.

                   **DO NOT DISCARD OR DESTROY THIS FILE!**

Due to its legal significance, please retain this rulemaking
record.  Government Code section 11347.3(c) requires that this
record be available to the public and to the courts for possible
later review.  See also the Records Management Act (Government
Code section 14740 et seq.) and the State Administrative Manual
(SAM) section 1600 et seq.) and regarding retention of your
records. Should you no longer desire to keep this rulemaking
record at your agency office or at the State Records Center,
please seriously consider releasing it to the Secretary of State
Archives via the state's records management program for
retention.

enclosures

STATE OF CALIFORNIA–OFFICE OF ADMINISTRATIVE LAW

## NOTICE PUBLICATION/REGULATIONS SUBMISSION

STD. 400 (REV. 2-91)

RESUBMITTAL

(See Instructions on reverse)

For use by Secretary of State only

| AGENCY | | | | AGENCY FILE NUMBER *(If any)* |
|---|---|---|---|---|
| DEPARTMENT OF CORRECTIONS | | | | 94-0108 |

ENDORSED FILED
IN THE OFFICE OF

96 JUL -9 PM 3: 49

*Bill Jones*
SECRETARY OF STATE

| OAL FILE NUMBERS | NOTICE FILE NUMBER Z95-0217-03 | REGULATORY ACTION NUMBER '96 0618 01 R | EMERGENCY NUMBER 96-0805-03ER 96-0220-07E | PREVIOUS REGULATORY ACTION NUMBER 96-0105-02C |
|---|---|---|---|---|

For use by Office of Administrative Law (OAL) only

ENDORSED
APPROVED FOR FILING
AND PUBLICATION  3: 32

OFFICE OF
ADMINISTRATIVE LAW

Office of Administrative Law

NOTICE                                           REGULATIONS

## A. PUBLICATION OF NOTICE  *(Complete for publication in Notice Register)*

| 1. TOPIC OF NOTICE SCOPE OF SERVICES FOR INMATES AND PAROLEES | TITLE(S) | FIRST SECTION AFFECTED | 2. REQUESTED PUBLICATION DATE |
|---|---|---|---|
| 3. NOTICE TYPE ☐ Notice re Proposed Regulatory Action   ☐ Other | 4. AGENCY CONTACT PERSON | | TELEPHONE NUMBER |

| OAL USE ONLY | ACTION ON PROPOSED NOTICE ☐ Approved as Submitted   ☐ Approved as Modified   ☐ Disapproved/ Withdrawn | NOTICE REGISTER NUMBER 95 #9-2 | PUBLICATION DATE 3-3-95 |
|---|---|---|---|

## B. SUBMISSION OF REGULATIONS  *(Complete when submitting regulations)*

### 1. SPECIFY CALIFORNIA CODE OF REGULATIONS TITLE(S) AND SECTION(S)  *(Including title 26, if toxics-related)*

| TITLE(S) | | |
|---|---|---|
| 15 | ADOPT  3350.1, 3350.2 , 3352.1 | CT |
| SECTIONS AFFECTED | AMEND  3016, 3032, 3043.5, 3063, 3350, 3351, 3352, 3353, 3354, 3355, 3356, 3357, 3358, 3353.1 | CT |
| | REPEAL  3354.1 | |

### 2. TYPE OF FILING

☐ Regular Rulemaking (Gov. Code, § 11346)   ☒ Resubmittal   ☐ Changes Without Regulatory Effect (Cal. Code Regs., title 1, § 100)   ☐ Emergency (Gov. Code, § 11346.1(b))

☒ Certificate of Compliance:  The agency officer named below certifies that this agency complied with the provisions of Government Code §§ 11346.4 - 11346.8 prior to, or within 120 days of, the effective date of the regulations listed above.

☐ Print Only   ☐ Other (specify) _____

3. DATE(S) OF AVAILABILITY OF MODIFIED REGULATIONS AND/OR MATERIAL ADDED TO THE RULEMAKING FILE  *(Cal. Code Regs. title I, §§ 44 and 45)*
May 2, 1996 - May 18, 1996

4. EFFECTIVE DATE OF REGULATORY CHANGES *(Gov. Code § 11346.2)*
☐ Effective 30th day after filing with Secretary of State   ☒ Effective on filing with Secretary of State   ☐ Effective other (Specify)

5. CHECK IF THESE REGULATIONS REQUIRE NOTICE TO, OR REVIEW, CONSULTATION, APPROVAL OR CONCURRENCE BY, ANOTHER AGENCY OR ENTITY
☐ Department of Finance (Form STD. 399)   ☐ Fair Political Practices Commission   ☐ State Fire Marshal

☐ Other (Specify) _____

| 6. CONTACT PERSON DONNA MCKINNEY | TELEPHONE NUMBER (916) 358-2456 |
|---|---|

7.
*I certify that the attached copy of the regulation(s) is a true and correct copy of the regulation(s) identified on this form, that the information specified on this form is true and correct, and that I am the head of the agency taking this action, or a designee of the head of the agency, and am authorized to make this certification.*

| SIGNATURE OF AGENCY HEAD OR DESIGNEE | DATE 6/10/96 |
|---|---|
| TYPED NAME AND TITLE OF SIGNATORY GREGORY W. HARDING, CHIEF DEPUTY DIRECTOR, SUPPORT SERVICES | |

000048

For these amendments, text added to the regulations is indicated in blue with double underline, and deleted text is indicated in red with strikethrough or in red with single underline with strikethrough.

Section 3016 is amended to read:

3016.  Stimulants, and Sedatives and Controlled Medications.

Inmates may not use, possess, or exchange, make, manufacture, sell or have under their control any substance or paraphernalia related to use of such substance, which produces intoxication, stimulation or depression, or is a medication controlled by the institution, except as specifically authorized by the facility's health care staff.

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:  Sections 2931, 4573, 4573.6 and 5054, Penal Code; and Sections 11350-11383, Health and Safety Code.

Section 3032 is amended to read:

3032.  Alteration of Clothing.

(a)     Inmates shall not alter or dispose of damaged or worn out personal or state-issued clothing or linen in any manner without specific authority to do so.  If the regular issue of clothing or linen does not meet an inmate's special physical/health needs, the chief medical officer may authorize a special issue to that inmate based upon a medical necessity as defined in section 3350(b)(1).  Upon staff verification, a state-issued item which is lost or damaged through no fault of the inmate shall be replaced without charge to the inmate.

Section 3032(b) is unchanged.

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

---

000049

ER 75

Section 3043.5 is amended to read:

3043.5.   Credit Earning Special Assignments.

Sections 3043.5(a) and (b) are unchanged.

(c)    Long term medical/psychiatric unassigned status.   In cases where the health condition necessitates that the inmate become medically unassigned for 30 calendar days or more, the physician shall specify an anticipated date the inmate may return to work.   The classification committee shall review the inmate's medical or psychiatric unassigned status and change the inmate's Work Group status as follows:

(1)    An inmate in the general population shall be changed to Work Group A-2, involuntary unassigned, to be effective upon exhaustion of the accrued ETO.

(2)    An inmate in a lockup unit who is in Work Group A-1 or B shall be changed to Work Group D-1 to be effective upon the exhaustion of the accumulated ETO.

(3)    An inmate in a lockup unit who is in Work Group D-1 or D-2 shall be retained in their respective Work Group.

Sections 3043.5(d) through (g) are unchanged.

NOTE: Authority cited:  Section 5058, Penal Code.
Reference:  Sections 2933, 5054 and 5068, Penal Code.

Section 3063 is amended to read:

3063.  Tattoos.

Inmates shall not tattoo themselves or others, and shall not permit tattoos to be placed on themselves. nor shall they place tattoos on

000050

ER 76

others.  Inmates shall not remove or permit removal of tattoos from themselves or others.

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:  Sections 653 and 2082, Penal Code.

### Article 8.  Medical and Dental Services

Section 3350 is amended to read:

3350.  Provision of Medical Care and Definitions.

Old Sections 3350(a) through (c) are relocated to new Sections 3350.2(a) through (c).

New Sections 3350(a) and (b) are adopted to read:

(a)   The department shall only provide medical services for inmates which are based on medical necessity and supported by outcome data as effective medical care.  In the absence of available outcome data for a specific case, treatment will be based on the judgment of the physician that the treatment is considered effective for the purpose intended and is supported by diagnostic information and consultations with appropriate specialists.  Treatments for conditions which might otherwise be excluded may be allowed when, in the judgment of the treating physician, case factors warrant consideration and prior approval is obtained from the health care review committee pursuant to section 3350.1(d).

(b)   For the purposes of this article, the following definitions apply:

(1)   **Medically Necessary** means health care services that are determined by the attending physician to be reasonable and necessary

to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care.

(2)    **Outcome Study** means the definition, collection and analysis of comparable data, based on variations in treatment, concerning patient health assessment for purposes of improving outcomes and identifying cost-effective alternatives.

(3)    **Outcome Data** mean statistics such as diagnoses, procedures, discharge status, length of hospital stay, morbidity and mortality of patients, that are collected and evaluated using science-based methodologies and expert clinical judgment for purposes of outcome studies.

(4)    Severe pain means a degree of discomfort that significantly disables the patient from reasonable independent function.

(5)    Significant illness and disability means any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death.

NOTE: Authority cited: Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

**New Section 3350.1 is adopted to read:**

**3350.1.  Medical Treatment/Service Exclusions.**

(a)    Treatment refers to attempted curative treatment and does not preclude palliative therapies to alleviate serious debilitating

000052

**ER 78**

conditions such as pain management and nutritional support. Treatment shall not be provided for the following conditions:

(1)    Conditions that improve on their own without treatment. Examples include, but are not limited to:

(A)    Common cold.

(B)    Mononucleosis.

(C)    Viral hepatitis A.

(D)    Viral pharyngitis.

(E)    Mild sprains.

(2)    Conditions that are not readily amenable to treatment, including, but not limited to, those which may be made worse by treatment with conventional medication or surgery, and those that are so advanced in the disease process that the outcome would not change with existing conventional or heroic treatment regimens.    Examples include, but are not limited to:

(A)    Multiple organ transplants.

(B)    Temporomandibular joint dysfunction.

(C)    Grossly metastatic cancer.

(3)    Conditions that are cosmetic.  Examples include, but are not limited to:

(A)    Removal of tattoos.

(B)    Removal of nontoxic goiter.

(C)    Breast reduction or enlargement.

(D)    Penile implants.

000053

ER 79

New Sections 3350.1(b) is relocated from old Section 3354.1(a), and is amended to read:

(b)     Surgery not medically necessary shall not be provided. Examples include, but are not limited to:

(1)     Castration.

(2)     Vaginoplasty (except for Cystocele or Rectocele).

(3)     Vasectomy.

(4)     Tubal ligation.

(c)     Services that have no established outcome on morbidity or improved mortality for acute health conditions shall not be provided. Examples include, but are not limited to:

(1)     Acupuncture.

(2)     Orthoptics.

(3)     Pleoptics.

(d)     Treatment for those conditions that are excluded within these regulations may be provided in cases where all of the following criteria are met:

(1)     The inmate's attending physician prescribes the treatment.

~~(2)     The treatment is medically necessary as defined in section 3350(b)(1).~~

(~~3~~2)     The service is approved by the ~~facility's chief medical officer or~~ medical authorization review committee~~,~~ and the health care review committee.  The decision of the review committees to approve an otherwise excluded service shall be based on:

000054

ER 80

(A)    Medical necessity as described in section 3350(b)(1).

(BA)    ApprovedAvailable health care outcome data supporting the effectiveness of the services as medical treatment.

(CB)    Other factors, such as:

1.    Coexisting medical problems.

2.    Acuity.

3.    Length of the inmate's sentence.

4.    Availability of the service.

5.    Cost.

NOTE: Authority cited: Section 5058, Penal Code.
Reference: Section 5054, Penal Code.

**New Section 3350.2 is adopted to read:**

**3350.2. Off-Site Health Care Treatment.**

**New Sections 3350.2(a) through (c) are relocated from old Sections 3350(a) through (c), and are amended to read:**

(a)    Each facility shall maintain contractual arrangements with local off-site agencies for those health services deemed to be medically necessary as defined in section 3350(b)(1), and that are not provided within the facility.  Such services may include medical, surgical, laboratory, radiological, dental, and other specialized services likely to be required for an inmate's health care.

(b)    When medically necessary services are not available for an inmate within a facility, the facility's chief medical or dental officer may request the institution head's approval to temporarily place that inmate in a community medical facility for such services.

---

FINALREG.DOC                    June 17, 1996                    Page 7

(c)     In an extreme emergency when a physician is not on duty or immediately available, the senior custodial officer on duty may, with assistance of on-duty health care staff, place an inmate in a community medical facility.   Such emergency action shall be reported to the facility's administrative and medical officers-of-the-day as soon as possible.

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:   Section 5054, Penal Code.

Section 3351 is amended to read:

3351.   Inmate Refusal of Treatment.

(a)     Health care treatment, including medication, shall not be forced over the objections of: a mentally competent inmate; the guardian of a mentally incompetent inmate; or a responsible relative of a minor inmate, except in an emergency, or as required to complete the examination or tests for tuberculosis infection, or to implement the treatment for tuberculosis disease, or unless the provisions of Probate Code sections 3200 et seq. or the procedures set forth in Keyhea v. Rushen, Solano County Superior Court No. 67432, Order Granting Plaintiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986, hereby incorporated by reference, are followed.   An emergency exists when there is a sudden, marked change in an inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is

FINALREG.DOC              June 17, 1996                  Page 8

impracticable to first obtain consent. When an inmate has executed an advance directive, pursuant to Probate Code sections 4600-4779 relating to the Durable Power of Attorney for Health Care, and Health and Safety Code sections 7185-7194.5 relating to the Natural Death Act, health care staff shall act in accordance with the provisions of that advance directive, as provided by law.

(b)    An inmate may accept or decline any or all portions of a recommended dental treatment plan. The inmate's decision is reversible at any time and shall not prejudice future treatments. Refusals shall be documented for inclusion in the inmate's health record.

NOTE: Authority cited: Section 5058, Penal Code.
Reference:  Sections 2600, 5054, and 7570 et seq., Penal Code; Sections 3200 et seq., Probate Code; Thor v. Superior Court (Andrews) (1993) 21 Cal.Rptr.2d 357; Keyhea v. Rushen, Solano County Superior Court No. 67432, Order Granting Plantiffs' Motion for Clarification and Modification of Injunction and Permanent Injunction, filed October 31, 1986; Sections 4600-4779, Probate Code; and Sections 7185-7194.5, Health and Safety Code.

Old Section 3352 has been relocated to new Section 3353.

New Section 3352 is adopted to read:

3352.  Medical Authorization Review Committee.

(a)   A medical authorization review (MAR) committee shall be established within each correctional treatment center's (CTC) service area.  The committee shall meet as often as necessary to approve or disapprove requests for medical services otherwise excluded by these regulations.

000057

ER 83

(b)    The committee shall:

1.    Be composed of representatives from the health care staff of each institution within the CTC's service area.

2.    Consist of not less than three service area staff physicians.

(c)    Committee decisions shall be based on criteria established in Section 3350.1(d).    Committee decisions shall be documented in the inmate's health record.    Those cases that receive committee approval, shall be forwarded along with all supporting documentation to the health care review (HCR) committee.    The treating physician shall notify the inmate of the committee's decision.

NOTE: Authority cited:  Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

New Section 3352.1 is adopted to read:

3352.1.    Health Care Review Committee.

(a)    The health care review (HCR) committee shall meet as often as necessary to review cases approved by the MAR committee for services otherwise excluded by these regulations.    The committee's decisions shall be based on the listed criteria in Section 3350.1(d).

(b)    The HCR Committee shall consist of, but not be limited to, the following:

1.    Assistant Deputy Director, Operations, Health Care Services Division (HCSD).

2.    Chief Medical Officer, Health Policy, HCSD.

3.    Assistant Deputy Director, Program Development, HCSD.

000058

ER 84

4.    Two selected specialist physicians.

5.    Nonvoting utilization management nurse, as necessary.

(c)    Decisions to approve or deny an excluded service requires at least one Assistant Deputy Director, HCSD, or designee be in attendance. All decisions shall be documented in the inmates health record. The treating physician shall notify the inmate of the committee's decision.

NOTE: Authority cited: Section 5058, Penal Code.
Reference: Section 5054, Penal Code.

New Section 3353 has been relocated from old Section 3352 and is amended to read:

3352**3**. Informed Consent Requirement.

When unusual, serious or major health care procedures are indicated and time and circumstances permit, the inmate's specific written informed consent shall be obtained before treatment is undertaken, except as otherwise provided in sections 3351 and 3364. If the inmate or the inmate's guardian or responsible relative objects to the recommended treatment, such objection shall be documented for inclusion in the inmate's health record.

NOTE: Authority cited: Section 5058, Penal Code.
Reference: Section 5054, Penal Code.

Old Section 3353 is relocated to new Section 3353.1 and is amended to read:

3353**.1**. Capacity for Informed Consent.

An inmate shall be considered capable of giving informed consent if in the opinion of health care staff the inmate is:

000059

ER 85

(a)   Aware that there is a physiological disorder for which treatment or medication is recommended.

(b)   Able to understand the nature, purpose and alternatives of the recommended treatment, medication, or health care procedures.

(c)   Able to understand and reasonably discuss the possible side effects and any hazards associated with the recommended treatment, medication, or health care procedures.  An inmate shall not be deemed incapable of informed consent solely because of being diagnosed as mentally disordered, abnormal, or mentally defective.

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

**Sections 3354 is amended to read:**

**3354. Health Care Responsibilities and Limitations.**

(a)   Authorized Staff.  Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their licensure, to diagnose illness or, prescribe medication and health care treatment for inmates.  No other personnel or inmates may do so.

(b)   Inmate Workers.  Only trained or certified inmates shall operate health care equipment.  Inmates shall not be permitted to:

(1)   Schedule appointments.

(2)   Determine another inmate's access to health care services.

(3)   Obtain blood samples.

000060

ER 86

(4)    Administer blood.

(5)    Introduce or discontinue intravenous infusions.

(6)    Have access to surgical instruments, syringes, needles, medications, or health records except as otherwise specified in these regulations.

(7)    Perform any task identified as a health care responsibility.

(c)    Private Consultants.  Health care personnel not employed by the department are not authorized to order treatment for an inmate. Such persons may offer opinions and recommendations for consideration by department health care staff as follows:  An inmate or an inmate's responsible guardian or relative, or an attorney or other interested person wanting the inmate examined by a private physician, shall submit a written request to the institution head.  The institution head shall, after consulting with the facility's chief medical officer grant the request unless convinced that specific case factors warrant denial.  The fact of and reasons for such denial, and notice of the right to appeal the decision in writing to the director, shall be documented and given to the inmate or the person requesting the outside health care service.  Costs of such private consultations or examinations shall be paid by the inmate or the person requesting the service.

(d)    Emergency Health Care Attention.  If an inmate is away from a facility for authorized reasons, such as assignment to a camp or transportation between institutions, becomes seriously ill or injured,

---

FINALREG.DOC            June 17, 1996            Page 13

emergency health care attention by available resources shall be obtained by the official in charge.    Community physicians and hospitals shall be used if the inmate's condition does not permit prompt return to a department medical facility.

**Sections 3354(e) and (f) are unchanged.**

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

**Section 3354.1 is repealed except as noted.**

**Old Section 3354.1(a) is relocated to new Section 3350.1(b).**

**Section 3355 is amended to read:**

**3355.   Health Care Examinations.**

**Section 3355(a) is unchanged.**

(b)    Transfers.    Inmates received on transfer from other facilities shall be interviewed by ~~medical~~ health care staff at the receiving facility within 24 hours of arrival.   The health record of each new arrival shall be reviewed to determine the need for previously prescribed medications or continuing treatment for unusual or chronic health problems.   Sending facility health care staff shall notify the receiving facility and any anticipated layover facilities regarding any inmate's need, as in the case of diabetics, for maintenance medications while en route and after arrival.

**Section 3355(c) is unchanged.**

(d)    Releases.    Each inmate shall be personally screened by health care staff prior to release to parole or discharge from a facility.   Staff conducting such screening shall alert the inmate's

---

**FINALREG.DOC**          **June 17, 1996**          **Page 14**

000062

**ER 88**

parole agent regarding any current health problems and shall provide the inmate with any necessary maintenance medication until the releasee can obtain medication in the community.

NOTE: Authority cited:  Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

**Section 3356 is amended to read:**

**3356. Health Care Treatment for Parolees.**

(a)    Community Treatment. Health care for parolees shall normally be provided by private physicians and community medical facilities, as desired by the parolee and at the parolee's own expense.

**Section 3356(b) is unchanged.**

NOTE: Authority cited:  Section 5058, Penal Code.
Reference:  Section 5054, Penal Code.

**Section 3357 is amended to read:**

**3357. Inmate Deaths.**

**Section 3357(a) is unchanged.**

(b)    When an inmate death occurs away from a facility, the remains of the deceased shall, unless the county coroner orders otherwise, be released to a licensed funeral director in the community where the death occurred.

(c)    If the deceased had a diagnosed communicable disease, health care staff shall ensure the contract funeral director and required public agencies are notified and that appropriate precautionary measures are exercised.

000063

ER 89

Sections 3357(d) and (e) are unchanged.

(f)    An effort shall be made to personally notify a deceased inmate's next-of-kin of the death, or by telephone if person contact is not practical.  A telegram notification shall be sent to the next-of-kin offering consolation, and shall include: the name and address of the funeral director to whom the remains have been or will be released; a request for the next-of-kin's instructions for disposal of the remains at the family's expense, within 48 hours to preclude disposal by the state; and the name and telephone number of a staff member who may be contacted for additional information.

Section 3357(g) is unchanged.

NOTE:  Authority cited:  Section 5058, Penal Code.
Reference:  Sections 2082, 5021, 5054 and 5061, Penal Code;
Sections 7104, 7200, 7201, 7302, 10203, 10204 and 10250, Health and
Safety Code; and Sections 12525, 27491 and 27491.2-.3, Government
Code.

Section 3358 is amended to read:

3358.   Artificial Appliances.

(a)    Appliance Categories.   Appliances include but are not limited to eyeglasses, artificial eyes, dental prosthesis, artificial limbs, orthopedic braces and shoes, and hearing aids.   An inmate's need for such appliance shall be based on medical necessity as described in section 3350(b)(1).

000064

ER 90

**INITIAL STATEMENT OF REASONS**

The California Department of Corrections and Rehabilitation (CDCR or the Department) proposes to amend Sections 3350.1, 3352, 3352.1, 3352.2, 3354, 3354.2, 3355.1 and 3358 of the California Code of Regulations (CCR), Title 15, Subchapter 4, Article 8, and to adopt new section 3352.3 within the same article.

This rulemaking action will provide regulatory authority for ongoing improvements in the quality of dental and medical care provided to CDCR inmate-patients. As a result of court orders resulting from class action lawsuits involving dental and medical care provided to inmates in CDCR adult facilities, the Department has revised its policies and procedures for the provision of health care services to inmates. This process has resulted in new court-approved policies and procedures for both dental and medical care. This rulemaking action will adopt these new policies and procedures into the CCR to provide the necessary regulatory authority for their continued application.

Dental Care

This action will provide regulatory authority for continued application of the approved Inmate Dental Services Program (IDSP), Policies and Procedures that became effective in August 2010 and were implemented at CDCR adult institutions. The development and approval process was based upon the court decision on August 21, 2006, by Judge Jeffrey White, United States District Court for the Northern District of California, in the *Perez* class-action lawsuit (Carlos Perez, et al v. Matthew Cate, et al). Plaintiffs in the *Perez* class action are CDCR inmates who have serious dental needs. The court approved an Amended Stipulation and Order that addressed dental care services to inmate-patients within CDCR. The Amended Stipulation and Order requires CDCR to implement a comprehensive set of Policies and Procedures to guide the CDCR, IDSP in providing dental care to inmate-patients.

The CDCR, IDSP has been in the process of improving the quality and timeliness of dental services provided to inmate-patients and documenting provision of these services to the satisfaction of representatives designated by the court to monitor the delivery of dental care under the *Perez* class action.

The IDSP, Policies and Procedures describe the standards of professional oral health care services provided to inmate-patients and specify the Department's expectations of dental staff.  In addition, dental staff is required to abide by the Standards and Scope of Services specified in the IDSP, Policies and Procedures, which comprises substantial compliance with the Amended Stipulation and Order.

These amendments and new adopted section will establish consistency between Title 15, Subchapter 4, Article 8 and the IDSP, Policies and Procedures regarding the type and scope of, and eligibility for, dental services provided to inmate-patients within CDCR institutions.

The IDSP, Policies and Procedures is available for public review on the Department's internet site at:

http://www.cdcr.ca.gov/DCHCS/docs/2010-August-PP.pdf

Enabling regulations will provide the authority to facilitate and ensure the ongoing delivery of dental services in accordance with the court approved Policies and Procedures and as such are essential to the continued success of the CDCR, IDSP in relation to the *Perez* Court.  The proposed changes provide a basis for demonstrating the Department's commitment to ongoing compliance with the Amended Stipulation and Order in the Settlement Agreement for the *Perez* class action.

Medical Care

This action will also provide regulatory authority for continued application of the approved Inmate Medical Services Policies and Procedures (IMSP&P), Utilization Management Program Policies and Procedures, that became effective in November 2010 and were implemented at CDCR adult institutions. The development and approval process was based upon the June 13, 2002, Stipulation for Injunctive Relief, ordered by Judge Thelton Henderson, United States District Court for the Northern District of California, in the *Plata* class-action lawsuit (Marciano Plata, et al v. Jerry Brown, et al), and the June 16, 2008, Order Approving Receiver's Turnaround Plan of Action. Plaintiffs in the *Plata* class action are CDCR prisoners who have serious medical needs. The Stipulation for Injunctive Relief addressed medical services provided to inmate-patients within CDCR, and requires CDCR to implement a comprehensive set of policies and procedures to guide the Department in providing medical care to inmate-patients. The Order Approving Receiver's Turnaround Plan of Action approved the Receiver's June 6, 2008 Turnaround Plan of Action, which included an objective of establishing a standardized utilization management program.

The IMSP&P describe the standards of professional medical health care services provided to inmate-patients and specify the Department's expectations of medical staff.

Additionally, this action will provide regulatory authority for the implementation of Penal Code section 5023.2, which became effective October 19, 2010 as a result of Assembly Bill 1628. This statute requires that the Department maintain a statewide utilization management program for health care services.

These amendments will implement Penal Code section 5023.2 and establish consistency between Title 15, Subchapter 4, Article 8 and the IMSP&P regarding the utilization management program in CDCR facilities.

The IMSP&P, Utilization Management Policies and Procedures, are available for public review on the Department's internet site at:

http://www.cphcs.ca.gov/imspp.aspx

The Receiver's Turnaround Plan of Action is the plan of action for moving the *Plata* case forward and is available for public review on the Receiver's internet site at:

http://www.cphcs.ca.gov/docs/court/ReceiverTurnaroundPlan_060608.pdf

000098

**ER 92**

Enabling regulations will provide the authority to facilitate and ensure the ongoing delivery of medical services in accordance with the court IMSP&P, Utilization Management Policies and Procedures, and Penal Code section 5023.3.

The proposed dental and medical revisions are being adopted as emergency regulations under the Department's authority specified in Penal Code 5058.3. Existing regulations are not consistent with the IDSP, Policies and Procedures, or the IMSP&P, that were developed by CDCR and plaintiff's representatives as a result of the Amended Stipulation and Order in the *Perez* class action and the Stipulation for Injunctive Relief in the *Plata* class action. This inconsistency may cause confusion among inmates who refer to existing regulations as a guide to the medical and dental services they are entitled to receive. Therefore, the adoption of these proposed regulations is an urgent priority for the Department.

The Department must determine that no alternative considered would be more effective in carrying out the purpose of this action, or would be as effective and less burdensome to affected private persons, than the action proposed.

The Department has made an initial determination that the action will not have a significant adverse economic impact on business. Additionally, there has been no testimony or other evidence provided that would alter the CDCR's initial determination.

The Department has determined that this action imposes no mandates on local agencies or school districts, or a mandate which requires reimbursement pursuant to Part 7 (Section 17561) of Division 4 of the Government Code.

The Department has determined that no reasonable alternatives to the regulation have been identified or brought to the attention of the Department that would lesson any adverse impact on affected private persons or small business then the action planned.

The Department, in proposing the adoption of these regulations, has relied upon the Economic Impact Assessment (see Notice of Emergency Regulations). The Department has not identified nor has it relied upon any other technical, theoretical, or empirical study, report, or similar document.

## SPECIFIC PURPOSE OF EACH SECTION PER GOVERNMENT CODE 11346.2(b)(1)

**3350.1. Medical and Dental Treatment/Service Exclusions.**

**Subsections 3350.1(a) through 3350.1(c) are amended** to add additional examples of conditions for which treatment, surgery, or services shall not be provided.

New text adds several dental conditions as examples to subsection 3350.1(a) describing conditions that improve on their own without treatment, conditions that are not readily amenable to treatment, and conditions that are cosmetic.

New text adds several dental conditions as examples to subsection 3350.1(b) describing medically unnecessary surgeries that shall not be provided

New text adds several dental conditions as examples to subsection 3350.1(c) describing services that have no established outcome on morbidity or improved mortality.

These additional examples of treatment, surgery and services that shall not be provided do not represent a denial of any service that was previously provided to inmates. The purpose of these examples is to provide clarification regarding existing practices. These service exclusions are consistent both with standards of practice within correctional health care and with the IDSP, Policies and Procedures agreed upon by Department and court representatives under the Amended Stipulation and Order in the *Perez* class action.

**Subsection 3350.1(d) is amended** to clarify the process and criteria whereby excluded conditions may be treated.

**Subsection 3350.1(d)(1) is amended** to add the words "as clinically necessary." This is necessary to make clear both to inmates and health care staff that only treatment of conditions excluded under subsections 3350.1(a) through 3350.1(c) that is considered clinically necessary by the attending physician or dentist may be provided.

**Subsection 3350.1(d)(2) is amended** to remove the text referring to the medical authorization review committee and the health care review committee. These entities no longer exist and their duties and functions have been taken over by new entities, as described in this text. The dental program health care review committee has been added to the text as the new second-level review committee regarding otherwise excluded dental care. The institutional utilization management committee and the headquarters utilization management committee have been added to the text as first and second level review committees regarding otherwise excluded medical care.

These revisions are necessary to reflect the current processes under the IDSP, Policies and Procedures, and the IMSP&P, Utilization Management Policies and Procedures, as well as the fact that the review committees for medical and dental services are separate, independent entities with defined responsibilities.

**Section 3352 is renamed Institutional Utilization Management Committee.**

**Section 3352(a) is amended** to replace "medical authorization review committee" with "institutional utilization management (IUM) committee", and "correctional treatment center's service area" with "facility."  This is necessary to establish the new correct name of this committee consistent with the IMSP&P, and to implement the utilization management program statewide consistent with the IMSP&P and the requirements of Penal Code (PC) section 5023.2, which requires the Department to maintain a statewide utilization management program for health care services.  This section is also amended to expand the duties of the IUM committee in accordance with Penal Code section 5023.2.

**Section 3352(b)(1) is amended** to expand the potential membership of the institutional utilization management committee beyond the healthcare staff of a correctional treatment center. This is necessary to expand the potential membership of the committee in accordance with the IMSP&P, for example, to the warden or the associate warden for health care. The text "within the CTC's service area" is no longer relevant and is deleted for clarity

000100

**ER 94**

1 | KAMALA D. HARRIS
Attorney General of California
2 | JAY C. RUSSELL
Supervising Deputy Attorney General
3 | JOSE ZELIDON-ZEPEDA
Deputy Attorney General
4 | PREETI K. BAJWA
Deputy Attorney General
5 | State Bar No. 232484
  1300 I Street, Suite 125
6 | P.O. Box 944255
  Sacramento, CA 94244-2550
7 | Telephone: (415) 703-1621
  Fax: (415) 703-5843
8 | E-mail: Preeti.Bajwa@doj.ca.gov
*Attorneys for Defendants J. Beard, M. Spearman,*
9 | *R. Coffin, J. Lozano, A. Adams, A. Newton, D. Van*
*Leer, and L. Zamora*

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| 15 **JEFFREY B. NORSWORTHY,** | C 14-00695 JST (PR) |
| 16 Plaintiff, | **DECLARATION OF PREETI K. BAJWA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| 17 **v.** | |
| 18 **JEFFREY BEARD, et al.,** | |
| 19 Defendants. | Date:        April 1, 2015 |
| 20 | Time:        2:00 p.m. Courtroom:   19 |
| 21 | Judge:       The Honorable Jon S. Tigar Trial Date:   N/A Action Filed: February 14, 2014 |

22

23    I, Preeti K. Bajwa declare:

24        1.    I am an attorney admitted to practice before the courts of the State of California and

25    before this Court. I am employed by the California Attorney General's Office as a Deputy

26    Attorney General in the Correctional Law Section, and assigned to represent Defendants Beard,

27    Spearman, Coffin, Lozano, Adams, Newton, Van Leer and Zamora (Defendants) in this case. I

28    am competent to testify to the matters set forth in this declaration, and if called on by this Court,

1

**ER 95**

1   would do so.  I submit this declaration in support of Defendants' opposition to Plaintiff's motion

2   for preliminary injunction.

3          2.      Attached as Exhibit A is the "Declaration of Custodian of Records" of Desiree

4   Azevedo, an authorized custodian of records for the California Department of Corrections and

5   Rehabilitation, records that are maintained for inmates committed to the custody of the California

6   Department of Corrections and housed at Mule Creek State Prison, in Ione, California.  This

7   exhibit authenticates the documents attached as Exhibits B and C.

8          3.      Attached as Exhibit B is a true and correct copy of inmate Michelle Norsworthy aka

9   Jeffrey Norsworthy's (CDCR No. D54100) notice of parole hearing scheduled for March 25,

10  2015.

11         4.      Attached as Exhibit C are true and correct copies of the Plaintiff Michelle

12  Norsworthy aka Jeffrey Norsworthy's appeal grievance dated September 16, 2014 (bate-stamped

13  AGO03295-AGO03303) and appeal grievance dated October 22, 2014 (bate-stamped

14  AGO005155-AGO005156 )

15         5.      On December 30, 2014, the deposition of Plaintiff Michelle Norsworthy aka Jeffrey

16  Norsworthy (CDCR No. D54100) was taken on behalf of Defendants.  Defendants were

17  represented by Deputy Attorney Generals Jose Zelidon-Zepeda and Preeti K. Bajwa.  Plaintiff

18  was represented by Herman J. Hoying from Morgan Lewis & Bockius.  Attached as Exhibit D are

19  true and correct copies of excerpts of record from Plaintiff's deposition transcript.

20         6.      On December 18, 2014, the deposition of Dr. Lori Kohler was taken on behalf of

21  Plaintiff.   Defendants were represented by Deputy Attorney General Jose Zelidon-Zepeda.

22  Plaintiff was represented by Herman J. Hoying from Morgan Lewis & Bockius.  Attached as

23  Exhibit E are true and correct copies of excerpts of record from Dr. Kohler's deposition

24  transcript.

25         7.      On December 17, 2014, the deposition of Dr. Raymond Coffin was taken on behalf of

26  Plaintiff.   Defendants were represented by Deputy Attorney General Edward Fluet.  Plaintiff was

27  represented by Herman J. Hoying from Morgan Lewis & Bockius.  Attached as Exhibit F are true

28  and correct copies of excerpts of record from Dr. Coffin's deposition transcript.

2

Decl. of Preeti K. Bajwa In Supp. Of Defs.' Opp. To Pl.'s Mot. For Prelim. Inj.   (C 14-00695 JST (PR))

ER 96

1    8.    Attached as Exhibit G is a true and correct copy of Defendants' Expert Disclosure

2    served on February 18, 2015, including as Exhibit A: Defendants' Expert Report, prepared by

3    Stephen B. Levine M.D, filed *under seal*.

4    9.    Attached as Exhibit H is a true and correct copy of Defendants' email correspondence

5    to Plaintiff in response to Plaintiff's discovery request.

6

7    I declare under penalty of perjury that the foregoing is true and correct and that this

8    declaration was executed on March 12, 2015, in San Francisco, California.

9

10                                          */s/ Preeti K. Bajwa*
                                            PREETI K. BAJWA
11                                          Deputy Attorney General

12   SF2014409242
     11778301.doc
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**ER 97**

## DECLARATION OF CUSTODIAN OF RECORDS

I, Desiree Azevedo, declare as follows:

I am the Office Technician employed by the California Department of Corrections and Rehabilitation in the Litigation Office at Mule Creek State Prison, in Ione, California. In this capacity, I am duly authorized access to the inmates Central Files (C-Files) and Medical Files at this institution.

C-Files and Medical Files are maintained on each inmate housed in the California Department of Corrections and Rehabilitation.

The documents attached hereto are true and correct copies located in the C-Files and/or Medical File for Inmate Wosworthy, Jeffrey, D54103 maintained in the regular course of business by the Department of Corrections and Rehabilitation at this institution.

I declare under penalty and perjury that I am competent to testify as a witness, that the foregoing is true and correct and based on my personal knowledge except for those statements based on information and belief, and as to those statements I believe them to be true, and that if called as a witness, I would so testify.

Executed on 11-7-14 , Mule Creek State Prison, Ione, California.

DESIREE AZEVEDO
OFFICE TECHNICIAN

11-7-14
DATE

Board of Parole Hearings
Post Office Box 4036
Sacramento, CA 958124036

---

## NOTICE OF HEARING

DATE:    February 24, 2015

TO:      KATE BROSGART
         2625 ALCATRAZ AVENUE #199
         BERKELEY CA 94705

RE:      Attorney Retained at Parole Hearing - JEFFREY,BRYAN, NORSWORTHY
                                                       D54100

Dear     KATE BROSGART

This is your confirmation to represent the above individual as follows:

         Type of Hearing:      Subsequent Suitability Hearing
         Date / Time:          March    25, 2015 01:30 PM
         Institution:          Mule Creek State Prison
                               4001 HIGHWAY 104
                               IONE, CA 95640

         Attorney Retained By:  State

Please make arrangements to interview your client and review his/her file at least 45 days prior to the hearing. To ensure arrangements will be made for your client to report promptly for the interview, contact the Institution Hearing Coordinator no later than 48 hours before the interview.

You should anticipate a representative from the district attorney's office will participate in the hearing, either by sending a representative to the institution or via video conference. In addition, participation by the victim of the crime or the victim's next of kin may also occur with their appearance at the hearing or via video conference.

If you have any questions regarding this matter, please contact Sylvia LaBare at (916) 324-0800.

Sincerely,



Sylvia LaBare
Hearing Support Unit

cc: C-File, Inmate

**ER 99**

BPH 1080
BOARD OF PAROLE HEARINGS                                                    STATE OF CALIFORNIA
NOTICE OF DATE, TIME AND PLACE OF HEARING

Your Subsequent Suitability Hearing
is scheduled for March 25, 2015 at 01:30 PM

**Certificate of Service**

On _2 - 2 5 - 1 5_____,

I ( X ) gave   (   ) mailed this notice to the prisoner/parolee.

_____          2-25-15
Signature of State Agent                          Date

Receipt Acknowledge (for Institution Use Only)

| Signature | CDC Number | Date |
|---|---|---|
| | D54100 | 2-25-15 |

| Name | CDC Number | Inst./Facility |
|---|---|---|
| NORSWORTHY, JEFFREY BRYAN | D54100 | Mule Creek State Prison |

**ER 100**

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA

## REASONABLE ACCOMMODATION NOTICE AND REQUEST

### REVIEWER'S ACTION

DATE RECEIVED BY ADA COORDINATOR: October 6, 2014
DATE OF BPT HEARING: March 25, 2015

TYPE OF ADA ISSUE

☒  EFFECTIVE COMMUNICATION
☐  AUXILIARY AID OR DEVICE REQUESTED
☐  OTHER
☐  PHYSICAL ACCESS

DISCUSSION OF FINDINGS:
You have a subsequent hearing scheduled for March 25, 2015.  On the BPT 1073 form, Notice and Request for
Assistance at Parole Proceeding, you have been identified as having mental health concerns; CCCMS.  It is
noted you have a 10.8 reading level.  You are not requesting help for your hearing.  Counselor Ward indicates
you appeared to understand during the initial service of rights interview.  Per DAI Summary, you have glasses.
A CDCR 128-MH3 form reveals you meet inclusion criteria for the MHSDS at the CCCMS level of care.
Inclusion is for medical necessity.

### DISPOSITION

☐  GRANTED        ☐  DENIED        ☒  OTHER

BASIS OF DECISION:
Based on the findings above, you qualify for an attorney as an ADA accommodation.  You will have an
attorney at your hearing unless you waive the assistance.  You are encouraged to bring your glasses to your
hearing.  A page magnifier will be available should you need the additional assistance.

_____                    2/26/15
ADA COORDINATOR SIGNATURE                           DATE SIGNED

| NAME | CDC NUMBER | TYPE OF HEARING | DATE OF HEARING | LOCATION |
|------|-----------|-----------------|-----------------|----------|
| Norsworthy | D54100 | Subsequent | March 25, 2015 | MCSP |

BPT 1073(a) (01/02)                                   1

**ER 101**

**BOARD OF PAROLE HEARINGS**                                                    **STATE OF CALIFORNIA**
LIFE PRISONER HEARING DECISION FACE SHEET

| | |
|---|---|
| ☐ PAROLE GRANTED - (YES) CDC: Do not release prisoner before Governor's review. | **Records Use Only** Parole Release Date |
| ☐ PAROLE DENIED - (NO)          YEAR(S) | YR    MO    DAY Attach Prison Calculation Sheet |
| ☐ INMATE SIGNED STIPULATION OF UNSUITABILITY FOR: | YEAR(S) |

☐ INMATE SIGNED VOLUNTARY WAIVER FOR:          YEAR(S)

☐ SPLIT DECISION

☐ CONTINUE          MONTH(S)

Reason:

*Sub # 6 Hearing Postponed. Place on next available calendar for Sub # 6.*

☒ HEARING POSTPONED                                          Length: 0 MONTH(S)

Reason:
\ Exigent Circumstances \ Prisoner Psychiatrically Unavailable

---

**PANEL RECOMMENDATIONS AND REQUESTS**

| The Board Recommends: | As Available |
|---|---|
| ☒ No more 115's or 128A's | ☒ Get self-help |
| ☐ Work to reduce custody level | ☒ Learn a trade |
| ☐ Stay discipline free | ☐ Get therapy |
| ☒ Earn positive chronos | ☐ Get a GED |
| ☐ Recommend transfer to | |
| ☐ Other | |

---

| **Penal Code 3042 Notices** | ☐ Sent | |
|---|---|---|
| Date Inmate came to CDC **April 15, 1987** | Date Life Term Began **April 15, 1987** | Minimum Eligible Parole Date **March 28, 1998** |

| ☐ Initial Hearing | ☒ Subsequent (Hearing #) 6 | ☒ Date of Last Hearing 12/18/2014 |
|---|---|---|

CDC Representative

Attorney for Prisoner  CANDICE L. CHRISTENSEN          Address  P.O. BOX 189097
                                                                    SACRAMENTO, CA 95818-9097

D.A. Representative  WALKER GWANDOLIN - IN PERSON          County  Orange

This form and the Board's decision at the hearing is only proposed and NOT FINAL.
It will not become final until it is reviewed.

| ROBERTS BRIAN - Commissioner | Date  02/20/2015 |
|---|---|
| CASSADY PAT - Deputy Commissioner | Date  02/20/2015 |

| NAME NORSWORTHY, JEFFREY BRYAN | CDC # D54100 | PRISON Mule Creek State Prison | |
|---|---|---|---|
| BPH 1001 | ACTION DATE  02/20/2015 | SCHEDULED DATE | 02/20/2015 |

**ER 102**

## BPH Investigations Comments

## Request to Review Psychological Report

- [ ] Administrative Error 1
- [ ] Administrative Error 2
- [ ] Administrative Error 3
- [ ] Administrative Error 4
- [ ] Inaccurate Life Crime
- [ ] Inaccurate number of crime victims

## Out of County Placement

## Hearing Comments

MCSP was operating under a fog count and the first hearing could not start until 10:30 and set the schedule too late to start this hearing.

## Hearing Objections

No Objections

Hearing Signed by: ROBERTS, BRIAN

Hearing Signed on: 02/20/2015

| NAME | CDC # | PRISON |
| --- | --- | --- |
| NORSWORTHY, JEFFREY BRYAN | D54100 | Mule Creek State Prison |

HEARING DATE: 02/20/2015    SCHEDULED DATE: 02/20/2015

ER 103

POOR ORIGINAL

STATE OF CALIFORNIA

**PATIENT/INMATE HEALTH CARE APPEAL**

CDCR 602 HC (REV. 04/11)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**CENTRAL FILE COPY**

Side 1

| STAFF USE ONLY | | Institution: | | Log #: | Category: |
|---|---|---|---|---|---|
| Emergency Appeal | ☐ Yes ☐ No | | | | |
| Signature: | Date: | | FOR STAFF USE ONLY | | |

You may appeal any California Prison Health Care Services (CPHCS) decision, action, condition, omission, policy or regulation that has a material adverse effect upon your welfare. See California Code of Regulations, Title 15, Section (CCR) 3084.1. You must send this appeal and any supporting documents to the Health Care Appeals Coordinator (HCAC) within 30 calendar days of the event that lead to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

Appeal is subject to rejection if one row of text per line is exceeded.          WRITE, PRINT, or TYPE CLEARLY.

| Name (Last, First): | CDC Number: | Unit/Cell No: | Assignment: |
|---|---|---|---|

State briefly the subject/purpose of your appeal (Example: Medication, To See Specialist, etc.):

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A):

B. Action requested (If you need more space, use Section B of the CDCR 602-A):

☐ Supporting Documents: Refer to CCR 3084.3.

List supporting documents attached (e.g. Trust Account Statement; CDCR 7410, Comprehensive Accommodation Chrono; CDCR 7362, Request for Health Care Services; etc.):

☐ No, I have not attached any supporting documents. Reason:

Patient/Inmate Signature: _____ Date Submitted: 7/16/12

☐ By placing my initials in this box, I waive my right to receive an interview.

**C. First Level - Staff Use Only**          Staff – Check One: Is CDCR 602-A Attached? ☒ Yes ☐ No

This appeal has been:

☐ Bypassed at the First Level of Review. Go to Section E.

☐ Rejected (See attached letter for instruction): Date: ____ Date: ____ Date: ____ Date: ____

☐ Cancelled (See attached letter): Date: ____

☒ Accepted at the First Level of Review

Assigned to: A. BRITH          Title: DON          Date Assigned: 9/7/12     Date Due: OCT 29 2012

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: 9/28/12          Interview Location: NF CLINIC

Your appeal issue is: ☐ Granted ☒ Granted in part ☐ Denied ☐ Other:

See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: L. FERNANDEZ RN          Title: RN          Signature: _____

Reviewer: A. CTF SOLEDAD NEWTON          Title: SRN          Signature: _____

(Print Name)

Date received by HCAC: 9/28/12

HCAC Use Only

Date mailed/delivered to appellant: ___/___/___

AG003295

**ER 104**

POOR ORIGINAL

STATE OF CALIFORNIA      DEPARTMENT OF CORRECTIONS AND REHABILITATION

**PATIENT/INMATE APPEAL**      Side 2

CDCR 602 HC (REV. 04/11)

CTF HC 12 0037405

**D. If you are dissatisfied with the First Level response,** explain the reason below, attach supporting documents and submit to the Health Care Appeals Coordinator for processing within 30 calendar days of receipt of response. If you need more space, use Section D of the CDCR 602-A.

_PETITIONER IS A HEAVILY DOCUMENTED VALIDATED_
_CONFIRMED Transsexual who Suffers Greatly w/out_
_GENDER REASSIGNMENT SURGERY, IT IS CRUEL & UNUSUAL_
_TO DELIBERATELY IGNORE A MEDICAL NEED AND SOLUTION_
_that will/can ELIVATE PETITIONERS PAIN + Suffering_
_the State NOT PROVIDE SEX REASSIGNMENT SURGERY._

Patient/Inmate Signature: _____ Date Submitted: _10/11/12_

**E. Second Level - Staff Use Only**    Staff - Check One: Is CDCR 602-A Attached? ☑Yes ☐No

This appeal has been:

☐ By-passed at Second Level of Review. Go to Section G.

☐ Rejected (See attached letter for instruction): Date: _____ Date: _____ Date: _____ Date: _____

☐ Cancelled (See attached letter): Date: _____

☐ Accepted at the Second Level of Review

Assigned to: _T. Bright_ Title: _CPAS_ Date Assigned: _10/4/12_ Due Date: _NOV 15 2012_

Second Level Responder: Complete a Second Level response. Include interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is: ☐ Granted ☑ Granted in part ☐ Denied ☐ Other: _____

See attached letter. If dissatisfied with Second Level response, complete Section D.

Interviewer: _____ Title: _____ Signature: _____ Date completed: _____

    (Print Name)

Reviewer: _A. Adams_ Title: _CME_ Signature: _____

    (Print Name)

Date received by HCAC: _11/14/12 & 11/27/12_      HCAC Use Only / Date mailed/delivered to appellant: _____

**F. If you are dissatisfied with the Second Level response,** explain below, attach supporting documents and submit by mail for Third Level Review. It must be received within 30 calendar days of receipt of prior response. Mail to: Chief, Office of Third Level Appeals – Health Care, California Prison Health Care Services, P.O. Box 4038, 660 Suite 400, Sacramento, CA 95812-4038. If you need more space, use Section F of the CDCR 602-A.

_____

_____

_____

_____

_____

Patient/Inmate Signature: _____ Date Submitted: _____

**G. Third Level - Staff Use Only**

☐ Rejected (See attached letter for instruction): Date: _____ Date: _____ Date: _____ Date: _____

☐ Cancelled (See attached letter): Date: _____

☐ Accepted at the Third Level of Review

Your appeal is ☐ Granted ☐ Granted in part ☐ Denied ☐ Other: _____

See attached Third Level response.

Third Level Use Only / Date mailed/delivered to appellant: ___/___/___

**Request to Withdraw Appeal:** I request that this appeal be withdrawn from further review because: State reason. (If withdrawal is conditional, list conditions.)

_____

_____

Patient/Inmate Signature: _____ Date Submitted: _____

Print Staff Name: _____ Title: _____ Signature: _____ Date: _____

AG003296

**ER 105**

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**POOR ORIGINAL**

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (08/09)

Side I

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | CTF HC | M037935 | |
| | **FOR STAFF USE ONLY** | | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

Appeal is subject to rejection if one row of text per line is exceeded.      WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Norsworthy, Jeffrey | D54100 | LA-145 | |

A. Continuation of CDCR 602, Section A only (Explain your issue): In constant torment for gender dysphoria, being diagnosed as gender identity disordered, petitioner has a "serious medical need" which only GRS can correct. Petitioner has lived as a woman, openly for 20 years under direct and continual medical supervision by state employed doctors & social workers. In January 2000 after lengthy examination the Ca. Dept. of Mental Health (DMH) legally declared and documented that petitioner is a transsexual in need of GRS. At that time estrogen was prescribed and brassieres were issued, petitioner is castrated and continues to receive the highest possible dose of estrogen, by injection every 2 weeks and shall continue to until GRS is completed as CDCR is bound by law to treat petitioner as a woman.

Inmate/Parolee Signature: _____   Date Submitted: 9/16/12

B. Continuation of CDCR 602, Section B only (Action requested): Providing petitioner with the medically necessary sex-reassignment surgery ( to alleviate petitioner's pain & suffering of living an existence contrary to petitioner's state documented condition, duly note: the CDCR by its own records officially supports the requested surgery and long ago classified petitioner a woman. See attached exhibits generated by the CDCR based on medical & legal standards. See also Massachusetts case in re: Michelle Kosilek, decision by Judge Mark Wolf.

Inmate/Parolee Signature: _____   Date Submitted: 9/16/12

AG003297

**ER 106**

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (08/09)                                                                                           Side 2

CTF HC 170037935

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____   Date Submitted: _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____   Date Submitted: _____

AG003298



## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



### Institution Response for Second Level HC Appeal

**Date:**   11/6/2012

**To:**   NORSWORTHY, JEFFREY (D54100)
A  LA A3310001U
Correctional Training Facility
P.O. Box 686
Soledad, CA 93960-0686

**Tracking/Log #:**   CTF HC 12037935

**Appeal Issues:**
In your CDCR-602HC Inmate/Parolee Health Care Appeal Form received on 10/4/2012, you indicated:

|  | Issue Type | Action Requested |
|---|---|---|
| **Issue 1:** | Surgical Issues ( Transgender ) | Wants gender reassignment surgery (GRS) |
| **Issue 2:** | Access to Care ( Transgender ) | To receive adequate medical care |

**Interview:**
You were interviewed by L. Fernandez, Registered Nurse (RN) on 9-24-12 around 1100 on North clinic regarding this appeal. During the interview, you were allowed the opportunity to fully explain your appeal issue(s). You stated that this will be a short interview because there is nothing this level or CDCR can do and you have to exhaust your options for formality sake. You presented on the interview a cut-out from the newspaper that the Federal courts ruled out in favor of Gender Reassignment Surgery (GRS) at the state expense. You are relating your experiences because you are feeling miserable of not being able to fully express yourself. You stated that you have been treated fairly by staff here at CTF and you are assisting the ADA inmates.

The response stated that review of your electronic Unit Health Record (eUHR) and all pertinent departmental policies and procedures were reviewed.

The Disability Effective Communication System was checked. You were determined to have a Test for Basic Adult Education (TABE) score of above 4.0 and did not require accommodation to ensure effective communication.

**Response:**

The First Level Appeal, received on 9/18/2012 indicated ...... you want gender reassignment surgery (GRS) and you want to receive adequate medical care.

The response stated .......on 9-18-12; you wrote that the Federal courts ruled in favor of GRS at the state's expense. You are in therapy and continue treatment with the highest possible dose of estrogen until GRS is completed as CDCR is bound by law. You are diagnosed as having gender identity disorder and have lived as a woman openly for 20 years under direct and continuous medical supervision by state doctors and state social workers. You have a serious medical need which only GRS can correct. You are requesting the necessary sex reassignment surgery to alleviate pain and suffering of living life as a women for more than 20 years.

You were seen by your Primary Care Provider (PCP) on 9-13-12, noting you are doing well and have no new complaints. Your pharmacy profile shows active medication of your needed treatment Estradiol Valerate 60mg IM, every 2 weeks and Spironolactone 100mg by mouth twice a day (see attached). You are counseled to

AG003299

**ER 108**

J.NORSWORTHY, D54100
CTF HC 12037935
Page 2 of 2

continue to discuss this matter with your PCP on how to accomplish this complex procedure. A follow-up is scheduled in 6 months with your PCP. If you develop any urgent / emergent concerns to submit a 7362 Health Care Form or inform custody.

At the First Level of Review this appeal was **partially granted.**

The Second Level Appeal, received on 10/4/2012 indicated ......you want gender reassignment surgery (GRS) and you want to receive adequate medical care.

The response stated .......There is no blanket policy in the CDCR that prohibits Sexual Reassignment Surgery (SRS). You are receiving medication management for trans-sexualism with Estradiol and Spironolactone. On December 1, 2011, March 12, 2011 and September 13, 2012 you were seen by your Primary Care Provider (PCP) who reported that you were doing well. Over the past year and a half, neither your mental health nor your PCP has recommended SRS as treatment for any of your medical conditions. You will continue your current medication treatment plan and will be referred to an Endocrinologist for further evaluation. *This current plan is working well to control your symptoms.*

You are a participant in the Mental Health Services Delivery System. You receive regular, extensive care for your Post-Traumatic Stress Disorder (PTSD), and are currently in the CCCMS level of care. Your mental health team is well aware of your needs and document relative stability of your diagnoses. They have not recommended SRS as treatment which would help any of your mental health conditions.

At the Second Level of Review this appeal was **partially granted.**
Your request for gender reassignment surgery is **denied.** Your PCP/Mental Health clinicians have not recommended SRS as treatment.
Your request for adequate medical care is **granted.** You are receiving adequate medical care.

A review of your appeal with attachment(s), Unit Health Record (UHR), and all pertinent departmental policies and procedures were reviewed.

**Appeal Decision:**
Based upon the aforementioned information, your appeal is **partially granted.**

_____ DATE 11 / 27 /12

A. Adams, M.D., CME
Correctional Training Facility
Health Care Services

AG003300

**ER 109**

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES



**Institution Response for First Level HC Appeal**

**Date:** 09-25-12

**To:** Name **NORSWORTHY # D54100**
Housing LA 143 U

Correctional Training Facility
P.O. Box 686
Soledad, CA 93960-0686




**Tracking/Log #:** CTF HC # 12037935

**Appeal Issues:**
In your CDCR-602HC Inmate/Parolee Health Care Appeal Form received on 09-18-12, you indicated:

COMPLETED SEP 28 2012 CTF HC APPEALS

| | **Issue Type** | **Action Requested** |
|---|---|---|
| **Issue 1:** | Surgical Issues ( Transgender ) | Wants gender reassignment surgery ( GRS ) |
| **Issue 2:** | Access to care ( Transgender ) | To receive adequate care |

**Interview:**
You were interveiwed by **RN FERNANDEZ** on 09-24-12 around 1100 at North clinic regarding this appeal. During the interview, you were allowed the opportunity to fully explain your appeal issue(s). You stated that this will be a short interview because you claimed there is nothing this level or CDCR can do but that you have to exhaust your options for formality sake. You presented on the interview a cut- out from the newspaper that the Federal courts ruled out in favor of GRS (gender reassignment surgery) at states expense. You were teary eyed relating your experiences in 2009 and because of your gender identity disorder feeling miserable of not being able to fully express yourself. You stated that have been fairly treated by staff here in CTF and assisting with the ADA inmates.

COMPLETED NOV 27 2012 HC APPEALS

**Response:**

The First Level Appeal, received on 09-18-12, you wrote that recently the Federal courts ruled in favor of gender reassignment surgery at state expense for all inmates .You are in constant therapy and continues treatment with the highest possible dose of estrogen until GRS is completed as CDCR is bound by law , being diagnosed as gender identity disorder, has lived as a woman openly for 20 years under direct and continous medical supervision by state employed doctors with social workers, has a serious medical need which only GRS can correct. You are requesting the medically necessary sex reassignment surgery to alleviate pain and suffering of living an existence contrary to states documented condition classified long ago as a woman.

The response is that your eUHR electronic unit health record indicated that you were seen by your PCP Primary care provider recently 09-13-12 noting that you are doing well and has no new complaints ; and your pharmacy profile shows active medications of your needed treatment Estradiol Valerate 60mg im q 2 weeks and spironolactone 100mg by mouth twice a day ( see attached ) You are counseled to continue to discuss this matter with your PCP primary care provider for a process on how to start with accomplishing this complex procedure . A follow up is scheduled in 6 months with the PCP. If you develop any urgent /emergent concerns to inform custody or submit a 7362 Health care request.
Your request for a GRS Gender reassignment surgery is Denied per state policy.
Your request to receive adequate care is Partially granted.

At the First Level of Review this appeal is Partially granted.

Page 2 of 2

A review of your appeal with attachment(s), Unit Health Record (UHR), and all pertinent departmental policies and procedures were reviewed. The Disability Effective Communication System was checked and you were determined to have a Test for Basic Adult Education ( TABE) score of above 4.0 and did not require accommodations to ensure effective communication.

**Appeal Decision:**
Based upon the aforementioned information, your appeal is Partially granted.

If you are dissatisfied with the First Level response, explain the reason on section D on the Health care 602, attach supporting documents and submit to the Health care appeals Coordinator for processing within 30 calendar days of receipt of response. If you need more space, use the (green) 602 A.

L.F. Fernandez
RN
Correctional Training Facility

Norsworthy #D54100HC 1203793



Gender Identity Disorder | BehaveNet                                          Page 1 of 2

Welcome Guest    Login or Register
Home    Disorders    Drugs    People    Resources    Terms

Connect with other sites in the UBM MedicaNetwork



**BehaveNet**

This space is a Web Advertisement site that CDCR has blocked by default.
Click On Accept To Bypass CDCRs Internet Filter

Glossaries

Addiction
Forensic
HIPAA
Memory
Pharmacology
Psychopathology
Psychotherapy
Reimbursement
Sleep Medicine
Stuttering

find us on
Facebook

StumbleUpon

This space is a Web
Advertisement site that
DCR has blocked by
efault.
lick On Accept To
ypass CDCRs Internet
ilter

Search

This space is a Web Advertisement site that
CDCR has blocked by default.
Click On Accept To Bypass CDCRs Internet
Filter



# Gender Identity Disorder

- mental disorder

Individuals with this mental disorder are uncomfortable with their apparent or assigned gender and demonstrate persistent identification with the opposite sex.

## Diagnostic criteria for Gender Identity Disorder

(DSM IV - TR)
(cautionary statement)

A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex). In children, the disturbance is manifested by four (or more) of the following:.

(1) repeatedly stated desire to be, or insistence that he or she is, the other sex
(2) in boys, preference for cross-dressing or simulating female attire; in girls, insistence on wearing only stereotypical masculine clothing
(3) strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex
(4) intense desire to participate in the stereotypical games and pastimes of the other sex
(5) strong preference for playmates of the other sex. In adolescents and adults, the disturbance is manifested by symptoms such as a stated desire to be the other sex, frequent passing as the other sex, desire to live or be treated as the other sex, or the conviction that he or she has the typical feelings and reactions of the other sex.

B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex. In children, the disturbance is manifested by any of the following: in boys, assertion that his penis or testes are disgusting or will disappear or assertion that it would be better not to have a penis, or aversion toward rough-and-tumble play and rejection of male stereotypical toys, games, and activities; in girls, rejection of urinating in a sitting position, assertion that she has or will grow a penis, or assertion that she does not want to grow breasts or menstruate, or marked aversion toward normative feminine clothing. In adolescents and adults, the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

C. The disturbance is not concurrent with a physical intersex condition.

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Code based on current age:

**302.6 Gender Identity Disorder in Children**
**302.85 Gender Identity Disorder in Adolescents or Adults**

Specify if (for sexually mature individuals):

**Sexually Attracted to Males**
**Sexually Attracted to Females**
**Sexually Attracted to Both**
**Sexually Attracted to Neither**

Reprinted with permission from the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Copyright 2000 American Psychiatric Association

Older criteria for this diagnosis

See also:

- transgender
- transgenderism
- transsexual
- transsexualism

Books
- Choose -

Movies
- Choose -

RECEIVED
SEP 18 2012
CTF HC APPEALS

COMPLETED
SEP 28 2012
CTF HC APPEALS

RECEIVED
OCT - 4 2012
CTF HC APPEALS

COMPLETED
NOV 27 2012
CTF HC APPEALS



AG003303

ER 112



0782191

STATE OF CALIFORNIA
CDC 7362 (Rev. 03/04)

**HEALTH CARE SERVICES REQUEST FORM**

DEPARTMENT OF CORRECTIONS

| PART I: TO BE COMPLETED BY THE PATIENT |
|---|
| *A fee of $5.00 may be charged to your trust account for each health care visit.* |
| **If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.** |

REQUEST FOR:   MEDICAL ☑   MENTAL HEALTH ☐   DENTAL ☐   MEDICATION REFILL ☐

NAME *Norsworthy*   CDC NUMBER *D54100*   HOUSING *C11-128*

PATIENT SIGNATURE   DATE *10-22-14*

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe Your Health Problem And How Long You Have Had The Problem) *I am a twice diagnosed Transsexual/Gender dysphoric (c) um in need of Sex reassignment Surgery. Please Schedule SRS based on PhD and M.D. Recommendations, and review all "risk Assessments" due to HEP C positive status (refer endocrinology reports/notes also)*

*NOTE: IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

| PART III: TO BE COMPLETED AFTER PATIENT'S APPOINTMENT |
|---|
| ☑ Visit is not exempt from $5.00 copayment. (Send pink copy to Inmate Trust Office.) |

| PART II: TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE |
|---|

Date / Time Received: *10/23/14 0610*   Received by: *(signature)*

Date / Time Reviewed by RN:   Reviewed by: *(signature)*

S:   Pain Scale:   1   2   3   4   5   6   7   8   9   10

O:   T:   P:   R:   BP:   WEIGHT:

A:

P:

☑ **See Nursing Encounter Form**

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY ☐ (IMMEDIATELY) | URGENT ☐ (WITHIN 24 HOURS) | ROUTINE ☐ (WITHIN 14 CALENDAR DAYS) |
|---|---|---|---|
| REFERRED TO PCP: | | DATE OF APPOINTMENT: | |
| COMPLETED BY *A. Palomino RN* | | NAME OF INSTITUTION *MCSP* | |
| PRINT / STAMP NAME *A. Palomino RN* | SIGNATURE / TITLE *(signature)* | | DATE/TIME COMPLETED *10/24/14 1000* |

CDC 7362 (Rev. 03/04)   Original - Unit Health Record   Yellow - Inmate (if copayment applicable)   Pink - Inmate Trust Office (if copayment applicable)   Gold - Inmate

Confidential Saved 2015-01-06T23:45:36Z

AG005155

**ER 113**

| DATE | TIME | Nursing Visit Progress Note |
|---|---|---|
| 10/24/14 | 0940 | VS: B/P: 142/87 ____ T: 97.0 P: 69 R: 16 Wt: 166 lbs. Pain: 0 /10 |

**S:** Chief Complaint/Onset/Duration:

"I am a transsexual diagnosed with GID,I am going thru court to get my reassignment surgery,I been dealing with this for 2 years,my lawyer said to fill out this medical request form to start the process here at MCSP so I can talk to a doctor about it"

Allergies: ☑ NKDA Per Med Recon: ____
New allergies/drug sensitivities since last visit: ☑ No ☐ Yes – List: ____
Medications: ☑ Med Recon reviewed  Rx'd medications r/t chief complaint: ____
Compliant with medications: ☑ Y ☐ N; if no, reason for noncompliance: ____
Chronic Diseases: ☑ Problem List Reviewed  Diseases r/t chief complaint:

**O:** ☑ Awake, alert, oriented to person place, time      ☑ No acute distress
Systems Review/Physical Assessment:

I/P c even & unlabored breating,O2 sats 99% RA, skin w/d to touch,speech clear & coherent,gait steady,pt gives above statements,Pt has Dx Gender Identity Disorder,requesting to see MD to discuss sex change surgery,Pt states"I will be paroled 4/15,so I want to try and have my surgery before I go".Pt has no other concerns at this time.

Last seen for this issue: 10/3/14 ____ Follow-up appointment with PCP already scheduled: ☐ Yes ☑ No

**A:** Anxiety AEB:Pt's statements and Dx GID.

**P:** ■ No treatment indicated; education provided to patient.
☐ Treatment given per RN Protocol.  Protocol Used:

| | | | |
|---|---|---|---|
| ☐ Burns | ☐ Hemorrhoids | ☐ Allergic Reaction | ☐ Insect Sting/Spider Bite |
| ☐ Constipation/Diarrhea/GERD | ☐ Inflammatory Skin/Rash | ☐ Asthma ☐ Resp Distress | ☐ Loss of Consciousness |
| ☐ Earache | ☐ Musculoskeletal | ☐ Chest Pain | ☐ Seizure |
| ☐ Eye Injury/Irritation | ☐ URI/Rhinitis/Pharyngitis | ☐ Dental Conditions | ☐ Tetanus Prophylaxis |
| ☐ Headache | ☐ Wound Care | ☐ Epistaxis | Trauma: ☐ Abdominal ☐ Chest |

☐ Protocol Meds Provided – see RN Protocol Medications Form ☐ Patient refused OTC meds
☐ Patient has current Rx for medications/continue meds as ordered – see med reconciliation
☐ Patient has scheduled appt with PCP for same complaint – pt educated to scheduled appt.
☑ Patient referred to PCP for routine appointment
☐ Consult with PCP ____
　☐ no additional orders
　☐ medication orders – see med reconciliation
　☐ diagnostic/lab orders – see physician's order form
　☐ f/u appointment orders – see physician's order form
　☐ referral to specialist – see physician's order form/RFS
☐ Other: ____

**E:** Patient instructed in:  ☐ use of new medications  ■ use of existing medications  ☐ level of activity
☐ wound care  ☐ skin care ☐ disease process  ■ f/u appointments/7362 Process
■ Other: Keep PCP app. and discuss concerns c MD.
■ Patient verbalized understanding of instructions
Disposition:
Time of Departure: 0953 ____ Mode of Transport: ☑ Ambulatory ☐ W/C ☐ Gurney/Cart
Patient's condition: ☑ stable/unchanged/improved - return to housing unit/custody
☐ unstable or in need of urgent tx/eval – refer to TTA/ED/CTC ☐ report given to TTA/ED RN/MD
RN SIGNATURE: _[signature]_

| INSTITUTION | HOUSING UNIT (YARD - BLDG - CELL) | | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|---|
| **MCSP** | C11 128U | | NORSWORTHY,JEFFREY |

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | D54100 |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☑ P/I asked questions | DOB 03/15/1964 |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☑ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☑ Reached | |
| | ☐ Other* | * See chrono/notes | |

TABE 10.8 NCF

**INTERDISCIPLINARY PROGRESS NOTES**
CDC 7230 (Rev. 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

Confidential Saved 2015-01-06T23:45:36Z

AG005156

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      - - -

 4

   MICHELLE-LAEL NORSWORTHY,        )
 5                                   )
                 Plaintiff,          )
 6                                   )
            Vs.                      ) No. C 14-00695 JST
 7                                   ) (PR)
                                     )
 8   JEFFREY BEARD, et al.,          )
                                     )
 9            Defendants.            )
     ----------------------------    )
10

11

12                    DEPOSITION OF

13            MICHELLE-LAEL NORSWORTHY

14          a/k/a  JEFFREY B. NORSWORTHY

15              IONE, CALIFORNIA

16            DECEMBER 30, 2014

17

18

19

20

21
   ATKINSON-BAKER, INC.
22 COURT REPORTERS
   (800) 288-3376
23 www.Depo.Com

24 Reported By:  Wendy Harrity, CSR License No. 11494

25 File No:  A80E660
```

1

ER 115

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    - - -

4
     MICHELLE-LAEL NORSWORTHY,        )
5                                     )
                  Plaintiff,          )
6                                     )
          Vs.                         )   No. C 14-00695 JST
7                                     )   (PR)
                                      )
8    JEFFREY BEARD, et al.,           )
                                      )
9                 Defendants.         )
     ----------------------------     )
10

11

12

13

14

15
            Deposition of MICHELLE-LAEL NORSWORTHY a/k/a
16

17   JEFFREY B. NORSWORTHY, Taken on Behalf of

18   DEFENDANTS, At 4001 Highway 104, Ione, California,

19   Commencing At 10:32 a.m., TUESDAY, DECEMBER 30, 2014,

20   Before Wendy Harrity, CSR No. 11494.

21

22

23

24

25

                                                              2

1    -- of the -- of the gender dysphoria, um, is to seek          10:53

2    therapy and other treatments.                                 10:53

3        Can you describe to us what treatments you have           10:53

4    sought?                                                        10:53

5        MR. HOYING:  Objection; misstates prior                   10:53

6    testimony.  You can answer if you can.                         10:53

7        THE WITNESS:  Repeat the question.  I'm sorry.            10:53

8    BY MS. BAJWA:                                                  10:53

9        Q.  What -- what treatments have you sought to, uh,       10:53

10   treat your -- uh, the gender -- well, then we'll refer         10:53

11   to it as the gender dysphoria and the associated pain          10:53

12   that comes with it.                                            10:53

13       A.  Well, I sought all recommended therapy.  My           10:54

14   original doctors recommended that I seek out                   10:54

15   psychotherapy and remain in it for a long duration of          10:54

16   time.  And I have since 2000.  I have been consistent          10:54

17   about going to a therapist regularly and to remain, uh,        10:54

18   true to the -- the medicines that were given to me             10:54

19   through the endocrinologist, the specialist in the area        10:54

20   of gender dysphoria.  So those are the things that I           10:54

21   sought out.  It's what I was taught.                           10:54

22       Q.  Who were the original doctors that, uh,               10:54

23   suggested the psychotherapy?                                   10:54

24       A.  Dr. Kohler and Dr. Viesti.                            10:54

25       Q.  When did they reco -- did they recommend the          10:54

22

**ER 117**

| | | |
|---|---|---|
| 1 | psychotherapy? | 10:54 |
| 2 | A.   1999 and 2000. | 10:54 |
| 3 | Q.   Huh -- | 10:54 |
| 4 | A.   Yeah.   That is when the -- that was when the | 10:54 |
| 5 | testing was done, so... | 10:54 |
| 6 | Q.   And when did, uh, Dr. Kohler recommend the | 10:54 |
| 7 | medical -- the medicines? | 10:55 |
| 8 | A.   In 2000, January. | 10:55 |
| 9 | Q.   Did Dr. Viesti recommend any medications? | 10:55 |
| 10 | A.   He couldn't.   It wasn't his place. | 10:55 |
| 11 | Q.   He -- | 10:55 |
| 12 | A.   He was a Ph.D. | 10:55 |
| 13 | Q.   He's a psychologist? | 10:55 |
| 14 | A.   Yeah, he was only confirming the diagnoses. | 10:55 |
| 15 | Q.   Uh, you -- you're dressed -- you appear as a | 10:55 |
| 16 | woman to me.   You're dressed as a woman. | 10:55 |
| 17 | How has that affected your gender dysphoria? | 10:55 |
| 18 | MR. HOYING:   Object to form. | 10:55 |
| 19 | BY MS. BAJWA: | 10:55 |
| 20 | Q.   Go ahead and answer. | 10:55 |
| 21 | A.   How has it affected?   I don't understand the | 10:55 |
| 22 | nature of that question. | 10:55 |
| 23 | Q.   By dressing as a woman -- | 10:55 |
| 24 | A.   Right. | 10:55 |
| 25 | Q.   -- has that alleviated your symptoms of the | 10:55 |

23

ER 118

```
 1    pain you feel with gender dysphoria?                10:55
 2        A.  Well, it helps when I'm allowed to express  10:55
 3    myself.  It helps.                                  10:55
 4        Q.  So --                                       10:55
 5        A.  It doesn't necessarily do anything for me.  10:55
 6    It's like dressing in female clothes or wearing makeup.  10:55
 7    It doesn't necessarily make me the woman that I am.  It  10:56
 8    only helps me express to the world how I feel about  10:56
 9    myself.  See, the clothes you are wearing, you can't  10:56
10    see.  They are for us to see.  And so what I do by  10:56
11    trying to appear more as a female is by -- it's my way  10:56
12    of expressing to the world this is how I feel.  And when  10:56
13    I'm in a situation of where I -- I have a lot of nice  10:56
14    staff here who actually, kind of, make way for me to be  10:56
15    a little bit more myself than most prisons do.  A lot of  10:56
16    prisons are a little bit more harsher.  And it makes  10:56
17    life that much easier and it makes therapy that much  10:56
18    more successful.                                    10:56
19        Q.  So how has -- I'm trying to get an          10:56
20    understanding here.  Is it the prison -- the harshness  10:56
21    of the prison conditions and this -- this prison being  10:56
22    easier to live as a woman, has that helped alleviate the  10:56
23    pain that you -- that you feel with your gender  10:56
24    dysphoria?                                          10:57
25        A.  Absolutely not.  Simply because like the    10:57
```

24

ER 119

```
 1   custody staff that's in the room right now, he's, uh,        10:57
 2   few and far between.  The majority of staff members are      10:57
 3   still pretty -- not so understanding about my kind.  So      10:57
 4   it's not exactly an easy life out there.  So, no, it         10:57
 5   hasn't become easier.  It's just I get these moments of      10:57
 6   calm.                                                         10:57
 7        Q.  As -- you are allowed to wear makeup in prison?     10:57
 8        A.  No.                                                  10:57
 9        Q.  You're not?                                          10:57
10        A.  No.                                                  10:57
11        Q.  You are allowed to keep your hair long and wear     10:57
12   it in a ponytail in prison?                                   10:57
13        A.  Yes.                                                 10:57
14        Q.  You are being provided with clothing                10:57
15   accommodations such as brassieres?                            10:57
16        MR. HOYING:  Object to form.  Go ahead.                 10:57
17        THE WITNESS:  If I pay for them.  They're              10:57
18   supposed to provide them for me, but they don't.             10:57
19   BY MS. BAJWA:                                                 10:57
20        Q.  Are you wearing makeup today?                       10:57
21        A.  No.  However, I want to clarify for the sake of    10:58
22   truth, I am using colored pencils as makeup.  But you        10:58
23   are asking me if I'm wearing makeup.  No, I do not have      10:58
24   makeup.  But I -- makeshift makeup.                          10:58
25        Q.  Makeshift make up?                                  10:58
```

25

**ER 120**

```
 1        A.   Yeah.                                          10:58

 2        Q.   Um, have you requested, um, other treatments to   10:58

 3   remove the male characteristics of your body?  For     10:58

 4   example, facial hair?                                  10:58

 5        A.   No.  It's against policy to ask for that, so...  10:58

 6        Q.   So what method do you use to remove facial    10:58

 7   hair?                                                   10:58

 8        A.   I shave.                                      10:58

 9        Q.   Have you requested any permanent method of hair  10:58

10   removal?                                                10:58

11        A.   No.                                           10:58

12        Q.   Why not?                                      10:58

13        A.   Because I believe that the sex reassignment   10:58

14   surgery grant will -- that will -- that will be a part  10:58

15   of it.  The -- the electrolysis is a part of that      10:58

16   process.  It's one of the things that are -- that are  10:58

17   part of the surgery, like other augmentation and other  10:58

18   adjustments to the body if I so desired them.  So I    10:59

19   didn't think to ask for something that is not as truly  10:59

20   medically necessary as fixing my psychological state and  10:59

21   my emotional stated or my physical state.              10:59

22        Q.   Okay.  Let's talk about the surgery.  What is  10:59

23   your understanding of sex reassignment surgery?        10:59

24             MR. HOYING:  Objection; vague.               10:59

25   BY MS. BAJWA:                                          10:59
```

26

**ER 121**

```
 1        Q.   Go head.   Answer.                          10:59
 2             MR. HOYING:   Calls for expert opinion.      10:59
 3   BY MS. BAJWA:                                          10:59
 4        Q.   What is your understanding of sex reassignment   10:59
 5   surgery?                                               10:59
 6        A.   My understanding of sex reassignment surgery is   10:59
 7   converting one genitalia to another.                   10:59
 8        Q.   Anything else that goes along with this -- the   10:59
 9   surgery?  For clarification, if it's okay with you, I'm   10:59
10   going refer to it as SRS for the rest of the deposition.   10:59
11        Is that okay?                                     10:59
12        A.   That's awesome.                              10:59
13        Q.   Okay.  What -- what else do you understand goes   10:59
14   into SRS?                                              11:00
15             MR. HOYING:   Objection; vague, calls for expert   11:00
16   opinion.                                               11:00
17   BY MS. BAJWA:                                          11:00
18        Q.   Go ahead and answer if you can.              11:00
19        A.   Well, sex reassignment surgery is based upon   11:00
20   the genitalia.  So the -- any -- any other additional   11:00
21   things like cheek enhancements or breast augmentation or   11:00
22   all those other things are -- are in addition to.      11:00
23   They're a part of the process if a person desires them,   11:00
24   but a lot of people don't want those.  So, but the sex   11:00
25   reassignment surgery to alleviate the -- the pain -- the   11:00
```

27

**ER 122**

```
 1    psychology pain that goes into the reasons why someone      11:00
 2    would get has everything to do with the genitalia          11:00
 3    itself.                                                     11:00
 4        Q.  So, um, you're -- what you're seeking by the        11:00
 5    surgery is to -- is to have your genitalia changed from     11:00
 6    male to the female form; is that correct?                   11:00
 7        A.  That is correct.                                    11:01
 8        Q.  That's all you're seeking with the surgery?         11:01
 9            MR. HOYING:  Objection; argumentative,              11:01
10    misstates testimony.                                        11:01
11    BY MS. BAJWA:                                               11:01
12        Q.  Is that all that you're seeking with the            11:01
13    surgery?                                                    11:01
14        A.  No.                                                 11:01
15        Q.  What else are you seeking with the surgery?         11:01
16        A.  Well, reconstruction in areas that would more       11:01
17    feminize my body.  Okay.  Because I was born male, uh, I    11:01
18    wasn't -- I'm not just gender female -- not just gender     11:01
19    female.  Um, I feel that there might be some things that    11:01
20    I might want to -- to help, um, my expression, you know.    11:01
21    But those are -- those are -- those are in addition to.     11:01
22    See, I don't -- I don't infuse the two.  I don't need       11:01
23    breast augmentation.  I want the breast augmentation.  I    11:01
24    need the genital reconstruction.  I have been on            11:01
25    hormones for such a long period of time -- let's be         11:01
```

**ER 123**

| | | |
|---|---|---|
| 1 | clear on this -- that my genitals have discontinued | 11:01 |
| 2 | working.  The CDCR has kept me on hormones for such a | 11:01 |
| 3 | long period of time that they will never function again. | 11:02 |
| 4 | They have facilitated and they have made it possible for | 11:02 |
| 5 | me to come to terms with who I really am -- that there | 11:02 |
| 6 | really is no choice but for me to go forward now simply | 11:02 |
| 7 | because I have the right to genital expression and | 11:02 |
| 8 | without the surgery, I will never have genital | 11:02 |
| 9 | expression again. | 11:02 |
| 10 | Q.  Why is it so important for you to have genital | 11:02 |
| 11 | expression, which is in an area that's typically covered | 11:02 |
| 12 | up, but it's not important for you to have the breast | 11:02 |
| 13 | augmentation? | 11:02 |
| 14 | MR. HOYING:  Objection; compound, misstates | 11:02 |
| 15 | testimony. | 11:02 |
| 16 | THE WITNESS:  I don't want to answer that | 11:02 |
| 17 | question.  I would like you to ask another question, | 11:02 |
| 18 | please. | 11:02 |
| 19 | BY MS. BAJWA: | 11:02 |
| 20 | Q.  Ms. Norsworthy, you have filed a lawsuit | 11:02 |
| 21 | against several individuals. | 11:02 |
| 22 | A.  I have. | 11:02 |
| 23 | Q.  We are here to, um -- we are defending these | 11:02 |
| 24 | individuals and we have a right to defend these | 11:03 |
| 25 | individuals and we have a right to depose you.  If you | 11:03 |

29

**ER 124**

| | | |
|---|---|---|
| 1 | the point that you would believe that you are feminine? | 11:08 |
| 2 | A.  I would like to have my -- | 11:08 |
| 3 | MR. HOYING:  Objection; vague, overbroad. | 11:08 |
| 4 | THE WITNESS:  Sorry. | 11:08 |
| 5 | MR. HOYING:  Compound.  You can answer if you | 11:08 |
| 6 | can. | 11:08 |
| 7 | THE WITNESS:  I would like to have my trachea | 11:08 |
| 8 | shaved, my Adam's apple, I guess, smaller. | 11:09 |
| 9 | BY MS. BAJWA: | 11:09 |
| 10 | Q.  Anything else? | 11:09 |
| 11 | A.  No. | 11:09 |
| 12 | Q.  All right. | 11:09 |
| 13 | A.  I am happy with my boobs. | 11:09 |
| 14 | Q.  Have any medical doctors informed you that the | 11:09 |
| 15 | surgery -- the sex reassignment surgery is medically | 11:09 |
| 16 | necessary? | 11:09 |
| 17 | A.  Medical doctors? | 11:09 |
| 18 | Q.  Medical doctors. | 11:09 |
| 19 | A.  No. | 11:09 |
| 20 | Q.  Have any -- | 11:09 |
| 21 | MR. HOYING:  I just want to be clear that | 11:09 |
| 22 | that's not covering any attorney-client privilege, any | 11:09 |
| 23 | work product, et cetera. | 11:09 |
| 24 | BY MS. BAJWA: | 11:09 |
| 25 | Q.  Have any mental health professionals told you | 11:09 |

34

**ER 125**

| | | |
|---|---|---|
| 1 | that this surgery is necessary? | 11:09 |
| 2 | A.  Yes. | 11:09 |
| 3 | Q.  Who? | 11:09 |
| 4 | A.  Dr. Reese. | 11:09 |
| 5 | Q.  Have you personally consulted -- you personally | 11:10 |
| 6 | consulted with any expert in the area of sex | 11:10 |
| 7 | reassignment surgery, uh, regarding the process? | 11:10 |
| 8 | MR. HOYING:  Just to be clear, separate from | 11:10 |
| 9 | this litigation? | 11:10 |
| 10 | MS. BAJWA:  Separate from the -- separate from | 11:10 |
| 11 | any attorney-client privileged information. | 11:10 |
| 12 | THE WITNESS:  So are you talking about prior to | 11:10 |
| 13 | the time of filing the appeal? | 11:10 |
| 14 | BY MS. BAJWA: | 11:10 |
| 15 | Q.  No.  I am talking about, any time up to the | 11:10 |
| 16 | present date, but excluding any attorney-client | 11:10 |
| 17 | discussions that you've had? | 11:10 |
| 18 | A.  Not that I know of. | 11:10 |
| 19 | Q.  Okay.  And to your knowledge, you don't have | 11:10 |
| 20 | any document about the sex reassignment surgery? | 11:10 |
| 21 | A.  You mean what goes into it? | 11:10 |
| 22 | Q.  Yes. | 11:10 |
| 23 | A.  No. | 11:10 |
| 24 | Q.  The documents that you mentioned that you had | 11:10 |
| 25 | received from some of the organizations, do you have any | 11:11 |

35

**ER 126**

| | | |
|---|---|---|
| 1 | MR. HOYING:  Thank you. | 01:11 |
| 2 | MS. TURNER:  Thank you. | 01:11 |
| 3 | (Off-the-record discussion.) | 01:13 |
| 4 | MS. BAJWA:  Really? | 01:13 |
| 5 | MR. HOYING:  Sure. | 01:13 |
| 6 | BY MS. BAJWA: | 01:13 |
| 7 | Q.  Mr. Norsworthy, I do apologize that this | 01:13 |
| 8 | appears to be a bit of a jumbled mess. | 01:13 |
| 9 | A.  That is okay. | 01:13 |
| 10 | Q.  This packet, Exhibit B, consists of your | 01:13 |
| 11 | appeal, request -- grievance that you prepared, | 01:13 |
| 12 | submitted to the first, second and third level of, um, | 01:13 |
| 13 | appeals to exhaust.  Okay? | 01:13 |
| 14 | A.  Okay. | 01:13 |
| 15 | Q.  And there are some medical record that were | 01:13 |
| 16 | attached with the documents.  Um, have you seen these | 01:13 |
| 17 | document before?  I understand you may not have prepared | 01:13 |
| 18 | them, but have you seen these document before? | 01:13 |
| 19 | A.  Yes, ma'am. | 01:13 |
| 20 | Q.  Okay.  Turning to the documents that you | 01:13 |
| 21 | prepared, uh, do you agree with me that the first time | 01:13 |
| 22 | you filed a grievance requesting sex reassignment | 01:13 |
| 23 | surgery was on September 6, 2012? | 01:13 |
| 24 | A.  9/16/2012. | 01:13 |
| 25 | Q.  9/16.  Okay. | 01:14 |

1     A.   Uh-huh.                                           01:14

2     Q.   Sorry, I missed the 1.  You received a response   01:14

3  on 9/25/2012, institution response at the first level?    01:14

4     A.   I believe --                                      01:14

5     Q.   Keep going --                                     01:14

6     A.   You are correct.                                  01:14

7     Q.   Keep going.  There you go.                        01:14

8     A.   Oh, actually you have to go on this.              01:14

9     Q.   Okay.  Did you not receive that typed document?   01:14

10    A.   I did.                                            01:14

11    Q.   Okay.  And you were interviewed at the first      01:14

12  level?                                                   01:14

13    A.   Yeah, by a registered nurse.                      01:14

14    Q.   And you -- you stated that there is nothing       01:14

15  that can be done at this level, but you are just         01:14

16  exhausting your options for formality sake; is that      01:14

17  right?                                                   01:14

18        MR. HOYING:  Objection; lack of foundation,        01:14

19  assumes facts.                                           01:14

20  BY MS. BAJWA:                                            01:14

21    Q.   Did you testify -- did you state that in the      01:14

22  interview?                                               01:14

23    A.   I believe that I did because she was a nurse.     01:14

24    Q.   Okay.  So you -- and you presented at the         01:15

25  interview the cut out, um, from the federal court's      01:15

96

**ER 128**

```
 1   ruling in favor of gender reassignment surgery for       01:15
 2   another -- for another inmate, correct?                   01:15
 3        A.  I did.  She had asked me what motivated it and   01:15
 4   I told her.                                                01:15
 5        Q.  When did you first find out about this other     01:15
 6   inmate?                                                    01:15
 7        A.  At the time that I read about it in the          01:15
 8   newspaper.                                                 01:15
 9        Q.  Which is when?                                    01:15
10        A.  Someone -- like a month before I filed this      01:15
11   appeal, I saw that Judge Mark Wolf had ordered the sex    01:15
12   reassignment surgery of a Michelle Kosilek in             01:15
13   Massachusetts.                                             01:15
14        Q.  So one month before you -- about one month       01:15
15   before you filed -- filed an appeal, so let's say         01:15
16   sometime in August of 2012, is when you first saw that a  01:15
17   federal court in Massachusetts had ordered gender         01:15
18   reassignment surgery; is that correct?                    01:15
19        A.  Yep.                                              01:15
20        Q.  And then you filed your grievance within         01:15
21   30 days?                                                   01:16
22        A.  I did.                                            01:16
23        Q.  And it was the first time you had formally       01:16
24   asked for gender reassignment surgery -- sex              01:16
25   reassignment surgery; is that correct?                    01:16
```

**ER 129**

```
 1        Q.  Any other of your primary care providers        01:28
 2   throughout the years ever mention to you about there     01:28
 3   being a policy?                                           01:28
 4        MR. HOYING:  Objection; vague and ambiguous,         01:28
 5   overbroad.                                                01:28
 6        THE WITNESS:  I don't remember if they did.          01:28
 7   BY MS. BAJWA:                                             01:28
 8        Q.  Okay.  Um, you are aware of the CDC form 7362,   01:28
 9   the medical services request form?                        01:28
10        A.  Uh-huh.                                           01:28
11        Q.  You've used them?                                 01:28
12        A.  Uh-huh.                                           01:28
13        Q.  Is that "yes"?                                    01:28
14        A.  Yes.                                              01:28
15        Q.  Okay.                                             01:28
16        A.  Sorry.                                            01:28
17        Q.  That is okay.  Um, have you ever submitted a     01:28
18   medical request form for sex reassignment surgery?        01:28
19        A.  I have.                                           01:28
20        Q.  When?                                             01:28
21        A.  About two months ago.                            01:28
22        Q.  We're in December, so about October 2014?       01:28
23        A.  Yep.                                              01:29
24        Q.  So that was after litigation commenced in this   01:29
25   case?                                                     01:29
```

ER 130

```
 1        A.   Yes.                                          01:29
 2        Q.   Prior to litigation commencing in this case,  01:29
 3   did you ever submit a medical request -- medical        01:29
 4   services request form?                                  01:29
 5        A.   No.                                            01:29
 6        Q.   Why not?                                       01:29
 7        A.   It wasn't necessary because the recommendation 01:29
 8   had already been made.  It was no longer -- it was no -- 01:29
 9   it's also policy that an inmate can no longer be        01:29
10   involved in the scheduling processes once one doctor    01:29
11   recommends to another doctor something that that inmate 01:29
12   needs.  Dr. Reese had sent a recommendation on this     01:29
13   date -- find the date.                                  01:29
14        Q.   Take your time.                                01:29
15        A.   Yeah, it should be in here, too.  He sent a   01:29
16   recommendation saying that I should be scheduled for the 01:29
17   surgery and so, thereafter, it would -- it would make -- 01:29
18   where is it?  You don't have it in here?  Um, that's    01:30
19   odd.  11/29.                                            01:30
20        Q.   Um, can I just see what page you are referring 01:30
21   to?                                                      01:30
22        A.   Is there pages?                                01:30
23        Q.   Probably not, but le me just look at that so I 01:30
24   can pull it up on mine.                                 01:30
25        A.   Right here.  On 11/29, he sent --             01:30
```

1    Q.  Um, and you filed a grievance aside from the         02:01
2  grievance for the sex reassignment surgery?                02:01
3    A.  Oh, yes.                                             02:01
4    Q.  When you are interviewed in connection with a        02:01
5  grievance at any level, um, what is your understanding     02:01
6  of the purpose of that interview?                          02:01
7         MR. HOYING:  Objection; lacks foundation, calls     02:01
8  for speculation, vague and ambiguous.                      02:01
9         THE WITNESS:  For the reviewer to get a better      02:01
10 understanding of the nature of my appeal and my wants.     02:01
11 BY MS. BAJWA:                                              02:02
12   Q.  When Dr. Coffin met with you and discussed with      02:02
13 you, did he ask you what your wants are?                   02:02
14   A.  Yes, we talked about the action requested.           02:02
15   Q.  The action requested being the surgery?              02:02
16   A.  Yeah.  The action requested -- that's what they      02:02
17 call it on the appeal.  It's the action requested, not     02:02
18 wants.  So that's just clarifying that.                    02:02
19   Q.  And what did you tell him about what you              02:02
20 wanted?                                                    02:02
21   A.  Essentially what I wrote in the appeal itself,       02:02
22 which is essentially the same thing that I talked about    02:02
23 in my original complaint, which is --                      02:02
24   Q.  Go ahead.                                            02:02
25   A.  No.  Go ahead.  Sorry.                               02:02

ER 132

1    KAMALA D. HARRIS
     Attorney General of California
2    JAY C. RUSSELL
     Supervising Deputy Attorney General
3    State Bar No. 122626
     JOSE ZELIDON-ZEPEDA
4    Deputy Attorney General
     PREETI K. BAJWA
5    Deputy Attorney General
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5717
7     Fax:  (415) 703-5843
      E-mail:  Jay.Russell@doj.ca.gov
8    *Attorneys for Defendants J. Beard, M. Spearman, R.*
     *Coffin, J. Lozano, A. Adams,  A. Newton, D. Van*
9    *Leer and L. Zamora*

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **MICHELLE-LAEL NORSWORTHY,** | C 14-00695 JST (PR) |
| Plaintiff, | **DECLARATION OF KELLY HARRINGTON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **JEFFREY BEARD, et al.,** | Date:        April 1, 2015 |
| Defendants. | Time:        2:00 p.m. |
| | Courtroom:  9 |
| | Judge:      The Honorable Jon S. Tigar |
| | Trial Date:   N/A |
| | Action Filed: February 14, 2014 |

         I, Kelly Harrington declare:

         1.      I am employed by the California Department of Corrections and Rehabilitation

(CDCR) as the Acting Director of the Division of Adult Institutions.  Given my employment,

experience, and knowledge, I am familiar with CDCR's policies, procedures, and practices

related to prison management, the management of inmate populations, gang management, and the

various safety and security concerns presented by the inmate population.  I am competent to

<div align="center">1</div>

<div align="right">**ER 133**</div>

1   testify to the matters set forth in this declaration and, if called on by the Court, would do so.  I

2   submit this declaration in support of Defendants' opposition to Plaintiffs' motion for a

3   preliminary injunction.

4        2.    I was appointed to the position of Acting Director of the Division of Adult

5   Institutions in 2015.  I had served as CDCR's Deputy Director of Facility Operations from 2013

6   to 2014, and before that, as Associate Director, High Security Mission in 2010 to 2013.  I have

7   been employed by CDCR for almost 28 years and have served in various capacities during my

8   tenure.  Prior to my appointment as Associate Director, High Security Mission, I served as the

9   Warden at Kern Valley State Prison, which is a Level IV maximum security prison.  I have also

10  held the positions of Chief Deputy Warden and Associate Warden at Wasco State Prison, as well

11  as Captain, Correctional Counselor I and II, and Correctional Officer.

12       3.    Given safety and security concerns related to Plaintiff Michelle Norsworthy's

13  continued correctional housing, particularly if she were to have sex reassignment surgery, I have

14  reviewed Norsworthy's central file and consulted with staff concerning the details of her housing.

15       4.    Norsworthy was convicted by a jury of second degree murder on December 15, 1986.

16  Norsworthy's pre-sentencing probation report shows that approximately six weeks before the

17  murder, she was arrested under Penal Code section 148.1(c) for having threatened to bomb her

18  former girlfriend's house after Norsworthy learned that the girlfriend was pregnant with her child.

19  The same pre-sentencing report and accompanying police report shows that Norsworthy "grabbed

20  [the girlfriend] in the stomach area after she told him she was pregnant."  Norsworthy's central

21  file records show that the Orange County District Attorney declined to file a complaint after the

22  victims chose not to cooperate in the prosecution of the bombing threat.

23       5.    Norsworthy has been incarcerated by CDCR since 1987.  She is a male-to-female

24  transgender inmate who began hormone therapy treatment in 1999.  Norsworthy is currently

25  housed in a sensitive needs yard at Mule Creek State Prison consistent with her correctional

26  classification level.  Norsworthy reports that she was sexually assaulted in 2009, but her central

27  file shows that she has been housed in Mule Creek's special needs yard without violent incident

28  for at least the past year.  For the past several years, Norsworthy has been permitted to purchase

2

Decl. K. Harrington Supp. Defs.' Opp'n Mot. Prelim. Inj.  (C 14-00695 JST (PR))

ER 134

1    and wear female undergarments, and she is allowed to wear her hair at her preferred length.

2    Records in her central file describe her as a "pleasant-looking woman, slender and coiffed in a

3    pony tail" who "is able to walk the yard . . . as a woman." Norsworthy's central file shows that

4    Mule Creek staff, similar to staff at institutions where she was previously housed, have generally

5    respected her female sexual identification.

6         6.    Mule Creek has successfully accommodated Norsworthy's correctional programming,

7    and her medical and mental health needs, without serious incident. My division has overall

8    responsibility for appropriately placing inmates in CDCR's prison system and in the specific

9    housing units within those institutions. The secure and safe custody of inmates is our preeminent

10   mission. There are  safety and security concerns presented by arranging for an inmate's

11   transportation and hospitalization for any surgery, accommodating the inmate's immediate post-

12   operative recovery period, and meeting the inmate's needs following significant medical

13   interventions. Arranging for an inmate's sex reassignment surgery, providing the necessary

14   security during hospitalization and ensuring that appropriate placement is available for both post-

15   operative recovery and placement have no precedent in California's prison system, or in any other

16   U.S. correctional environment of which I am aware. The extent that other legal issues might be

17   raised cannot be known with any certainty. I am aware that there have been numerous issues

18   experienced in providing a stable housing environment with a male-to-female transgender person

19   whose surgery took place before her arrival to CDCR. As a result of threats and assaults from

20   female inmates and from the transgender inmate herself, there have been frequent internal

21   transfers, including to administrative segregation, and transfers between the female institutions.

22        7.    I believe that Norsworthy's change to full female anatomy would preclude her from

23   being housed in an all-male facility like Mule Creek. Despite every precaution, housing an

24   anatomically female inmate in an all-male facility would unacceptably increase the possibility of

25   assault, rape, and other violent or disruptive acts.

26        8.    There are two prisons whose sole mission is to house female inmates, the California

27   Institution for Women in Chino and Central California Women's Facility in Chowchilla. I further

28   believe that significant safety and security concerns would arise if CDCR attempted to house

3

Decl. K. Harrington Supp. Defs.' Opp'n Mot. Prelim. Inj.  (C 14-00695 JST (PR))

ER 135

1  believe that significant safety and security concerns would arise if CDCR attempted to house

2  Norsworthy in an all-female facility. If female inmates learned of Norsworthy's past assault on

3  her girlfriend and arrest for threatening to bomb the girlfriend's house, Norsworthy would be at

4  significant risk of being assaulted or victimized by female offenders. I also have concerns that

5  given this history, Norsworthy might herself victimize female inmates.  Our experience with

6  post-operative transgender inmates is extremely limited, and an inmate's sex reassignment

7  surgery while incarcerated will be a matter of first impression that would present significant

8  challenges to CDCR and likely create significant risks to Norsworthy and other inmates.

9        9.      Norsworthy is presently a patient within CDCR's Mental Health Services Delivery

10  System at the Correctional Clinical Case Management System (CCCMS) level of treatment.

11  CCCMS is a level of mental heath treatment defined by the program guides promulgated as part

12  of the *Coleman v. Brown* class-action litigation.  The *Coleman* court has recently ordered that

13  CCCMS inmates may not be placed in administrative segregation for extended periods of time for

14  non-disciplinary reasons.  *See* Order (ECF 5131) at 46-55, *Coleman v. Brown*, No. S-90-520

15  KJM/DAD.  Accordingly, as an inmate-patient at the CCCMS level of mental health care

16  treatment, Norsworthy cannot be permanently housed in an administrative segregation unit, even

17  for her own safety.

18        I declare under penalty of perjury that the foregoing is true and correct to the best of

19  my knowledge.  Executed in Sacramento, California, on March 11, 2015.

20

21

22                            Kelly Harrington

23

24  SF2014409242
    41235326.doc

25

26

27

28

                                        4

**ER 136**

1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   Supervising Deputy Attorney General
3  PREETI K. BAJWA
   Deputy Attorney General
4  State Bar No. 232484
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 703-1621
6    Fax:  (415) 703-5843
     E-mail:  Preeti.Bajwa@doj.ca.gov
7  *Attorneys for Defendants*
   *R. Coffin, A. Adams, A. Newton, D. Van Leer and L.*
8  *Zamora*

9
                 IN THE UNITED STATES DISTRICT COURT
10
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                        SAN FRANCISCO DIVISION
12

13

14  **JEFFREY B. NORSWORTHY AKA**         C 14-00695 JST (PR)
    **MICHELLE-LAEL B. NORSWORTHY,**
15                                        **DECLARATION OF DR. I. MUNIR**
                              Plaintiff,
16                                        Date:          April 1, 2015
                                          Time:          2:00 p.m.
17          v.                            Courtroom:     19
                                          Judge:         The Honorable Jon S. Tigar
18  **JEFFREY BEARD, et al.,**            Trial Date:    N/A
                                          Action Filed:  February 14, 2014
19                            Defendants.

20

21       I, I. Munir, declare:

22       1.    I am a licensed medical doctor and a Board-Certified Endocrinologist. Presently, I am

23  employed at the Riverside County Regional Medical Center. I am contracted with California

24  Department of Corrections and Rehabilitation (CDCR) to provide telemedicine consultations to

25  inmates incarcerated by CDCR.

26       2.    I am familiar with Plaintiff Michelle-Lael Norsworthy (CDCR No. D54100) as I have

27  been treating her for hormone therapy since July 2014.

28

                                    1

**ER 136.1**

Case3:14-cv-00695-JST  Document74  Filed03/12/15  Page2 of 2

1    3.    When I first treated Ms. Norsworthy on July 2, 2014, she was receiving Estradiol,

2    Medroxyprogesterone, and Bromocriptine.

3    4.    In my course of treatment of Ms. Norsworthy, I have readjusted her prescription

4    medications so that they safely provide the appropriate therapeutic benefit to Ms. Norsworthy.

5    Currently, Ms. Norsworthy is on Estradiol, 1 mg, twice a day, in pill form. I have recommended

6    changing her estradiol formulation to estradiol patch or injection.

7    5.    I will continue to monitor Ms. Norsworthy's liver enzyme levels and adjust her

8    hormone therapy as necessary to ensure her liver enzyme levels are maintained within an

9    acceptable medical range. She should be evaluated by a hepatologist as well in the light of her

10   past history of hepatitis C.

11

12   I declare under penalty of perjury that the foregoing is true and correct and that this

13   declaration was executed on March 11, 2015, in Moreno Valley, California.

14

15

16

17   I. Munir, M.D.
     Endocrinologist

18

19   SF2014409242
     41210043.doc

20

21

22

23

24

25

26

27

28

2

ER 136.2

1   KAMALA D. HARRIS
    Attorney General of California
2   JAY C. RUSSELL
    Supervising Deputy Attorney General
3   JOSE ZELIDON-ZEPEDA
    Deputy Attorney General
4   PREETI K. BAJWA
    Deputy Attorney General
5   State Bar No. 232484
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5781
7     Fax:  (415) 703-5843
      E-mail:  Preeti.Bajwa@doj.ca.gov
8   *Attorneys for Defendants J. Beard, M. Spearman,*
    *R. Coffin, J. Lozano, A. Adams, A. Newton, D. Van*
9   *Leer, and L. Zamora*

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  **MICHELLE-LAEL NORSWORTHY,**          C 14-00695 JST (PR)

15                           Plaintiff,

16       v.                               **DEFENDANTS' OPPOSITION TO**
                                          **PLAINTIFF'S MOTION FOR A**
17                                        **PRELIMINARY INJUNCTION**

18  **JEFFREY BEARD, et al.,**
                                          Date:        April 1, 2015
19                         Defendants.    Time:        2:00 p.m.
                                          Dept:        Courtroom 9
20                                        Judge:       The Honorable Jon S. Tigar
                                          Trial Date:  N/A
21                                        Action Filed: 2/14/2014

22

23

24

25

26

27

28

**ER 136.3**

**INTRODUCTION**

After having received continuous and effective medical and mental health treatment for over fifteen years to address her gender dysphoria, Plaintiff Michelle Norsworthy now seeks the extraordinary remedy of a preliminary injunction ordering state doctors to perform immediate sex reassignment surgery.  But Norsworthy has not demonstrated a medical necessity for such surgery, much less any sudden or dramatic deterioration in her medical or mental health that might otherwise warrant such an order.  Instead, she seeks a "preliminary" injunction that would alter the status quo, not preserve it, while she pursues her legal claims.  Indeed, an order requiring that such surgery be performed immediately would effectively moot the remainder of her case by irreversibly providing her with the entire relief that she seeks.  There is no basis for granting a mandatory preliminary injunction here—particularly where the record has not been sufficiently developed to address complex factual and medical questions as well as reasonable safety concerns by prison administrators that would arise from such an order.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (per curiam).  In seeking one, Norsworthy must demonstrate that she is likely to succeed on the merits of her claims, that she is likely to suffer irreparable harm without preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Moreover, a *mandatory* preliminary injunction of the sort sought here "goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citation and brackets omitted).  "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party,'" *Stanley v. Univ. of Southern Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994), and "unless extreme or very serious damage will result," *Marlyn*, 571 F.3d at 879.  *See also Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) ("'mandatory preliminary relief' is

1

**ER 136.4**

1   correctional classification, while at the same time keeping her and others in CDCR's institutions

2   safe and secure, would raise significant administrative and security concerns.

3   <div align="center">**ARGUMENT**</div>

4   **I.    UNDER THE STRINGENT MANDATORY INJUNCTION STANDARD, INJUNCTIVE RELIEF IS
         NOT NECESSARY.**

5

6           As a preliminary matter, Norsworthy misstates the legal standard applicable to her request

7   for a preliminary injunction ordering CDCR to provide sex reassignment surgery and "additional

8   treatment." (Pl.'s Mot. at 18.) While a "prohibitory injunction" prohibits a party from taking

9   action and preserves the status quo, a mandatory injunction orders a responsible party to "take

10  action." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014). A mandatory

11  injunction "goes well beyond simply maintaining the status quo [p]endente lite [and] is

12  particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d

13  873, 879 (9th Cir. 2009) (citation omitted); *see also Citizens United v. Gessler*, 773 F.3d 200, 218

14  n.12 (10th Cir. 2014) ("Three types of preliminary injunctions are specifically disfavored: (1)

15  preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3)

16  preliminary injunctions that afford the movant all the relief that it could recover at the conclusion

17  of a full trial on the merits.") (citation omitted).

18          When a party seeks a mandatory injunction, relief should not be granted "in doubtful

19  cases." *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879. "When a mandatory preliminary injunction

20  is requested, the district court should deny such relief 'unless the facts and law clearly favor the

21  moving party.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted);

22  *Ferring Pharm., Inc. v. Watson*, 765 F.3d 205, 219 n.3 (3d Cir. 2014) ("A party seeking a

23  mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden

24  in demonstrating its necessity.") (citation omitted). That is especially true when the injunction

25  will, as here, effectively adjudicate the case on the merits, providing the moving party with all the

26  relief sought via the litigation absent a trial to develop the facts or any final judgment of legal

27  entitlement to the requested relief. (*Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.

28  1994), *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) ["In

<div align="center">11</div>

Defs.' Opp'n Pl.'s Mot. Prelim. Inj. (C 14-00695 JST (PR))

**ER 136.5**

1    Dr. Ettner, notes that Norsworthy evinces "mild symptoms of depression." (Ettner Decl. ¶ 70.)[7]

2    Although she evinces symptoms of gender dysphoria, there is no indication that these symptoms

3    are extreme. (*Id.* ¶¶ 72, 75.) Further, though Dr. Ettner opines that gender dysphoria can lead to

4    emotional decompensation and "externalizing behaviors such as suicide or surgical self-

5    treatment," he does not describe any such concerns specific to Norsworthy herself. (*Id.* ¶ 75.)[8]

6    And, as noted below, Norsworthy has been treated for gender dysphoria for over 20 years—there

7    is no indication that her condition has somehow worsened to the point where she must obtain sex

8    reassignment surgery *now* rather than waiting until this case produces a final judgment on the

9    merits. Dr. Ettner opines that Norsworthy requires sex reassignment surgery, which he claims

10   should be "immediately implemented," but he does not explain the reason for the urgency. The

11   Court is not bound by this unsupported statement. Fed. R. Civ. P. 26(a)(2)(B)(i); *Finwall v. City*

12   *of Chicago*, 239 F.R.D. 494, 501 (N.D. Ill. 2006) ("Expert reports must include 'how' and 'why'

13   the expert reached a particular result, not merely the expert's conclusory opinions."). Ultimately,

14   Norsworthy submits no evidence—much less evidence to clearly establish—that she will suffer

15   irreparable harm unless she receives immediate, mandatory injunctive relief.

16         Norsworthy's reliance on Dr. Gorton's declaration is likewise misplaced. Dr. Gorton

17   opines that Dr. Coffin's methodology is "neither appropriate nor reflective of the current

18   standards by which transgender patients are treated." (Gorton Decl. ¶ 32.) But Dr. Gorton is not

19   a psychologist, and thus his expertise to opine on Dr. Coffin's report is questionable. (Gorton

20   Decl. ¶ 2.) Dr. Gorton points out cases where transgender individuals have resorted to self-

21   castration when denied access to hormones or sex reassignment surgery. (Gorton Decl. ¶ 36.)

22   But Norsworthy has not been denied hormones, and she has denied any intention to self-mutilate.

23

24         [7] Defendants have not had the opportunity to conduct discovery on Dr. Ettner's
     background and experience, and reserve the right to challenge his qualifications as an expert
     under the Federal Rules of Evidence.

25         [8] Norsworthy also submitted the declaration of Dr. Marci Bowers, a medical doctor.
     (Bowers Decl.) Dr. Bowers did not review Norsworthy's medical file or meet with her. (*Id.* at

26   13.) Although she states that "surgery for many people is a medically necessary treatment needed
     to treat gender dysphoria," she does not opine that it is medically necessary for Norsworthy, let

27   alone that it must be provided without delay. (*Id.* at ¶ 31.) Accordingly, her declaration is not
     relevant to whether Norsworthy can establish entitlement to preliminary injunctive relief.

28

**ER 136.6**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For these reasons, the Court should deny Norsworthy's request for a mandatory preliminary injunction.

Dated:  March 12, 2015                          Respectfully Submitted,

                                                             KAMALA D. HARRIS
                                                             Attorney General of California
                                                             JAY C. RUSSELL
                                                             Supervising Deputy Attorney General
                                                             JOSE ZELIDON-ZEPEDA
                                                             Deputy Attorney General


                                                             */s/ Preeti K. Bajwa*
                                                             PREETI K.BAJWA
                                                             Deputy Attorney General
                                                             *Attorneys for Defendants J. Beard, M.*
                                                             *Spearman, R. Coffin, J. Lozano, A. Adams,*
                                                             *A. Newton, D. Van Leer, and L. Zamora*

SF2014409242

<div align="center">30</div>

Defs.' Opp'n Pl.'s Mot. Prelim. Inj.  (C 14-00695 JST (PR))

**ER 136.7**

# EXHIBIT H

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|---|---|---|
| 4-25-2013 | 08:04 | EPRD: 15-L 33 YRS DOWN |

**S:** DID NOT DISPLAY SI/HI. "AS YOU KNOW DR. REESE, MY MEDICAL RECORD SHOWS THAT I AM A BIOLOGTICAL FEMALE WITH AN ESTROGEN READING OF 2609 WHICH IS IN THE RANGE OF FEMALE PERSONS. ALSO MY TESTOSTERONE READING OF 26 IS WELL BELOW THE MALE BIOLOGCA. RANGE OF 242 TO 847. AS YOU KNOW I HAE DONE RESEARCH ON THIS, AND AM WELL READ RELATING TO THE MEDICAL EVIDENCE4 OF THE TRANS-SECXUAL PROCVESS. I WAS DESIGNATED AND EVALUATED TO BE A TRANSSEXUAL PERSON THIRTEEN YEAR AGO BY THE PSYCHIATRIST, (EXPERET IN SEXUALITY) AT THE DEPARTMENT OF CORRECTIONS, CALIFORNIA MEDICAL CENTER (CMF) VACAVILLE CA. FOR THRITEEN ;YEARS I HAVE TAKEN THE ESTRADIOL TO REACH THIS POINT INJ THE TRANS-SEXUAL PORCESS. SO THE NEXT STEP FOR ME IS TO COMPLETE MY OPERATION AND OBTAIN THE FVAGINA THROUGH SURGERY.--USING THE SKIN FROM MY FORESKIN FOR THIS PROCEEDURE.

**O:** Appearance: APPROPRIATE
Behavior / Cooperation: GOOD
Orientation: 0 X 5
Speech: SOMEWHAT RAPID
Affect: PLEASANT BUT UPSET OVER ISSUE.
Mood: STABLE BUT UPSET
Sleep: OK
Appetite: FAIR
Cognition: WNL
Thought Process: LINEAR
Perception: DENIES AH/VH.
Thought Content: NO DELUSIONS
Insight: GOOD
Judgment: GOOD
Suicidal or Homicidal Ideation? DENIED SI/HI

RECEIVED APR 26 2013 By

**A:** MOOD DO
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: See problem list in UHR.
Axis IV: INCARCERATION
Axis V: GAF Score: 58

**P:** THIS I/P HAS BEEN PSYCHOLOGICALLY CLEARED BY PSYCHIATRY AND PRIMARY CLINICIANS (CLINICAL PSYCHOLOGISTS TRAINED IN EVALUATING CANDIDATES FOR TRANS-SEXUAL SURGERY), AS NOTED BY THE UNDERSIGNED).

| INSTITUTION CTF-NORTH | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA A3346601U |
|---|---|---|

**WILLIAM REESE, PHD, MSCP**

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: * TABE = 10.8. DDP is NCF. No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26T16:53:10Z
Page 1 of 1

AG000397

ER 138

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 4-25-2013 | | 08:04 |
| | | MY RECOMMENDATIONS ARE: |
| | | 1) AS I/P HAS BEEN PSYCHOLOGICALLY CLEARED, BY PSYCHIATRY AND PRIMARY CLINICIANS TRAINED IN THE TRANS-SEXUAL PROCESS.; I/P SHOULD COMPLETE THIS PROCESS IN A TIMELY MANNER. |
| | | 2) I/P'S CONTINUED MENTAL A PHYSICAL HEALTH REQUIRE THAT SHE COMPLETE THE TRANS-SEXUAL PROCESS, AS SO DIAGNOSED, AND PREPARED FOR DURING THE LAST 13 YEARS OF ESTROGEN THERAPY, AND PSYCHIATRIC/PSYCHOLOGICAL TREATMENT. |
| | | 3) I/P HAS REQUESTED A FEMALE NAME CHANGE (LAEL MICHELLE NORSWORTHY) AND THIS SHOULD BE GRANTED WHEN THE OPERATION IS COMPLETED. |
| | | 4) UPON COMPLETION OF THE SURGERY, IF NOT RELEASED ON PAROLE, I/P SHOULD BE TRANSFERRED TO A CDCR FEMALE INSTITUTION. |
| | | 5) IN MY OPINION, HEALTH, SAFETY, FAIRNESS AND JUSTICE MANDATE THE ABOVE RECOMMENDATION BE DONE FOR THE CONTINUED WELL-BEING OF THIS INDIVIDUAL, IN THE BEST INTERESTS OF INMATE NORSWORTHY AND THE CDCR. |
| | E: | DECS CHECKED TODAY WITH TABE OF 10.8 AS OF 05.15.2009 |
| | | GOOD COMMUNICATION ESTABLISHED WITHOUT PROBLEMS AND WITHOUT AUXILLIARY COMMUNICATION DEVICES OR EQUIPMENT. |
| | | DECS NOTES, SPECIAL EQUIPMENT, BRASSIERRES, ISSUED. |
| | | I/P ASKED QUESTIONS, SUMMED INFORMATION, AND FED BACK UNDERSTANDING. |

RECEIVED
APR 26 2013
By_____

| INSTITUTION | CLINICIAN | BED NUMBER |
|-------------|-----------|------------|
| CTF-NORTH | W. REESE, PhD, MSCP | A LA A3310001U |

**WILLIAM REESE, PHD.**

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---------------------|-------------------|------------------------------|--------------------------------------------------|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | **Please check one:** | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |
| * TABE = 10.8.  DDP is NCF.  No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

AG000398

ER 139

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|---|---|---|
| 4-18-2013 | 08:04 | EPRD: 15-L 33 YRS DOWN |

**S:** DID NOT DISPLAY SI/HI. I/P LAEL NORSWORTHY IS UNDERGOING THE TRANSSEXUAL PROCEXS FROM MALE TO FEMALE. I/P NORSWORTHY WAS AWARDED THE TRANSSEXUAL DIAGNOSIS 13 YEARS AGO BY HER PSYCHIATRIST AT THE CALIFORNIA MEDIZCL CENTER (CMF). I/P NORSWORTHY HAS TAKEN ESTRADIOL FOR TH E PAST 13 YEARS AND ILS NOW A BIOLOGICAL FEMALE, ACCORDING TO HER ESTROGEN AND TESTOSTERONE LEVELS. EMOTIONALLHY AND PSYCHOLOGICAL, I/P MICHELLE LAEL MEETS THE CRITERIIA FOR EING FEMALE. SHE IS A SENSITIVE AND COURTEOUS PERSON, WHO VLAUES OTHERS MORE AS FEMALES IN OUR SOCIETY. RECENTLY I/P NORSWORTHY WAS MOVED TO A SINGLE CELL STATUS, AND THIS  IS PROBABLY BEST FOR HER NOW WHILE SHE UNDERGOES THE SEX-CHANGE PROCESS. I/P'S ACCOMPLISHMENTS AS AN ADA PERSON HELPING OTHER INMATES BOTH NOTE-WORTHY AND PRAISE-WORTHY.   RECOMMEND COMPLETION OF THE SEX-CHANGE PROCESS, AND VALIDATE THAT I/P NORSTWORTHY IS BOTH PSYCHOLOGICAL CLEARED AND PSYCHOLOGICALLY AND EMOTIONALLY, AND COGNITIVELY TO COMPLETE THIS SEX CHANGE OPERATION.

**O:** Appearance:  APPROPRIATE
Behavior / Cooperation:  GOOD
Orientation: 0 X 5
Speech:  SOMEWHAT RAPID
Affect:  PLEASANT BUT UPSET OVER ISSUE.
Mood:  STABLE BUT UPSET
Sleep:  OK
Appetite:  FAIR
Cognition:  OK
Thought Process:  OK
Perception:  OK
Thought Content:  OK
Insight:  GOOD
Judgment:   GOOD
Suicidal or Homicidal Ideation?  DENIED SI/HI

RECEIVED
APR 1 9 2013
By

**A:** MOOD DO
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD,  AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: See problem list in UHR.
Axis IV: INCARCERATION
Axis V:         GAF Score: 58

**P:** RECOMMEND SEX-CHANGE PROCESS CONTINUE. C3MS THERAPY, RE: ISSUES, TIMELESS FOR APPOPRIATE COMPLETION OF THE SEX-CHANGE PROCESS; NAME CHANGE APPROVAL FROM FORMER MALE NAME OF JEFFREY TO CHOSEN FEMALE NAME OF 'LAEL'  [HEWBREW LANGUAGE FOR 'FEMALE CHILD FAVORED BY GOD.'

| INSTITUTION | CLINICIAN | BED NUMBER |
|---|---|---|
| CTF - NORTH. | W. REESE, PhD, MSCP | A LA A3310001U |

WILLIAM REESE, PHD, MSCP

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |
| * TABE = 10.8.  DDP is NCF.  No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26T16:53:10Z        Page 104 of 1

AG000399

ER 140

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 4-18-2013 | | .]
**E:** DECS CHECKED TODAY WITH TBE OF 10.8.

DECS NOES SPECIAL GARMENT BRASSIERRES [ISSUE OF SIX BRASSIERS].

GOOD COMMUNICATION ESTABLISHED WITHOUT PROBLEMS AND WITNHOUT AUXILLIARY COMMUNICATIONS DEVICES OR EQUIPMENT.

NOTE: THAT I/P'S ULTIMATE HEALTH, MENTALLY AND PHYSICALLY, INVOLVES THE COMPLETION OF HER SEX-CHANGE PROCESSS.

I/P ASKED QUESTIONS, SUMMED INFORMATION, ANDF ED BACK UNDERSTANDING. |

| INSTITUTION CTF - NORTH. | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA A3310001U |

WILLIAM REESE PHD, MSCP

| 1. **Disability Code:** | 2. **Accommodation:** | 3. **Effective Communication:** | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | **Please check one:** | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. **Comments:** * TABE = 10.8. DDP is NCF. No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26T16:53:10Z    Page 1 of 1

AG000400
ER 141

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 4-11-2013 | 1300 | EPRD: 15-L 33 YRS DOWN |

**S:** DID NOT DISPLAY SI/HI. "THANK YOU FOR SEEING ME TODAY. I APPRECIATE THE WEEKLY THERAPY WHICH IS PREPARING ME FOR MY LOAL OF COMPLETED THE TRANS-SEXUAL SEX CHANGE OPERATION. AS NOTED,I, I HAVE TAKEN THE H;ORMONES FOR THE PAST 13 LYEARS, HAVE BEEN DIAGNOSED AS HAVING SEXUAL DYSPHORIE, I.E., A WOMAN TRAPPED IN A MANS BODY. I AM A BIOLOGICAL FEMALE NOW, HAVE THE HIGH ESTORGEN COUNT AND THE LOW TESTOSTERONE. I WEAR MY BRASSIERS AND FEEL AND ACT LIKE THE WOMAN THAT I AM. I WANT TO CHANGE MY NAME NOW TO THE FEMININE LAEL NORSWORTHY, AND I WANT TO DO THIS BEFORE I HAVE THE S3EX CHANGE OPERTION, SO THAT AFTER I WAKE UP FROM THE OPERATION, I WILL B FEMALE AND STRASNFERRED TO A FEMALE PRISON. THIS WAS EXACTLY THE CASE IN A UNITED ST5ATES APPEALS FEDERAL COURT IN BOSTON MASS WHERE THE MASACHUSETTS CORRECTIONAL SYSTEM WAS DIRECTED TO PEROM THE NECSESSARY SEX CHANGED OPERATION, IN ORDER TO COMPLETE THE TRASNEXUAL PROCESS. I/P NORSWORTHY SEES HERSELF IN THE SIMILAR SITUATION POSITION AND HOPE TO COMPLET HER SEX-CHANGE OPERATION SSON, IN THE BEST INTERESTS OF HER PHYSICAL AND MENTAL HEALTH.

**O:** Appearance: APPROPRIATE
Behavior / Cooperation: GOOD
Orientation: 0 X 5
Speech: SOMEWHAT RAPID
Affect: PLEASANT BUT UPSET OVER ISSUE.
Mood: STABLE BUT UPSET
Sleep: OK
Appetite: FAIR
Cognition: OK
Thought Process: OK
Perception: OK
Thought Content: OK
Insight: GOOD
Judgment: GOOD
Suicidal or Homicidal Ideation? DENIED SI/HI

RECEIVED APR 12 2013 By

**A:** MOOD DO
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: See problem list in UHR.
Axis IV: INCARCERATION
Axis V: GAF Score: 55

| INSTITUTION CTF - NORTH | CLINICIAN W. REESE, PhD, MSCP WILLIAM REESE, PHD | BED NUMBER A LA A3310001U |
|---|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: * TABE = 10.8. DDP is NCF. No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

AG000401
**ER 142**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|---|---|---|
| 4-11-2013 | **P:** | C3MS THERAPY, RE, ISSUES. SEVERE DEPRESSION OVER HER SITUATION, AND SUPPORT DURING I/P NORSWORTHY'S COMPLETEION OF THE SEX CHANGE PROCESS IN THE BEST INTERESTS ;OF HER PHYSICAL AND MENTAL HEALTH. |
| | **E:** | DECS CHECKED TODAY WITH TABE OF 10.8 AS OF 05.15.2009. DECS REPORTS SPEECIAL GARMENT, BRASSIERRE IN SUPPORT OF HER SEX CHANGE PORCESS FROM MALE TO BIOLOGICAL FEMALE WHICH SHE NOW IS. COMPLETION OF THE PROCESS INCLUDES SURGERY THAT MAKES HER PENIS INTO THE VAGINA, AND COMPLETES THE PROCES IN THE GE3STS L;INTERESTS ;OF HER PHYSICAL AND MENTAL HEALTH. |
| | | GOOD COMMUNICATION ESTABLISHED WITHOUTPORBLEMS AND WITHOUT AUXILLIARY COMMUNICATION DEVICES OR EQUIPMENT. |
| | | I9;P ASKED QUESTIONS, SU;MMED INFORMATION, AND FED BACK UNDERSTANDING. |

| INSTITUTION | CLINICIAN | BED NUMBER |
|---|---|---|
| CTF - NORTH | W. REESE, PhD, MSCP | A LA A3310001U |

**WILLIAM REESE, PHD, M**

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |
| * TABE = 10.8. DDP is NCF. No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26T

AG000402

**ER 143**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|-----------------------------------|
| 4-4-2013 | 0800 | EPRD: 15-L. |

**S:** DID NOT DISPLAY SI. "I SAW A NEW ENDOCRINOLOGIST AND HE SAID HE WOUJLD NPPOSE MY SURGLY, SICNE THE DIAGNOSIS OF TRANSSEXUAL WAS MADE BY A PSYCHIATRIST,L AND FOR THE PAST 13 I/P HAS TAKEN HORMONES TO BECOME A FULLY BIOLOGKICAL WOMAN.ALSO ,L I/P WAS CLEARED BY PSYCHIATRILST AND CLINICALL PSYCHOLOGY CASE MANAGERS AS "PSCHOLOGICALLY READY, PREPARED,L AND FULLY UNDERSTANDS THE OPERATION PROCESS.  I/P FOR ALL INTENTS AND PURPOSES AND BY ESTROGEN READINGS, AND BELOW THE THRESHOLD MALE, RELATING TO TESTOSTERONE.   FOR I/P'S WEEL-BING, I/P IS NOW READY, PSYCHOILOGICALLY SOUND AND PREPARED TSO THAT THE TRANSEXUAL OPERATION PROCESS (CONSTRUCTING AN INTERNAL VAGINA FROM THE EXTERNAL PENIS AND FORESKIN, ETC.((, SHOULD MOVE FORWARD & BE SCHEDULE FOR I/P'S MENTAL HEATLH, PHYSICAL AND MENTAL WELL-BEING, AND STABILITY WITHIN CDCR.

**O:** Appearance:  APPROPRIATE
Behavior / Cooperation:  GOOD
Orientation: 0 X 5
Speech: SOMEWHAT RAPID
Affect:  PLEASANT BUT UPSET OVER ISSUE.
Mood:  STABLE BUT  UPSET
Sleep:  OK
Appetite: FAIR
Cognition:  OK
Thought Process:  OK
Perception:  OK
Thought Content:  OK
Insight:  GOOD
Judgment:    GOOD
Suicidal or Homicidal Ideation?  DENIED SI/HI

RECEIVED
APR 0 4 2013
By

**A:** Axis I: 296.9 MOOD DO NOS, 309.81 PTSD,  AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: See problem list in UHR.
Axis IV: INCARCERATION
Axis V:        GAF Score: 55 DUE TO LATEST DISAPPOINT RESULTS…I/P MEETS BPH IN THREE YEARS, VOWING TO COMPLETE ALL RECOMMENDED REQUIREMENTS FOR RELEASE TO THE COMMUNITY SUCCESSFULLY. IN THE MEATIME IS IS UNDERGOING THE SEXUAL REASSIGNMENT (SRS) SURGERY PROCESS.
note: 602 APPEAL PROCESS RELATED TO THIS ISSUE.

| INSTITUTION CTF - NORTH | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA A3310001U |
|---|---|---|

**WILLIAM REESE, PHD, MSCP**

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: * TABE = 10.8.  DDP is NCF.  No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26 Page 53 of 02

AG000403

**ER 144**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 4-4-2013 | | |

**P:** C3MS THERAPY, RE ISSUES: MOVING AHEAD WITH TRANSSEXUAL OPERATION PROCEDURE; NOTE: I/P HAS PREVIOUSLY CONSULTED WITH ENDOCRINOLOGIEST WHO DID NOT OPPOSE THIS OPERATION, AND VALIDATED THE FINDING MY PSYCHIATRIY AND PRIMARY PSYCHOLOGIST CLOINCIANS THAT I/P WAS PSYCHOLOGY CLEARED AND PREPARED FOR THIS OPERATION FOR THE BENEFIT OF HIS HEALTH AND WELLO-BEING WHILE IN CDCR

**E:** DECS CHECKED TODAY WITH TABE3 OF 10.89 AS OF 05.15.2009.
DECS REPROTS SPECAIL GARMENT, BRASSIEES, ISSUED TO I/P AS BIOLOGICAL FEMALE.

GOOD COMMUNICATION ESTBLISHED WITHOUT PROBLEMS AND WITHOUT AUXILLIARY COMMUNICATIONS EQUIPMENT O R DEVICES.

I/P ASKED QUESTIONS, SUMMED INFORMATION AND FED BACK UNDERSTANDING.

| INSTITUTION | CLINICIAN | BED NUMBER |
|-------------|-----------|------------|
| CTF - NORTH | W. REESE, PhD, MSCP | A LA A3310001U |

WM REESE, PHD, MSCP

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |
| * TABE = 10.8.  DDP is NCF.  No DPP codes. | | | |

Confidential Saved 2014-08-26 Page 56 of 70Z

AG000404
**ER 145**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 3-28-2013 | 0700 | EPRD: 15-L. |

**S:** DID NOTY DISPLAY SI/HI. I/P TOLD THERAPIST "DR. R i HAVE BEEN ASSIGNED A NEW MEDICAL GENETICISM AND ENDOCRINOLOGIST, BUT HE TOLD ME IN THE PHONE CONVERSATION THAT HE "FULLY SUPPORTS THE FINDINGS OF A PSYCHIATRIST WHO 13 YEARS AGO FOUND ME TO BE A TRASNSSEXUAL IN THE PROCESS OF SEXUAL CHANGE,L AND AFTER 13 YEARS OF HORMONES AND WEARING FEMININE CLOTHES, I.E., BRASIERRES FOR MY FEMALE BRE3ASTS, THAT I AM FULLY READY FOR THE OPERATION. DR. TOLD ME HE SUPPORTED THE FINDINS OF YOURSELF (DR. R) AND PSYCHIATRISTS OF CRECORD THAT I WAS PSYCHOLOGICALLY CLEARED AND READY FOR THE OPERATION.

**O:** Appearance: APPROPRIATE
Behavior / Cooperation: GOOD
Orientation: 0 X 5
Speech: SOMEWHAT RAPID
Affect: PLEASANT BUT UPSET OVER ISSUE.
Mood: STABLE BUT UPSET
Sleep: OK
Appetite: FAIR
Cognition: OK
Thought Process: OK
Perception: OK
Thought Content: OK
Insight: GOOD
Judgment: GOOD
Suicidal or Homicidal Ideation? DENIED SI/HI

RECEIVED
MAR 29 2013
By _____

**A:** MOOD
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: See problem list in UHR.
Axis IV: INCARCERATION
Axis V: GAF Score: 55 DUE TO LATEST DISAPPOINT RESULTS...I/P MEETS BPH IN THREE YEARS, VOWING TO COMPLETE ALL RECOMMENDED REQUIREMENTS FOR RELEASE TO THE COMMUNITY SUCCESSFULLY. IN THE MEATIME IS IS UNDERGOING THE SEXUAL REASSIGNMENT (SRS) SURGERY PROCESS.

**P:** I/P HAS BEEN PSYCHOLOGICALLY CLEARED FOR THE SEX-CHANGE OPERATION BY PSYCHIATRISTS AND PSYCHOLOGISTS OF RECORD, AND SHOULD MOVE FORWARD WITH THIS PLAN. PER TELEMED, I/P INFORMED THAT THE MD ENDOCRINOLOGISTS FOLLOWS AND CONFIRMS THESE PSYCHIATRIC AND PSYCHOLOICAL CLEARANCES. TO MOVE FORWARD WITH THE SEX-CHANGE PROCESS AS NOT Contra-Indicated

| INSTITUTION CTF NORTH | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA A3310001U |
|---|---|---|

**WILLIAM REESE, PHD, MSCP**

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |
| * TABE = 10.8. DDP is NCF. No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26 Page 63:00Z

AG000405

**ER 146**

State of California                                    Department of Corrections and Rehabilitation
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 3-28-2013 | | NOTE THAT I/P;S MENTAL HEALTH AND WELL BEING ARE DEPENDENT ON MOVING FORWARD WITH THIS SEX-CHANGE OPERATION. |
| | **E:** | |
| | | DECS CHECKED TODAY WITH TABE OF 10.8 AS OF 05.15.2009. NOTE SPECIZL GARMENT (BRASSIERRES). |
| | | GOOD COMMUNICATION ESTABLISHED WITHOUT PROBLEMS AND WITHOUT AUXILLIARY COMMUNICATIONS DEVICES. |
| | | I/P ASKED QUESTIONS, SUMMED INFORMATION, AND FED BACK UNDERSTANDING. |

RECEIVED
MAR 29 2013
By_____

| INSTITUTION CTF NORTH | CLINICIAN W. REESE, PhD, MSC | BED NUMBER A LA A3310001U |
|---|---|---|

**WILLIAM REESE, PHD**

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | **Please check one:** | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | |
| 4. Comments: | | | 3/15/1964 |
| * TABE = 10.8. DDP is NCF. No DPP codes. | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)      Confidential Saved 2014-08-26T15:53:10Z

AG000406
ER 147

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 3-14-2013 | 12:15 | EPRD: 15-L. |

**S:** DID NOT DISPLAY SI/HI. I/P NORSWORTHY HAS BEEN QUITE UPSET AND DISTRAUGT OVER THE SET-BACK OF NOT BEING RELEASED FROM PRISON, AND HAVING A THREE YEAR DENIAL FROM THE BPH. HE BELIEVED THAT HE HAD MET ALL REQUIREMENTS ASKED OF HIM, AND FURTHER THAT HIS JOB OF ADA ASSISTING OTHER INMATES PLACED IN HIM A SPECIAL TRUST, AND DEMONSTRATED HIS ABILITY TO SERVE OTHERS WELL IN ASSISTING THEM WITH THEIR MEDICAL NEEDS.

I/P NORSWORTHY IS PURUSING AN SRS (SEXUAL REASSIGNMENT SURGERY) PORCESS. FOR THE PAST 13 YEARS HE HAS BEEN DIAGNOSED BY; COMPETENT ACDCR PSYCHIATRIC AUTHORITY AS A TRANSSEXUAL. HE WAS RE ENTLY SEEN BY DR. ASHIQU V. PATEL, MD ENDOCRINOLOGY CONSULTANT WHO KEPT HIS HORMONAL ESTROGEN DOSE AT A PRE-SURGICAL LEVE. THIS HAS BEEN SEEN BY HIS PRIMARY CARE PRODUCE (PCP) MONITORING HIS PPROGRESS. FOR THE PAST YEAR THE PRIMARY MENTAL HEALTH CLINI8CIAN HAS RECOMMENDED SRS AS TREATMENT FOR HIS MEDICAL (IN COORDINATION WITH PC/ AND ENDROCRINOLOGIST) AND HIS MENTAL THEATH AND WELL BEING. I/P NEEDS AND IS RECOMMENDED TO CONTINUE THIS SRS SURGERY PROCESS. HE IS PSYCHOLOGICALLY PREPARED AND CLEARED FOR THIS SRS OPERATION--NEEDED FOR HIS MENTAL HEALTH AND WELL-BEING. HE IS SCHEDULED TO RETURN TO THE ENDOCRINOLOGIST WITH THIS MONTH IN ORDER TO MOVE THE SEXUAL RREASSIGNMENT SURGERY (SRS) PROCESS FORWARD.

WE WILL CONTINU;E TO WORK WITH THE PSYCHOLOGICAL ASPECTS OF MOOD DISORDER AND IT IS IMPORTANT TO PROVIDE CONTINUITY OF MEDICAL AND MENTAL HEALTH HERE AT CTF, WHILE I/P UNDERGOES APPROVAL AND SCHEDULING FOR THE SEXUAL REASSIGNMENT (SRS) SURGERY.

**O:** Appearance: APPROPRIATE
Behavior / Cooperation: GOOD
Orientation: 0 X 5
Speech: SOMEWHAT RAPID
Affect: PLEASANT BUT UPSET OVER ISSUE.
Mood: STABLE BUT UPSET
Sleep: OK
Appetite: FAIR
Cognition: OK
Thought Process: OK
Perception: OK
Thought Content: OK
Insight: GOOD
Judgment: GOOD
Suicidal or Homicidal Ideation? DENIED SI/HI

| INSTITUTION CTF - NORTH | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA B1142001U |
|---|---|---|

WILLIAM REESE, PhD, MSCP

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | MAR 18 2013 |
| ☐ Not Applicable | ☐ Other* | *See chrono/notes | |
| 4. Comments: | | | 3/15/1964 |
| | | | By |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26Page63:00Z

AG000407

**ER 148**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|---|---|---|
| 3-14-2013 | **A:** | MOOD DO<br>Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.<br><br>Axis II: 799.9 Deferred<br>Axis III: See problem list in UHR.<br>Axis IV: INCARCERATION<br>Axis V:     GAF Score: 58, DUE TO LATEST DISAPPOINT RESULTS...I/P MEETS BPH IN THREE YEARS, VOWING TO COMPLETE ALL RECOMMENDED REQUIREMENTS FOR RELEASE TO THE COMMUNITY SUCCESSFULLY. IN THE MEATIME IS IS UNDERGOING THE SEXUAL REASSIGNMENT (SRS) SURGERY PROCESS. |
|  | **P:** | COOPERATE WITH ENDOCRINOLOGIST SPECIALIST AND PRIMARY CARE PHYSICIAN (PCP) DURING THIS SEXUAL REASSIGNMENT SURGERY PROCESS (SRS). I/P IS PREPARATED MENTALLY, AND PSYCHOLOGICALLY CLEAR TO PROCEED WITH THE SEXUAL REASSIGNMENT (SRS) SURGERY. |
|  | **E:** | DECS CHECKED TODAY WITH TABE OF 10.8 AS OF 05/15/2009. DECS NOTES, SPECIAL GARMENT, APPROVED FOR SIX BRASSIERRE ISSUES.  I/P IS A FULLY BIOLOGICAL FEMALE WITH DOCUMENT ESTROGEN READING OF 2609 (HIGH AND FEMALE) AND A LOW TESTOSTERONE RATING OF 26.  SHE IS FULLY PEPARED AND PSYCHOLOGICALLY CLEARED TO HAVE THIS SEXUAL REASSIGNMENT (SRS) SURGERY.<br><br>I/P ASKED QUESTIONS, SUMMED INFORMATION, AND FED BACK UNDERSTANDING. |

| INSTITUTION<br>CTF - NORTH | CLINICIAN<br>W. REESE, PhD, MSCP | BED NUMBER<br>A LA B1142001U |
|---|---|---|

WILLIAM REESE, PHD, MSCP

| 1. **Disability Code:**<br>☐ TABE score ≤ 4.0<br>☐ DPH ☐ DPV ☐ LD<br>☐ DPS ☐ DNH<br>☐ DNS ☐ DDP<br>■ Not Applicable<br>4. **Comments:** | 2. **Accommodation:**<br>☐ Additional time<br>☐ Equipment ☐ SLI<br>☐ Louder ☐ Slower<br>☐ Basic ☐ Transcribe<br>■ Other* | 3. **Effective Communication:**<br>■ P/I asked questions<br>■ P/I summed information<br>**Please check one:**<br>☐ Not reached* ■ Reached<br>*See chrono/notes | Inmate's Name (Last, First, MI), CDC Number, DOB<br>NORSWORTHY, JEFFREY<br><br>D64100<br><br>3/15/1964 | MAR 1 8 2013<br><br>By |

Confidential Saved 2014-08-26T... Page 1 of 1

AG000408

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|---|---|---|
| 3-8-2013 | 15:30 | EPRD: 15-L. |

**S:** I/P WAS UPSET AND QUITE DEPRESSED FOLLOWING APPEARANCE BEFORE BPH. I/P WHO REPORTED THAT HE HAD COMPLETED EVERY ELEMENT OF THE RECOMMENDATIONS OF THE PREVIOUS BPH, AND HAS SPENT 30 YEARS IN CUSTODY, EXPECTION POSSIBLE POSITIVE RESULTS. IN LIEU OF THE WRITTEN RESULTS,L I/P IS STRIVING TO MAINTAIN HIS EQUILIBRIUM AND IS IN THE PROCESS OF GENDER REASSIGNMENT SURGERY. HE RECEIVED A MEDICAL REPORT FROM THE ENDOCRINOLOGIST, DR. ASHIQ. V. PATEL, MD, ENDOCRINOLOGY CONSYULTANT, THE REPORT SUGGESTS THAT I/P IS ELIGIBLE FOR SU RGERY WITH AN ESTOROGEN READING OF 2609, MANIFESTING HERSELF AS A BIOLOGICAL FEMALE. FOR I/P'S HEALTH AND WELL-BEING , IT IS RECOMMENDED THAT I/P PROCEED WITH THE PLANNED SURGERY PROCESS.

**O:** Appearance: APPROPRIATE
Behavior / Cooperation: GOOD
Orientation: 0 X 5
Speech: SOMEWHAT RAPID
Affect: PLEASANT BUT UPSET OVER ISSUE.
Mood: STABLE BUT UPSET
Sleep: OK
Appetite: FAIR
Cognition: OK
Thought Process: OK
Perception: OK
Thought Content: OK
Insight: GOOD
Judgment: GOOD
Suicidal or Homicidal Ideation? DENIED SI/HI

**A:** MOOD DO, FOR M/H THERAPY, AND NOTE GENDER REASSIGNMENT SURGERY PROCESS.
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: NOTED: REFER TO; MEDICAL RECORD OF ENDOCRINOLOGY REPORT, AND PSYCHOLOGICAL CLEARANCE TO PROCEED WITH GENDER REASSIGNMENT SURGERY . ESTROGEN READING IS 2609 PER LATEST MEDICAL CONSULTANCY FROMJ ENDOCTRINOLOGY,L AND TESTOSTERONE READING 26 (LOW). I/P TAKES ESTRADIOL AND TRANS-GENDER SEX-CHANGE PROCEDURE IN PROCESS.
Axis IV: INCARCERATION
Axis V: GAF Score: 58, DUE TO LATEST DISAPPOINT RESULTS…I/P MEETS BPH IN THREE YEARS, VOWING TO COMPLETE ALL RECOMMENDED REQUIREMENTS FOR RELEASE TO THE COMMUNITY.

| INSTITUTION CTF -N | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA B1142001U |
|---|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |

RECEIVED MAR 1 2 2013 By

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26 Time:10:21

AG000409
**ER 150**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 3-8-2013 | **P:** | PROCEED WITH GENDER REASSIGNMENT SURGERY PROCESS BASED UPON MEDICAL CONSULTANCY BY ENDOCRINILOGIST. I/P IS PSYCHOLOGICALLY CLEARED AND READY FOR THIS PROCEDURE. I/P'S ULTIMENT MENTAL HEALTH AND WELLNESS SUGGESTS THAT HE SHOULD FOLLOW-THROUGH WITH THE PROCESS BEGAN 13 YEARS AGO, FOR THE BENEFIT OF HIS MEDICAL AND MENTAL WELL-BEING (PLEASE SEE DETAILED DOCUMENTATION IN THE E UHR, MEDICAL RECORD. |
| | **E:** | DECS CHECKED TODAY; WITH TABE OF 10.8 AS OF 05.15.2009.

GOOD COMMUNICATION ESTABLISHED WITHOUT AUXILLIARY COMMUNICATION DEVICES.

I/P ASKED QUESTIONS AND FED BACK ;UNDERSTANDING, SO THAT GOOD COMMUNICATION WAS ESTABLISHED. |

RECEIVED MAR 1 2 2013 By____

| INSTITUTION CTF -N | CLINICIAN W. REESE, PhD/MFCP | BED NUMBER A LA B1142001U |

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26T Page:1021

AG000410
**ER 151**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|---|---|---|
| 2/05/13 | 10:00 | EPRD: |
| | **S:** | IM stated that he (transgender male) is very nervous but hoping for the best regarding his upcoming board hearing. IM discussed background history related to gender-dysphoria and how time and insight and even the difficult times that the IM reported that he has experienced in prison have enabled IM to "be a different person." |
| | **O:** | Transgender white male, cooperative, Ox3, speech goal directe, mood euthymic with congruent affect, sleep and appetiti good, cognition WNL, thought process logical, perceptoin unremarkable, thought content unremarkable, insight good, judgment good, IM denied suicidal ideation/intent, none presented. |
| | **A:** | Axis I: 296.90 Mood Disorder NOS<br><br>Axis II: 799.9 Deferred<br>Axis III: See problem list in UHR.<br>Axis IV: Incarceration<br>Axis V:        GAF Score: 60 |
| | **P:** | MSE, brief history, supportive intervetions, cognitive restructuring and insight therapy.  IM to return in 2 weeks. |
| | **E:** | Good communication established without problems and without auxilliary communication devices. |

| INSTITUTION<br>CTF | CLINICIAN | BED NUMBER<br>A LA A3310001U |
|---|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | **Please check one:** | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | |
| ☐ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |

FEB 11 2013
By

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26 Page 1 of 2

AG000411
**ER 152**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 1/24/13 | 8 AM | EPRD: 17 hr 4/6 |

**S:** "I'm doing okay, I'm not suicidal or anything like that. I've missed meeting with Dr. Reese, I missed the opportunity to talk to someone."

**O:** IM is a transgender white male, cooperative, Ox4, mood euthymic with congruent affect, sleep and appetite good, cognition/thought process/perception/content unremarkable, IM is verbally expressive, insight and judgment presented as good. IM discussed personal history/background. Provided supportive interventions and reinforced postive coping skills.

**A:** Axis I: 296.90 Mood Disorder NOS

Axis II: 799.9 Deferred
Axis III: See problem list in UHR.
Axis IV: Incarceration
Axis V:        GAF Score: 60

**P:** nMSE, brief history, supportive interventions

RECEIVED
JAN 29 2013
By_____

**E:** good communication establibed without problems and without auxilliary communication devices.

*signature: Chris Marchand, LCSW*

| INSTITUTION CTF | CLINICIAN Chris Marchand, LCSW | BED NUMBER A LA A3310001U |
|---|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | |
| ☐ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)          Confidential Saved 2014-08-26T16:59:40Z

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 12-13-12 | 12:03 | EPRD: 15-L. |

**S:** DID NOT DISPLAY SI/HI. "I AM PRESSING AHEAD WITH MY CASE. I WAS DIAGNOSED AS A TRANS-SEXUAL BY THE ONE-WEEK ASSESSMENT PRO9CESS AT THE CALIFORNIA MEDICAL FACILITY (CMF). 302.85 GENDER ILDETIFY DISORDER/TRASN-SEXUAL. THIS DIAGNOSIS HAS BEEN RE-VALIDATED DURING MY THERAPY FOR THE PAST 13 YEARS. I HAVE TAKEN THE FEMALE HORMONE THERAPY AS WELL FOR THE PAST 13 YEEARS(ESTRDIOL). I WANT TO STAY IN THERAPY HER WITH YOU FOR THE EMOTIONAL ISSUES, AND I KNOW THAT I WILL NOT BE WELL UNTIL I COMPLETE THE TRANS-GENDER SEX CHANGE PROCESS. [NOTE: WORKING WITH I/P RELATED TO SEX CHANGE ISSUES, AND FULLY RECOMMEND EITHER NOW OR WHEN AND IF I/P RELEASED TO RETURN TO THE COMMUNITY-- COMPLETION OF THE TRANS-SEXUAL OPERATION, IN ORDER FOR I/P TO OBTAIN FULL MEDICAL, EMOTIONAL AND MENTAL HEALTH."

**O:** Appearance: APPROPRIATE

Behavior / Cooperation: GOOD

Thought Process: OK
☒ WNL ☐ Tangential ☐ Circumstantial ☐ Loose

Orientation: ☒ WNL 0 X 5

Speech: ☒ WNL SOMEWHAT RAPID

Perception: OK
Hallucinations ☒ None

Affect: ☒ WNL PLEASANT BUT UPSET OVER ISSUE.

Thought Content: OK
Delusions ☒ WNL
Ideas of Reference ☒ WNL
Obsessions ☒ WNL
Magical Thinking ☒ WNL

Mood: ☐ WNL STABLE BUT UPSET

Sleep / Appetite: ☒ WNL OK

Cognition: OK
Fund of Information ☒ WNL
Intellectual Functioning ☒ WNL
Concentration ☒ WNL
Attention ☒ WNL
Memory ☒ WNL

Insight: ☒ WNL
Judgment: ☐ WNL FAIR
Suicidal or Homicidal Ideation? ☒ None DENIED SI/HI

**A:** TRANS-SEXUAL--SEX CHANGE IN PROCESS & TREATING EMOTIONAL HEALTH
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA , TRANS SEXUAL SEX CHANGE IN PROCESS.

Axis II: 799.9 Deferred
Axis III: NOTED: ESTRADIOL AND TRANS-GENDER SEX-CHANGE PROCEDURE IN PROCESS.
Axis IV: INCARCERATION
Axis V:     GAF Score: 62

**P:** C3MS THERAPY, RE: ISSUES, EMOTIONAL AND TRAUMATIC ISSUES RELATED TO I/P'S BRUTAL GANG RAPE AT THE PREVIOUS CDCR INSTITUTION. I/P NEEDS TO COMPLETE HER SEX CHANGE OPERATION (MALE TO FEMALE) SO THAT SHE CAN ACHIEVE PHYSICAL, MENTAL AND EMOTIONAL WELL-BEING

| INSTITUTION CTF - NORTH | CLINICIAN W. REESE-PHD, MSCP | BED NUMBER A LA B1142001U |
|---|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ■ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

AG000413
**ER 154**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 12-13-12 | **E:** | TIME OF INTERVIEW WAS 12.03.. <br><br> DECS CHECKED TODAY WITH TABE OF 10.8 AS OF 05.15.2009. <br><br> I/P'S ACCOMODATION INCLUDES EQUIPMENT, SIX BRASSIERES ISSUE TO HER FOR HER BREAST SUPPORT, AS PART OF I/P'S COMPLETING HER SEX-CHANGE PROCESS. <br><br> GOOD COMMUNICATION ESTABLISHED WITHOUT PROBLEMS AND WITHOUT AUXILLIARY COMMUNICATIONS DEVICES. <br><br> I/P ASKED QUESTIONS, SUMMED INFORMATION AND FED BACK UNDERSTANDING OF THE SEX-CHANGE PROCESS FOR WHICH SHE IS UNDERGOING AT CDCR, OR WILL COMPLETE WHEN AND IF RELEASED FROM CDCR AT THE NEXT BPH HEARING, THIS YEAR. <br><br> IT IS VITAL FOR I/P'S PHYSICAL, MENTAL AND EMOTIONAL HEALTH, THAT SHE COMPLETEDS THIS SEX CHANGE PROCESS WHICH I/P NORSWORTHY HAS UNDERGONE FOR PAST 13 YEARS. |

| INSTITUTION <br> C T F - N O R T H | CLINICIAN <br> W. REESE PhD. MSCP | BED NUMBER <br> A LA B1142001U |
|---|---|---|

| 1. **Disability Code:** | 2. **Accommodation:** | 3. **Effective Communication:** | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 <br> ☐ DPH ☐ DPV ☐ LD <br> ☐ DPS ☐ DNH <br> ☐ DNS ☐ DDP <br> ■ Not Applicable <br> 4. **Comments:** | ☐ Additional time <br> ☐ Equipment ☐ SLI <br> ☐ Louder ☐ Slower <br> ☐ Basic ☐ Transcribe <br> ■ Other* | ■ P/I asked questions <br> ■ P/I summed information <br> Please check one: <br> ☐ Not reached* ■ Reached <br> *See chrono/notes | NORSWORTHY, JEFFREY <br><br> D54100 <br><br> 3/15/1964 |

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

AG000414

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 12-4-12 | 12:00 | EPRD: 15-L. |

**S:** DID NOT DISPLAY SI/HI. I/P IS MAKKING PROGRESS TOWARD HER SEX CHANGE OPERATION. I/P NORSWORTHY HAS BEEN DIAGNOSED WITH 302.85 FOR THE PAST 10 YEARS, AND HAS BEEN A BIOLOGICAL WOMAN FOR THIS PERIOD. TO COMPLETE HER ADJUSTMENT AND STABILITY AS A PERSON, I/P NORSWORTHY NEEDS TO MOVE AHEAD WITH HER SEX CHANGE SURGERY, MAKING CONTINUING PROGRESS IN THE PRESENT, AND COMPLETING HER SEX CHANGE PROCESS IN THE NEAR FUTURE.

**O:** Appearance: APPROPRIATE

Behavior / Cooperation: GOOD

Orientation: ☒ WNL 0 X 5

Speech: ☒ WNL SOMEWHAT RAPID

Affect: ☒ WNL PLEASANT BUT UPSET OVER ISSUE.

Mood: ☐ WNL STABLE BUT UPSET

Sleep / Appetite: ☒ WNL OK

Cognition: OK
| Fund of Information | ☒ WNL |
| Intellectual Functioning | ☒ WNL |
| Concentration | ☒ WNL |
| Attention | ☒ WNL |
| Memory | ☒ WNL |

Thought Process: OK  ☒ WNL  ☐ Tangential  ☐ Circumstantial  ☐ Loose

Perception: OK
Hallucinations  ☒ None

Thought Content: OK
| Delusions | ☒ WNL |
| Ideas of Reference | ☒ WNL |
| Obsessions | ☒ WNL |
| Magical Thinking | ☒ WNL |

Insight: ☒ WNL

Judgment: ☐ WNL FAIR

Suicidal or Homicidal Ideation? ☐ None DENIED SI/HI ☒

**A:** MOOD DO,
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA

Axis II: 799.9 Deferred
Axis III: NOTED: ESTRADIOL AND TRANS-GENDER SEX-CHANGE PROCEDURE IN PROCESS.
Axis IV: INCARCERATION
Axis V: GAF Score: 62

**P:** C3MS THERAPY, RE: ADJUSTMENT RELATING TO THE SEX CHANGE PROCESS FOR THIS EXCELLENT PERSON.

**E:** DECS CHECKED TODAY WITH TABE OF 10.8 AS OF 05.15.2009. DECS NOTES SPECIAL GARMET (BRASSIERE) FOR HER FEMALE PERSON. GOOD COMMUNICATION ESTABLISHED WITHOUT PROBLEMS AND WITHOUT AUXILLIARY COMMUNICATIONS DEVICES. I/P IS A STABLE PERSON WHO IS MAKING SUCCESSFUL ADJUSTMENT DURING HER SEX CHANGE PROCESS.

| INSTITUTION CTF - NORTH | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA B1142001U |
|---|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | Inmate's Name (Last, First, MI), CDC Number, DOB |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ■ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ■ P/I summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | D54100 |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe ☐ Not reached* ■ Reached | | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. Comments: | | | |

RECEIVED DEC 05 2012

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidently Saved 2014-08-26T16:53:10Z Page 1 of

AG000415

**ER 156**

State of California
**Interdisciplinary Progress Notes**
CDCR 7230-MH (Rev. 07/11)

Department of Corrections and Rehabilitation

| DATE | TIME | COMMENTS (USE S.O.A.P.E. FORMAT) |
|------|------|----------------------------------|
| 11-29-12 | 12:00 | EPRD: 15-L. |

**S:** DID NOT DISPLAY SI/HI. I/P NORSWORTHY HAS A CLINICAL/MEDICAL/MENTAL HEALTH DIANOSIS OF 302.5, SEXUAL IDENTIY DISORDER. I/P IS IN THE PROCESS OF A SEX CHANGE FROM MALE TO FEMALE AND IN FACT HAS BEEN LIVING AS A FEMALE FOR THE PAST 13 YEARS WHEN FIRST DIAGNOSED BY MEDICAL AUTHORITIES AT THE CALIFORNIA MEDICAL FACILITY (CMF), VACAVILLE, CA. I/P IS NOW A BIOLOGICAL FEMALE WITH TESTOSTERONE READING LESS THAN 20. SHE WEARS SUBTLE AND APPROPRIATE MAKE-UP, HAS ENLARGED BREASTS AS BEFITTING A FEMALE PERSON, AND WEARS TO CDCR BRASSIERES (SET OF SIX(6) ISSUED TO HER. WE HAVE BEEN WORKING WITH THE TRIGGERS TO HER TRAUMATIC RAPE AS WELL, WHEN THIS I/P WAS GANG RAPED BY 88 LARGE BURLY MALES AT HER LAST CDCR ASSIGNMENT. MICHELLE IS ADJUSTING TO THE POST-TRAUMATIC STRESS (309.81), AND MOOD DISORDERS (296.9) WHICH EXQCERBATE HER MENTAL CONDITION. AS A FEMALE PERSON, AND ONE FOR THE LAST 13 YEARS, WITH THE DIAGNOSES GIVEN AND AWARDED 13 YEARS AGO, IT IS CLEAR THAT CLINICAL MEDICAL NECESSITY SUGGEST AND MANDATE A SEX CHANGE MEDICAL OPERATION BEFORE NORMAL MENTAL HEALTH CAN BE ACHIEVED FOR THIS FEMALE PATIENT.

**O:**

Appearance: APPROPRIATE

Behavior / Cooperation: GOOD

Orientation: ☒ WNL 0 X 5

Speech: ☒ WNL SOMEWHAT RAPID

Affect: ☒ WNL PLEASANT BUT UPSET OVER ISSUE.

Mood: ☐ WNL STABLE BUT UPSET

Sleep / Appetite: ☒ WNL OK

Cognition: OK
- Fund of Information ☒ WNL
- Intellectual Functioning ☒ WNL
- Concentration ☒ WNL
- Attention ☒ WNL
- Memory ☒ WNL

Thought Process: OK
☒ WNL ☐ Tangential ☐ Circumstantial ☐ Loose

Perception: OK
- Hallucinations ☒ None

Thought Content: OK
- Delusions ☒ WNL
- Ideas of Reference ☒ WNL
- Obsessions ☒ WNL
- Magical Thinking ☒ WNL

Insight: ☒ WNL

Judgment: ☐ WNL FAIR

Suicidal or Homicidal Ideation? ☒ None DENIED SI/HI

**A:** MOOD DO
Axis I: 296.9 MOOD DO NOS, 309.81 PTSD, AND 302.85 SEXUAL IDENTIFY DISORDER/ DYSPHORIA

Axis II: 799.9 Deferred
Axis III: NOTED: ESTRADIOL AND TRANS-GENDER SEX-CHANGE PROCEDURE IN PROCESS.
Axis IV: INCARCERATION
Axis V: GAF Score: 54☐

**P:** I/P SHOULD PLAN FOR A SEX CHANGE OPERATION, ESPECIALLY IF RELEASED FROM PRISON NEXT YEAR UNDER THE BOARD OF PRISON HEARINGS, (BPH). IF I/P IS RETAINED IN THE CDCR FOR A PERIOD OF THREE YEARS OR MORE FOLLOWING HER

| INSTITUTION CTF | CLINICIAN W. REESE, PhD, MSCP | BED NUMBER A LA B1142001U |
|---|---|---|

| 1. **Disability Code:** | 2. **Accommodation:** | 3. **Effective Communication:** | Inmate's Name (Last, First, MI), CDC Number |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ P/I asked questions | NORSWORTHY, JEFFREY |
| ☐ DPH☐ DPV☐ LD | ☐ Equipment☐ SLI | ☐ P/I summed information | |
| ☐ DPS☐ DNH | ☐ Louder☐ Slower | Please check one: | D54100 |
| ☐ DNS☐ DDP | ☐ Basic☐ Transcribe | ☐ Not reached* ☐ Reached | |
| ■ Not Applicable | ■ Other* | *See chrono/notes | 3/15/1964 |
| 4. **Comments:** | | | |

RECEIVED NOV 30 2012 By___

Interdisciplinary Progress Notes, CDCR 7230-MH (Rev. 07/11)

Confidential Saved 2014-08-26T16:53:10Z Page 1 of 1

AG000416

**ER 157**

1   CHRISTOPHER J. BANKS (Bar No. 218779)
    HERMAN J. HOYING (Bar No. 257495)
2   MORGAN, LEWIS & BOCKIUS LLP
    One Market, Spear Street Tower
3   San Francisco, CA 94105-1126
    Telephone: 415.442.1000
4   Fax: 415.442 1001
    cbanks@morganlewis.com
5   hhoying@morganlewis.com

6   ILONA M. TURNER (Bar No. 256219)
    JENNIFER ORTHWEIN (Bar No. 255196)
7   SHAWN THOMAS MEERKAMPER (Bar No. 296964)
    TRANSGENDER LAW CENTER
8   1629 Telegraph Avenue, Suite 400
    Oakland, California  94612
9   Telephone:     415.865.0176
    Facsimile:      877.847.1278
10  ilona@transgenderlawcenter.org
    jen@transgenderlawcenter.org
11  shawn@transgenderlawcenter.org

12
    *Attorneys for Plaintiff*,
13  MICHELLE-LAEL B. NORSWORTHY

14
                    UNITED STATES DISTRICT COURT
15
                NORTHERN DISTRICT OF CALIFORNIA
16

17
    MICHELLE-LAEL B. NORSWORTHY,          No. 3:14-cv-00695-JST
18
                Plaintiff,                **DECLARATION OF HERMAN J.
19                                        HOYING IN SUPPORT OF MOTION
          v.                              FOR PRELIMINARY INJUNCTION**
20
    JEFFREY BEARD, A. NEWTON, A.           Hearing Date:  April 1, 2015
21  ADAMS, LORI ZAMORA, RAYMOND J.
    COFFIN, MARION SPEARMAN, DAVID         Time:          2:00 PM
22  VAN LEER, JARED LOZANO, and DOES 1-
    30,                                    Judge Jon S. Tigar
23
                Defendants.               Courtroom 9
24

25

26

27

28

─────────────────────────────────────────────────────────
        DECLARATION OF HERMAN J. HOYING IN SUPPORT OF MOTION FOR
                       PRELIMINARY INJUNCTION

**ER 158**

I, Herman J. Hoying, declare:

1.      I am an associate with the law firm of Morgan, Lewis & Bockius LLP, counsel for plaintiff Michelle-Lael B. Norsworthy.  I have personal knowledge of the facts contained in this declaration and, if called as a witness, would and could competently testify to them.

2.      Attached hereto as Exhibit A is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG000845-AG000865, Mental Health Evaluation and Gender Identity Disorder Evaluation of Michelle Norsworthy by Dr. Raymond Coffin, dated July 1, 2013.

3.      Attached hereto as Exhibit B is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG005089-AG05097, Subsequent Risk Assessment Report for Board of Parole Hearings by Dr. Thacker, dated October 23, 2012.

4.      Attached hereto as Exhibit C is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG005054-AG005056, Board of Parole Hearings Life Prisoner Hearing Decision Face Sheet for Michelle Norsworthy, dated March 6, 2013.

5.      Attached hereto as Exhibit D is a true and accurate copy of the transcript of the deposition of Plaintiff Michelle Norsworthy, taken in this litigation on December 30, 2014.

6.      Attached hereto as Exhibit E is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG005098-AG005116, Comprehensive Risk Assessment Report for the Board of Parole Hearings by Dr. Jacqueline Caoile, dated August 21, 2014.

7.      Attached hereto as Exhibit F is a true and accurate copy of the transcript of the deposition of Dr. Lori Kohler, taken in this litigation on December 18, 2014.

8.      Attached hereto as Exhibit G is a true and accurate copy of documents produced by Defendants in this litigation as Bates Nos. AG004948-AG004999, consisting of Plaintiff's appeal to the Office of Third Level Appeals.

1

**ER 159**

9.      Attached hereto as Exhibit H is a true and accurate copy of documents produced by Defendants in this litigation as Bates Nos. AG000397-AG000416, consisting of California Department of Corrections and Rehabilitation Interdisciplinary Progress Notes by Dr. William Reece for Michelle Norsworthy dated November 29, 2012 through April 25, 2013.

10.     Attached hereto as Exhibit I is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG000921-0922, California Department of Corrections and Rehabilitation Interdisciplinary Progress Notes by Dr. C. Matlen for Michelle Norsworthy, dated June 10, 2013.

11.     Attached hereto as Exhibit J is a true and accurate copy of the transcript of the deposition of Defendant Alexandra Newton taken in this litigation on December 22, 2014.

12.     Attached hereto as Exhibit K is a true and accurate copy of the transcript of the deposition testimony of Defendant Anise Adams taken in this litigation on December 19, 2014.

13.     Attached hereto as Exhibit L is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG005175-AG005179, Clinical Review of Michelle Norsworthy's third level appeal by Dr. T. S. Robinson, dated May 22, 2013.

14.     Attached hereto as Exhibit M is a true and accurate copy of a document produced by Defendants in this litigation as Bates No. AG005180, Clinical Review of Michelle Norsworthy's third level appeal by Dr. Cornish, dated May 31, 2013.

15.     Attached hereto as Exhibit N is a true and accurate copy of the transcript of the deposition of Defendant Raymond Coffin taken in this litigation on December 17, 2014.

16.     Attached hereto as Exhibit O is a true and accurate copy of documents produced by Defendants in this litigation as Bates Nos. AG004880-AG004929, consisting of a flyer for a presentation titled "Assessment & Treatment of Gender Identity Disorder Persons" by Dr. Stephen B. Levine on April 5, 2012 and the presentation slides with handwritten notes by Defendant Dr. Raymond Coffin.

2

**ER 160**

17.     Attached hereto as Exhibit P is a true and accurate copy of the transcript of the deposition of Defendant Lori Zamora taken in this litigation on December 15, 2014.

18.     Attached hereto as Exhibit Q is a true and accurate copy of Defendants' Amended Privilege Log, dated February 24, 2015.

19.     Attached hereto as Exhibit R is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG000031-AG000032, Telemedicine Services Clinic Report by Dr. Iqbal Munir for Michelle Norsworthy, dated August 20, 2014.

20.     Attached hereto as Exhibit S is a true and accurate copy of the transcript of the deposition of Dr. Ashiq V. Patel taken in this litigation on December 19, 2014.

21.     Attached hereto as Exhibit T is a true and accurate copy of a document produced by Defendants in this litigation as Bates No. AG004931, an excerpt from the CDCR Operations Manual, including Section 91020.26 Gender Dysphoria Treatment.

22.     Attached hereto as Exhibit U is a true and accurate copy of an e-mail chain between Preeti Bajwa, counsel for Defendants, and Herman J. Hoying, counsel for Plaintiff, dated February 24, 2014 11:12 AM, supplementing and clarifying Defendants' discovery responses.

23.     Attached hereto as Exhibit V is a true and accurate copy of a document produced by Defendants in this litigation as Bates Nos. AG005167-AG005169, Telemedicine Services Clinic Report by Dr. Iqbal Munir, dated November 19, 2014.

24.     Attached hereto as Exhibit W is a true and accurate copy of a document produced by Defendants in this litigation as Bates No. AG004932, Secretary, Department of Corrections and Rehabilitation Duty Statement.

/ / /

/ / /

/ / /

/ / /

3

**ER 161**

1        I declare under penalty of perjury under the laws of the United States that the foregoing is

2   true and correct.

3        Executed this 26th day of February, 2015, in San Francisco, CA.

4

5                       By         */s/ Herman J. Hoying*

6                               HERMAN J. HOYING

7                       MORGAN, LEWIS & BOCKIUS LLP
                             One Market, Spear Street Tower

8                       San Francisco, California  94105-1126
                             Telephone:  415.442.1000

9                       Facsimile:  415.442.1001
                             hhoying@morganlewis.com

10                     *Attorneys for Plaintiff,*
                       MICHELLE-LAEL B. NORSWORTHY

11                    (a/k/a JEFFREY B. NORSWORTHY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER 162

# EXHIBIT A

**Mental Health Evaluation**
**Gender Identity Disorder Evaluation**

| | |
|---|---|
| Inmate/Patient: | Norsworthy, Jeffrey "Michelle" |
| CDC #: | D54100 |
| DOB: | 03/15/1964 |
| Date of Interview: | 07/01/2013 |

Identification Data:

I/P Jeffrey Norsworthy, CDCR D54100, is a 49-year-old, divorced Caucasian genetic male with one adult daughter. The inmate-patient identifies as a transgender female who prefers to be addressed as "Michelle." (While this evaluator notes with respect I/P Norsworthy's identification as a transgender female, consistent with his current CDCR classification, male pronouns have been used throughout this report.) He is in the process of petitioning CDCR and the Superior Court for a name change to "Lael Bryanna Norsworthy." In its February 14, 2013 ruling the Superior Court denied I/P Norsworthy's petition on procedural grounds as premature (Superior Court, County of Monterey, Case No. HC7882, and he has appealed the CDCR denial of the requested name change, which was determined to be inappropriate "until the appellant is determined to meet the criteria to be assigned to an institution for female offenders" (CTF –S-13-00418, Second Level Reviewer's Response).

Referral Questions:

This evaluation was requested as part of a CDCR review of I/P Norsworthy's CDCR-602HC appeal (CTF HC 12037935) which originally was received on 10/04/2012. In that appeal I/P Norsworthy requested approval for gender reassignment surgery and related "adequate medical care," and indicated that he was feeling miserable as a result of not being able to fully express himself as a woman. He asserted that the medical need was serious, and consisted of pain and suffering of living life as a woman for more than 20 years. In his appeal, I/P Norsworthy asserted that his pain and suffering could only be relieved by gender reassignment surgery.

After analyzing the issues raised in I/P Norsworthy's appeal in the context of to Department policy, this evaluator determined that the following specific referral questions needed to be addressed in this evaluation:

1. Does the medical record reflect compliance with current Department policy for classification as a Gender Identity Disorder (GID) patient?

2. If properly diagnosed as a GID patient, has I/P Norsworthy received mental health services consistent with his diagnosis and mental health needs?

3. Is there documented evidence that I/P Norsworthy has been recommended and approved for sex reassignment surgery by medical specialists and psychological/psychiatric clinicians, consistent with Department policy?

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                            Page 2

4.  I/P Norsworthy has requested sex reassignment surgery, but Title 15, § 3350.1 (b)
    specifically defines castration and vaginoplasty as among the surgical procedures not
    considered to be medically necessary and, therefore, generally are not provided to inmates by
    CDCR. Do I/P Norsworthy's current mental health needs meet the criteria for provision of
    SRS as an exception to those general exclusions due to medical necessity as defined in Title
    15, § 3350?

Data Sources:

Available information from I/P Norsworthy's Unit Health Record (UHR) and C-File were
reviewed, and he participated in a two and one-half hour clinical interview on 07/01/2013
conducted by this evaluator. (Unless otherwise indicated, citations reported here to document
these findings reference clinical documentation found in I/P Norsworthy's UHR.)   The UHR
records covered the period beginning 04/27/1987 through 06/11/2013, and appeared to be
substantially complete.  C-file information available on ERMS and SOMS was reviewed, but
backfile data appeared not yet to have been scanned into the system at the time of this evaluation.
Thus the custody information available for this review was limited.

Family History:

According to records and I/P Norsworthy's report, he was born on 03/15/1964 in Detroit,
Michigan and was the middle child of three in his family.  His biological parents were married at
the time of his birth, but the couple separated in 1966-67 and he reported that he was raised
primarily by his mother and grandmother.  His father was alcoholic and committed suicide in
1976; I/P Norsworthy did not witness his death. During the interview he reported that he had no
memories of his biological father and did not react to the news of his death, something that he
subsequently felt guilty about—"I spent my life wondering what he would have been like."

His mother left I/P Norsworthy with his grandmother when he was approximately ten years old,
while she pursued her interests in the Women's Movement and dealt with a cancer diagnosis.  She
was a successful serial small business entrepreneur, eventually moving to Washington State
where she ran a boat marina.  I/P Norsworthy stated that he had been angry with his mother for
leaving him in the care of his grandmother, who had a boyfriend at the time who was abusive to
him and I/P Norsworthy "was affected by that."  Except for exposure to his grandmother's abuse,
he denied having suffered any form of abuse while growing up.

I/P Norsworthy was reunited with his mother when he was twelve years old, and moved to
Washington to live with her.  He described himself as having been "spoiled" by his mother with
regard to his material lifestyle, receiving most everything he wanted. However he remained angry
with her for having abandoned him to live with his grandmother.  His mother had remarried by
that time, and he reported that his step-father, an African-American, was "great," but controlled
by his mother. His step-father worked in an auto body repair shop.

Confidential Saved 2014-08-26T16:53:10Z

AG000846

ER 165

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                    Page 3

## Educational History

I/P Norsworthy dropped out of school at the age of sixteen, but later completed his GED while serving in the U.S. Army and National Guard. He received training as a combat medic, but no college or other advanced education was documented in the records.

## Work History

I/P Norsworthy has a limited work history prior to incarceration. After leaving home at the age of 16, he performed a variety of "odd jobs," but was unable to support himself and continued to rely on his mother for support. He became a volunteer informant for the Buena Park Police Department in the early 1980s, and was described in an early Board of Prison Terms report as being referred to by Buena Park Police as "Rambo" and characterized him as having an "exaggerated belief in his own omnipotence and power to cleanse society" (Allison & Hollingsworth, 12/18/1989). When he was unable to support himself, and in order to achieve greater independence from his mother, he joined the Army around 1983-84. He completed basic and received training as a combat medic. While in the Army he stated that he had been teased for his feminine appearing legs when showering with other soldiers. I/P Norsworthy reported that at the time of his arrest he was serving in the National Guard, and had just returned from his duty weekend.

## Criminal History:

I/P Norsworthy's C-file records indicate that his first reported arrest was on 09/29/1982 when he was charged with PC 241 Assault on a police officer and PC 243 Battery on a Peace Officer in 1982, however the charges were dropped. There also was a report of harassing and threatening phone calls to his daughter's mother. In 1984 he was cited for Contempt of Court, and on 12/06/1985 he was charged with PC 187 Murder in the second degree with use of a firearm. He was convicted on 04/15/1987 and sentenced to 17 years to life in prison.

I/P Norsworthy was received by CDCR on 04/15/1987 and entered CDCR at the Chino Reception Center (CIM). After initially being transferred to Folsom on 05/19/1987, he underwent a series of transfers primarily related to concerns about his safety. There was documented evidence of violence concerns related to the Hessian Bikers and Black Guerrilla Family gangs, as well as family and associates of the victim of his murder. He was transferred to California Training Facility (CTF) on 07/28/1988, and again on 11/03/1988 to California Men's Colony (CMC), and then to Corcoran State Prison (COR) on September 5, 1990. In 1997 he was transferred to Wasco State Prison, and on 02/19/1999 he was transferred to California Medical Facility (CMF). In March 2009 he was transferred to Mule Creek State Prison (MCSP) on an emergency basis, after he raised concerns about his safety at CMF due to perceived threats from the Skinheads. In March 2009 he was transferred to Avenal State Prison (ASP), and in August 2009 transferred again to California Correctional Institution (CCI). He arrived at California Treatment Facility (CTF) in July 2011.

At the time of this evaluation I/P Norsworthy was housed at the California Training Facility on a Sensitive Needs Yard. The inmate-patient's Custody Designation was Medium (A), Level 2 with a Placement Score of 19. I/P Norsworthy was being treated in the Mental Health Services Delivery System at the CCCMS level of care, and his DDP evaluation indicated no significant

Confidential Saved 2014-08-26T16:53:10Z

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                      Page 4

cognitive deficits or special communication needs. He was working full-time as a Disability Assistant, an assignment that he started on 01/25/2013. His controlling release date is 05/31/1998. He was denied parole at the most recent Board of Parole Hearings review on 03/06/2013, but scheduled for a subsequent hearing in three years. The Board recommended that he remain discipline free, continue to earn positive credits, and, to the degree possible, pursue self-help and therapy activities.

## CDCR Disciplinary History

During the early years of his incarceration I/P Norsworthy received a number of 115s, generally for minor offenses, including Refusing to Report for Work Assignment (05/15/1988), Inappropriate Behavior in Visiting (03/12/1989), and testing positive for alcohol after a family visit (12/21/1989). However, over time he has adjusted and succeeded in reducing his custody score to its current level of 19. Based on his disciplinary history, he generally appears to be programming successfully at the present time, and has maintained a generally low level of disciplinary infractions for a number of years.

## Sexual Development & Relationship History

I/P Norsworthy reported a sexual development history that reflects early confusion about his sexual identity, before consolidating his understanding of as sexual identity as that of a transsexual. At approximately age twelve I/P Norsworthy reports he began to dress himself in women's clothing when he was alone in the house. He continued to feminize his appearance through his teenage years. He reported that he experienced his first organism with an older man, and commented, "I knew a tone was being set." He indicated he preferred to be the "recipient" of sex, and did not like his penis being touched. He reported that during his teenage years he had had 3-4 sexual encounters with men which solidified his feelings about his sexuality, and he viewed those encounters as "consensual." He did attempt to have relationships with girls, and had one sexual encounter with a girl during that time, but "there were some things you didn't do." I/P Norsworthy explained that he felt alienated from everyone as a teenager. "I had trouble relating to either side. I was very social, but didn't feel I fit in with boys or girls. It was quite a lonely time." He described himself as angry with women, "envious of women's position."

He dropped out of school when he was sixteen, and left for California where he ended up in Hollywood. He supported himself by taking odd jobs, and began drinking alcohol. While in Hollywood he engaged in "secret" relationships with older men in which he described his role as sexually submissive and the relationships as consensual, despite at times substantial differences in age and sexual experience. I/P Norsworthy had a relationship with Ms. Melody Matteson and the couple conceived a daughter prior to his incarceration. He married Ms. Matteson on 08/02/1987 after being committed to prison. They subsequently divorced, and I/P Norsworthy has had virtually no contact with his daughter until they recently began exchanging letters.

When he entered CDCR I/P Norsworthy did not initially present himself as transgender, and was still engaged in a relationship with his ex-wife (mother of his daughter). In fact, he became agitated when he would lose contact with her, leading at times to threats of self harm. However by the time of his Board of Prison Terms hearing in 1996 his evaluation reflects the fact that he was openly discussing his preference for women's clothes and that he was looking forward to hormone treatment leading to an eventual sex change. That evaluation reported that, while he did

Confidential Saved 2014-08-26T16:53:10Z

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                    Page 5

not consider himself to be "gay," he did report having had relationships with various cellmates which created both confusion and safety concerns (Evans, October 1996). The fact that he was presenting himself in a feminine manner was reflected in reports he made to his treating clinicians that he was experiencing emotional problems because of his feminine appearance (MH3 dated 12/19/1996). A progress note dated January 14, 1997 records I/P Norsworthy saying, "I am not a homosexual. I am a transsexual." He expressed conflict over "feeling like a woman but I am a man." While the clinical notes from that period indicate that he generally was programming successfully on the yard, he "wants to be able to act completely like a woman."

From the late 1990s on the clinical documentation is increasingly consistent in reporting I/P Norsworthy's identification as a transgender female. An entry dated March 31, 1997 reports that he had a "history of homosexual experience, but always as a feminine partner." On February 9, 1998 he reported that he wanted to have a "sex change" and referred to himself as a transvestite. Mental status reports began to reflect the fact that he presented himself in an effeminate manner—hair brushed up in a band, made-up face. Similar observations were reported at each of the institutions to which he was transferred, including CMC, COR, WSP, ASP, MCSP, and CMF. While housed at COR, I/P Norsworthy stated that he had worked for a Catholic chaplain and had discussed his gender concerns with him. He reported that the chaplain encouraged him to explore the possibility of a transsexual identity. During the two years he spent at WSP I/P Norsworthy reported that he was "coming into my own" and that "by that time I really looked like a girl." On June 8, 1998 I/P Norsworthy reported that he had been beaten by his peers because of gender issues. A progress note recorded on March 5, 1999 indicated that I/P Norsworthy had been sexually active with two men in prison who were IV drug users, however he was not exhibiting any symptoms of HIV-AIDS.

I/P Norsworthy reported he had had a "lover" at CMF prior to his transfer to MCSP, and he acknowledged several other relationships with men since incarceration. He described himself as always having been "highly sexual," but denied a history of being promiscuous or preoccupied with sex. However, since the rape by inmates which he reported occurred at MCSP in 2009, after initially being aversive to sex, he reported he has experienced PTSD symptoms among which he includes heightened sexual arousal (up to three times a day), to the point that he has become concerned about compulsive sexuality ("nymphomania").

Gender Identity Disorder Treatment

I/P Norsworthy indicated that one of the counselors had recommended a transfer to Vacaville where he underwent an extensive evaluation, and reported that "after every evaluation, they recommended change to female."

The UHR records indicate that the patient was self-referred to the Gender Clinic at CMF on October 7, 1999. The intake notes indicated that he had "only recently considered transsexuality," and that over the previous several years he had not felt like a very sexual person. At that time he identified himself as bisexual. He indicated that he had read a lot about transsexuality, and that his ex-wife reportedly had suggested he was transsexual. Over the previous six years he stated that his desire for a sex change had consolidated, and that he had been attending a transgender (lifestyle) group. Furthermore he attributed much of the anger and self-mutilation (lacerations on his arms) he had experienced over the years as related to confusion over his gender identity and efforts to repress his female qualities. He indicated that he

Confidential Saved 2014-08-26T16:53:10Z

AG000849

ER 168

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                          Page 6

had confessed "homosexuality" to a priest who, by the patient's report, told him that he was transsexual. (Evaluator's Note: while repeated references were made to gender issues in the mental health progress notes from the period during which he presented himself for treatment at the gender clinic, no mention is made of those issues in the MH2 treatment plan orMH4 history documents.)

I/P Norsworthy was referred for a psychological evaluation from the Gender Clinic, and the results of that evaluation were summarized in a chrono dated January 12, 2000. In that chrono Dr. Viesti indicated that the battery of psychological tests and his impressions from the interview "were consistent with the profile of a transsexual." He opined that I/P Norsworthy met criteria for a diagnosis of Gender Identity Disorder (DSM-IV 302.85). I/P Norsworthy returned to the Gender Clinic on January 20, 2000, and Dr. Kohler concluded that he was appropriate for hormone therapy, and began the process of reviewing risks and benefits with him. A regimen of aspirin, spironolactone, and ethinyl estradiol was initiated at that time, and has continued with periodic dose adjustments through the present time. Dr. Kohler noted I/P Norsworthy's excitement over the appearance of breast changes (progress note dated April 6, 2000), as well as mental health issues related to environmental stressors. A chrono for issuance of a brassiere was completed, and that chrono has been renewed annually, with few lapses, through the present time. Dr. Kohler continued to follow the patient every 4 to 8 weeks, monitoring response to the treatment regimen, and documenting the patient's concerns about increasing victimization due to his emerging feminine features.

I/P Norsworthy indicated that his family has not been accepting of the disclosure of his gender identification. Several progress notes recorded during 2000 document the patient's increasing concern and frustration that he was losing contact with his family. On September 18, 2000, Dr. Kohler referred the patient to mental health to address those concerns. Nevertheless, the patient indicated he was pleased with the progress of his treatment and wanted to continue. I/P Norsworthy notified his mother of his initiation of hormone therapy in 2001, presenting it to her as coming to terms with an internal conflict which resulted in him being less aggressive. His mother responded by indicating she wanted him to stop the treatment immediately. She hung up during that call and is not accepted calls from him since that time.

I/P Norsworthy also reported having trouble with the Rabbi over his hormone treatments. "I have problems with the Rabbi and with prison living. I'm expected to be a man." In addition to the conflict he was having with the Rabbi, he expressed concern that he would be killed by staff or peers due to his hormone treatment (progress note dated May 25, 2001). Later that year he reported having difficulty with dorm living and mood swings related to the hormone treatments (progress note dated November 28, 2001). A few months later he reported being concerned about being physically searched in front of other male inmates, fearing both peers and Custody officers making lewd, derogatory comments or statements (progress note dated March 5, 2002). On November 25, 2003 he discussed his concerns with his primary clinician about returning to the street as a Jewish transsexual – "the KKK will torture me for a couple of weeks." He continued to have concerns about being targeted both for his religion and his changing gender identity, particularly fearing to be housed in the dorm setting. In February 2005 I/P Norsworthy expressed concerns about men leering at him, and it was noted that "Norsworthy wears somewhat provocative clothes baring the stomach – bordering on a flamboyant effeminate homosexual style" (progress note dated February 11, 2005). Later that year he became involved in reading books for the blind, spending 35 hours a week volunteering. He also was reported to be attending

Confidential Saved 2014-08-26T16:53:10Z

AG000850

Mental Health Evaluation:  Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                    Page 7

AA meetings monthly, and meeting with Veterans Administration therapists for monthly one-to-one sessions (progress note dated May 20, 2005). He appeared to be pleased with the changes that he was experiencing in his appearance, despite his concerns about victimization. He appeared to be adjusting to the changes he was undergoing, and coping increasingly effectively with most situations.

In 2009 the patient was transferred to MCSP after expressing concern about his safety. However in March 2009 he reportedly was raped by multiple inmates following transfer, and believed the assault was due at least in part to his appearance and gender changes.

For a period of time during the process of these transfers his contact with the Gender Clinic was disrupted. The UHR indicates that he resumed treatment with Dr. Kohler on June 25, 2011. She reported that he had been on cross gender therapy for more than 10 years and "is doing well with current treatment plan." She noted that he had been diagnosed with HEP-C type 1A, and would require a liver biopsy in order to consider treatment. However she noted no contraindications to estradiol and renewed his prescriptions, which at that time were as follows: Estradiol valerate 60 mg IM q 2 wk x 180 days NAM; Spironolactone 100 mg PO BID x 180 days; and EC-ASA 81 mg PO QID x 180 days. In an endocrinology consult on June 14, 2011 Dr. Patel noted that the patient's last mammogram was two years previous. During a follow-up consult on January 22, 2013 Dr. Patel reported that he had discussed the patient's history and the possibility of surgery with I/P Norsworthy, and noted that he had been told by the patient that he "has received 'approval' for gender reassignment surgery." He continued the then current medication regimen. On February 26, 2013 Dr. Patel reported that the patient "wants to proceed with reassignment surgery." On March 26, 2013 the patient was examined by Dr. Kumar, an endocrinologist, who also reported that the patient "wants to go for sex reassignment surgery and is going through the process."

Mental Health History:

By his report, I/P Norsworthy was treated with Dexedrine for hyperactivity between the ages of 12 and 15. He reported receiving no other mental health treatment prior to his incarceration in 1987.  When he first entered CDCR a history of depression was noted, although notes reflect that he did not appear to be depressed to evaluating clinicians. He made suicide threats and engaged in self mutilation—inflicting lacerations on his arms—during his early years of incarceration over housing complaints, visitation, and other programming issues (e.g., 02/05/1988; 03/17/1988; 09/06/1990).  He was admitted to the infirmary/MHCB following these threats and was determined not to have a desire to kill himself, but acknowledged using self mutilation of his upper extremities to relieve anxiety. He frequently expressed concerns about his safety in general population during these episodes of threats of self-harm.

In a phone call documented with the patient's mother who had called regarding her concern about his psychological deterioration, his mother reportedly described I/P Norsworthy as "delusionary" and prone to exaggeration. For example he was reported to have made claims of achieving black belt status in Wo Ying Tau karate, and of having written several books on the subject (BPT Psychiatric Evaluation, April 1990), which his mother felt were exaggerations of his achievements and not accurate.  While early evaluations by department clinicians did not note psychotic thought processes, in the mid-1990s there were a series of reports documenting I/P Norsworthy's training for the "gathering"—Armageddon, and visits from "Michael the

Confidential Saved 2014-08-26T16:53:10Z

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                    Page 8

Archangel." In addition to Gender Identity Disorder, over the course of his incarceration he has
received a range of diagnoses on DSM-IV-TR Axis I, including alcohol dependence, major
depression, bipolar disorder, psychotic disorder NOS, schizophrenia paranoid type, adjustment
disorder, as well as narcissistic personality disorder and borderline personality disorder on Axis
II.

The Board of Prison Terms psychological evaluation submitted for consideration during his
October 1996 hearing noted that he had been considering himself a transsexual "for the past few
years" (Evans, 09/03/1996). It noted, "(He) has transvestic fetishism in the form of a preference
for women's clothes and he looks forward to some sort of treatment which he describes as
hormone therapy and sex change. The inmate is very concerned about his future and how he is
perceived by other inmates. Although he does not consider himself "gay," he reports having been
lovers with various cellies with accompanying confusion and safety concerns." The evaluator
noted "grandiose thought process, and over identification with the military, guns, and law
enforcement together with a sexual identity crisis currently exacerbated by other factors."

Following his referral to Vacaville in 2000, I/P Norsworthy began intensive therapy around his
gender issues. Those issues have continued to be addressed through the present time, primarily
at the CCCMS level of care. I/P Norsworthy reported that he had been raped by inmates at
MCSP in March 2009 (progress notes dated May 26, 2009, October 18, 2012), and has been
treated for PTSD symptoms of anxiety, flashbacks, and hypervigilance since that time.

Review of the mental health treatment I/P Norsworthy received immediately before and after
filing his appeal on 09/18/2012 indicated that he has been receiving a level of services that, in
fact, significantly exceeded the minimum required under the CCCMS level of care (cf., 2009
Mental Health Services Delivery System Program Guide, p. 12-3-15). However I/P
Norsworthy's treatment plan dated 07/03/2012 reported that he was "hypervigilant, but at the
same time living a productive life serving as a special ADA (Americans for Disabilities) assistant
on the yard." The only problem identified was "mood changes," but his mood was described as
"stable but upset." The planned treatment included medication, individual therapy focused on
developing "insight into triggers of sudden, mood swings" and "practice appropriate and
constructive communication of moods," as well as continued participation in Transgender Group
Therapy.

07/12/2012: I/P Norsworthy was seen in response to a self referral, and reported he had "some
pressing issues to address." However he chose to wait to discuss those issues with his primary
clinician. His mood was reported as stable with no thoughts of harming self or others. His Mental
Status Examination was unremarkable, and his GAF reported as 60.

07/17/2012: The patient was seen again by Dr. Asselborn, psychiatrist, who noted euthymic
mood, restless behavior and rapid speech, but no thought disorder or perceptual distortions. I/P
Norsworthy was fully oriented and denied thoughts of harming himself or others. He reported
that Zoloft was working well for him, and that he was encouraged that he was going to be seen
by the Coleman monitors. No GAF was reported.

07/26/2012: I/P Norsworthy was seen by Dr. Reese, and reported he was "real happy and busy
now with my new job (ADA Assistant)." His mood was described as stable, but upset, but his

Confidential Saved 2014-08-26T16:53:10Z

AG000852

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100 | Page 9

Mental Status Examination otherwise was unremarkable. A GAF of 60 was reported on that visit.

08/02/2012: Dr. Reese documented a scheduling adjustment permitting I/P Norsworthy to attend early morning appointments which would not interfere with his job. The patient reported having met with Dr. Matlen and discussing the limits of the support Mental Health could provide relating to his case. He responded, "I am OK as long as Mental Health and Medical does what it is supposed to do as a licensed physician or psychologist." His mood was assessed as "stable but upset" and his Mental Status Examination was unremarkable with a GAF of 60.

08/30/2012: I/P Norsworthy was seen again by Dr. Reese, and issues related to parole were discussed. His mood was noted as "stable but upset" and his Mental Status Examination was unremarkable. Work was continued on parole planning, and I/P Norsworthy's GAF was rated at 60.

09/06/2012: I/P Norsworthy reported "I am getting better adjusted here. I am fully female and now have my brassieres, so now I can take off my bulky coat and walk on the yard or do ADA duties with just my blue garments on. I am proud that my body is in tone. I am female and comfortable showing it. I am still sensitive to my past trauma and being raped in prison." No significant changes were noted by Dr. Reese, and GAF was rated at 58.

09/07/2012: Dr. Asselborn, psychiatrist, saw I/P Norsworthy and reported that the patient wanted to be taken off Zoloft, stating, "I don't like it." He assessed his mood to be "mostly euthymic" and his Mental Status Examination was unremarkable. The patient's request to stop Zoloft was honored, and he was encouraged to continue therapy.

09/13/2012: Dr. Reese saw I/P Norsworthy and noted the patient presented as a "pleasant looking woman" and had adjusted to the body changes resulting from hormone treatment. Triggers were still reported related to the prison rape reported by the patient. The Mental Status Examination was unremarkable, and GAF rated at 58.

09/27/2012: Dr. Reese reported continued work on PTSD and reported a GAF of 58.

10/04/2012: Dr. Reese continued PTSD treatment and I/P Norsworthy commented, "I know I will need long-term therapy to recover from my prison gang rape." GAF was rated at 58.

10/11/2012: Nightmares and flashbacks were reported about the prison rape. I/P Norsworthy was waking up in a cold sweat. GAF reported as 58.

10/18/2012: I/P Norsworthy reported he had appeared at a hearing related to the prison rape, and "told the truth to the examiner." Dr. Reese notes, "The emotional toll on the I/P M. Norsworthy is so vivid so intense emotionally that I/P has continuing nightmares about the severely traumatic incident and will need long term help in the future to put this traumatic experience behind and move on with her life." Despite the intensity of those memories, I/P Norsworthy's mood was described as "WNL (within normal limits) stable but upset," and his affect as "pleasant but upset over issue." Overall the Mental Status Examination conducted at that time was unremarkable, and I/P Norsworthy's GAF was rated at 58.

Confidential Saved 2014-08-26T16:53:10Z

AG000853

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                    Page 10

11/15/2012: I/P Norsworthy was continuing to report anxiety and flashbacks related to the prison rape, which he described as nine hours long. Dr. Reese agreed to I/P Norsworthy's request to see him on "emergency" days. Despite the high level of distress reported by the patient, the Mental Status Examination reported stable, but upset mood and pleasant affect. The GAF was rated at 54.

11/29/2012:   Dr. Reese describes I/P Norsworthy's feminine appearance and the history of hormone treatment, and states, "It is clear that clinical medical necessity suggest and mandate a sex change medical operation before normal mental health can be achieved for this female patient."  He indicated that "I/P should plan for a sex change operation, especially if released from prison next year under the Board of Prison Hearings (BPH).  If I/P is retained in the CDCR for a period of three years or more following her meeting with the Board of Prison Hearings (BPH), she should be scheduled for the sex change operation as part of a clinical and medical necessity for her health and well being."  The Mental Status Examination reported at that time was unremarkable, and GAF rated at 54.

12/04/2012:  Dr. Reese states, "I/P Norsworthy has been diagnosed with 302.85 for the past 10 years, and has been a biological woman for this period.  To complete her adjustment and stability as a person, I/P Norsworthy needs to move ahead with her sex change surgery, making continuing progress in the present, and completing her sex change process in the near future." I/P Norsworthy's mood was described as "stable but upset" with "pleasant but upset" affect.

12/13/2012:  I/P Norsworthy stated, "I am pressing ahead with my case. I was diagnosed as a transsexual by the one week assessment process at the California Medical Facility (CMF) 302.85 Gender Identity Disorder Trans-sexual. This diagnosis has been revalidated during my therapy for the past 13 years. I have taken the female hormone therapy as well for the past 13 years (estradiol). I want to stay in therapy here with you for the emotional issues, and I know that I will not be well until I complete the transgender sex change process." Dr. Reese notes that work was continuing on sex change issues and opined that he "fully recommend(s) either now or when and if I/P released to return to the community – completion of the trans-sexual operation, in order for I/P to obtain full medical emotional and mental health." The patient's mood was noted as stable, but upset with pleasant affect. He denied suicidal or homicidal ideation, and his Mental Status Examination was unremarkable. GAF was rated at 62.

01/24/2013:   LCSW Marchand was covering for Dr. Reese on this date, and reports I/P Norsworthy stated, "I am doing okay. I am not suicidal or anything like that. I have missed meeting with Dr. Reese. I miss the opportunity to talk to someone." His mood was noted as euthymic with congruent affect, and sleep and appetite were good. The Mental Status Examination was otherwise unremarkable, and GAF was rated at 60.

02/05/2013: I/P Norsworthy was seen again by LCSW Marchand on this date, and the patient reported being very nervous about his upcoming Board hearing, but hoping for the best. The patient discussed his background, and commented that even the difficult times that he had experienced in prison have enabled him to "be a different person." His mood was reported as euthymic with congruent affect, good sleep and appetite, and otherwise unremarkable presentation. He denied suicidal or homicidal ideation. GAF was rated at 60.

Confidential Saved 2014-08-26T16:53:10Z

AG000854

ER 173

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                    Page 11

03/06/2013: Board of Prison Terms Hearing.
[Evaluator's note: I/P Norsworthy attended his Board of Prison Terms hearing on March 6, 2013. Prior to receiving the result of the BPT Hearing, the primary focus of treatment had been recovering from the rape he reported occurring at MCSP in March 2009. However, following the Board's decision, there appears to have been a decisive shift in the primary focus of Dr. Reese's treatment to issues related to sex reassignment surgery (SRS). This shift in treatment focus did not appear to follow a modification of the treatment plan endorsed in IDTT.]

03/08/2013: Dr. Reese met with the patient again on this date, and reported that he was upset and depressed following his appearance at the Board of Prison Terms hearing. I/P Norsworthy believed that he had completed every element of the Board's previous recommendations, with expectations of positive results. However he was striving to maintain his equilibrium, and remained focused on the process of gender reassignment surgery. "He received a medical report from Dr. Ashiq V. Patel, MD, endocrinology consultant, and reported that that report suggests I/P is eligible for surgery with an estrogen reading of 2609, manifesting herself as a biological female. For I/P's health and well-being, it is recommended that I/P proceed with the planned surgery process." His mood was reported as "stable but upset" with pleasant affect. His Mental Status Examination was otherwise unremarkable, and GAF was rated at 58.

03/14/2013: Dr. Reese reported that I/P Norsworthy had been quite upset and distraught over the setback of not being released from prison and receiving a three-year denial from the BPH. He remained focused on obtaining SRS, and restated his understanding of the results of the report by Dr. Patel, the endocrinology consultant, as well as the fact that his primary clinician had recommended the surgery for the patient's mental health and well-being. Dr. Reese indicated "we will continue to work with the psychological aspects of mood disorder and it is important to provide continuity of medical and mental health here at CTF, while I/P undergoes approval and scheduling for the sexual reassignment (SRS) surgery." The patient's mood was noted as "stable but upset" with pleasant affect, and he denied suicidal or homicidal ideation. His Mental Status Examination otherwise was unremarkable, and GAF was rated at 58.

03/28/2013: I/P Norsworthy was seen again on this date by Dr. Reese and reported "I have been assigned a new medical geneticist and endocrinologist, but he told me in the phone conversation that he fully supports the findings of a psychiatrist who 13 years ago found me to be a transsexual in the process of sexual change . . . That I am fully ready for the operation." Dr. Reese again states "I/P has been psychologically cleared for the sex change operation by psychiatrists and psychologists of record, and should move forward with his plan per telemed-I/P's mental health and well-being are dependent on moving forward with his sex change operation." The patient's mood was noted as "stable but upset" with pleasant affect, and there was no evidence of suicidal or homicidal ideation. His GAF was rated at 55.

04/04/2013: On this date I/P Norsworthy reported to Dr. Reese "I saw a new endocrinologist and he said he would not oppose my surgery, since the diagnosis of transsexual was made by a psychiatrist and for the past 13 (years) I/P is taken hormones to become a fully biological woman." Dr. Reese further opined, "for I/P's well-being, I/P is now ready psychologically sound and prepared so that the transsexual operation process (constructing an internal vagina from the external penis foreskin, etc.) should move forward and be scheduled for I/P's mental health, physical and mental well-being, and stability within CCR." The patient's mood was described as "stable but upset" with pleasant affect, and no evidence of suicidal or homicidal ideation. The

Confidential Saved 2014-08-26T16:53:10Z

AG000855

ER 174

Mental Health Evaluation:  Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                                Page 12

Mental Status Examination was unremarkable, and GAF was rated at 55—"due to latest disappointing results—I/P meets BPH in three years, vowing to complete all recommended requirements for release to the community successfully. In the meantime is undergoing the sexual reassignment (SRS) surgery process." He notes a 602 appeal process related to this issue.

04/11/2013:  The patient was seen again on this date by Dr. Reese, and thanked him for the opportunity to meet weekly.  He restated his desire to complete the SRS process, citing his history of hormone therapy and belief that he was now a biological female. The patient described a Federal Appeals Court decision from Boston which he understood had ordered the Massachusetts Correctional System to perform a sex change operation for an inmate in their custody in order to complete the transsexual process. I/P Norsworthy considers himself to be in a similar situation, and was encouraged that the decision would support his efforts to obtain SRS. Dr. Reese noted that the patient's mood remained stable, but upset with pleasant affect. No evidence of suicidal or homicidal ideation was present, and his Mental Status Examination was otherwise unremarkable.  GAF was rated at 55.

04/18/2013:  Dr. Reese again reported that the patient was focused on his appeal for surgery and restated his case in support of obtaining the SRS procedure. He noted that I/P Norsworthy had been moved to a single cell, and commented "this is probably best for her while she undergoes the sex change process." The patient's mood was noted as "stable but upset" with pleasant affect, and no evidence of suicidal or homicidal ideation. Sleep was reported as "OK" with fair appetite, but the Mental Status Examination was otherwise unremarkable. GAF was rated at 58, a slight improvement from the previous session.

04/25/2013:  Dr. Reese reported that the patient again reviewed his arguments in support of obtaining the SRS procedure. I/P Norsworthy's mood remained "stable but upset" with pleasant affect, and no evidence of suicidal or homicidal ideation. He reported that his appetite was "fair" and his Mental Status Examination was otherwise unremarkable. GAF was again rated at 58. Dr. Reese itemized his recommendations as follows:

1) As I/P has been psychologically cleared by psychiatry and primary clinicians trained in the transsexual process, I/P should complete this process in a timely manner.
2) I/P's continued mental (and) physical health require that she complete the transsexual process, as so diagnosed, and prepared for during the last 13 years of estrogen therapy, and psychiatric/psychological treatment.
3) I/P has requested a female name change (Lael Michelle Norsworthy). This should be granted when the operation is completed.
4) Upon completion of the surgery, if not released on parole, I/P should be transferred to a CCR female institution.
5) In my opinion, health, safety, fairness and justice mandate the above recommendation be done for the continued well-being of this individual, in the best interests of inmate Norsworthy and the CDCR.

[**Evaluator's Note**: Dr. Reese is clear in explaining the basis for his recommendations, and it is clear that both he and I/P Norsworthy believe the patient is prepared for the procedure and that his mental health would benefit from completion of that step of the reassignment process. However, neither in this note nor previous entries does he directly address the issue of medical necessity, as required under Department regulations (Title 15 § 3350).]

Confidential Saved 2014-08-26T16:53:10Z

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                          Page 13

05/02/2013  I/P Norsworthy was seen by Dr. Reese and reported "I am making progress with my sex change request. I am a biological female. This is my 13[th] year of female sex hormones—so I am psychologically ready for operation."  The Mental Status Examination was unremarkable, and his GAF was rated as 63. Dr. Reese noted, "recommend for sex change operation—I/P is psychologically ready."

05/10/2013  The patient was seen again by Dr. Reese, and I/P Norsworthy reiterated his belief that he was "psychologically ready for this trans-sexual operation."  His mood was described as "anxious and somewhat depressed." GAF was rated at 62.

05/17/2013  The next session occurred on 05/17/2013 and was described as a brief session due to a conflicting medical appointment.  Dr. Reese indicated that he planned to fully discuss the psychiatric, psychological, and medical evaluations related to the transition process from male to female in the next session.  He documented comments attributed to the patient (i.e. "Subjective") as follows:

> Note that I/P Norsworthy has taken Estradiol hormones for the past 13 years and is now a biological female based upon her estrogen female hormone counts, and the fact that her testosterone hormone count is well below that of a biological male.  The next step in her trans-sexual transition process is for her to have the operation which uses her extant scrotal sac and phallus to construct her vagina. Michelle has taken the female name of Lael Michelle (child favored by God) and wants approval to use this name, following her sex change operation.  At that juncture I/P Norsworthy expresses a wish to be transferred as a biological and physiological female to a CDCR female inmate institution.

His mood was described as "anxious and somewhat depressed about her situation," with the GAF rated as 62. The plan for treatment included therapy regarding mood changes and "monitoring the process of sex change from male to female."

On 05/24/2013: I/P Norsworthy presented with labile mood, but denied suicidal or homicidal ideation. Dr. Reese processed the decision to transfer I/P Norsworthy's care to another clinician, Dr. Heigh, and I/P Norsworthy indicated that he preferred to wait until Dr. Heigh returned from medical leave to resume sessions.  His mood was reported as "anxious and somewhat depressed about her situation," with GAF rated as 52.

06/03/2013:  This session was scheduled in preparation for IDTT. Dr. Balch reported completing a suicide risk assessment and Mental Health evaluation.  The chief complaint noted was "I spend most of my day feeling vulnerable," with stressors reported as "a woman living in a male environment" and ambivalence about being single celled. I/P Norsworthy was continuing to deal with frequent intense panic attacks, and reported being "extremely angry" over being reassigned to a different clinician. His Mental Status Examination was unremarkable, and his GAF rated at 65.

06/10/2013: I/P Norsworthy was interviewed by a clinical supervisor to assess his reaction to his reassignment from Dr. Reese to another primary clinician.  The patient reported he was "lonely and was feeling abandoned...not only because of that change but because he is housed in a single

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                          Page 14

cell per custody because of safety concerns." He had requested a cellie be assigned to him. I/P
Norsworthy also noted he is petitioning the State for a sex change operation, which, if granted,
he expected would cost the State $1,000,000. He was assessed to be "slightly depressed" and
reported that he had had "fleeting suicidal thoughts when he was first changed to a new clinician
but he is 'ok' now." The Mental Status Examination otherwise was unremarkable, and his GAF
was rated at 60.

06/11/2013: Review of I/P Norsworthy's annual treatment plan dated 06/11/2013 noted that I/P
Norsworthy reported his stressors as "I am a woman living in a male environment." He was
described as experiencing "symptoms of anxiety and "panic" related as a residual symptom from
having been raped in prison." A total of six panic attacks in the previous two months were
reported, rated as seven of ten in intensity. I/P Norsworthy identified coping with having been
raped and gender identity issues as being constant daily stresses." He commented, "I (am) kind
of mother to the new transsexuals, get them bras." Mood swings again were identified as his
primary problem, though he reported his mood generally had been "fairly stable, controllable;"
however he acknowledged he was angry about his treatment being transferred from Dr. Reese to
a different therapist. He reported his sleep was disturbed by nightmares related to his rape
approximately twice a week, and that he was waking up with night sweats. No disturbances of
thought processes or cognition were noted, and orientation, speech, affect, and mood all were
within normal limits.

08/08/2013: On 08/08/2013 Dr. Balch noted that I/P Norsworthy reported continued mood
swings triggered by interpersonal situations, which he attributed to his hormone treatment. He
denied family stressors, or stress from the legal issues he is dealing with, and cited the interview
conducted in conjunction with this evaluation as stressful. Much of the session was spent
processing the patient's reaction to the recent suicide of an inmate in another prison, and his
reactions were judged to be normal grief responses. The Mental Status Examination conducted at
that time was unremarkable, and his GAF was rated as 65.

Substance Abuse History:
Mr. Norsworthy stated that he began drinking when he was 13-years-old, and began drinking
heavily during basic training in the Army. The alcohol reportedly made him sick, but
nevertheless he drank as much as he could. When intoxicated his behavior became "bizarre," and
alcohol clearly played a significant role in the altercation which led to his incarceration. In
addition to alcohol, I/P Norsworthy acknowledged that he had tried "everything," but did not
consistently use substances other than alcohol. He stated he stopped drinking and using in order
to be in control of his faculties, and has been sober since 1998, though he reported he still has
cravings.
(Evaluator's note: A progress note date 8/29/2005 documents I/P Norsworthy's statement that,
at that time, he had been using drugs and alcohol 1-2 times a week, and was advised that the
infraction would be reported to custody. I/P Norsworthy acknowledged that action was
consistent with policy, and reportedly was not upset by the reporting.)

Mental Status Examination

I/P Norsworthy was interviewed in conjunction with an ongoing review of an appeal s/he
submitted regarding request for sexual reassignment therapy. The interview was conducted in a
confidential office setting, with the I/P seated and without physical restraints. Review of DECS

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                    Page 15

indicated that no special communication accommodations were required to conduct the
interview, and no ADA issues were identified that related to communication or the interview
setting. Effective communication was judged to have been achieved based on the I/P's
restatement of the purpose of the interview, and the relevant questions and responses provided
throughout the interview. After discussing the purpose of the interview, consent was given by
the I/P to proceed with the interview.

I/P Norsworthy presented on-time and was alert and oriented to person, place, time and situation.
S/he was neatly dressed in institutional issued clothing, including a bra with appropriate T-shirt
covering, as well as well groomed with conservative facial make-up evident. Speech was normal
in volume, pace, rhythm and spontaneity. Thoughts were logical and goal-oriented, with no
evidence of delusions, auditory or visual hallucinations, or other Schneiderian symptoms.
Suicidal ideation and thoughts of harming others were denied by the I/P. Mood was mildly
anxious, with a full range of affect appropriate to mood. Memory for recent and remote events
was grossly intact. Insight and judgment were within normal limits. The I/P was cooperative
and responsive to all questions, and, based on documents presented during the session and the
consistency of responses provided, appeared to be reliable historian.

Current Medications

The UHR reports that I/P Norsworthy is taking the following medications:

1) aspirin 81 mg as needed;
2) Clotrimazole 1% twice daily (topical, applied to toenails);
3) Estradiol valerate 20 mg IM weekly;
4) Medroxyprogesterone 10 mg daily;
5) Ranitidine HCL 150 mg twice daily;
6) Spironolactone 100 mg twice daily.

**Gender Identity Disorder Diagnostic Considerations:**

According to the DSM-IV TR, two components must be present for the diagnosis of Gender
Identity Disorder. Criterion A requires "evidence of strong and persistent cross-gender
identification, which is the desire to be, or the insistence that one is, of the other sex;" and
Criterion B which states that "cross-gender identification must not merely be the desire for any
perceived cultural advantages of being the other sex. There must also be evidence of persistent
discomfort about one's assigned sex or a sense of inappropriateness in the gender role of that
sex." In addition, Criterion B requires that there "must be evidence of clinically significant
distress or impairment in social, occupational, or other areas of functioning...Gender Identity
Disorder represents a profound disturbance in the individual's sense of identity with regard to
maleness or femaleness."

Criterion A. While I/P Norsworthy went through an extended period of gender identity
confusion from adolescence through early adulthood, he appears to have consolidated his gender
identity around that of a transgender female during the 1990s. For approximately 15-20 years he
has been attempting to live as a female, within the constraints of his classification and housing
as a male in the CDCR system. He received a thorough psychological evaluation in 2000 from Dr.
Viesti who concluded that I/P Norsworthy met criteria for a diagnosis of GID. I/P Norsworthy's

Confidential Saved 2014-08-26T16:53:10Z

AG000859

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                           Page 16

subsequent behavior appears to confirm the accuracy of that diagnosis. On receipt of Dr. Viesti's psychological consultation report, Dr. Kohler confirmed I/P Norsworthy's appropriateness for hormone therapy, and initiated treatment.

Criterion B.  I/P Norsworthy listed the following issues that create distress for him related to his gender identity:

- I cannot shower with men.
- I do not feel safe being around male prisoners – I suspect the frequent moves were for safety.
- The requirement for continued hormone therapy.
- I live a submissive existence with men. I achieve life satisfaction from being pleasing to my male partner.
- My sexual arousal comes from the submissive activities.
- I think about living a miserable existence. I am not happy with who I am.
- I can have anal intercourse and have an orgasm but it falls short – it is not a vagina. It is not the same.

These and related fears have led to I/P Norsworthy being placed in AdSeg for safety, as well as being transferred frequently between institutions.  He has been briefly hospitalized in response to concerns about being attacked for his feminine appearance.

Based both on the results of the interview conducted for this evaluation and review of available documentation since 1987, it does not appear that I/P Norsworthy has pursued classification as a GID patient for any "perceived cultural advantages" related to female status.  While the record shows that he has received single cell placement and special housing in response to safety concerns related in part to his feminine presentation, as well as occasional informal accommodations with respect to showers and other "modesty" issues, those do not appear to be the basis for I/P Norsworthy pursuing gender change treatment.

Based on the above rationale, the following diagnosis is offered:

| | |
|---|---|
| Axis I: | Post-traumatic stress disorder, in partial remission (DSM-IV-TR 309.81) |
| | Gender Identity Disorder, sexually attracted to males (DSM-IV TR 302.85) |
| | Alcohol abuse, in sustained Institutional Remission (DSM-IV TR 305.00) |
| Axis II: | 301.9 Personality Disorder NOS, with Narcissistic and Borderline Features |
| Axis III: | Gender reassignment hormone treatment; HEP-C |
| Axis IV: | Moderate to Severe:  Incarceration; history of rape; estrangement from family. |
| Axis V: | Current: 65   Highest in past year: 65 |

Confidential Saved 2014-08-26T16:53:10Z

AG000860

**ER 179**

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                                        Page 17

**Summary and Conclusion:**

1. *Does the medical record reflect compliance with current Department policy for classification as a Gender Identity Disorder (GID) patient?* **Substantially compliant.**

   While I/P Norsworthy went through an extended period of gender identity confusion, he appears to have consolidated his gender identity around that of a transgender female during the 1990s. For approximately 15-20 years he has been attempting to live as a female, within the constraints of his classification and housing as a male in the CDCR system. He received a thorough psychological evaluation in 2000 from Dr. Viesti who concluded that I/P Norsworthy met criteria for a diagnosis of GID. I/P Norsworthy's subsequent behavior appears to confirm the accuracy of that diagnosis. On receipt of Dr. Viesti's psychological consultation report, Dr. Kohler confirmed I/P Norsworthy's appropriateness for hormone therapy and initiated treatment. That treatment has continued through the present time.

   However, absent from the available documentation is an indication of a CDCR 128-C3 chrono documenting the joint conclusion of the medical and psychological evaluators (although chronos authorizing issuance of a brassiere were completed most years), as well as a joint treatment plan that clearly spells out the anticipated course of treatment. This lack of clarity and documentation substantially increase the likelihood of misunderstandings and miscommunication between inmate-patients and their treatment teams.

   (Evaluator's note: It should also be noted that current policy does not clearly specify that a joint treatment plan must be developed for GID cases or who is responsible for completing that process. However, under Title 15 § 62080.3, special medical treatment classification decisions do require annual reviews documented by a CDCR 128-C3, which does not appear to have happened consistently in this case.)

2. *If properly diagnosed as a GID patient, has I/P Norsworthy received mental health services consistent with his diagnosis and mental health needs?* **Yes.**

   Although disrupted by a series of transfers—generally in response to patient safety concerns, the UHR documents continuous availability of mental health services which have addressed I/P Norsworthy's mental health needs, including assisting him in adjusting to the effects of hormone treatments on his ability to program safely on the yard. Over the course of treatment his level of care has been adjusted with placements in OHUs and MHCB units as necessary for safety, in response to changes in his level of symptoms and functioning. The frequency of sessions also has been adjusted in response to increased acuity levels, and he continues to be monitored closely for safety.

3. *Is there documented evidence that I/P Norsworthy has been recommended and approved for sex reassignment surgery (SRS) by competent medical and psychological/psychiatric clinicians, consistent with Department policy?* **No, based on available records.**

   Based on UHR progress notes and his responses during the interview conducted by this evaluator, I/P Norsworthy clearly believes he has been approved for sexual reassignment

Confidential Saved 2014-08-26T16:53:10Z

AG000861

**ER 180**

surgery (SRS). However the available evidence does not clearly document that the necessary recommendations have been made or approved, consistent with Department policy.

Medical Approval: There does not appear to be evidence on the record that the gender and endocrinology specialists involved in I/P Norsworthy's care have made a specific recommendation regarding SRS. Dr. Kohler clearly approved, initiated, and supervised I/P Norsworthy's hormone therapy for several years. However the information available in the UHR does not document her recommendation, if any, regarding SRS. Drs. Patel and Kumar, endocrinologists, note that I/P Norsworthy reported he had been approved for SRS and that the patient was moving forward with that plan, but does not indicate that either of them offered their independent recommendations regarding the surgery.

Mental Health Approval: Dr. Viesti provided a comprehensive psychological evaluation in 2000 and concluded that I/P Norsworthy did meet criteria for GID. However the only note (January 12, 2000) reporting the result of his evaluation does not document a recommendation regarding SRS. In the years following Dr. Viesti's report and confirmation of the GID diagnosis, the diagnosis was carried forward by treating clinicians, but, until care was assumed by Dr. Reese, none of the treating clinicians offered an opinion regarding the necessity of SRS that was documented in the available records.

Dr. Reese began treating I/P Norsworthy primarily for symptoms of PTSD related to his rape at MCSP after his transfer to CTF in 2012, although his notes do indicate that I/P Norsworthy's GID issues also were discussed. The progress notes began to reflect increasing advocacy in support of I/P Norsworthy's request for SRS in the Fall 2012 (e.g., 11/29/2012), the primary focus of treatment appeared to remain that of coping with PTSD symptoms related to the rape. When I/P Norsworthy was denied parole in March 2013, Dr. Reese appears to have shifted the focus of therapy away from the PTSD symptoms to supporting I/P Norsworthy's efforts to obtain SRS. There is no indication that this shift in treatment focus was endorsed by the IDTT, consistent with the 2009 Mental Health Services Delivery System Program Guide.

Dr. Reese refers generally to detailed documentation in the patient's medical record and indicates I/P Norsworthy is "psychologically cleared and ready for this procedure" (progress note dated March 8, 2013). However he fails to cite the specific evidence to which he is referring that supports his conclusion that I/P Norsworthy has not achieved "normal mental health," nor evidence supporting his recommendation that a sex change operation would be the appropriate and effective intervention needed for I/P Norsworthy to achieve "normal mental health." On the contrary—and consistent with the impressions of this evaluator derived from the interview conducted for this evaluation, since beginning treatment with I/P Norsworthy, Dr. Reese's assessments indicate that his mood has been stable (though upset), his affect pleasant, and that the symptoms he was dealing with focused primarily on PTSD secondary to the rape reported at MCSP. That impression is reinforced by the fact that I/P Norsworthy appears to have developed sufficient resilience to maintain a stable mood under duress, as evidenced by his reported reaction to the hearing at which he testified regarding the MCSP rape (see progress note

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                    Page 19

dated 10/18/2012) and his ability to cope successfully with the disappointment of being
denied parole at the BPT Hearing on 03/06/2013.

Absent substantiated evidence of medical necessity, a recommendation for SRS does not
appear to be consistent with current CDCR policy regarding medical treatment (Title 15,
§ 3350.1(b)).

4. *Given that Title 15, § 3350.1 (b) specifically defines castration and vaginoplasty as
among the surgical procedures not considered to be medically necessary and therefore
generally are not provided to inmates by CDCR. Do I/P Norsworthy's current mental
health needs meet the criteria for provision of SRS as an exception to those general
exclusions due to medical necessity as defined in Title 15, § 3350?* **No, not at this time.**

Title 15 § 3350(a) specifies the medical services available to inmates as those "which are
based on medical necessity and supported by outcome data as effective care." Medical
necessity is further defined as "health care services that are determined by the attending
physician to be reasonable and necessary to protect life, prevent significant illness or
disability, or alleviate severe pain, and are supported by health outcome data as being
effective medical care" (Title 15 § 3350(b)(1).

Available documentation over the past several years supports the conclusion that I/P
Norsworthy has been programming effectively and functioning well with his current
mental health and hormone treatment regimen. He has found rewarding volunteer
activities (e.g., PREA educator) and work in his current ADA Assistant assignment, and
appears to be respected by staff and peers. Mental health progress notes over the past
year generally indicate no urgent emotional, cognitive, or behavioral problems related to
his gender identity, and he consistently has been judged to present with stable mood and
pleasant affect, with no thoughts of harming himself or others. He has maintained a low
custody score and minimal disciplinary profile for many years. In short, based on his
reported successful programming, generally stable mood, and the meaningful activities he
has found and in which he reports finding meaning, SRS does not appear to be necessary
in order for I/P Norsworthy to function effectively in prison. Furthermore, there is
nothing in the available medical record that indicates that SRS is an urgent issue in
maintaining the patient's physical health. While it appears likely that his medical
consultants would approve him as a candidate for SRS as an *elective* procedure, in the
opinion of this evaluator the available documentation does not establish SRS as medically
necessary at this time.

In addition, this evaluator notes that it has been over 25 years since I/P Norsworthy has
experienced free society. While for much of that time he has been living as much as a
female as permitted in a male institution in CDCR, it is unclear whether or not his
decision regarding SRS would change following release. Given the relative permanence
of this procedure and the absence of urgent medical reasons for immediate action,
delaying surgery for three—or possibly fewer—years in anticipation of a possible
granting of parole at the next BPT hearing would preserve the opportunity for I/P
Norsworthy to "update" his understanding of current society, and make his final SRS
decision with the knowledge that experience would afford him.

Confidential Saved 2014-08-26T16:53:10Z

AG000863

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                        Page 20

In my opinion, SRS at this time not only does not meet the test of medical necessity, but, given the potential medical complications of any major surgical procedure, and the time, energy, and attention required to successfully undergo and recover from such surgery, this procedure very possibly could undermine I/P Norsworthy's efforts to achieve a more important step toward living fully and freely as a woman—namely, obtaining his release from prison. The Board made clear in its March 2013 ruling that I/P Norsworthy was eligible to petition for a rehearing in three years—or sooner, if he could demonstrate progress in achieving the growth outlined in their ruling. In my opinion, remaining "laser focused" on demonstrating progress on the issues cited by the Board in denying parole at I/P Norsworthy's 03/06/2013 hearing should remain the primary focus of his mental health care.

**Recommendations**:

As noted above, in the opinion of this evaluator, incarceration remains the single greatest obstacle to I/P Norsworthy's desire to live fully and freely as a woman, as well as to his overall mental health and well-being. From that perspective, ensuring that he does everything in his power to demonstrate to the Board of Prison Terms that he has made significant progress toward achieving the goals recommended to him in their latest ruling should be his most immediate concern, and the primary focus of his treatment. (Completing sexual reassignment surgery was not among the concerns articulated by the Board.) In light of the Board's comments, the following recommendations are offered for consideration by I/P Norsworthy and his treatment team:

1. *Continue current hormone therapy and medical treatment as directed by I/P Norsworthy's treating and consulting physicians.*

2. *Focus Mental Health treatment on improving coping strategies and addressing areas of concern raised by BPT in their comments during the 03/06/2013 hearing, including:*

   a. *Improving judgment and impulse control in the context of disappointment and lawful direction with which I/P Norsworthy disagrees.*
   The BPT noted that consistent maintenance of a discipline-free record was a critical factor in their decision regarding release (03/06/2013 Transcript 12:12-24). The Board noted a pattern of discipline-free living, punctuated by periods in which I/P Norsworthy receives a series of counseling chronos followed by a 115. The Commissioners noted that they did not believe he deliberately set out to violate rules, but, similar to the situation that led to his commitment offense, when situations arise that upset him, he is prone to acting impulsively in ways that undermine his efforts to change his behavior.

   b. *Support increased involvement in volunteer and self-help opportunities available to him, particularly regular participation in AA and other 12-step groups.*
   The Board complimented I/P Norsworthy on the steps he has taken to involve himself in pro-social helping activities, but also noted the importance of participation in those activities as part of his own recovery and support process. Particularly if released at his next hearing, establishing a relapse prevention strategy will be critical to successful reintegration in the community, and will be

Mental Health Evaluation: Gender Identity Disorder Evaluation
Norsworthy, Jeffrey "Michelle" CDC #:D54100                                    Page 21

helpful to him immediately as one of the tools available to him to help cope with issues that emerge between scheduled therapy sessions. Reducing the level of professional support needed to maintain behavioral control and emotional stability will help demonstrate I/P Norsworthy's readiness for release. Consistent use of self-help resources is a skill that will transfer to community settings, and something that is in the patient's direct control—not dependent on insurance, publicly funded programs, or other factors that may or may not be available at times of crisis.

    c.   *Continue processing PTSD symptoms related to the rape I/P Norsworthy has disclosed and previously has been working on in therapy.* Work to identify triggers and improving his ability to contain his reactions to those triggers appears central to ensuring his behavioral and emotional stability.

    d.   *Continue psychotropic medication treatment as indicated and order by his treating psychiatrists.*

3.   *Subject to Custody factors and Departmental need, continue current housing assignment.* I/P Norsworthy appears to have adjusted well to his current institution, and is engaged in a job and volunteer activities which he finds meaningful, and in which reports indicate he is performing well. These roles can be helpful in further consolidating a healthy self-image, and in developing future job and community involvement directions that will contribute to his success both while incarcerated and in the community, should he be granted release.

4.   *Assist in efforts to strengthen communication and rebuild a relationship with I/P Norsworthy's daughter.* I/P Norsworthy indicated during his interview that his daughter recently has expressed some interest in reestablishing communication with him. Rehabilitating that relationship likely would be beneficial both to I/P Norsworthy and to his daughter, and can further reinforce the development of a healthy self-concept, as well as enhance the support system available to both.

Signed,

Raymond J. Coffin, Psy.D.
Chief Psychologist
CSATF/SP-Corcoran

Date: 10/10/2013

Confidential Saved 2014-08-26T16:53:10Z

AG000865

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                             NORTHERN DISTRICT OF CALIFORNIA

10

11   JEFFREY B. NORSWORTHY (a/k/a          CASE NO. 3:14-CV-00695-JST
     MICHELLE-LAEL B. NORSWORTHY),
12                                         DECLARATION OF DR. MARCI L.
                      Plaintiff,           BOWERS IN SUPPORT OF PLAINTIFF'S
13                                         MOTION FOR PRELIMINARY
            vs.                            INJUNCTION
14
     JEFFREY BEARD, A. NEWTON,
15   A. ADAMS, LORI ZAMORA,
     RAYMOND J. COFFIN, MARION
16   SPEARMAN, DAVID VAN LEER, JARED
     LOZANO, and DOES 1-30,
17
                      Defendants.
18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
  SAN FRANCISCO                                     DECLARATION OF DR. MARCI BOWERS

DB2/ 25728882.1

**ER 185**

1.    I, Marci L. Bowers, MD have been asked by Plaintiff Michelle Norsworthy, by and through counsel, to provide my expert medical opinion regarding the efficacy and appropriateness of sex reassignment surgery as a medically necessary treatment for gender dysphoria.  I have actual knowledge of the matters stated herein and could and would so testify if called as a witness.

### QUALIFICATIONS AND BACKGROUND

2.    I am a pelvic and gynecologic surgeon with over 25 years experience. I was the former Department Chairperson at Swedish Medical Center (Providence) in Seattle, where I practiced as an Obstetrician/Gynecologist for 20 years, delivering more than 2,200 babies. I currently practice general gynecology and surgery and am the first North American gynecologic surgeon trained to functionally reverse female genital cutting.

3.    I am board certified by the American Board of Obstetrics & Gynecology.

4.    I am licensed to practice medicine in the states of Washington and California.

5.    I have completed over 3,000 sex reassignment surgeries and performed approximately 220 other surgeries related to gender transition annually. Around 90% of the surgeries have been for people transitioning from male to female.

6.    I received my bachelor's degree in Medical Microbiology (1980) from the University of Wisconsin, Madison, WI, my medical degree (1986) from the University of Minnesota, Minneapolis, MN. I completed my residency (1986-1990) in Obstetrics/Gynecology at the University of Washington, Seattle, WA.

7.    I am a current member of the European Academy of Sciences. I was honored as one of the Best Doctors in America (2002-2004), awarded the Chief Resident Award for Teaching Excellence (1986-1990), and was President of the University of Minnesota Medical Student Council (1985-1986).

8.    I frequently speak at medical schools across the United States and with media on the subject of SRS. I have demonstrated SRS surgical techniques for plastic surgeons and urologists in Australia, Belgium, Brazil, China, Israel, Mexico, Serbia and other countries.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25728882.1

2    DECLARATION OF DR. MARCI BOWERS

ER 186

9. I have published three chapters in books related to sex reassignment surgery:

- "Complications of Male-to-Female Vaginoplasty" in MANAGEMENT OF GENDER DYSPHORIA: A MULTIDISCIPLINARY APPROACH. Trombetta et al. (Ed.), 2015.
- "Transgender Surgery" in TRANS BODIES, TRANS SELVES: A RESOURCE FOR THE TRANSGENDER COMMUNITY, Erickson-Schroth (Ed.), 2014.
- "Male-to-female Vaginoplasty" in AESTHETIC GYENECOLOGY. GOODMAN,ALSINROD, ET AL

10. I have not provided deposition or trial testimony as an expert witness in the past four years.

11. I am providing my expert consulting services in this case *pro bono* due to Ms. Norsworthy's inability to pay as a result of her incarceration.

12. A copy of my curriculum vitae is attached as Exhibit A.

## OPINIONS

13. In forming my opinions, I have relied on my scientific education and training, my knowledge of the scientific literature in the pertinent fields, and my extensive clinical experience in treating patients with sex reassignment surgery. Based on my review of the foregoing, and for reasons set forth in more detail below, my opinions are the following:

### I. Sex Reassignment Surgery for Transgender Female Patients

14. For transgender female patients, sex reassignment surgery generally consists of: vaginoplasty (including orchiectomy) and also may include breast augmentation, tracheal shaving (chondrolaryngoplasty), and facial feminization surgery (FFS).

15. Vaginoplasty is the definitive male-to-female sex reassignment surgery. Historically, the procedure was first performed in Berlin in 1933 and was the culmination of research that began in the early 1910s by Drs. Steinach and Hirschfeld. Their early research enabled the eventual discovery of the world's first synthetic estrogen. Following the destruction of Dr. Hirschfeld's research laboratory by the Nazi party in 1933, a psychiatrist working in the

DB2/ 25728882.1

3       DECLARATION OF DR. MARCI BOWERS

**ER 187**

**V.     Sex Reassignment Surgery is Medically Necessary Treatment**

31.     Although some transgender people are able to effectively treat their gender dypshoria through other treatments, sex reassignment surgery for many people is a medically necessary treatment needed to treat gender dysphoria and establish congruence with one's gender identity.

32.     Sex reassignment surgery is not an "experimental" or "cosmetic" procedure. Many thousands of gender corrective surgeries have been performed worldwide for decades, and the treatment is in no way "experimental."  Rather, sex reassignment surgery has been shown to be a life-saving procedure and is unequivocally medically necessary.

33.     The American Medical Association ("AMA"), the preeminent health care organization in the United States, along with the American Psychiatric Association and other health care organizations[4] have issued resolutions supporting coverage of sex reassignment surgery as a medically necessary treatment for gender dysphoria.

34.     It is vital that patients with severe gender dysphoria have access to sex-reassignment surgery in a timely manner. Gender dysphoria, if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating expression and, for some people without access to appropriate medical care and treatment, suicidality and death.  As stated in the AMA resolution, "delays in access to appropriate medical care for gender identity disorder can result in significant psychological distress including debilitating depression, suicidality and death."

35.     MediCal is California's version of the federal Medicaid program, which provides health coverage for low-income people and people with disabilities. MediCal covers sex reassignment surgery as a medically necessary treatment. I have a contract with the San Francisco Health Plan and also contract with other county MediCal administrators in California to provide

---

[4] Lambda Legal Professional Organization Statements Supporting Transgender People in Health Care. See http://www.lambdalegal.org/sites/default/files/publications/downloads/fs_professional-org-statements-supporting-trans-health_4.pdf

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25728882.1

8                    DECLARATION OF DR. MARCI BOWERS

ER 188

SRS and other transition-related surgeries.  We have performed approximately two dozen MediCal contracted patients to date, all with relatively positive outcomes.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 31, 2015

Marci L. Bowers, MD

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25728882.1

9

DECLARATION OF DR. MARCI BOWERS

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10

11   JEFFREY B. NORSWORTHY (a/k/a            Case No. 3:14-CV-00695-JST

12   MICHELLE-LAEL B. NORSWORTHY),
                                             **DECLARATION OF DR. R. NICK**
13              Plaintiff,                   **GORTON IN SUPPORT OF**
                                             **PLAINTIFF'S MOTION FOR**
14        v.                                 **PRELIMINARY INJUNCTION**

15   JEFFREY BEARD, A. NEWTON,

16   A. ADAMS, LORI ZAMORA,
     RAYMOND J. COFFIN, MARION
17   SPEARMAN, DAVID VAN LEER, JARED
     LOZANO, and DOES 1-30,
18
                Defendants.
19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
  SAN FRANCISCO

**ER 190**

1.    I, R. Nick Gorton, have been asked by Plaintiff Michelle Norsworthy, by and through counsel, to review Ms. Norsworthy's relevant medical records and provide my expert medical opinion regarding what would constitute "adequate medical care" for Ms. Norsworthy. I have actual knowledge of the matters stated herein and could and would so testify if called as a witness.

## I.    QUALIFICATIONS

2.    I received my medical degree from the University of North Carolina School of Medicine in 1998 and completed my residency and chief residency in emergency medicine at Kings County Hospital in Brooklyn, New York.

3.    I am a physician licensed in California with expertise in the treatment of transgender patients. In addition to working as an Emergency Medicine physician at Sutter Davis Hospital, for the past decade I also have served as a primary care physician at Lyon-Martin Health Services ("Lyon-Martin") in San Francisco. Lyon-Martin is a non-profit organization providing community-based health care services in a safe and compassionate environment, with sensitivity to sexual orientation and gender identity, for the past 30 years. In addition, Lyon-Martin is one of just a handful of sites in the United States that trains medical students, residents, and fellows to provide transgender primary care, and I have been a primary clinical instructor for over 75 trainees during this time.

4.    Through my work volunteering in Lyon-Martin's transgender clinic, I have provided primary care and transgender-related care to over 200 transgender patients. I provide medical assessments, initiate and monitor hormonal treatment. I determine whether and when patients meet criteria for sex reassignment surgeries, provide pre-operative preparation and clearance, and provide post-operative care in consultation with the appropriate surgeon.

5.    In addition to my services at Lyon-Martin, I serve as a consultant for Trans Line a national transgender medical consultation service for clinicians needing expert advice about the care of their individual patients.

6.    I also am an active member of the World Professional Association for Transgender Health (WPATH) and serve on their research committee. I am also on the medical advisory board

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

2

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

ER 191

1   of the UCSF Center of Excellence for Transgender Health and have served on the American

2   Medical Association's GLBT Advisory Committee.

3        7.      I have presented lectures and grand rounds at numerous medical school and

4   residency programs throughout the United States as well as national and international

5   conferences.

6        8.      As identified in my Curriculum Vitae, I also have co-authored both professional

7   journal articles and chapters and sections in professional texts as well as those aimed at the

8   transgender community itself.

9        9.      I have not provided expert deposition or trial testimony in any litigation in the past

10  four years.

11       10.     I am providing my expert consulting services in this litigation pro bono due to

12  Ms. Norsworthy's inability to pay as a result of her incarceration.

13       11.     A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit A.

14  **II.    MATERIALS CONSIDERED**

15       12.     In addition to drawing on my experience, training and review of research over the

16  past decade treating transgender patients, I also have reviewed certain of Ms. Norsworthy's

17  medical records.  (AG000001-AG000033, AG000054-AG000139, AG000176-AG000187,

18  AG001221-AG001356, AG001438-1478, AG005141-AG005171.)

19       13.     I also have reviewed the deposition testimony provided by Ms. Norsworthy in this

20  case on December 30, 2014.

21       14.     In addition, I have reviewed the Mental Health Evaluation Gender Identity

22  Disorder Evaluation," dated October 10, 2013 prepared by Dr. Raymond Coffin "as part of a

23  CDCR review of [Ms. Norsworthy's] appeal … request[ing] approval for gender reassignment

24  surgery and related 'adequate medical care.'"  (AG000845-AG000865.)

25  **III.   MS. NORSWORTHY'S MEDICAL HISTORY**

26       15.     Ms. Norsworthy is a fifty year old transgender woman that was originally

27  diagnosed with gender identity disorder (now referred to as Gender Dysphoria) in or around 2000.

28  In the years that have followed, Ms. Norsworthy's Gender Dysphoria has been re-confirmed by

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25721564.5

3

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

**ER 192**

1   multiple mental health professionals. (*See, e.g.*, AG000845-AG000865.) Ms. Norsworthy has

2   been receiving hormonal treatments for her Gender Dysphoria since that time. Ms. Norsworthy

3   also has been living in the appropriate female role since at least that time, including the use of her

4   preferred name, Michelle.

5         16.    Despite having received hormone therapy and counseling for over a decade, in

6   2012, Ms. Norsworthy's treating mental health provider noted that she continued to suffer

7   dysphoria and recommended that Ms. Norsworthy "should be scheduled for the sex change

8   operation as part of a clinical and medical necessity for her health and well-being." (AG000854.)

9         17.    In addition to Gender Dysphoria, Ms. Norsworthy also was diagnosed with

10  hepatitis C after being raped at Mule Creek State Prison in or around 2009. (AG000849,

11  AG001298.) As a result, Ms. Norsworthy has ongoing liver damage and repeatedly has had

12  significantly elevated hepatic transaminase levels (reflecting ongoing damage to her liver from

13  the infection). Ms. Norsworthy has not been provided with treatment for her hepatitis C. (*See,*

14  *e.g.*, AG001308, AG001302, AG1290.)

15        18.    Ms. Norsworthy also has a history of hypertension and has an allergy to

16  spironolactone. (AG005167-AG005169.)

17  **IV.    MS. NORSWORTHY'S TREATMENT**

18        19.    As noted, Ms. Norsworthy has been receiving hormone replacement therapy for

19  over a decade. There are certain risks associated with the long term use of the high dosages of

20  hormone replacement therapy needed for preoperative female transgender patients like

21  Ms. Norsworthy. These include heart attack, stroke, deep venous thrombosis (blood clots that

22  often form in the deep veins of the legs) and pulmonary emboli (blood clots that have embolized

23  to the lungs), breast cancer, liver toxicity, and development of pituitary tumors called

24  prolactinomas. Most of these risks increase and become more serious for older patients.

25        20.    Ms. Norsworthy's hepatitis C and allergy to spironolactone, individually and taken

26  together, make her hormone replacement therapy more difficult and more dangerous for Ms

27  Norsworthy. Specifically, hepatitis C is associated with ongoing liver damage, the effects of

28  which can be exacerbated by the hormone replacement therapy - specifically with the oral

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

4

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

**ER 193**

1    estrogens that Ms. Norsworthy has been provided.  Spironolactone is the most common anti-

2    androgen used in the treatment of transgender women in the United States to suppress

3    testosterone production. Because of her allergy, suppression of Ms. Norsworthy's androgen

4    production (sometimes referred to as "chemical castration") had been done using a progesterone

5    as her anti-androgen. Use of a progesterone can additionally increase risk for breast cancer, heart

6    disease, and, of particular concern in Ms. Norsworthy's case, increase risk for liver toxicity above

7    that of isolated estrogen therapy.

8        21.    Indeed, Ms. Norsworthy has experienced significant complications with her

9    hormone replacement therapy.  Ms. Norsworthy's liver function tests – which already are

10   abnormally elevated because of her hepatitis C – have became even more elevated while she was

11   on hormone replacement therapy.  Either the estrogen or the progesterone (or both) may

12   contribute to this problem.

13       22.    Because of the elevation in her liver function tests, in or around August 2014, Ms

14   Norsworthy's endocrinologist ordered that her hormonal treatments – both the estrogen and

15   progesterone – be completely discontinued.  (AG000005, AG000031-AG000032.)

16       23.    Although the endocrinologist also recommended that Ms. Norsworthy receive an

17   alternative (albeit less effective) anti-androgen, called finasteride, that would not have caused

18   damage to her liver, the Chief Medical Officer at Mule Creek State Prison denied

19   Ms. Norsworthy access to this treatment, finding it to be "not essential." (AG000006.)  From a

20   medical perspective, I can see no reason why this inexpensive and effective medicine would have

21   been denied her and believe that the finasteride is "essential" in this case. While finasteride would

22   unlikely have been fully adequate as an anti-androgen, it potentially would have minimized the

23   amount of progesterone and estrogen needed.

24       24.    The complete removal of hormone therapy is an extremely dangerous course of

25   action for a patient's overall well-being and, in my opinion, was neither medically necessary nor

26   safe.  The risk of worsening gender dysphoria with resultant risk for depression and even suicide

27   is potentially much greater in the short term than the risk of a few months of liver inflammation

28   while a more permanent and medically appropriate solution to Ms. Norsworthy's problems could

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

5

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

ER 194

1    be found.  In my opinion, complete termination of the hormone therapy reflects a dangerous lack

2    of experience treating transgender patients.  An adequate, alternative course of treatment would

3    have been to decrease her dose of estrogen and demand that an alternative anti-androgen

4    medication such as finasteride be provided to her.

5              25.      Another alternative would have been to provide her estrogen through either

6    transdermal estrogen, implanted estrogen pellets, or intramuscular estrogen that would have

7    decreased toxicity compared with oral estrogen. When given orally, estrogen is absorbed and high

8    blood levels are sent directly to the liver (also known as 'first pass') which results in liver

9    toxicity.  By giving estrogen through alternate meals (injection, implant, or transdermal) this

10   would have avoided the 'first pass' effect and had diminished liver toxicity.

11             26.      In or around November 2014, after being completely off the hormone therapy for

12   three months, Ms. Norsworthy's liver function tests had improved and she was permitted to

13   resume estrogen therapy at lower dosages (but not the progesterone).  In his November 19, 2014

14   report, Ms. Norsworthy's endocrinologist once again recommended that Ms. Norsworthy be

15   given finasteride and strongly recommended that the preparation of estrogen Ms. Norsworthy

16   received be changed from the estradiol pill form to a transdermal or injected preparation.

17   (AG005167-AG005169.)  Specifically, he noted that Ms. Norsworthy's age and recent liver

18   toxicity "favor use of patch at this time.  (*Id.*)  He stated that the estradiol pill heightens the risk of

19   the liver toxicity reoccurring and thus should only be provided as a "last resort in consideration

20   with any psychological distress that she may have without estrogen." (*Id.*)  In addition, I would

21   note that transdermal estrogen also is recommended as safer for transgender women over 40

22   because it decreases the risks of deep venous thrombosis, pulmonary emboli, and heart attack.

23             27.      Although the Chief Medical Officer changed course and finally agreed to provide

24   Ms. Norsworthy with the finasteride, Ms. Norsworthy still is receiving the "last resort" treatment

25   of the estradiol pill.  This treatment clearly is not adequate and is not sustainable.  As

26   Ms. Norsworthy's endocrinologist expressly noted, continued use of the estradiol pill increases

27   the risk of the liver toxicity returning.  In fact, Ms. Norsworthy's most recent labs indicate that

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

6

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

ER 195

1    her liver inflammation – which reflects ongoing damage from the hepatitis C and medication

2    effects – has again worsened since returning to the estradiol pills.  (AG005160-AG005161.)

3         28.    This has serious, long term health implications for Ms. Norsworthy, whose liver

4    has already suffered damage from hepatitis C and is suffering further ongoing damage as a result

5    of her untreated hepatitis C.  In addition, it increases the very real risk that Ms. Norsworthy will

6    have to be completely removed from hormone therapy again, thereby exposing her to increased

7    dysphoria, which may result in serious depression or suicidal ideation or self harm. In addition,

8    Ms. Norsworthy is at greater risk for depression, suicidal ideation, or self harm even while at the

9    lower dose of estrogen she is on presently. With inadequate suppression of testosterone, physical

10   masculinizing effects are experienced by transgender women. This alone increases their

11   dysphoria and the resultant risks described above.

12   **V.    RECOMMENDED TREATMENT**

13        29.    As an initial matter, based on my review of Ms. Norsworthy's records and, in

14   particular, the recommendation from her treating mental health provider that sex reassignment

15   surgery was medically necessary, sex reassignment should have been performed years ago as a

16   medically necessary treatment for the distress Ms. Norsworthy experiences from her gender

17   dysphoria.  She meets the criteria established by the WPATH Standards of Care for sex

18   reassignment surgery as a medically necessary treatment and the delay in providing surgery has

19   subjected and continues to subject Ms. Norsworthy to significant and unnecessary pain.

20        30.    I disagree with the conclusions of Dr Coffin's report, and, in particular, his

21   conclusion that sex reassignment surgery is not medically necessary, and do not believe his

22   conclusions are reasonable based on the data available. (AG000845-AG000865.)  Dr Coffin states

23   that "the available evidence does not clearly document that the necessary recommendations have

24   been made or approved consistent with Department policy." To the contrary, Ms. Norsworthy's

25   readiness and eligibility for SRS were documented by her primary mental health provider, Dr.

26   Reese, consistent with the WPATH Standards of Care.  In fact, Dr Coffin concedes in his report

27   that Dr Reese advocated for her to have SRS. Although a formal letter of referral to a surgeon

28   apparently was not made this is not surprising since CDCR refused to approve Ms. Norsworthy's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

7

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

**ER 196**

1   surgery, so any such letter would have been premature. If Dr. Coffin believe a formal letter of

2   recommendation (which is normally sent to the surgeon who will be performing SRS) was needed

3   by the Department, he should have clarified that with the treating providers rather than claiming

4   that no approval had been obtained, which obviously is not the case based on her records.

5       31.     In addition, Dr Coffin concludes that her mental health needs are not severe

6   enough to indicate medical necessity for provision of SRS. This is completely unsupported by the

7   documentation Dr Coffin cites in his report and does not reflect the standards by which medical

8   necessity is determined for patients with GID.  Severe mental health dysfunction is not necessary

9   to refer patients for medically necessary sex reassignment surgery, and, in fact, a current severe

10  mental impairment is a contraindication for sex reassignment surgery. Patients must demonstrate

11  a reasonable level of psychological function and improvement in their social and occupational

12  functioning after the provision of hormone replacement therapy and living in the target gender

13  role, in order to be recommended for sex reassignment surgery.

14      32.     Dr. Coffin's purported use of psychological functioning as a determinant of

15  medical necessity is neither appropriate nor reflective of the current standards by which

16  transgender patients are treated.  I have had numerous patients who, like Ms. Norsworthy, were

17  highly functional yet symptomatic of gender dysphoria who have been recommended and referred

18  for surgery as a medically necessary treatment for their gender dysphoria. In my personal

19  practice, these have included nurses, a teacher, computer programmers, graduate students,

20  including a medical student, and an attorney. In all cases while they were able to function quite

21  well in work or school environments, ultimately sex reassignment surgery was medically

22  necessary and resulted in significant improvements in their overall mental health. In addition, to

23  my knowledge, in California none of the insurance providers that I have worked with (including

24  private insurance, CalPERS, and MediCal) have determined medical necessity based on such

25  criteria as Dr Coffin uses. Moreover, neither WPATH nor the American Medical Association

26  policy indicate that medical necessity should be determined by the criteria used by Dr Coffin.

27      33.     Because CDCR has not provided Ms. Norsworthy with the sex reassignment

28  surgery she seeks for her Gender Dysphoria, she has been forced to accept treatment for her

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

8

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

ER 197

1    Gender Dysphoria that is ultimately less effective and more dangerous than definitive surgery.

2    The hormone replacement therapy is causing ongoing inflammation of her liver, which already is

3    undergoing constant damage due to her hepatitis C.  As she also has not been provided with

4    currently available curative treatments for her hepatitis C, the hormone replacement treatment has

5    an additive effect of damaging her liver in addition to the damage caused by her untreated

6    hepatitis C.

7         34.    Based on a liver biopsy in 2011, a decision was made by CDCR not to treat Ms.

8    Norsworthy's hepatitis C.  With the advent of new interferon free treatment regimens that have

9    much lower side effect profiles and have been shown to achieve cure in about 95% of patients

10   with Ms. Norsworthy's subtype of hepatitis C (Type Ia),  she should be provided with this

11   curative treatment as soon as possible. While her liver biopsy in 2011 showed a low fibrosis

12   score, I believe treatment should be prioritized.  In particular, given that treatment of her gender

13   dysphoria involves the lifelong use of potentially hepatotoxic drugs, she is at greater risk for

14   development of the life threatening complications of hepatitis C.

15        35.    As a result of the damage to her liver, Ms. Norsworthy was completely removed

16   from hormone therapy with no safer replacements being offered which placed Ms. Norsworthy at

17   severe risk of worsening dysphoria, depression, and suicide.  Ms. Norsworthy continues to

18   receive ineffective hormone therapy that likely will result in continued damage to her liver and a

19   continuous cycle of going on and off the hormone treatments, resulting in unnecessary damage to

20   her liver and continually placing her at risk of worsening dysphoria.

21        36.    Without adequate hormone treatment, transgender patients' dysphoria becomes

22   worse, they experience depression, and in a significant number of cases resort to self harm or

23   suicide. In particular there are a number of cases that have been reported of transgender women

24   prisoners resorting to life threatening self-surgery when denied access to hormone therapy and/or

25   sex reassignment surgery.  [Brown, George R. "Autocastration and autopenectomy as surgical

26   self-treatment in incarcerated persons with gender identity disorder." INTERNATIONAL JOURNAL

27   OF TRANSGENDERISM 12.1 (2010): 31-39.]  In these cases the severe mental anguish of untreated

28   gender dysphoria pushes these women to castrate themselves or even amputate their penis in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25721564.5

9

**ER 198**

1  desperation when they feel completely deprived of any chance of getting appropriate medical

2  care.

3      37.     Given these circumstances, sex reassignment surgery would not only significantly

4  diminish (and potentially even permanently eliminate) Ms. Norsworthy's gender dysphoria, but

5  would also have the significant health benefit of decreasing the need for hormone therapy.  Once

6  the testosterone-producing male genitalia is removed, there is no longer a need for anti-

7  androgens.  Surgery would also significantly decrease the need for estrogens such that

8  Ms. Norsworthy could be safely treated with much smaller doses of estrogen – in a preparation

9  other than the estradiol pill – that do not risk damaging her liver and worsening the long term

10  outcome of her hepatitis C.  In addition, the significantly reduced levels of hormone therapy

11  required following surgery would reduce the risk of heart attack and stroke, which is significant

12  given Ms. Norsworthy's history of hypertension.

13  **VI.    CONCLUSION**

14      38.     In summary, based upon my experience serving as the primary care physician for

15  hundreds of transgender patients and my review of the medical records, I recommend the

16  following as the adequate, medically necessary treatment plan for Ms. Norsworthy:

17          1.     Immediate switch of the preparation for the administration of

18              Ms. Norsworthy's estrogen therapy to the patch - specifically estradiol transdermal

19              0.1 mg/day patch – 2 patches applied twice weekly or, at a minimum, injections -

20              specifically estradiol valerate 20 mg IM every 2 weeks.

21          2.     Immediate, urgent referral for genital sex reassignment surgery.

22          3.     Continue finasteride (though Lupron would be preferred) at 5 mg daily as

23              an adjunctive anti-androgen until surgery.

24          4.     Regular treatment by a qualified therapist as set out in the WPATH

25              Standards of Care with experience treating patients with Gender Dysphoria

26              throughout the time that Ms. Norsworthy is on lower dose estrogen pending the

27              definitive surgery that will further decrease her gender dysphoria to a less

28              dangerous level.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

10

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

**ER 199**

5.      Once sex reassignment surgery is accomplished, continuation of estrogen at a lower dose (typically no more than 1.5 times the normal replacement dose for cisgender women of the same age and health status).

6.      Evaluation by a gastroenterologist for curative treatment of hepatitis C.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 2, 2015

_____
R. Nick Gorton, MD

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25721564.5

11

DECL. OF DR. R. NICK GORTON ISO PL.'S
MOT. FOR PRELIM. INJUNCTION
Case No. 3:14-CV-00695-JST

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY B. NORSWORTHY (a/k/a MICHELLE-LAEL B. NORSWORTHY), | **CASE NO. 3:14-CV-00695-JST** |
| Plaintiff, | **DECLARATION OF DR. RANDI C. ETTNER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| JEFFREY BEARD, A. NEWTON, A. ADAMS, LORI ZAMORA, RAYMOND J. COFFIN, MARION SPEARMAN, DAVID VAN LEER, JARED LOZANO, and DOES 1-30, | |
| Defendants. | |

1.     I, Randi C. Ettner, have been retained by Plaintiff Michelle Norsworthy, by and through counsel, to provide my expert evaluation and opinion regarding Ms. Norsworthy's mental health condition and the appropriateness of the mental health treatment provided to Ms. Norsworthy by the California Department of Corrections and Rehabilitation ("CDCR"), including through the named defendants in this lawsuit, whom I understand to have been CDCR employees or agents during the relevant period.  This declaration provides my opinions and conclusions, including (i) scientific information regarding gender dysphoria and its impact on the health and well-being of individuals inflicted with it; (ii) information regarding best practices and the generally accepted standards of care for individuals with gender dysphoria, including the efficacy

DECLARATION OF DR. RANDI ETTNER

1   of sex reassignment surgery as a treatment for gender dysphoria; and (iii) the results of my

2   evaluation of Ms. Norsworthy and recommendations with regard to her treatment.  I have actual

3   knowledge of the matters stated herein and could and would so testify if called as a witness.

4   **I.       QUALIFIATIONS**

5          2.       I received my doctorate in psychology from Northwestern University in 1979.I

6   have been involved in treating patients with gender dysphoria[1] since 1977, when I was an intern

7   at the Cook County Hospital.

8          3.       Since that time I have developed significant experience and expertise in the

9   treatment of individuals with gender dysphoria.  In 2005, I was involved in establishing the

10  Chicago Gender Center, which specializes in the treatment of individuals with gender dysphoria,

11  and have served as the chief psychologist at the Chicago Gender Center since 2005.

12         4.       During the course of my career, I have evaluated and/or treated between 2,500 and

13  3,000 individuals with gender dysphoria and mental health issues related to gender variance.

14         5.       I have published three books related to the treatment of individuals with gender

15  dysphoria,  including the medical text entitled *Principles of Transgender Medicine and Surgery*

16  (co-editors Monstrey & Eyler; Routledge, 2007). In addition, I have authored numerous articles in

17  peer-reviewed journals regarding the provision of health care to this population. I have served as

18  a member of the University of Chicago Gender Board, and am a member of the editorial board for

19  the International Journal of Transgenderism.

20         6.       I am a member of the Board of Directors of the World Professional Association for

21  Transgender Health (WPATH) (formerly the Harry Benjamin International Gender Dysphoria

22  Association), and an author of the WPATH Standards of Care for the Health of Transsexual,

23  Transgender and Gender-nonconforming People (7th version), published in 2012.

24

25  _____

26  [1] The American Psychiatric Association published a revised version of its Diagnostic and
    Statistical Manual of Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity
    disorder" diagnosis with "gender dysphoria."  For consistency, I will refer to the condition as

27  "gender dysphoria" throughout my report, even when making reference to the condition prior to
    2013.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

2                              DECLARATION OF DR. RANDI ETTNER

7.      I have lectured throughout North America and Europe on topics related to gender dysphoria.  On numerous occasions, I have given grand rounds presentations on gender dysphoria at medical hospitals.

8.      I have been retained as an expert regarding gender dysphoria and the treatment of gender dysphoria in multiple court cases and administrative proceedings, including cases involving the treatment of individuals with gender dysphoria in prison settings.  I was deposed as an expert in the following cases over the past four years:  *Jane Doe v. Clenchy, et al.*, No. CV-09-201 (Me. Super. Ct. 2011); *Kothmann v. Rosario*, No. 13-CV-28-OC22 (D. Fla. 2013).  In *Fields v. Smith*, No. 06-C-112 (E.D. Wisc. 2006), I provided testimony in court and was qualified as an expert.

9.      In addition, I have been a consultant to news media and have been interviewed as an expert on gender dysphoria for hundreds of television, radio and print articles throughout the country.

10.      My consulting fee in this case is $200 per hour.

11.      A true and correct copy of my Curriculum Vitae (CV), which provides a complete overview of my education, training, and work experience and a full list of my publications, is attached hereto as Exhibit A.

II.      **MATERIALS CONSIDERED**

12.      I have considered information from various sources in forming my opinions enumerated herein, in addition to drawing on my extensive experience and review of the literature related to gender dysphoria over the past three decades.  A complete bibliography of the materials referenced in this report is attached hereto as Exhibit B.

13.      I also have reviewed Ms. Norsworthy's medical records (AG000001-AG001972, AG005141-AG005171) and the deposition testimony provided by Ms. Norsworthy in this case on December 30, 2014.

14.      In addition, I have reviewed the Mental Health Evaluation Gender Identity Disorder Evaluation," dated October 10, 2013 prepared by Dr. Raymond Coffin "as part of a CDCR review of [Ms. Norsworthy's] appeal … request[ing] approval for gender reassignment

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

3

DECLARATION OF DR. RANDI ETTNER

**ER 203**

1  surgery and related 'adequate medical care.'" (AG000845-AG000865.) I also have reviewed the

2  transcript of Dr. Coffin's deposition taken in this lawsuit on December 17, 2014.

3      15.    Finally, in preparation for this report, I conducted an interview of Ms. Norsworthy

4  on November 18, 2014 at Mule Creek State Prison in Ione, California. During that interview, I

5  conducted and subsequently reviewed and considered the following psychodiagnostic tests:

6      1.    Beck Depression Inventory-II,

7      2.    Beck Anxiety Inventory,

8      3.    Beck Hopelessness Scale, and

9      4.    Traumatic Symptom Inventory

10 **III.  GENDER DYSPHORIA**

11      16.    Gender dysphoria, formerly known as gender identity disorder (GID), is a serious

12 medical condition codified in the International Classification of Diseases (10th revision; World

13 Health Organization) and the American Psychiatric Association's Diagnostic and Statistical

14 Manual of Mental Disorders–5th edition (DSM-V). The condition is characterized by an

15 incongruence between one's experienced/expressed gender and assigned sex at birth, and

16 clinically significant distress or impairment of functioning as a result. The suffering that arises

17 from this condition has often been described as "being trapped in the wrong body." "Gender

18 dysphoria" is also the psychiatric term used to describe the severe and unremitting emotional pain

19 associated with the condition.

20      17.    The diagnostic criteria for Gender Dysphoria in Adolescents and Adults are as

21 follows:

22      A.    A marked incongruence between one's experienced/expressed gender and assigned
             gender, of at least 6 months' duration, as manifested by at least two of the
23           following:

24           1.    A marked incongruence between one's experienced/expressed gender and
                   primary and/or secondary sex characteristics (or in young adolescents, the
25                 anticipated secondary sex characteristics).

26           2.    A strong desire to be rid of one's primary and/or secondary sex characteristics
                   because of a marked incongruence with one's experienced/expressed gender
27                 (or in young adolescents, a desire to prevent the development of the anticipated
                   secondary sex characteristics).

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

4                          DECLARATION OF DR. RANDI ETTNER

**ER 204**

3.  A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.   A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5.  A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.  The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

18.     Adults who manifest a severe degree of the disorder are commonly referred to as "transsexuals."  Without treatment, individuals with gender dysphoria experience anxiety, depression, suicidality and other attendant mental health issues. (*See, e.g.*, Fraser, 2009; Schaefer & Wheeler, 2004; Ettner, 1999; Brown, 2000, DSM-V (2013)). They are also frequently socially isolated because they carry a burden of shame and low self-esteem, attributable to the feeling of being inherently "defective." This leads to stigmatization that over time proves ravaging to healthy personality development and interpersonal relationships. As a result, without treatment, many are unable to function effectively in occupational, social, or other important areas of daily living.  A recent survey shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for North America. (Haas *et al*., 2014).

19.     Male-to-female transsexuals without access to appropriate care, particularly those who are imprisoned, are often so desperate for relief that they resort to life-threatening attempts at auto-castration – the removal of one's testicles – in the hopes of eliminating the major source of testosterone that kindles the distress. (Brown, 2010; Brown & McDuffie, 2009).

20.     Gender dysphoria intensifies with age. Middle-aged and elderly gender dysphoric adults experience an exacerbation of symptoms.

IV.     **TREATMENT OF GENDER DYSPHORIA**

A.     **WPATH Standards of Care**

21.     The standards of care for treating gender dysphoria are set forth in the World Professional Association for Transgender Health's Standards of Care for the Health of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

5

DECLARATION OF DR. RANDI ETTNER

**ER 205**

1   Transsexual, Transgender, and Gender Nonconforming People (WPATH Standards of Care). The

2   WPATH Standards of Care are recognized as authoritative by the American Medical Association,

3   the American Psychiatric Association, and the American Psychological Association. (See

4   American Medical Association (2008), Resolution 122 (A-08); American Psychiatric

5   Association-DSM-V; American Psychological Association Policy Statement on Transgender,

6   Gender Identity, and Gender Expression Non-discrimination (2009)).

7       22.     The Standards of Care identify the following treatment protocols for treating

8   individuals with gender dysphoria:

9       • Changes in gender expression and role (which may involve living part time or full
          time in another gender role, consistent with one's gender identity);

10      • Hormone therapy to feminize or masculinize the body;

11      • Surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/ chest,
          external and/or internal genitalia, facial features, body contouring);

12
13      • Psychotherapy (individual, couple, family, or group) for purposes such as exploring
          gender identity, role, and expression; addressing the negative impact of gender
          dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing
14        social and peer support; improving body image; or promoting resilience.

15      23.     Once a diagnosis of gender dysphoria is made, a treatment plan should be

16   developed based on an individualized assessment of the medical needs of the particular patient.

17      24.     The development of any treatment plan and all subsequent treatment must be

18   administered by clinicians qualified in treating patients with gender dysphoria.

19      25.     The WPATH Standards of Care specify the qualifications that professionals must

20   meet in order to provide care to gender dysphoric patients.  (*See* Section VIII.)  In particular, the

21   WPATH Standards of Care provide that a mental health professional must have "Knowledge

22   about gender-nonconforming identities and expressions, and the assessment and treatment of

23   gender dysphoria" and obtain continuing education in the assessment and treatment of gender

24   dysphoria.  Importantly, the WPATH Standards of Care require that "[m]ental health

25   professionals who are new to the field (irrespective of their level of training and other experience)

26   should work under the supervision of a mental health professional with established competence in

27   the assessment and treatment of gender dysphoria."

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

6                    DECLARATION OF DR. RANDI ETTNER

ER 206

26.     In addition to these minimum credentials, clinicians working with gender dysphoric patients should develop and maintain cultural competence to provide optimal care. A growing body of scientific literature underlies this specialized area of medicine and presents advances in treatment that inform care.

27.     To develop competence in the assessment and treatment of gender dysphoria, clinicians should work under the supervision of mental health professionals with established expertise in this area and pursue self-study. Self-study, however, cannot substitute for first-hand clinical experience in treating the range of clinical presentations of gender dysphoria, or the mentorship and supervision of an expert in this field

28.     Treatment plans generated by providers lacking the requisite experience can result in inappropriate care, or place patients at significant medical risk.

29.     Like protocols for the treatment of diabetes or other medical disorders, medical management of gender dysphoria for incarcerated individuals does not differ from protocols for non-institutionalized persons. For this reason, the WPATH Standards of Care expressly state that all elements of the prescribed assessment and treatment are equally applicable to patients in prison (Section XIV) and the National Commission on Correctional Health Care (NCCHC) recommends treatment in accordance with the WPATH Standards of Care for people in correctional settings.  (NCCHC Policy Statement, Transgender Health Care in Correctional Settings (October 18, 2009), http://www.ncchc.org/transgender-health-care-in-correctional-settings).

30.     Psychotherapy or counseling can provide support and help with the many issues that arise in tandem with gender dysphoria. Counseling alone, however, is not a substitute for medical intervention where medical intervention is needed nor is it a precondition for such intervention. By analogy, in Type One diabetes, counseling might provide psychoeducation about living with a chronic condition, and information about nutrition, but it does not obviate the need for insulin.

31.     For many individuals with gender dysphoria, changes to gender expression and role to feminize or masculinize one's appearance, often called the "real life experience," are an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

7                    DECLARATION OF DR. RANDI ETTNER

ER 207

1  important part of treatment for the condition. This involves dressing, grooming and otherwise

2  outwardly presenting oneself through social signifiers of gender consistent with one's gender

3  identity. This is an appropriate and necessary part of identity consolidation. Through this

4  experience, the shame of growing up living as a "false self" and the grief of being born into the

5  "wrong body" can be ameliorated.  (Greenberg and Laurence, 1981; Ettner, 1999; Devor, 2004;

6  Bockting, 2007).

7  **B.**    **Hormone Therapy**

8    32.    For individuals with persistent, well-documented gender dysphoria, hormone

9  therapy is essential and medically indicated treatment to alleviate the distress of the condition.

10  Hormone therapy is a well-established and effective means of treating gender dysphoria. The

11  American Medical Association, the Endocrine Society, the American Psychiatric Association and

12  the American Psychological Association all agree that hormone therapy in accordance with the

13  WPATH Standards of Care is medically necessary treatment for many individuals with gender

14  dysphoria. (See American Medical Association (2008), Resolution 122 (A-08); Endocrine

15  Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009);

16  American Psychological Association Policy Statement on Transgender, Gender Identity and

17  Gender Expression Nondiscrimination (2009)).

18    33.    The goals of hormone therapy for individuals with gender dysphoria are (i) to

19  significantly reduce hormone production associated with the person's birth sex and, thereby, the

20  secondary sex characteristics of the individual's birth sex and (ii) to replace circulating sex

21  hormones associated with the person's birth sex with feminizing or masculinizing hormones,

22  using the principles of hormone replacement treatment developed for hypogonadal patients (*i.e.*,

23  males born with insufficient testosterone or females born with insufficient estrogen). (*See*

24  Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline

25  (2009)).

26    34.    The therapeutic effects of hormone therapy are twofold: (i) with endocrine

27  treatment, the patient acquires congruent sex characteristics, *i.e.* for transgender women, breast

28  development, redistribution of body fat, cessation of male pattern baldness, and reduction of body

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25720691.3

8

DECLARATION OF DR. RANDI ETTNER

**ER 208**

1    hair; and (ii) hormones act directly on the brain, via receptors sites for sex steroids, which

2    produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a

3    sense of well-being. (*See, e.g.*, Cohen-Kettenis & Gooren, 1992).

4           35.    The efficacy of hormone therapy to treat gender dysphoria is observed clinically

5    and well documented in the literature. For example, in one study, researchers investigated 187

6    transsexual patients who had received hormones and compared them with a group who did not.

7    Untreated patients showed much higher levels of depression, anxiety, and social distress.

8    (Rametti, et al., 2011; see also Colizzi, et al. 2014; Gorin-Lazard et al., 2011).

9           36.    There are risks, however, associated with estrogen administered orally, particularly

10   when taken for extended periods of time. These include venous thrombotic and cardiovascular

11   events. A history of elevated liver enzymes, hepatitis, or other diseases of the liver, greatly

12   increase the risk of morbidity and mortality in patients receiving oral estrogen.

13          37.    Some individuals with gender dysphoria experience profound relief from hormone

14   therapy alone such that further treatment, such as surgical intervention, is not required. (WPATH

15   Standards of Care, 2013).

16          **C.    Sex Reassignment Surgery**

17          38.    For many individuals with severe gender dysphoria, however, hormone therapy

18   alone is insufficient. Relief from their dysphoria cannot be achieved without surgical intervention

19   to modify primary sex characteristics, *i.e.*, genital reconstruction.

20          39.    Genital reconstruction surgery for male-to-female transsexuals has two therapeutic

21   purposes: First, removal of the testicles eliminates the major source of testosterone in the body.

22   Second, the patient attains body congruence resulting from the normal appearing and functioning

23   female uro-genital structures. Both are critical in alleviating or eliminating gender dysphoria.

24          40.    Decades of careful and methodologically sound scientific research have

25   demonstrated that sex reassignment surgery is a safe and effective treatment for severe gender

26   dysphoria and, indeed, for many people, it is the only effective treatment. (*See, e.g.*, Pfafflin &

27   Junge, 1998; Smith et al., 2005; Jarolim et al., 2009).

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25720691.3

9                     DECLARATION OF DR. RANDI ETTNER

**ER 209**

41.     WPATH , the American Medical Association, the Endocrine Society, and the American Psychological Association all support surgery in accordance with the WPATH Standards of Care as medically necessary treatment for individuals with severe gender dysphoria. *See* American Medical Association (2008), Resolution 122 (A-08); Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009) ("For many transsexual adults, genital sex reassignment surgery may be the necessary step towards achieving their ultimate goal of living successfully in their desired gender role."); American Psychological Association Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (2009) (recognizing "the efficacy, benefit and medical necessity of gender transition treatments" and referencing studies demonstrating the effectiveness of sex-reassignment surgeries).

42.     Surgeries are considered "effective" from a medical perspective if they "have a therapeutic effect" (Monstrey et al. 2007).  More than three decades of research confirms that sex reassignment surgery is therapeutic and therefore an effective treatment for gender dysphoria. Indeed, for many patients with severe gender dysphoria, sex reassignment surgery is the only effective treatment.

43.     In a 1998 meta-analysis, Pfafflin and Junge reviewed data from 80 studies, spanning 30 years, from 12 countries. They concluded that "reassignment procedures were effective in relieving gender dysphoria. There were few negative consequences and all aspects of the reassignment process contributed to overwhelmingly positive outcomes" (Pfafflin & Junge 1998).

44.     Numerous subsequent studies confirm this conclusion. Researchers reporting on a large-scale prospective study of 325 individuals in The Netherlands concluded that after surgery there was "a virtual absence of gender dysphoria" in the cohort and "results substantiate previous conclusions that sex reassignment is effective" (Smith et al. 2005). Indeed, the authors of the study concluded that the surgery "appeared therapeutic and beneficial" across a wide spectrum of factors and "[t]he main symptom for which the patients had requested treatment, gender dysphoria, had decreased to such a degree that it had disappeared."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

10                    DECLARATION OF DR. RANDI ETTNER

ER 210

45. In 2007, Gijs and Brewayes analyzed 18 studies published between 1990 and 2007, encompassing 807 patients. The researchers concluded: "Summarizing the results from the 18 outcome studies of the last two decades, the conclusion that [sex reassignment surgery] is the most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals still stands: Ninety-six percent of the persons who underwent [surgery] were satisfied and regret was rare."

46. Studies conducted in countries throughout the world conclude that surgery is an extremely effective treatment for gender dysphoria. For example, a 2001 study published in Sweden states: "The vast majority of studies addressing outcome have provided convincing evidence for the benefit of sex reassignment surgery in carefully selected cases" (Landen 2001). Similarly, urologists at the University Hospital in Prague, Czech Republic, in a Journal of Sexual Medicine article concluded, "Surgical conversion of the genitalia is a safe and important phase of the treatment of male-to-female transsexuals" (Jarolim 2009).

47. Patient satisfaction is an important measure of effective treatment.  Achieving functional and normal physical appearance consistent with gender identity alleviates the suffering of gender dysphoria and enables the patient to function in everyday life. Studies have shown that by alleviating the suffering and dysfunction caused by severe gender dysphoria, sex reassignment surgery improves virtually every facet of a patient's life. This includes satisfaction with interpersonal relationships and improved social functioning (Rehman *et al.* 1999; Johansson et al. 2010; Hepp *et al.* 2002; Ainsworth & Spiegel 2010; Smith *et al.* 2005); improvement in self-image and satisfaction with body and physical appearance (Lawrence 2003; Smith *et al.* 2005; Weyers *et al.* 2009); and greater acceptance and integration into the family (Lobato *et al.* 2006).

48. Studies have also shown that surgery improves patients' abilities to initiate and maintain intimate relationships (Lobato *et al.* 2006; Lawrence 2005; Lawrence 2006; Imbimbo *et al.* 2009; Klein & Gorzalka 2009; Jarolim *et al.* 2009; Smith *et al.* 2005; Rehman *et al.* 1999; DeCuypere *et al.* 2005).

49. Multiple long term studies have confirmed these results.  *See, e.g.,* "Transsexualism in Serbia: a twenty-year follow-up study" (Vujovic *et al.* 2009); "Long-term

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

11

DECLARATION OF DR. RANDI ETTNER

ER 211

1   assessment of the physical, mental, and sexual health among transsexual women" (Weyers 2009);

2   "Treatment follow-up of transsexual patients" (Hepp *et al.* 2002); "A five-year follow-up study of

3   Swedish adults with gender identity disorder" (Johansson *et al.* 2010); "A report from a single

4   institute's 14 year experience in treatment of male- to-female transsexuals" (Imbimbo *et al.*

5   2009); 'Followup of sex reassignment surgery in transsexuals: a Brazilian cohort' (Lobato *et al.*

6   2006).

7           50.     Given the extensive experience and research supporting the effectiveness of sex

8   reassignment surgery spanning decades, it is clear that sex reassignment surgery is a medically

9   necessary, not experimental, treatment for gender dysphoria as demonstrated by its inclusion as a

10   medically necessary treatment in the WPATH Standards of Care.

11          51.     In 2008, WPATH issued a "Medical Necessity Statement" expressly stating:

12   "These medical procedures and treatment protocols are not experimental:  decades of both clinical

13   and medical research show they are essential to achieving well-being for the transsexual patient."

14          52.     Similarly, Resolution 122 (A-08) of the American Medical Association states:

15   "Health experts in GID, including WPATH, have rejected the myth that these treatments are

16   'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and

17   effective treatment for a serious health condition."

18          53.     On September 25, 2013 the Department of Health Care Services of the State of

19   California Health and Human Services Agency issues All Plan Letter 13-011, which makes clear

20   that gender reassignment surgery was a covered service for Medi-Cal beneficiaries when the

21   surgery was not cosmetic in nature and referred providers to the WPATH Standards of Care for

22   the "criteria for the medical necessity of transgender services."

23          54.     On May 30, 2014, the Appellate Division of the Departmental Appeals Board of

24   the United States Department of Health and Human Services issued decision number 2576, in

25   which the Board determined that a Medicare regulation denying coverage of "all transsexual

26   surgery as a treatment for transsexualism" was not valid under the "reasonableness standard."

27   The Board specifically concluded that "transsexual surgery is an effective treatment option for

28   transsexualism in appropriate cases."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

12          DECLARATION OF DR. RANDI ETTNER

**ER 212**

## V.   EVALUATION AND RECOMMENDATION REGARDING MS. NORSWORTHY

### A.   Relevant Background History

55.   Ms. Norsworthy was the middle child of three. Her biological father committed suicide in 1976, and she was raised by her mother and grandmother. Her mother moved to the Pacific Northwest, leaving the children with the grandmother and the grandmother's abusive boyfriend. At approximately age 12, Ms. Norsworthy reunited with her mother, joining her to live in Washington.  Ms. Norsworthy stated that her mother felt guilty about having abandoned her children and "used money" to solve problems.

56.   Ms. Norsworthy does not recall having any friends as a child, certainly none that she felt close to. She left school at approximately age 16, and moved to California. She worked as an informant for the police, and subsequently entered the army. She obtained a GED while in the service.  In 1987, she was convicted of murder and incarcerated. Since that time, she has been housed at several different facilities. She reported being raped in 2009 during a prior period of incarceration at Mule Creek State Prison.

#### 1.   Sexual and Gender History

57.   Ms. Norsworthy was aware that she was "different" at an early age. She began to cross-dress at approximately age 12. At approximately 13, she had her first sexual experience, with an older man. During adolescence, she conflated sex and gender. She knew she was attracted to men, and that she must behave as a man, even though she was dressing in female clothing surreptitiously. Like most transsexual individuals, she tried to conform to society's expectations of male behavior, and entered what is known as the "flight into hypermasculinity"— an attempt to engage in stereotypical ultra-masculine pursuits to "cure" oneself of female feelings. For Ms. Norsworthy, this included a fascination with weapons, a stint in the army, work as a zealous informant, and earned her the moniker of "Rambo." This hypermasculine phase also included marriage to a woman, and fathering a child.

58.   Ms. Norsworthy states she has had sexual relationships with five women, and numerous men, some significantly older than her, during her life. During her thirty-year incarceration, she has had relations with some male inmates. Her sexual interest is limited to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25720691.3

13                     DECLARATION OF DR. RANDI ETTNER

ER 213

1  adult, consenting partners. She denies paraphilic fantasies. She states a preference for being a

2  submissive recipient in sexual activity. Ms. Norsworthy dislikes her male genitals, and does not

3  use them as a vehicle for sensuality.  She is aware, however, that scrotal and penile tissue is

4  essential to successful vaginoplasty and thus dispels thoughts of auto-castration.

5      59.    A review of records indicates that since 1998, a series of providers in the

6  correctional system have consistently diagnosed Ms. Norsworthy with gender identity disorder

7  (present nomenclature is gender dysphoria).  (*See, e.g.*, AG000350, AG000845-AG000865.)   She

8  commenced hormone therapy in 2000.

9              *2.    Medical History*

10     60.    Ms. Norsworthy's medical history is significant for hypertension.  She presently

11  takes metoprolol and aspirin. She does not smoke cigarettes. There is a past history of alcohol and

12  marijuana use but not in the recent past. She has had no previous surgeries.

13     61.    She had been receiving anti-androgenic compounds and estrogen, but all were

14  completely discontinued from approximately August 2014 until November 2014 due to elevated

15  liver enzymes.  She is allergic to spironolactone. Particularly due to her history of transaminase

16  elevation, medically indicated hormone therapy should be administered transdermally or

17  intramuscularly.  Although Ms. Norsworthy's endocrinologist has strongly recommended this,

18  Ms. Norsworthy continues to receive her estrogen treatments orally.  (AG005152, AG005167-

19  AG005169.)

20     62.    During her 30-year incarceration, she has been prescribed a variety of

21  psychotropic drugs, but takes none at present.

22              *3.    History of Suicidality*

23     63.    Ms. Norsworthy has a history of suicidal ideation and two suicide attempts. It is

24  clinically imperative to be attentive to the presence of suicidal ideation. At the behest of the

25  Surgeon General, a plan for identifying populations at risk for suicide and advancement of

26  scientific methods to assess risk, resulted in recent abundant scientific investigation. Several lines

27  of research suggest that single suicide attempters differ significantly from multiple suicide

28  attempters. Multiple attempters are far more likely to die by suicide than are single attempters.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25720691.3

14          DECLARATION OF DR. RANDI ETTNER

**ER 214**

1    (Miranda et al. 2008.)  Her risk is additionally increased four to six fold, by virtue of having a

2    biological parent who committed suicide.  (Brent et al. 2002.)

3         **B.    Mental Status Examination**

4         64.    Michelle Norsworthy appeared well-groomed, wearing prison-issued garments. At

5    5 feet 10 inches and 160 pounds, she makes an authentic female presentation. Her hair was long

6    and neatly fashioned in a pony-tail.  Her make-up application was subtle and appropriate. She was

7    alert and oriented to person, place, time and situation. She was able to sit comfortably throughout

8    the two and three-quarter hours-long interview without a break, and with no agitation or

9    restlessness. There were no disorders of thought or affect, and thought processes were logical,

10   directed, and without distortion. Language was fluent, and speech was natural and well-

11   modulated. Mood was anxious.  Affect was appropriate, and memory appeared to be within

12   normal limits.

13              *1.    Cluster Analyses of Clinical Data*

14        65.    Anxiety and depression are symptoms that are prevalent in many mental disorders.

15   Like "pain" or "fatigue" their mere presence does not provide sufficient information to be

16   clinically useful. For example, an individual will experience pain from a head injury. One will

17   also experience pain if there is a blockage in the ureter. The diagnosis and therapeutic

18   interventions will differ in these two presentations.

19        66.    Similarly, anxiety is a multi-faceted construct, and clinicians endeavor to

20   disentangle the affective, behavioral, and somatic symptoms of anxiety. This is critical in

21   determining the nature of a disorder, its severity and appropriate treatment. Patterns of anxiety

22   symptoms are often diagnostically relevant. Indeed, statistical factor analysis reveals four distinct

23   symptom clusters which assist in making a differential diagnosis and inform treatment.  (Beck et

24   al. 1998.)  These clusters reflect neurophysiological, subjective, panic, and autonomic symptoms

25   of anxiety. The inter-correlations of the four clusters are statistically significant (beyond the .001

26   level).

27        67.    The administration of psychometric tests to measure various aspects of anxiety in

28   adult populations greatly assists with differential diagnosis. The self-reported anxiety that arises

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

15                    DECLARATION OF DR. RANDI ETTNER

**ER 215**

1   from social phobia, for example, differs markedly from the anxiety exhibited by a patient

2   suffering from obsessive compulsive disorder, or gender dysphoria. This allows the clinician to

3   respond with a full range of appropriate therapeutic interventions.

4                  ***2.       Psychological Test Results***

5          68.     Four standardized psychometric indices with high levels of reliability and validity

6   were administered to corroborate the clinical assessment: the Beck Anxiety Inventory, the Beck

7   Depression Inventory, the Traumatic Symptom Inventory and the Beck Hopelessness Scale.

8          69.     Ms. Norsworthy experiences symptoms associated with generalized anxiety. The

9   intensity of the symptoms is severe, and represents subjective and panic-related aspects of

10  anxiety. These include feeling discomfort in abdomen, feeling hot, heart pounding, feeling faint,

11  and fear of "the worst happening." This cluster of symptoms describes autonomic and

12  neurophysiological aspects of anxiety, not subject to voluntary control or cognitive reappraisal.

13  This level of anxiety is consistent with a gender dysphoria diagnosis.

14         70.     She also reveals mild symptoms of depression, mostly in the domain of self-

15  criticalness. Her responses on the Beck Hopelessness Scale indicate that she is able to maintain

16  morale, so long as there is concrete hope of improved future circumstances.

17         71.     Ms. Norsworthy meets the diagnostic criteria for posttraumatic stress disorder

18  (PTSD). This was confirmed by psychodiagnostic testing with a standardized instrument designed

19  to evaluate and measure the psychological impact of traumatic events. She presents with a classic

20  posttraumatic response set, indicative of chronic, not acute, response to events in the past.

21  Specifically, she exhibits symptomotology of intrusive and unwanted thoughts of a traumatic

22  experience (B cluster in 309.81, DSM-V). This intrusion of disruptive material into current

23  awareness produces associated states of distress. She also experiences avoidance responses

24  (subsumed under the C group of PTSD symptoms). Individuals with this profile attempt to

25  eliminate painful memories from conscious awareness by pushing them out of their mind. They

26  will often attempt to avoid places or events in their environment that re-stimulate upsetting

27  thoughts or memories. This is a conscious cognitive and behavioral strategy to manage and

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 25720691.3

16                    DECLARATION OF DR. RANDI ETTNER

**ER 216**

1    distract oneself from internal distress. It is an indication that the individual has resolved the acute

2    trauma, usually as a result of treatment.

3         **C.    Gender Dysphoria**

4         72.    A review of records reveals that beginning at least by 1998, Ms. Norsworthy has

5    consistently been diagnosed with gender dysphoria (or gender identity disorder).

6         73.    She has been  treated with hormone therapy since 2000. As a result of long-term

7    hormonal usage, she is now *hormonally reassigned*. She has female secondary sex characteristics

8    and sex steroid levels corresponding to an adult female. She has changed the social aspects of

9    gender expression, which is often more challenging than changing physical characteristics,

10   particularly in a prison setting.

11        74.    She has engaged in counseling, and has successfully consolidated her identity. She

12   has attempted to change her given name legally and to obtain sex reassignment surgery, but her

13   requests were denied by CDCR.

14        75.    Despite fourteen years of feminizing hormone therapy and counseling, Ms.

15   Norsworthy continues to suffer from gender dysphoria and attendant anxiety. The long-term

16   hormonal treatment she has undergone has served to intensify Ms. Norsworthy's anatomical

17   dysphoria. Having a female body and male genitalia generates significant distress. The inability to

18   reduce or modulate the profound internal anguish can cause these patients to decompensate

19   emotionally and resort to externalizing behaviors such as suicide or surgical self- treatment, *i.e.*,

20   auto-castration.

21        76.    Clearly, after years of counseling and hormone therapy, Ms. Norsworthy now

22   requires genital surgery. *i.e.,* the reconstruction of primary sex characteristics. Were Ms.

23   Norsworthy to undergo this surgical procedure, all symptoms would be attenuated or eliminated.

24

25   / /

26   / /

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

17                    DECLARATION OF DR. RANDI ETTNER

**ER 217**

### D.   Recommended Treatment

77.   The WPATH Standards of Care establish the following requirements for a patient seeking sex reassignment surgery:

1.  Persistent, well-documented gender dysphoria.

2.  Capacity to make a fully-informed decision and to consent for treatment.

3.  Age of majority in a given country;

4.  If significant medical or mental health concerns are present, they must be well controlled.

5.  12 months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual).

6.  12 continuous months of living in an identity-congruent gender role.

78.   Ms. Norsworthy meets, and exceeds, the criteria for surgery: She has persistent gender dysphoria, documented at least as early as 1998. She is free of any disorders of thought or impaired reality testing and possesses average or above average intelligence; and is able to provide informed consent and participate in decisions regarding her healthcare. Ms. Norsworthy understands the irrevocable nature of surgery. Having been on hormonal therapy for fourteen years, irreversible anatomical changes have already eventuated. Throughout those fourteen years, she has consistently lived in her affirmed and well-consolidated gender.  Michelle Norsworthy has no mental health or medical concerns that contraindicate surgery. On the contrary, surgery is the therapeutic intervention that would significantly improve her emotional and physical health.

79.   Owing to the severity of gender dysphoria and resultant clinically significant distress, and its persistence despite years of hormone therapy and counseling, reassignment surgery is the necessary intervention for Ms. Norsworthy, and should be immediately implemented.

80.   Ms. Norsworthy is intellectually competent and has an indisputable diagnosis of severe gender dysphoria. She presently suffers from severe anxiety, stemming from the anatomical dysphoria of living in "purgatory," *i.e.* "being part male and part female." While hormone therapy is a component of treatment, health professionals recognize that many

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

18                    DECLARATION OF DR. RANDI ETTNER

ER 218

1    individuals, like Ms. Norsworthy, need surgery to alleviate gender dysphoria and to facilitate the

2    physical change from male to female as fully as possible.

3         81.   The rationale for surgery for this patient is twofold. First and foremost, surgery

4    would provide congruent genitalia, which eliminates the distress of having male genitalia but a

5    female body and female gender identity. This attenuates psychological symptoms and provides a

6    sense of well-being.

7         82.   Second, removal of the target organs (testes) eliminates 80% of androgen

8    production and involves an entirely different pathophysiology than a medically suppressive

9    regiment. This means that the entire hormonal protocol would be minimized (low-dose estrogen

10   is still required to maintain bone density), providing considerable health benefits to the patient.

11   Given Ms. Norsworthy's history of liver damage, surgery is particularly therapeutic, obviating the

12   need for high dose estrogen.

13        83.   Gender dysphoria intensifies with age.  Although she currently denies suicidal

14   ideation, she is presently optimistic that she will receive surgery as a result of this lawsuit.

15   Without surgical treatment, Ms. Norsworthy is at risk for emotional destabilization, which may

16   result in renewed suicide attempts given Ms. Norsworthy past suicide attempts and familial

17   history.

18        84.   There are no contraindications to the implementation of medically necessary

19   surgical intervention for this inmate. The potential consequences of denying treatment however,

20   are predictable and dire.

21   **VI.   RESPONSE TO RECOMMENDATION AND TESTIMONY OF DR. COFFIN**

22        85.   I have reviewed the "Mental Health Evaluation Gender Identity Disorder

23   Evaluation," dated October 10, 2013 prepared by Dr. Raymond Coffin "as part of a CDCR review

24   of [Ms. Norsworthy's] appeal … request[ing] approval for gender reassignment surgery and

25   related 'adequate medical care.'"  (AG000845-865.)  I also have reviewed the transcript of Dr.

26   Coffin's deposition taken in this lawsuit on December 17, 2014.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

19                    DECLARATION OF DR. RANDI ETTNER

**ER 219**

1    86.    Throughout Mental Health Evaluation and deposition testimony, Dr. Coffin

2    reveals a profound misunderstanding of, and lack of scientific information regarding, the nature,

3    assessment, and treatment of gender dysphoria.

4    87.    For example, in the Mental Health Evaluation, Dr. Coffin chose to use male

5    pronouns to refer to Ms. Norsworthy – a patient that he confirms is gender dysphoric.  Such usage

6    is anathema to professionals who specialize in gender conditions and an egregious departure from

7    evidence-based clinical care. It is a telltale sign of his incompetence in this area, and belies claims

8    of expertise.

9    88.    With regard to his experience, Dr. Coffin testified that his education included

10    coursework in developmental psychology, wherein he was presented with "theories about

11    …gender identities, and how those processes can be disrupted."  (Coffin Dep. Tr. 19:23-20:1.)

12    He also contends that he participated in continuing education that "included gender and alternate

13    lifestyle issues."  (*Id.* at 20:7.)  Gender dysphoria is not an alternate lifestyle, nor is it an abnormal

14    developmental process subject to "disruption."  In fact, it is a serious medical condition, codified

15    in the International Classification of Disease, published by the World Health Organization, the

16    etiology of which is brain-based, not developmental.

17    89.    The only course that Dr. Coffin has taken specifically focused on gender dysphoria

18    took place in 2012, when Dr. Coffin attended a one-day seminar.  (*Id.* at 21:15-17.)  Attendance

19    at a one day seminar does not qualify a psychologist to assess or treat individuals with gender

20    dysphoria.  Dr. Coffins training and experience clearly is insufficient under the qualifications

21    required by the WPATH Standards of Care for diagnosis and treatment of gender dysphoria.  The

22    American Psychological Association provides clear injunctions against practicing outside of

23    one's area of expertise.

24    90.    At his deposition, Dr. Coffin often conflates important concepts.  For instance, he

25    conflates sexual orientation and gender identity, stating that when he worked in private practice

26    settings where he encountered individuals with gender dysphoria and "gender confusion," he

27    referred these patients to gay and lesbian centers to "explore the resources available there."  (*Id.*

28    at 24:5-25:7.)  More alarmingly, he claims that his experience with patients who have suffered

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

20                    DECLARATION OF DR. RANDI ETTNER

ER 220

1  abuse and subsequent depression, anxiety, and other symptoms allows him to treat gender

2  dysphoria, because patients with gender dysphoria also experience depression and anxiety.  (*Id.* at

3  76:22-25, 88:23-89:6.)  That contention is akin to a physician stating that, because he has treated

4  the symptom of "cough" many times when associated with a common cold that he therefore also

5  has the clinical competencies to treat lung cancer because it too carries the symptom of a cough.

6  This is a blatant conflation of symptoms and disorder.

7       91.     Regarding reassignment surgery, Dr. Coffin states that such surgery would only be

8  medically necessary for a patient who has a GAF (global assessment of functioning) score of 35,

9  or lower.  (*Id.* at 43:9-10, 45:14.)  This is a peculiar line of reasoning, as nowhere in the extant

10  literature is there any references to GAF scores in the treatment of gender dysphoria.  Moreover,

11  the GAF scoring system was abandoned by the American Psychiatric Association.  (*Id.* at 43:15.)

12  Even if it were a viable system, a GAF of 35 is indicative of "major impairment in judgment,

13  thinking, communication …behavior influenced by hallucinations, delusions…(Diagnostic and

14  Statistical Manual of Mental Disorders- IV)."  Dr. Coffin's proposed GAF requirement thus is

15  antithetical to the WPATH Standards of Care (*see* section XI), which require that an individual

16  not be psychotic or have impaired reality testing.  And yet, Dr. Coffin states that he relied on "the

17  7th edition of the WPATH guidelines" in arriving at this opinion.  (Coffin Dep. Tr. 47:3.)

18       92.     Dr. Coffin also opines that "self-mutilative behavior," suicidality and/or severe

19  mental illness are indicators that would lead him to conclude that surgery is medically necessary.

20  (*Id.* at 40:20-41:17.)  Ironically, he thus reached the conclusion that surgery was not necessary for

21  Ms. Norsworthy on the grounds that her functioning is not significantly disturbed and he has

22  purported concern that she might come to regret surgery. Wouldn't it be more reasonable to

23  worry about regret in individuals who hallucinate, have severe mental health issues or delusions

24  — *i.e.*, those with GAF scores below 35?  Moreover, establishing a standard for medical necessity

25  that requires patients to engage in auto-castration and/or suicide attempts is contrary both to the

26  WPATH Standards of Care and professional best practices.

27       93.     Dr. Coffin testified that his "concerns" about potential surgical regret stem from

28  Ms. Norsworthy not "having the opportunity to live as a woman in the community outside of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

21

DECLARATION OF DR. RANDI ETTNER

**ER 221**

1   prison." (*Id.* at 154:17-18.)  Although he claims that "… WPATH and …the research

2   demonstrate [that this opportunity] is important in a successful outcome to SRS," Dr. Coffin was

3   unable to cite to any specific studies to support his hypothesis.  (*Id.* at 154:19-22.)  In fact, neither

4   WPATH nor the scientific literature supports Dr. Coffin's assertion.  The WPATH Standards of

5   Care specify that, prior to surgery, patients must engage in 12 continuous months of living in the

6   affirmed gender role, irrespective of whether or not they are institutionalized.  Gender dysphoria

7   is not contextually-based. Patients do not "decide" they have a male gender identity in one

8   "community" and a female gender identity in another.  Furthermore, Ms. Norsworthy clearly had

9   symptoms of gender dysphoria prior to incarceration. Regarding scientific research, there is no

10  correlation between time spent in a "real-life-experience" and outcome of SRS. Lawrence (2003)

11  examined factors associated with satisfaction or regret following reassignment surgery in 232

12  patients. The study concluded: "Participants reported overwhelmingly that they were happy with

13  their SRS results and that SRS had improved the quality of their lives. None reported outright

14  regret…Dissatisfaction was most strongly associated with unsatisfactory physical and functional

15  results of surgery." Numerous studies worldwide have documented the therapeutic efficacy of

16  surgery, and the extremely low rate of regret.

17          94.      Dr. Coffin's ignorance of the WPATH Standards of Care and relevant research

18  was obvious throughout his deposition and clearly reveals his inability to assess treatment

19  requirements for patients with gender dysphoria.  Despite the WPATH Standards of Care express

20  provisions with regard to the treatment of incarcerated patients, Dr. Coffin testified that the

21  WPATH Standards are unclear about the ability of incarcerated persons to undergo a real-life

22  experience.  (Coffin Dep. Tr. at 162:22-163:13.)  Dr. Coffin testified that he is unclear as to the

23  definition of "medically necessary" treatment for gender dysphoria.  (*Id.* at 97:17-98:7.)  Dr.

24  Coffin testified that he is unclear as to what type of provider is qualified to refer patients for

25  surgery. (*Id.* at 188:1-6.)  Dr. Coffin testified that he is unclear as to the rate of regret in post-

26  operative patients or what factors contribute to outcome.  (*Id.* at 92:1-10.)  Dr. Coffin testified

27  that he is unaware of the effects of hormones on gender dysphoric patients or the physiological

28  effects of removal of the gonads.  (Id. at 203:23-204:19.)  In fact, Dr. Coffin was unaware, or

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3

22                    DECLARATION OF DR. RANDI ETTNER

ER 222

1    unable to recall, even one relevant study amongst the thousands of peer-reviewed publications in

2    this area.  (*See, e.g., Id.* at 91:2-93:4.)

3

4          I declare under penalty of perjury that the foregoing is true and correct.

5

6

7

8    Dated: January 30, 2015                          _Randi C Ettner PhD_

9                                                     Randi C. Ettner, PhD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25720691.3                              23                    DECLARATION OF DR. RANDI ETTNER

ER 223

1    CHRISTOPHER J. BANKS (Bar No. 218779)
     HERMAN J. HOYING (Bar. No. 257495)
2    MORGAN, LEWIS & BOCKIUS LLP
     One Market, Spear Street Tower
3    San Francisco, California  94105-1126
     Telephone: 415.442.1000F
4    Facsimile:  415.442.1001
     cbanks@morganlewis.com
5    hhoying@morganlewis.com

6    ILONA M. TURNER (Bar No. 256219)
     JENNIFER ORTHWEIN (Bar No. 255196)
7    SHAWN THOMAS MEERKAMPER (Bar No. 296964)
     TRANSGENDER LAW CENTER
8    1629 Telegraph Avenue, Suite 400
     Oakland, California  94612
9    Telephone: 415.865.0176
     Facsimile:  877.847.1278
10   ilona@transgenderlawcenter.org
     jen@transgenderlawcenter.org
11   shawn@transgenderlawcenter.org

12   *Attorneys for Plaintiff,*
     MICHELLE-LAEL B. NORSWORTHY
13   (a/k/a JEFFREY B. NORSWORTHY)

14

15                   UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17

18   JEFFREY B. NORSWORTHY (a/k/a          Case No. 3:14-cv-00695-JST
     MICHELLE-LAEL B. NORSWORTHY),
19                                          **PLAINTIFF'S NOTICE OF MOTION
                     Plaintiff,             AND MOTION FOR PRELIMINARY
20                                          INJUNCTION AND MEMORANDUM OF
           v.                               POINTS AND AUTHORITIES IN
21                                          SUPPORT THEREOF**
     JEFFREY BEARD, A. NEWTON,
22   A. ADAMS, LORI ZAMORA,                 Hearing Date:  April 1, 2015
     RAYMOND J. COFFIN, MARION
23   SPEARMAN, DAVID VAN LEER,              Time:            2:00 PM
     JARED LOZANO, and DOES 1-30,
24                                          Judge Jon S. Tigar
                     Defendants.
25                                          Courtroom 9

26

27

28

MORGAN, LEWIS &
 BOCKIUS LLP
 ATTORNEYS AT LAW
 SAN FRANCISCO

1   TO ALL DEFENDANTS AND THEIR COUNSEL OF RECORD:

2          PLEASE TAKE NOTICE THAT on April 1, 2015 at 2:00 p.m., or as soon thereafter as

3   this matter may be heard before the Honorable Jon S. Tigar, U.S. District Court Judge, in the

4   above-entitled Court, located at Phillip Burton Federal Building & United States Courthouse, 450

5   Golden Gate Ave., San Francisco, CA 94102, Plaintiff Michelle Norsworthy ("Plaintiff"),

6   pursuant to Fed. R. Civ. P. 65, will and hereby does move this Court for the issuance of a

7   preliminary injunction requiring Defendants to provide Plaintiff with adequate medical care,

8   including medically necessary sex reassignment surgery pursuant to the *Standards of Care for the*

9   *Health of Transsexual, Transgender, and Gender-Nonconforming People* developed by the World

10   Professional Association for Transgender Health.

11          The grant of a preliminary injunction is warranted because:  (i) the denial of SRS violates

12   Plaintiff 's Eighth and Fourteenth Amendment rights under the Constitution; (ii) the denial of

13   such treatment is causing Plaintiff irreparable injury and will continue to cause her irreparable

14   injury; (iii) providing such treatment will not harm Defendants; and (iv) the public interest favors

15   upholding the Constitution, including by providing necessary medical treatment to persons

16   confined in correctional institutions.

17          In support of this motion, Plaintiff Michelle Norsworthy respectfully refers the Court to

18   this Motion, the Memorandum of Points and Authorities in Support of the Motion for Preliminary

19   Injunction, the Declaration of Herman J. Hoying in Support of Plaintiff's Motion for Preliminary

20   Injunction, the Declaration of Dr. Randi C. Ettner in Support of Plaintiff's Motion for Preliminary

21   Injunction, the Declaration of Dr. Nick Gordon in Support of Plaintiff's Motion for Preliminary

22   Injunction, and the Declaration of Dr. Marci L. Bowers in Support of Plaintiff's Motion for

23   Preliminary Injunction, and the exhibits, the papers, records, and pleadings on file in this action,

24   and the arguments of counsel.

25   Dated:  February 26, 2015          MORGAN, LEWIS & BOCKIUS LLP

26

27                    By       */s/ Herman J. Hoying*

28                           Herman J. Hoying
                      Attorneys for Plaintiff Michelle Norsworthy

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

1

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

**ER 225**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 1

    I.      PLAINTIFF'S GENDER DYSPHORIA ............................................. 1

    II.     TRANSGENDER SPECIALIST DR. LORI KOHLER AND THE CDCR
          GENDER CLINIC ....................................................................... 3

    III.    TREATMENT OF PLAINTIFF'S GENDER DYSPHORIA ................... 4

    IV.    WPATH STANDARDS OF CARE .................................................... 5

    V.     PLAINTIFF'S APPEAL SEEKING SRS .......................................... 6

LEGAL STANDARD ....................................................................................... 11

ARGUMENT .................................................................................................... 11

    I.      THE EVIDENCE SHOWS THAT PLAINTIFF WILL SUCCEED ON
          THE MERITS OF HER CLAIMS ................................................. 11

    II.     DEFENDANTS DEPRIVED PLAINTIFF OF HER RIGHTS UNDER
          THE EIGHTH AMENDMENT BY DENYING HER MEDICALLY
          NECESSARY TREATMENT. ...................................................... 11

        A.    Defendants Willfully Ignored Both Plaintiff's Symptoms and the
            Internationally Recognized Standards of Care ........................... 13

        B.    Defendants Were Deliberately Indifferent to the Recommendations
            of Plaintiff's Treating Mental Health Provider. ........................ 15

        C.    Defendants' Failure to Refer Plaintiff to a Transgender Specialist
            Demonstrates Deliberate Indifference ....................................... 16

        D.    Defendants' Proffered Reasons for Denying SRS Are Pretextual. ........... 17

        E.    CDCR Has a Blanket Policy Against Providing SRS. ............................. 21

        F.    Case Law Supports a Finding of Deliberate Indifference for Denial
            of SRS. ...................................................................................... 23

    III.    DEFENDANTS DEPRIVED PLAINTIFF OF HER EQUAL
          PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT ........ 24

    IV.    PLAINTIFF IS SUFFERING IRREPARABLE HARM AND WILL
          CONTINUE TO DO SO IN THE ABSENCE OF A PRELIMINARY
          INJUNCTION ............................................................................ 25

    V.     THE BALANCE OF HARDSHIPS HEAVILY FAVORS PLAINTIFF. ............ 27

    VI.    AN INJUNCTION IS IN THE PUBLIC INTEREST. ........................... 28

CONCLUSION ................................................................................................. 29

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

DB2/ 25766718.2

**ER 226**

1  now seeks a preliminary injunction requiring the CDCR to provide adequate medical treatment

2  for her gender dysphoria, including SRS.

3  **LEGAL STANDARD**

4  "A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed

5  on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief,

6  that the balance of equities tips in h[er] favor, and that an injunction is in the public interest."

7  *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008); *see Pimentel v. Dreyfus*, 670 F.3d

8  1096, 1105 (9th Cir. 2012) (applying *Winter* to claim under 42 U.S.C. § 1983). "'[S]erious

9  questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff

10  can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a

11  likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the*

12  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

13  **ARGUMENT**

14  **I.    THE EVIDENCE SHOWS THAT PLAINTIFF WILL SUCCEED ON THE**
**MERITS OF HER CLAIMS**

15

16  Title 42 U.S.C. section 1983 protects plaintiffs from deprivations of their constitutional

17  rights.  Here, Defendants violated Section 1983 by denying Plaintiff medically necessary

18  treatment for her gender dysphoria in violation of the Eighth Amendment's prohibition against

19  cruel and unusual punishment and the Fourteenth Amendment's mandate that all persons enjoy

20  "equal protection of the laws."  Const. Amend. VII, XIV.

21  **II.   DEFENDANTS DEPRIVED PLAINTIFF OF HER RIGHTS UNDER THE**
**EIGHTH AMENDMENT BY DENYING HER MEDICALLY NECESSARY**
**TREATMENT.**

22

23  "A prison official violates the Eighth Amendment when he acts with 'deliberate

24  indifference' to the serious medical needs of an inmate."  *Snow v. McDaniel*, 681 F.3d 978, 985

25  (9th Cir. 2012) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)), *overruled on other*

26  *grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).  To establish an Eighth

27  Amendment violation based upon the deprivation of a medical treatment, a plaintiff "must satisfy

28  both an objective standard–that the deprivation was serious enough to constitute cruel and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

11

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 227

1    unusual punishment–and a subjective standard–deliberate indifference."  *Snow*, 681 F.3d at 985.

2              To satisfy the objective standard, "the denial of a plaintiff's serious medical need must

3    result in the 'unnecessary and wanton infliction of pain.'"  *Id.* (quoting *Estelle v. Gamble*, 429

4    U.S. 97, 104 (1976)).  As this Court has previously noted, "[c]ourts have consistently considered

5    [gender dysphoria] (including transsexualism or transgenderism) to be a serious medical

6    condition for purposes of the Eighth Amendment."  (Dkt. No. 4 (citing cases).)  Here, the

7    evidence is undisputed that Plaintiff suffers from gender dysphoria.  (*See, e.g.*, Ex. A at

8    AG000861; Ex. G.)  Indeed, for the past 15 years, CDCR has provided Plaintiff counseling and

9    hormone therapy as a medically necessary treatment for her gender dysphoria.  (*See* Ex. A.)  It is

10   undisputed that–despite these treatments–Plaintiff continues to suffer significant dysphoria,

11   anxiety and distress as a result of her gender dysphoria.  (*See, e.g.*, Coffin at 123:13-126:1 (stating

12   that he found Plaintiff credible and describing her symptoms).)[4]  Courts have recognized that the

13   denial of treatment for these symptoms of gender dysphoria satisfies the "sufficiently serious"

14   standard under the objective prong.  *Fields v. Smith*, 712 F. Supp. 2d 830, 862 (E.D. Wis. 2010),

15   *supplemented* (July 9, 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011) (discussing cases finding that

16   Gender Identity Disorder is a "serious medical need" for purposes of the Eighth Amendment).

17             Second, the plaintiff must meet the subjective prong by showing that the prison officials

18   were deliberately indifferent to the serious medical need.  *See Farmer v. Brennan*, 511 U.S. at

19   845.  "[A] prison official cannot be found liable under the Eighth Amendment for denying an

20   inmate humane conditions of confinement unless the official knows of and disregards an

21   excessive risk to inmate health or safety; the official must both be aware of facts from which the

22   inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

23   inference."  *Id.* at  837.  "Whether a prison official had the requisite knowledge of a substantial

24   risk is a question of fact subject to demonstration in the usual ways, including inference from

25   circumstantial evidence . . . ."  *Id.* at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421

26   (9th Cir. 2003) ("Much like recklessness in criminal law, deliberate indifference to medical needs

27   may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a

28

---

[4]       *See also* Part IV, *infra*, for a more detailed discussion of the evidence establishing
Plaintiff's emotional and physical distress resulting from the denial of SRS.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
                                                                                                                                    3:14-cv-00695-JST

**ER 228**

1   defendant actually knew of a risk of harm.").  A defendant may be found to be deliberately

2   indifferent when "choosing to rely upon a medical opinion which a reasonable person would

3   likely determine to be inferior." *See, e.g.*, *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir.

4   1992), *abrogated in part on other grounds by Estate of Ford v. Ramirez–Palmer,* 301 F.3d 1043,

5   1045 (9th Cir. 2002).

6        **A.    Defendants Willfully Ignored Both Plaintiff's Symptoms and the**
              **Internationally Recognized Standards of Care.**
7

8        Courts have recognized that prison officials are deliberately indifferent to an inmate's

9   gender dysphoria where, as here, the prison officials fail to address the patient's persistent

10  symptoms by relying on the patient's current treatment plan.  *See, e.g.*, *Kothmann v. Rosario*, 558

11  F. App'x 907, 910 (11th Cir. 2014) ("The failure to provide diagnostic care and medical treatment

12  known to be necessary is deliberate indifference") (internal quotations and citations omitted);

13  *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011).  "Just because [defendants] have provided [a

14  prisoner] with *some* treatment consistent with the GID Standards of Care, it does not follow that

15  they have necessarily provided her with constitutionally adequate treatment."  *De'lonta v.

16  Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis original).

17       It is undisputed that Defendants were aware of the continued suffering caused by

18  Plaintiff's gender dysphoria.  The appeal forms submitted by Plaintiff expressly referenced that

19  she was "feeling miserable [from] not being able to fully express [her]self" (Ex. G at AG004954)

20  and that she "suffers greatly w/out gender reassignment surgery" (*Id.* at AG004951).  Plaintiff

21  included with her appeal paperwork exemplar documents from her medical file documenting the

22  distress Plaintiff continued to experience as a result of her gender dysphoria in spite of the

23  counseling and hormone therapy she received.  (*Id.* at AG004948-99.)  In addition, Defendants

24  had access to—and purported to review—Plaintiff's complete medical records, which include

25  numerous references to the ongoing suffering experienced by Plaintiff.  (*Id.* at AG004948-57.)

26  Plaintiff also emphasized in her appeal that she "continues to receive the highest possible dose of

27  estrogen . . . until [SRS] is completed" and Defendants were aware of her hepatitis C status.  (*Id.*

28  at AG004952; Zamora Dep. at 146:24-147:6; Adams Dep. at 90:15-20.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

13

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 229

1    Defendants also were aware that SRS has been recognized as a medically necessary

2    treatment for individuals with gender dysphoria whose symptoms do not subside as a result of

3    counseling and/or hormone therapy.  Indeed, in her appeal, Plaintiff expressly directed

4    Defendants to review the *Kosilek* decision, in which a federal court in Massachusetts found prison

5    officials had violated a transgender inmate's Eighth Amendment rights by not providing SRS

6    when medically indicated pursuant to the WPATH Standards of Care.[5]  Plaintiff also submitted

7    information regarding SRS to Defendants, which referenced the WPATH Standards of Care.  (Ex.

8    G at AG004986-89.)  Thus, Defendants were fully aware that Plaintiff continues to suffer from

9    gender dysphoria and that SRS is a medically recognized, accepted and necessary treatment for

10    gender dysphoria where a patient continues to suffer from dysphoria even after receiving

11    counseling and hormone therapy.  Despite this knowledge, Defendants denied Plaintiff access to

12    SRS and took no action to address her ongoing dysphoria, anxiety and distress.

13    Defendants also were aware that Plaintiff was receiving the "highest possible dose of

14    estrogen." (Ex. G at AG004952.)  The WPATH Standards of Care, to which Defendants had

15    been directed, make clear that high dosages of estrogen increase the risks of significant health

16    issues, including liver function and cardiovascular issues.  (Dkt. No. 10-1 at 60.)  As CDCR's

17    own doctors have noted, these risks are of particular concern to Plaintiff's health given her history

18    of hypertension and hepatitis C.  (Ex. R; *see also* Gorton Decl. ¶¶ 19-20.)  Despite Defendants'

19    knowledge of these risks and that SRS would dramatically reduce the amount of the hormones

20    required, Defendants denied Plaintiff access to SRS and took absolutely no action to address the

21    increased health risks faced by Plaintiff as a result of the high dosages of hormone therapy

22    required until she received SRS.

23    Defendants thus were deliberately indifferent to Plaintiff's medical needs in violation of

24    the Eighth Amendment.  *See, e.g.*, *Kothmann*, 558 F. App'x at 912 (finding deliberate

25    indifference where officials disregarded plaintiff's GID and medically-accepted treatments).

26

[5]    *See Kosilek v. Spencer*, 889 F. Supp. 2d 190, 197 (D. Mass. 2012) *rev'd*, 774 F.3d 63 (1st
27    Cir. 2014) (en banc).  As explained below, although the First Circuit ultimately reversed the trial
court's decision in *Kosilek*, the First Circuit's decision was improperly decided, is not binding on
28    this Court and is easily distinguished from the facts of this case.  Regardless, the district court's
decision had not been reversed at the time Defendants were considering Plaintiff's appeal.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

14

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

**B.      Defendants Were Deliberately Indifferent to the Recommendations of Plaintiff's Treating Mental Health Provider.**

Not only did Defendants willfully ignore the obvious symptoms of Plaintiff's gender dysphoria and the internationally recognized standards of care for the treatment of those symptoms, Defendants also deliberately ignored the recommendations of Dr. Reese, Plaintiff's treating mental health professional, to provide SRS.  Dr. Reese's progress notes for the period immediately preceding Plaintiff's appeal—which are part of the health records reviewed by Defendants—made clear that SRS was the recommended treatment for Plaintiff's gender dysphoria.  (*See, e.g.*, Ex. G at AG004970-73 (referencing "trans-gender sex change procedure" and "support of sex change operation").)  Newton and Adams completely ignored these recommendations when rendering decisions at the first and second levels of review.  Instead, they claimed that no formal referral for surgery had been made but failed to check with any of Plaintiff's health care providers or refer Plaintiff to a specialist for evaluation.  (*See, e.g.*, Adams Dep. at 67:18-23, 72:14-17; 143:4-9.)

Prior to the third level of review, Dr. Reese's recommendation that SRS was medically necessary became even more explicit.  In one of the reports included in the appeal file, Dr. Reese stated unequivocally:  "It is clear that clinical medical necessity suggest and mandate a sex change medical operation before normal mental health can be achieved for this female patient." (Ex. G at AG004959.)  Dr. Reese repeatedly renewed this opinion for the following six months. (Ex. H at AG000415 ("To complete her adjustment and stability as a person, I/P Norsworthy needs to move ahead with her sex change surgery, making continuing progress in the present, and completing her sex change process in the near future."); *see generally* Ex. H.)  Dr. Reese's opinion was verified by the mental health consultant for Third Level Appeals, Dr. Cornish, who concluded that Plaintiff "is psychologically ready for the SRS." (Ex. M.)

Although Defendants acknowledge that a treating health care provider is in the best position to assess a patient's needs (Zamora Dep. at 107:12-24; Ex. O at AG004912), they completely disregarded Dr. Reese's recommendation for SRS without offering any justification. Defendants' decision to willfully ignore Plaintiff's symptoms and Dr. Reese's and Dr. Cornish's

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

15

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 231

1    clear recommendations for SRS constitutes deliberate indifference.  *See Estelle,* 429 U.S. at 104–

2    05 (deliberate indifference may manifest when prison doctors intentionally interfere "with the

3    treatment once prescribed"); *Wakefield v. Thompson,* 177 F.3d 1160, 1165 & n. 6 (9th Cir. 1999)

4    ("a prison official acts with deliberate indifference when he ignores the instructions of the

5    prisoner's treating physician or surgeon"); *Hamilton,* 981 F.2d at 1067 (finding that reliance on

6    the opinion of a prison doctor instead of the opinion of the prisoner's treating physician may

7    constitute deliberate indifference); *Escobar v. Smith,* No. 2:12-CV-0773 GEB, 2013 WL

8    6389034, at *9 (E.D. Cal. Dec. 6, 2013) ("It is well established that deliberate indifference may

9    be shown when prison officials ignore express orders from a prisoner's treating physician(s)").

10          **C.    Defendants' Failure to Refer Plaintiff to a Transgender Specialist**
                    **Demonstrates Deliberate Indifference.**
11

12          Not only did Defendants disregard the express recommendation of Plaintiff's treating

13   mental health provider, but they failed to seek the recommendation of a specialist with experience

14   treating patients with gender dysphoria.  Despite CDCR's own policies acknowledging that health

15   care decisions regarding transgender inmates should be made only after consulting a Medical

16   Transgender Specialist and a Mental Health Transgender Specialist (Ex. G at AG004992-98),

17   none of Defendants has any specialty with regard to treating transgender patients.[6]  *Pride v.*

18   *Correa*, 533 F. App'x 745, 747 (9th Cir. 2013) (triable issue existed as to deliberate indifference

19   where nurse who signed off on denial of medical treatment was unqualified); *see also Toussaint*

20   *v. McCarthy,* 801 F.2d 1080, 1111–12 (9th Cir. 1986) (if registered nurses provided "a number of

21   [medical] services which they [were] not qualified to perform," this would demonstrate deliberate

22   indifference), *abrogated in part on other grounds by Sandin v. Conner,* 515 U.S. 472 (1995).  Nor

23   did Defendants seek the advice of—or refer Plaintiff to—a Transgender Medical or Mental

24   Health Specialist in considering Plaintiff's appeal.  This omission is particularly egregious and

25   [6]     Although Coffin suggested at his deposition that he might consider himself to be a
     transgender specialist, the evidence makes clear that he is not, particularly with regard to the
26   assessment of the need for SRS.  Prior to completing the assessment of Plaintiff, Defendant
     Coffin had not seen a transgender patient in over 10 years and had never been involved in
27   evaluating a patient for SRS.  (*Id.* at 34:7-35:5, 64:20-65:9.)  It is apparent throughout Defendant
     Coffin's written evaluation of Plaintiff and deposition testimony, that he is not a transgender
28   mental health specialist and does not even have a basic understanding of the requirements for
     SRS.  (*See* Ettner Decl. ¶¶ 85-94; Gorton Decl. ¶¶ 30-32.)

**ER 232**

1    telling because Dr. Kohler–the transgender specialist who established CDCR's Gender Clinic and

2    treated Plaintiff for years–was working as a physician in the CDCR institution at which Plaintiff

3    was housed when her appeal was being considered.  (Newton Dep. 61:1-12.)  Remarkably, no one

4    ever contacted Dr. Kohler with regard to Plaintiff's request for SRS.  (Kohler Dep. 133:12-

5    134:10.)  Instead, Defendants only consulted with the legal department.  (Ex. Q; Adams Dep. at

6    120:4-16; Coffin Dep. at 111:18-112:9.)

7           Defendants' failure to send Plaintiff to a specialist—or at least consult a specialist—

8    constitutes deliberate indifference.  *See, e.g.*, *McNearney v. Washington Dep't of Corr.*, No. C11-

9    5930 RBL/KLS, 2012 WL 3545267, at *12-13 (W.D. Wash. June 15, 2012) *report and*

10   *recommendation adopted*, No. 11-CV-5930-RBL/KLS, 2012 WL 3545218 (W.D. Wash. Aug. 16,

11   2012) *and  modified*, No. C11-5930 RBL/KLS, 2013 WL 392489 (W.D. Wash. Jan. 31, 2013);

12   *Miller v. Bannister*, No. 3:10-CV-00614-RCJ-RA, 2011 WL 666106, at *4 (D. Nev. Feb. 9, 2011)

13   *report and recommendation adopted in part*, No. 3:I0-CV-00614, 2011 WL 666097 (D. Nev.

14   Feb. 14, 2011); *Rosado v. Alameida*, 349 F. Supp. 2d 1340, 1346-47 (S.D. Cal. 2004).

15          **D.      Defendants' Proffered Reasons for Denying SRS Are Pretextual.**

16          None of Defendants offer any valid justification for refusing to provide Plaintiff any

17   treatment for the symptoms of her gender dysphoria that persist despite counseling and hormone

18   therapy.  At the first level of review, Newton—relying on the decision of an evaluating nurse—

19   denied SRS without explanation "per state policy."  (Ex. G at AG004954.)  Newton took *no*

20   *action* to address the persistent and well-documented dysphoria, anxiety and distress Plaintiff was

21   suffering as a result of her gender dysphoria.

22          At the second level of appeal, Adams denied the request for SRS purportedly because

23   Plaintiff's "PCP/Mental Health clinicians have not recommended SRS as treatment."  (Ex. G at

24   AG004957.)  Tellingly, Adams consulted with the legal department in reaching this conclusion

25   but did not consult with Plaintiff's PCP or mental health provider.  (Adams Dep. at 120:4-16.)

26   Nor did Adams consult with Dr. Kohler–who was working as a physician under Dr. Adams at the

27   time.  (Kohler Dep. 133:12-134:10.)  Adams' proffered reason for the denial clearly is pretextual.

28   As explained above, Plaintiff's treating mental health provider, in fact, had recommended SRS.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2                                          17                    MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
                                                                                              3:14-cv-00695-JST

ER 233

1    Plaintiff's PCP was never asked for a recommendation with regard to SRS and, regardless, was

2    not qualified to make a recommendation.  (Kohler 128:4-17.)  Regardless, Adams took *no action*

3    to address the persistent and well-documented dysphoria, anxiety and distress Plaintiff was

4    suffering as a result of her gender dysphoria.

5           At the third level of appeal, Zamora ignored the express recommendations offered by Dr.

6    Reese and Dr. Cornish in favor of SRS.  Instead, Coffin was called in to do an evaluation.  The

7    facts surrounding the evaluation and subsequent report make clear that it was a completely

8    pretextual exercise designed to support the CDCR's desired outcome—denial of SRS.  Tellingly,

9    Coffin was selected even though he lacked any training or experience related to the evaluation of

10   a patient for SRS and had never treated Plaintiff, and Dr. Kohler–a transgender specialist resident

11   at the facility where Plaintiff was housed–was not even consulted.  Coffin was selected on the

12   basis of having attended a one-day training session provided by Defendants' expert in this case,

13   Dr. Levine, in which Dr. Levine made clear that SRS was not an available treatment for patients

14   while incarcerated.  (Coffin Dep. 108:15-23; Ex. O.)  It thus was a foregone conclusion when the

15   Office of Third Level Appeals appointed Coffin to assess Plaintiff that he would recommend

16   against SRS.

17          Coffin's report offers no justification for substituting his judgment based upon a single

18   meeting with Plaintiff for that of Dr. Reese, who met with Plaintiff almost weekly for a two year

19   period.  Moreover, Coffin's findings are completely unsupported and inconsistent with the

20   WPATH Standards of Care he himself conceded were the widely accepted standards of care.

21   (Coffin at 84:2-13.)  For example, Coffin contends that Plaintiff should not receive SRS because

22   she may change her mind about wanting to live as a woman once released from prison.  (Ex. A at

23   AG000863.)  Coffin provides no support for this statement in his report and, at deposition, was

24   unable to identify any studies to support this position.  (Coffin Dep. 91:2-93:4.)  This position is

25   also contrary to the Standards of Care which expressly state that SRS should be an available

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

18

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

**ER 234**

1    treatment regardless of incarceration status.[7]  (Dkt. 10-1 at 43-44; *see also* Ettner Decl. ¶ 94.)

2           Coffin's written evaluation fails to include several of the most important factors

3    supporting a finding of medical necessity—disgust with her male genitalia, anxiety, depression

4    and suicidal ideation—yet Coffin concedes that these were all things Plaintiff mentioned during

5    her brief interview with Coffin.  (Coffin Dep. at 124:16-126:1.)  According to Coffin, SRS would

6    only be medically necessary for someone who either (i) had a Global Assessment of Functioning

7    ("GAF") score so low that she likely was psychotic or unable to function; or (ii) was likely to

8    commit suicide or auto-castration.  (Coffin Dep. 40:20-43:10.)  Demanding that a patient exhibit

9    these behaviors contradicts the Standards of Care, which require that "[i]f significant . . . mental

10   health concerns are present, they must be well controlled" before SRS is prescribed.  (Standards

11   of Care at 202; *see also* Ettner Decl. ¶¶ 91-92; Gorton Decl. ¶¶ 30-32.)  Coffin's approach puts

12   Plaintiff in an impossible position—if Plaintiff is emotionally unstable, she would not be eligible

13   for SRS under the Standards of Care; but since Plaintiff remains stable by coping with the pain

14   she experiences from gender dysphoria, Coffin deems SRS not medically necessary.  That Coffin

15   was more focused on reaching the result desired by the Office of Third Level Appeals than

16   ensuring the proper treatment of Plaintiff is evident not only from his consultation with legal

17   before finalizing his report, but in his choice to use male pronouns to refer to Plaintiff.  (Coffin

18   Dep. 201:4-202:4 (acknowledging that he uses transgender patient's preferred pronoun in

19   treatment but chose to use the male pronoun in his report to avoid seeming biased toward

20   patient).)

21          Following Coffin's evaluation, Zamora issued the decision of the Office of Third Level

22   Appeals denying SRS as a medically necessary treatment.  Zamora does not purport to rely on

23   Coffin's report for this conclusion, but instead claims that Plaintiff's "current providers have

24   documented the determination that the subject surgery is not medically necessary for you."  (Ex.

25   G at AG004949.)  This is a complete fabrication.  In fact, ***none*** of Plaintiff's providers have ever

26   _____

27   [7]      Coffin's position also is inconsistent with his own deposition testimony, during which he
     agreed that SRS can greatly alleviate the suffering caused by gender dysphoria, that the WPATH
28   Standards of Care should apply equally to prisoners, and that what constitutes "medically
     necessary" treatment for gender dysphoria should not change just because a patient is in prison.
     (*See* Coffin Dep. at 91:17-94:9, 98:2-7.)

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB2/ 25766718.2                                    19                    MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
                                                                         3:14-cv-00695-JST

ER 235

1  made a determination that SRS was not medically necessary.  To the contrary, Dr. Reese—

2  Plaintiff's primary mental health provider at the time—explicitly recommended SRS as a

3  medically necessary treatment.  (*Id.*)  Dr. Kohler—who treated Plaintiff for years and is a

4  transgender specialist—also testified that SRS was needed to treat Plaintiff's gender dysphoria.

5  (Kohler Dep. 129:22-130:7).  Plaintiff's endocrinologist and primary care physician ("PCP") at

6  the time had not taken any position with regard to SRS as a medically necessary treatment, nor

7  are they qualified to do so.  (Ex. S ("Patel Dep.") at 15:14-22; 24:12-24; Kohler Dep. at 128:4-

8  17.)  Zamora conceded at her deposition that she did not speak with any of Plaintiff's providers

9  and that Coffin was not a "provider" but rather only an evaluating psychologist.[8]  (Zamora Dep.

10  82:16-89:12.)

11       Zamora also conceded at deposition that she has no health care education, experience or

12  training and thus is not qualified herself to assess a patient's need for SRS.  (Zamora Dep. at

13  19:14-20:12.)   She testified in her deposition that she typically defers to treating providers or

14  health care consultants utilized by the Office of Third Level of Appeals.  (Zamora Dep. 39:25-

15  43:22.)  In fact, Zamora could not recall a single instance in which the plan of treatment

16  prescribed by a primary care physician was overruled by the appeals process.  (*Id.*)  Yet, in this

17  case, Zamora completely disregarded the recommendation of Plaintiff's primary treating mental

18  health provider, Dr. Reese, and the Office of Third Level Appeals' consulting psychologist, Dr.

19  Cornish.  Zamora's proffered reason for the denial—which is wholly unsupported by the

20  evidence—thus was merely pretextual.   Zamora took *no action* to address the persistent and well-

21  documented dysphoria, anxiety and distress Plaintiff was suffering as a result of her gender

22  dysphoria.  Defendants' pretextual justifications cannot shield them from the finding of deliberate

---

[8]     To the extent Defendant Zamora was relying upon Defendant Coffin's pretextual report to
find that SRS was not medically necessary, it is not a sufficient justification.  While "mere
difference of medical opinion" does not support a deliberate indifference claim, *Toguchi v.
Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (internal quotation marks and citation omitted),
Defendants cannot deny a procedure by relying on the recommendations of non-specialist, non-
treating medical professionals, especially when circumstances indicate that prison officials did so
for reasons unrelated to the prisoner's medical needs.  *See Snow*, 681 F.3d at 988; *see also
Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (triable issue of fact on deliberate
indifference where prison officials ignored recommendations of treating specialists and instead
relied on opinions of non-specialist and non-treating medical officials who made decisions based
on an administrative policy); *Endell*, 981 F.2d 1062.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

20

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 236

1    indifference that is warranted here.  *See Snow*, 681 F.3d at 984, 987 (denying summary judgment

2    where defendants declined to provide surgery because plaintiff was "functioning satisfactorily,"

3    but there was evidence that plaintiff's request for treatment was denied for "reasons unrelated to

4    [the plaintiff's] medical needs," such as a policy against treating chronic pain); *Hamilton*, 981

5    F.2d at 1067 (denying motion for summary judgment where plaintiff alleged that prison officials

6    "sought [a specific doctor's recommendation] simply as a device to allow the prison official to

7    proceed with their predetermined decision to effectuate his transfer to Oklahoma").

8            **E.      CDCR Has a Blanket Policy Against Providing SRS.**

9            Behind the Defendants' pretextual justifications, the true reason for Defendants' denial of

10   SRS is that CDCR has a very clear, express policy barring SRS as a treatment for transgender

11   inmates.  The CDCR Department Operations Manual ("DOM") Section 91020.26, entitled

12   "gender dysphoria Treatment," states "*implementation of surgical castration, vaginoplasty, or*

13   *other such procedures shall be deferred beyond the period of incarceration.  Surgical procedure*

14   *shall not be the responsibility of the Department*."  (Ex. T (emphasis added).)  Defendants

15   conceded that the DOM was an applicable policy considered in the appeals process.  (Zamora

16   Dep. at 132:11-15; Adams Dep. at 95:5-11; Newton Dep. 78:12-16.)

17           In accord with this policy, Plaintiff repeatedly was told by her health care providers at

18   CDCR that SRS was not a treatment provided to inmates.  Upon reviewing Plaintiff's medical

19   records and determining that Plaintiff "is psychologically ready for the SRS," Dr. Cornish noted,

20   however, that she "did not know if CDCR is performing SRS."  (Ex. M.)  Dr. Kohler—who

21   established CDCR's gender clinic—testified that there was an "understanding" that SRS would

22   not be available to transgender inmates.  "It was more like don't even think about it," she

23   testified.  (Kohler Dep. at 45:10-14.)  Despite this "understanding," Kohler twice expressly

24   requested that SRS be made available to transgender inmates—first to the Chief Medical Office

25   in connection with the gender clinic, and second to the statewide director of California Prison

26   Healthcare Services in connection with drafting CDCR transgender policies—but the proposal

27   was denied both times.  (Kohler Dep. at 57:21-59:2.)  This blanket policy also is clear from the

28   CDCR's express policies and care guide for the treatment of transgender inmates, which all

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

21

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

**ER 237**

1    expressly discuss the requirements for diagnosis and treatment but which make no mention of

2    SRS as a treatment option.  (Ex. G at AG004992-4998.)  Similarly, the training provided to

3    CDCR health care providers regarding transgender inmate care made clear that SRS would not be

4    available to inmates while incarcerated.  (Ex. O.)

5         In this litigation, Defendants have argued that there is no blanket policy against SRS as a

6    treatment for transgender inmates by pointing to Title 15 California Code of Regulation Section

7    3350.1.  (Dkt. No. 30 (arguing that "section 3350.1 explicitly *permits* vaginoplasty if a physician

8    and a medical review board deem it medically necessary" (emphasis in original)).)  Section

9    3350.1 explicitly identifies castration and vaginoplasty (save for two types of vaginoplasty that

10   are not used in male-to-female SRS) as surgery that is "not medically necessary."  15 C.C.R. §

11   3350.1(b).  However, the regulation provides a theoretical exception to this explicit bar if (i) the

12   prisoner's attending physician prescribes the procedure as "clinically necessary," and then (ii) the

13   procedure is approved by both the Institutional Utilization Management committee and the

14   Headquarters Utilization Management committee.  *Id.* § 3350.1(d).  However, none of the

15   Defendants expressly referenced this specific statute in denying Plaintiff's appeal.  (Ex. G.)

16   Contrary to Defendants' litigation position that this regulation purportedly was applicable to the

17   appeal being considered, none of the Defendants could explain how the regulation actually would

18   be applied to Plaintiff's appeal.  (Zamora Dep. 149:3-20 (stating that "don't remember … even

19   seeing this before, so I don't know that we even looked at this"); Newton Dep. 86:4-15; Coffin

20   Dep. 176:23-180:25 (noting that "it's not clear from the policy, in my opinion, how the term is

21   being used with regard to mental health"); Adams Dep. at 101:2-103:20 (testifying that the policy

22   applies to denial of referrals by providers, not to inmate 602 appeals).)

23        Under these policies, no inmate has actually received vaginoplasty as a treatment in the

24   past five years, if ever, and Defendants are not aware of any inmate actually ever receiving SRS.

25   (Ex. U.)  Defendant Dr. Jeffrey Beard ("Beard"), as the Secretary of the CDCR, has ultimate

26   authority and responsibility for these policies.  (Ex. W (stating that the Secretary "provides

27   uniform policy direction and operational control" for the correctional system).)  By failing to take

28   action to correct these policies, Beard has endorsed and affirmed the discriminatory and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

22

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 238

1    deliberately indifferent conduct of the other Defendants.

2            Defendants thus have deprived Plaintiff of her Eighth Amendment rights due to a policy

3    or custom rather than an individualized determination as is required.  *See Colwell v. Bannister*,

4    763 F.3d 1060, 1069 (9th Cir. 2014) (holding that prison overriding medical recommendations

5    because of administrative policy may constitute deliberate indifference); *Roe v. Elyea*, 631 F.3d

6    843, 862-63 (7th Cir. 2011) (holding that categorical denial of treatment for hepatitis C to inmates

7    with less than two years left of sentence indicated Eighth Amendment violation).

8            **F.      Case Law Supports a Finding of Deliberate Indifference for Denial of SRS.**

9            Plaintiff has found no controlling authority addressing the provision of SRS as a treatment

10   required under the Eighth Amendment for gender dysphoria.  Courts in other circuits, however,

11   have found deliberate indifference where inmates have been denied access to treatment for gender

12   dysphoria under similar circumstances.  *See, e.g.*, *Kothmann*, 558 F. App'x at 911; *Fields*, 653

13   F.3d at 556; *De'lonta*, 708 F.3d at 526; *Battista v. Clarke*, 645 F.3d 449, 454-55 (1st Cir. 2011).

14   Just as hormone therapy is required where medications and psychotherapy are inadequate to treat

15   inmates who still suffer, SRS is required where hormone therapy and other treatments fail to

16   adequately treat Plaintiff's physical and emotional suffering as is the case here.

17           The First Circuit's recent decision in *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en

18   banc), in which it reversed the decisions of the trial court and a panel of the First Circuit that had

19   found the deprivation of SRS to violate the Plaintiff's Eighth Amendment rights, is not binding

20   on this Court and was wrongly decided.  As one of the dissenters in *Kosilek* eloquently stated:

21           I am confident that I would not need to pen this dissent, over twenty years after
             Kosilek's quest for constitutionally adequate medical care began, were she not
22           seeking a treatment that many see as strange or immoral. Prejudice and fear of the
             unfamiliar have undoubtedly played a role in this matter's protraction. Whether
23           today's decision brings this case to a close, I cannot say. But I am confident that
             this decision will not stand the test of time, ultimately being shelved with the likes
24           of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), deeming
             constitutional state laws requiring racial segregation, and *Korematsu v. United*
25           *States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), finding constitutional the
             internment of Japanese–Americans in camps during World War II. I only hope that
26           day is not far in the future, for the precedent the majority creates is damaging.

27   *Kosilek*, 774 F.3d at 113 (Thompson, J., dissenting).  Regardless, the First Circuit's opinion

28   expressly cautioned that its decision did not create a de facto ban against SRS as a medical

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

23

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 239

1    treatment for any incarcerated individual and noted that a "blanket policy" barring SRS would run

2    afoul of the requirement that medical care be individualized based on a particular prisoner's

3    serious medical needs.  *Id.* at 90 n.12.  The First Circuit also emphasized that its decision "in no

4    way suggests that correctional administrators wishing to avoid the treatment need simply to find a

5    single practitioner willing to attest that some well-accepted treatment is not necessary.  We do not

6    establish here a per se rule allowing a dissenting medical opinion to carry the day."  *Id.*  Thus,

7    even under the reasoning of the *Kosilek* decision, Defendants' application of a blanket policy and

8    pretextual reliance on the opinion of a non-treating, non-specialist psychologist to deny Plaintiff

9    SRS violates her Eighth Amendment rights.

10   **III.    DEFENDANTS DEPRIVED PLAINTIFF OF HER EQUAL PROTECTION
            RIGHTS UNDER THE FOURTEENTH AMENDMENT.**

11

12   Defendants intentionally treated Plaintiff differently from similarly situated cisgender inmates

13   seeking vaginoplasty by barring her access to SRS, even after the surgery was found to be

14   medically necessary to treat her gender dysphoria.   This violated her constitutional right to equal

15   protection.  *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (Equal

16   Protection Clause requires State to treat all persons similarly situated alike).  The record provides

17   ample evidence that Defendants acted with an "intent or purpose to discriminate" (*Furnace v.*

18   *Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013)) against Plaintiff due to her gender and transgender

19   status because Defendants (i) repeatedly denied SRS to Plaintiff without providing any alternative

20   treatment for her ongoing pain and suffering; (ii) relied on purely pretextual reasons for

21   disregarding the recommendations of her treating mental health provider; and (iii) failed to

22   consult with a specialist as required by CDCR policy and the governing standards of care.  *See*

23   *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15 (1977) (" 'Disparate

24   treatment' ... is the most easily understood type of discrimination. The [defendant] simply treats

25   some people less favorably than others because of their ... sex.").

26           Indeed, DOM section 91020.26 makes clear that Defendants could not and did not

27   evaluate medical necessity in Plaintiff's case because, under section 91020.26, vaginoplasty and

28   castration are expressly prohibited as treatments for gender dysphoria.  (Ex. T.)  Likewise, 15

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

24

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 240

1    C.C.R. section 3350.1 presumes that castration and vaginoplasty (except as a treatment for

2    cystocele and rectocele) are "not medically necessary" making it near impossible, if not

3    impossible, for transgender inmates to access these surgeries as treatments for gender dysphoria

4    even when, as here, the surgery has been deemed "medically necessary" by a treating health care

5    provider. [9]

6         The evidence is clear that Defendants had a blanket policy against providing SRS, which

7    necessarily discriminates against transgender inmates–the only group of inmates that require the

8    surgery as a medically necessary treatment.  Because Defendants discriminated against Plaintiff

9    based on her gender and her transgender status, intermediate scrutiny applies.  *Norsworthy v.*

10   *Beard*, No. 14-CV-00695-JST, 2014 WL 6842935, at *10 (N.D. Cal. Nov. 18, 2014) (citing

11   *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011)).  Intermediate scrutiny requires the State

12   to show that its classification based on transgender status is "substantially related to a sufficiently

13   important governmental interest."  *Cleburne*, 473 U.S. at 441.  The asserted governmental

14   justification must be "'exceedingly persuasive,'" and it must be "genuine, not hypothesized or

15   invented *post hoc* in response to litigation." *United States v. Virginia,* 518 U.S. 515, 533 (1996)

16   (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724 (1982)).  But Defendants

17   have not and cannot point to any governmental interest to support their discriminatory practice of

18   denying transgender inmates access to medically necessary treatments.  Thus, Defendants

19   deprived Plaintiff of her Fourteenth Amendment right to equal protection due to their unjustified

20   discriminatory policy.

21   **IV.    PLAINTIFF IS SUFFERING IRREPARABLE HARM AND WILL CONTINUE TO
22          DO SO IN THE ABSENCE OF A PRELIMINARY INJUNCTION**

23        Defendants' refusal to provide Plaintiff medically necessary SRS has indisputably caused

24

25   [9] To the extent defendants attempt to justify their denial of SRS based upon DOM Section
     91020.26 and/or 15 C.C.R. Section 1350.1, those policies violate the Fourteenth Amendment both
26   on their face and as applied.  Because these provisions explicitly discriminate on the basis of
     gender/transgender status, they are subject to intermediate scrutiny and invalid because
27   Defendants have not and cannot advance any governmental interest, much less a sufficiently
     important one, to justify these discriminatory policies.  *Latta v. Otter*, 771 F.3d 456, 480-81 (9th
28   Cir. 2014) (Berzon, J., concurring) (when the text of a law distinguishes between classes of
     people, it is a facial classification subject to intermediate scrutiny) (inner citations omitted).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2          25          MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
                                      3:14-cv-00695-JST

ER 241

1   her to suffer from severe clinical emotional distress, depression, dysphoria and physical pain.

2   Plaintiff has described the "psychological and emotional pain . . . frustration and agony" she

3   experiences as a result of being "unable to complete [her] existence" without SRS.  (Norsworthy

4   Dep. at 20:8-14).  The pain is "excruciating," and the anxiety due to gender dysphoria manifests

5   itself in sleeplessness, frustration, cold sweats, hypervigilance, mood swings, and panic attacks.

6   (*Id.* at 87:16-25; 88:1-10.)  This pain persists despite the hormone treatments and other prescribed

7   medications.  (*See id.* at 158:5-25, 159:1-7; Coffin Dep. at 166:2-5.)  Dr. Reese, Plaintiff's

8   treating meantal health provider, consistently recognized these symptoms. (Ex. H.)  Defendants

9   have provided no reason to doubt Plaintiff's excruciating mental pain.  (*See, e.g.*, Coffin Dep. at

10   123:8-125:17, 130:17-24), nor have they disputed that SRS would reduce this pain.

11         The Ninth Circuit has repeatedly held that emotional distress, anxiety, and depression

12   constitute irreparable injury.  *See Chalk v. U.S. Dist. Court Cent. Dist. Of California*, 840 F.2d

13   701, 709 (9th Cir.1988) (irreparable injury found when plaintiff suffers "emotional stress,

14   depression and reduced sense of well-being…."); *Thomas v. County of Los Angeles*, 978 F.2d

15   504, 512 (9th Cir. 1992) ("Plaintiffs have … established irreparable harm, based on this Court's

16   finding that the deputies' actions have resulted in irreparable physical and emotional injuries to

17   plaintiffs and the violation of plaintiffs' civil rights."); *see also Wood v. County of Alameda*, 1995

18   WL 705139, *16 (N.D. Cal. 1995) (irreparable injury found when plaintiff's "declaration makes

19   clear that she has suffered feelings of guilt, depression, anxiety, and loss of self-esteem….").

20         In addition to her mental health, Plaintiff's physical health—in particular, her liver

21   function—is currently seriously threatened by Defendants' denial of SRS.  Plaintiff has received

22   high dosages of hormone replacement therapy for over a decade, increasing her risk of heart

23   attack, deep venous thrombosis, pulmonary emboli, breast cancer, liver toxicity, and development

24   of pituitary tumors. (Gorton Report ¶ 19.)  Plaintiff also contracted hepatitis C after a violent

25   gang rape in prison in or around 2009, and has an allergy to spironolactone (an antiandrogen),

26   "mak[ing] her hormone replacement therapy more difficult and dangerous." (Gorton Report ¶

27   20.)  In or around August 2014, Plaintiff was removed from hormone therapy due to liver

28   complications, which has caused both physical and emotional distress. (Gorton Report ¶ 22, Ex.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**ER 242**

1    V (noting "psychological distress that [Plaintiff] may have without estrogen).)  Plaintiff's treating

2    endocrinologist recommended that she resume hormone therapy on a very low dose through

3    injected or transdermal patch application, with oral doses of hormones used only as a "last

4    resort."  (Ex. V.)  Despite this, Plaintiff is still receiving the "last resort" oral doses, which puts

5    extra strain on her liver and increases liver inflammation. (Gorton Report ¶¶ 25, 27-28.)

6            As explained by Dr. Gorton, CDCR's course of hormone therapy "is causing ongoing

7    inflammation of [Plaintiff's] liver, which already is undergoing constant damage due to her

8    hepatitis C."  (Gorton Report ¶ 33.)  Dr. Gorton ultimately concludes that, in addition to SRS

9    being medically necessary to treat Plaintiff's gender dysphoria, it "would also have the significant

10   health benefit of decreasing the need for hormone therapy," since "[o]nce the testosterone-

11   producing male genitalia is removed, there is no longer a need for anti-androgens."  (Gorton ¶

12   37.)  This decrease in hormone dosage would in turn save Plaintiff from a host of physical

13   dangers, especially the continuing strain and damage to her liver, and would also avoid the mental

14   health risks of cycling on and off hormone therapy.  (Gorton Report ¶¶ 35-36.)

15           In addition to these emotional and physical harms, the deprivations of Plaintiff's Eighth

16   and Fourteenth Amendment rights described above also are sufficient to establish irreparable

17   harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional right, "for even

18   minimal periods of time, unquestionably constitutes irreparable injury."); *Doe v. Harris*, 772 F.

19   3d 563, 583 (9th Cir. 2014);  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282 (N.D. Cal.

20   2014).

21   **V.      THE BALANCE OF HARDSHIPS HEAVILY FAVORS PLAINTIFF.**

22

23           The balance of equities heavily favors Plaintiff's requested relief.  Plaintiff has established

24   that she will suffer irreparable harm if she is denied her constitutional right to sex reassignment

25   surgery, the only medical treatment that will address her suffering from gender dysphoria.  *See*

26   *supra* Part V.  Conversely, the Defendants cannot show any legally cognizable harm in

27   complying with Plaintiff's constitutional demands.  *See Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727

28   (9th Cir. 1983) (defendant "cannot reasonably assert that it is harmed in any legally cognizable

     sense by being enjoined from constitutional violations"); *Graham v. Richardson*, 403 U.S. 365,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

27

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

**ER 243**

1    374-75 (1971) (preservation of resources alone cannot justify discrimination in allocating those

2    resources).

3          To the extent, however, that the prison can show a theoretical harm, the Ninth Circuit has

4    still tipped the balance in favor of plaintiffs suffering emotional and/or psychological harm. *See,*

5    *e.g., Chalk*, 840 F.2d at 711.  Thus, the government's harm, if any, is insufficient to overcome the

6    harm Plaintiff will suffer in the denial of her constitutional rights.  *See Zepada*, 753 F.2d at 727.

7    **VI.**    **AN INJUNCTION IS IN THE PUBLIC INTEREST.**

8          An injunction requiring Defendants to perform SRS and enjoining CDCR's discriminatory

9    policies in accordance with Plaintiff's constitutional rights would be in the public interest.  *See*

10   *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to

11   prevent the violation of a party's constitutional rights." (citations and internal quotations

12   omitted)).

13         The scope of Plaintiff's proposed injunction also conforms to the Prison Litigation

14   Reform Act ("PLRA").  The PLRA provides that "[t]he court shall not grant or approve any

15   prospective relief unless the court finds that such relief is narrowly drawn, extends no further than

16   necessary to correct the violation of the Federal right, and is the least intrusive means necessary to

17   correct the violation of the Federal right."  18 U.S.C. § 3626.  The PLRA "has not substantially

18   changed the threshold findings and standards required to justify an injunction."  *Gomez v. Vernon*,

19   255 F. 3d 1118, 1129 (9th Cir. 2001).  Here, Defendants have violated Plaintiff's rights under the

20   Eighth and Fourteenth Amendments by denying her requests for SRS.  The appropriate relief—

21   which is narrowly drawn, extends not further than necessary, and is the least intrusive means to

22   correct Defendants' violation—is to require Defendants to provide adequate medical care,

23   including SRS, to Plaintiff.

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

28

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 244

1

**<u>CONCLUSION</u>**

2

For the foregoing reasons, the Court should grant Plaintiff's Motion in its entirety.

3

4        Dated: February 26, 2015                    MORGAN, LEWIS & BOCKIUS LLP

5

6                                                     By _____/s/ Herman J. Hoying_____
                                                              HERMAN J. HOYING
7
                                                      MORGAN, LEWIS & BOCKIUS LLP
8                                                     One Market, Spear Street Tower
                                                      San Francisco, California  94105-1126
9                                                     Telephone:  415.442.1000
                                                      Facsimile:  415.442.1001
10                                                    hhoying@morganlewis.com
                                                      *Attorneys for Plaintiff,*
11                                                    MICHELLE-LAEL B. NORSWORTHY
                                                      (a/k/a JEFFREY B. NORSWORTHY)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25766718.2

29

MOT. FOR PRELIM. INJ. & MPA IN SUPPORT
3:14-cv-00695-JST

ER 245

1 | CHRISTOPHER J. BANKS (Bar No. 218779)
HERMAN J. HOYING (Bar. No. 257495)
2 | MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
3 | San Francisco, California  94105-1126
Telephone:     415.442.1000
4 | Facsimile:     415.442.1001
cbanks@morganlewis.com
5 | hhoying@morganlewis.com

6 | ILONA M. TURNER (Bar No. 256219)
JENNIFER ORTHWEIN (Bar No. 255196)
7 | SHAWN THOMAS MEERKAMPER (Bar No. 296964)
TRANSGENDER LAW CENTER
8 | 1629 Telegraph Ave, Suite 400
Oakland, CA 94612
9 | Telephone:     415.865.0176
Facsimile:     877.847.1278
10 | ilona@transgenderlawcenter.org
jen@transgenderlawcenter.org
11 | shawn@transgenderlawcenter.org

12 | *Attorneys for Plaintiff*
MICHELLE-LAEL B. NORSWORTHY (a/k/a JEFFREY
13 | B. NORSWORTHY)

14 |

15 | UNITED STATES DISTRICT COURT

16 | NORTHERN DISTRICT OF CALIFORNIA

17 |

18 | JEFFREY B. NORSWORTHY (a/k/a          Case No. 3:14-cv-00695-JST
MICHELLE-LAEL B. NORSWORTHY),
19 |                                       **FIRST AMENDED COMPLAINT**
                 Plaintiff,
20 |
              vs.
21 |
JEFFREY BEARD; A. NEWTON; A.
22 | ADAMS; LORI ZAMORA; RAYMOND
J. COFFIN; MARION SPEARMAN;
23 | DAVID VAN LEER; JARED LOZANO;
and DOES 1-30,
24 |
                 Defendants.
25 |

26 |

27 |

28 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiff Michelle-Lael B. Norsworthy (a/k/a Jeffrey B. Norsworthy) ("Plaintiff" or "Norsworthy") for her Complaint against Defendants Jeffrey Beard, A. Newton, A. Adams, Lori Zamora, Raymond J. Coffin, Marion Spearman, David Van Leer, Jared Lozano and Does 1-30, alleges as follows:

## NATURE OF THIS ACTION

1.      Plaintiff brings this civil rights action under 42 U.S.C. § 1983 to seek prospective injunctive relief based upon Defendants' failure to provide Plaintiff with medically necessary surgery in violation of the Eighth and Fourteenth Amendments to the United States Constitution and failure to allow Plaintiff to pursue a legal name change also in violation of the Eighth and Fourteenth Amendments.

## PARTIES

2.      Plaintiff Michelle-Lael Bryanna Norsworthy is a citizen of California currently housed at Mule Creek State Prison in Ione, California by the California Department of Corrections and Rehabilitation ("CDCR").  Plaintiff has been incarcerated under the custody of the CDCR since on or around April 15, 1987.  Plaintiff is a transsexual woman – an individual whose gender identity is different from the male gender assigned to her at birth, who requires medical treatment to better conform her body to that gender identity.  She experiences severe dysphoria and distress resulting from the incongruence between her male physical features and her female gender identity.  Plaintiff has been living as a female since the mid-1990s and has received feminizing hormone therapy and chemical castration treatments since 2000.  As a result, plaintiff is a biological female based upon her estrogen and testosterone levels, yet Defendants have refused to allow Plaintiff to obtain medically necessary surgery to further her treatment.

3.      Upon information and belief, Defendant Dr. Jeffrey Beard ("Beard") is a resident of California.  Since his appointment by Governor Edmond G. Brown, Jr. on December 27, 2012, Beard has served as Secretary of the CDCR.  In his position as Secretary, Beard has ultimate responsibility and authority for the operation of the CDCR, including the administration of health care and the execution of policies governing medical care and name changes.

4.      Upon information and belief, Defendant A. Newton ("Newton") is a resident of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

California.  Upon information and belief, at all relevant times, Newton was an agent or employee of the CDCR with the title "SRN II" and was charged with evaluating certain appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, A. Newton is currently employed by the CDCR at Salinas Valley State Prison in Soledad, California.

5.      Upon information and belief, Defendant A. Adams ("Adams") is a resident of California.  Upon information and belief, at all relevant times, Adams was an agent or employee of the CDCR with the title "CME" and was charged with evaluating certain second level appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, A. Adams is currently employed by the CDCR at the Correctional Training Facility in Soledad, California.

6.      Upon information and belief, Defendant Lori Zamora ("Zamora") is a resident of California.  Upon information and belief, at all relevant times, Zamora was Chief of the CDCR Office of Third Level Appeals-Health Care with the authority to grant or deny the relief requested in the appeals.

7.      Upon information and belief, Defendant Raymond J. Coffin ("Coffin") is a resident of California.  Upon information and belief, at all relevant times, Coffin was the Chief Psychologist at the California Substance Abuse Treatment Facility and State Prison in Corcoran, California and an employee of the CDCR charged with evaluating the merits of certain inmates' claims of inadequate medical care.

8.      Upon information and belief, Defendant Marion Spearman ("Spearman") is a resident of California.  At all relevant times, Spearman was the Warden for the California Correctional Training Facility located in Soledad, California, at which facility Plaintiff was housed when the CDCR decisions at issue here were made. As warden, Spearman is responsible for reviewing and approving or denying an inmate's request for a legal name change.

9.      Upon information and belief, Defendant David Van Leer ("Van Leer") is a resident of California.  Upon information and belief, at all relevant times, Van Leer was an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 248

Appeals Examiner for the CDCR with responsibility for reviewing and approving or denying the appeal of the denial of an inmate's request for a legal name change.

10.     Upon information and belief, Defendant Jared Lozano ("Lozano") is a resident of California.  Upon information and belief at all relevant times, Lozano was the Chief of the Office of Appeals for the CDCR with responsibility, among other things, for reviewing and approving or denying the appeal of the denial of an inmate's request for a legal name change.  Upon information and belief, Lozano is currently employed by the CDCR at the California Health Care Facility in Stockton, California.

11.     Does 1-30 are unnamed agents or employees of CDCR that participated in the decision to deny Plaintiff medical care and/or the right for Plaintiff to seek a legal name change.

12.     Plaintiff reserves the right, consistent with applicable rules and orders, to amend this Complaint to include other officials should it become apparent that those officials' inclusion is necessary to grant the prospective injunctive relief requested herein.

## JURISDICTION

13.     This court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 1331 and 1343(a)(3).

14.     Venue is appropriate in this judicial district pursuant to 42 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred in the Northern District of California.

## FACTUAL BACKGROUND

### I.     PLAINTIFF'S PERSONAL HISTORY WITH GENDER DYSPHORIA

15.     Plaintiff was born in 1964 in Detroit, Michigan.  While Plaintiff was still an infant, her parents divorced and Plaintiff was sent to live with her grandmother.  Approximately ten years later, Plaintiff's mother retook custody of Plaintiff and moved the family to the West Coast, eventually settling in California.  Throughout childhood and adolescence, Plaintiff never felt comfortable in the male gender assigned to her at birth.  Plaintiff attempted to overcompensate for feeling weak and less than a man as a result of Plaintiff's feminine characteristics and gender

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 249

1  identity confusion by acting out aggressively, owning guns and turning to alcohol. At sixteen,

2  Plaintiff dropped out of high school and moved to Hollywood, California, eventually working as

3  a police informant in her late teens and joining the military.

4      16.    On December 4, 1985, Plaintiff encountered a male acquaintance at a bar in

5  Fullerton, California with whom Plaintiff had a contentious history due to Plaintiff's work as an

6  informant.  Both intoxicated, an argument began in the bar and Plaintiff left the bar to go to

7  Plaintiff's car.  The acquaintance followed Plaintiff to the car, and Plaintiff retrieved a loaded

8  rifle from the car.  Plaintiff fired a warning shot but the acquaintance reached for the gun and a

9  struggle ensued.  During the struggle, the acquaintance was shot in the neck.  Plaintiff

10 immediately attempted to administer first aid and, upon police arriving, stated "I shot my friend."

11 The acquaintance was taken to the hospital, but died a few days later as the result of a blood clot

12 from the gunshot wound.  Plaintiff was convicted of second degree murder and sentenced to

13 seventeen years to life.  Plaintiff has been under the custody of CDCR since on or about April 15,

14 1987 and currently is housed at Mule Creek State Prison in Ione, California.

15     17.    Since at least adolescence Plaintiff has experienced significant distress and anxiety

16 as a result of the discrepancy between the male sex assigned to her at birth and her own female

17 gender identity.  In the 1990s, Plaintiff's feelings and understandings surrounding her gender

18 began to consolidate and Plaintiff came to understand and accept that she is a transsexual woman.

19     18.    In 1999, Plaintiff underwent several weeks of testing by a psychologist, Dr. Carl

20 Viesti, at a CDCR facility.  "The results of all test instruments were consistent with the profile of

21 a transsexual" and Plaintiff was diagnosed with gender identity disorder – "the only DSM-IV

22 diagnosis available for this condition."  Subsequent to Plaintiff's initial diagnosis, the American

23 Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of

24 Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity disorder" diagnosis

25 with "gender dysphoria."  The DSM-V characterizes the diagnosis of gender dysphoria as

26 follows: "[i]ndividuals with gender dysphoria have a marked incongruence between the gender

27 they have been assigned to (usually at birth, referred to as *natal gender*) and their

28 experienced/expressed gender." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                    4

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 250**

Mental Disorders 453 (5th ed. 2013) ("DSM-V") In addition to this marked incongruence, "[t]here must also be evidence of distress about this incongruence." *Id.* Hereinafter this Complaint will generally refer to the condition as gender dysphoria even when referring to diagnoses prior to 2013.

19.     Upon receiving this diagnosis in early 2000, it was determined that it was medically necessary for Plaintiff to receive treatment for her condition that would help to bring her body into greater conformity with her gender identity.  Toward this end, Plaintiff was prescribed feminizing hormone therapy and injections of a progestin (Depo-Prevera) to accomplish chemical castration.  Plaintiff has received these treatments continually from January 2000 through the present, with periodic dose adjustments as necessary.

20.     As a result of Plaintiff's feminizing hormone therapy and chemical castration treatments over the past fourteen years, Plaintiff's physical features and voice have feminized. Plaintiff has been living as a female since the 1990s and her medical records repeatedly describe her as a "biological female" based upon her presentation, her estrogen and testosterone levels and the chemical castration.  Her prison records note that she "tend[s] to move and gesture in a feminine manner" and describe her as "a pleasant-looking woman, slender and coiffed in a pony tail" who "walk[s] the yard . . . as a woman."

21.     The end goal of Plaintiff's treatment has always been to bring her primary and secondary sex characteristics into conformity with her female gender identity.  The only way this can be accomplished for Plaintiff is through sex reassignment surgery ("SRS"), also known as gender confirming surgery, which involves, *inter alia*, reconstructing the genitalia to conform in appearance and function to that typically associated with the person's gender identity.  Plaintiff's records from the 1990s through the present reflect that she considered herself a transsexual, suffered severe distress as a result of her condition and desired to obtain a "sex change."  Her medical records consistently reflect that she was "undergoing a sex change" and in the "process" of changing her sex, with the final step of that process being SRS.

22.     In addition to treating the severe mental anguish Plaintiff experiences as a result of her gender dysphoria, SRS also is medically necessary so that Plaintiff may reduce the high

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 251

dosages of feminizing hormones and Depo-Provera that she receives, which Defendants have repeatedly acknowledged are medically necessary treatment for Plaintiff's gender dysphoria. Large intake of these hormones over the course of many years has been attributed to increased risk for heart and vascular conditions and certain types of cancer. Eliminating these unnecessary increased risks is particularly essential in Plaintiff's case, because she contracted Hepatitis C after being gang raped while in CDCR custody in 2009 and thus already has significant risk factors and would face significant, heightened risks if she were to develop one of these conditions. SRS would entirely eliminate the need for Plaintiff to take Depo-Provera and would reduce by approximately 2/3 the required feminizing hormone dosage.

23. In 2012, Plaintiff's treating psychologist, Dr. Reese, expressly prescribed SRS as medically necessary for Plaintiff, finding that "it is clear that clinical medical necessity suggest and mandate a sex change medical operation before normal mental health can be achieved for this female patient." Dr. Reese repeatedly renewed his opinion with regard to the necessity of SRS for the following six months, at which time Plaintiff was removed from his care by the CDCR.

## II. SRS IS WIDELY RECOGNIZED AS MEDICALLY NECESSARY TREATMENT FOR GENDER DYSPHORIA

24. Dr. Reese's finding that SRS was a medically necessary treatment for Plaintiff's gender dysphoria is supported by leading medical research and standards of care. Gender dysphoria is recognized as a serious medical condition, with mental and physical manifestations. SRS has widely been accepted as genuine, necessary treatment for severe cases of gender dysphoria, including by the federal courts that have addressed the issue.

25. Gender dysphoria is not just a mild discomfort with one's sex assigned at birth; rather, it is a profound disturbance such that the lives of some transsexual people revolve only around performing activities to lessen their gender distress. DSM-V 453-454. Gender dysphoria often comes with severe mental anguish and the inability to function normally at school, at work, or in a relationship. *Id.* at 457-58. Moreover, those suffering from gender dysphoria often become socially ostracized and stigmatized, which further diminishes self-esteem. *Id.* Although gender dysphoria on its own is not considered a life-threatening illness, when not properly

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 252

1    treated, it is often associated with dangerous related conditions such as depression, substance

2    related disorders, self-mutilation, and suicide.  *Id.* at 458-59.  Without treatment, the path for

3    those suffering from gender dysphoria can be torturous, as evidenced by shockingly

4    high suicide rates:  45 percent for those aged 18-44, in comparison to the national average of 1.6

5    percent, according to the 2009 National Transgender Discrimination Survey.

6        26.    The World Professional Association for Transgender Health ("WPATH") is a non-

7    profit, multidisciplinary professional association dedicated to understanding and treating gender

8    dysphoria.  The organization seeks to promote evidence-based care, education, research,

9    advocacy, public policy, and respect for transgender health.  WPATH publishes the Standards of

10   Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards

11   of Care"), which are based upon the best available science and expert professional consensus and

12   articulate clinical guidance for health professionals to assist with safe and effective care that

13   maximizes the patients' overall health and psychological well-being.  The current version of the

14   Standards of Care—Version 7—was released in September 2011 following a five-year process in

15   which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the

16   most effective treatments for gender dysphoria.  Eli Coleman et al., Standards of Care for the

17   Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 INT'L J.

18   OF TRANGENDERISM, 165 (2011) ("Standards of Care"), attached hereto as Exhibit 1.  WPATH's

19   Standards of Care are the prevailing standards for treating gender dysphoria.  Mental health

20   providers and medical professionals rely heavily on the Standards of Care in determining the best

21   course of treatment for their patients.

22       27.    The Standards of Care make clear that SRS is an "essential and medically

23   necessary" treatment for gender dysphoria in certain cases.  Hormone therapy alone for those

24   individuals is not sufficient.  As the Standards of Care explain:

25       While many transsexual, transgender, and gender-nonconforming individuals find
         comfort with their gender identity, role, and expression without surgery, for many
26       others surgery is essential and medically necessary to alleviate their gender
         dysphoria.  For the latter group, relief from gender dysphoria cannot be achieved
27       without modification of their primary and/or secondary sex characteristics to
         establish greater congruence with their gender identity.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 253

28.     Under the Standards of Care, the criteria for vaginoplasty (surgical construction of a vagina) in male-to-female transsexuals include "[p]ersistent, well-documented gender dysphoria," "[twelve] continuous months of hormone therapy as appropriate to the patient's gender goals," and "[twelve] continuous months of living in a gender role that is congruent with their gender identity." *Id.* at 60.  The twelve-month requirement that an SRS candidate live in an identity-congruent gender role is "based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery." *Id.*  It is also recommended that patients seeking SRS have regular visits with a mental health professional or other medical professional.

29.     The Standards of Care apply equally to inmates and non-inmates, expressly noting that "[h]ealth care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . .  All elements of assessment and treatment as described in the SOC can be provided to people living in institutions.  Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements." *Id.* at 206-07.

30.     In California, both Medicaid and private health insurance plans offer coverage for health care treatment related to gender transition, including SRS.

31.     Medical studies have shown the effectiveness of SRS as a treatment for gender dysphoria.  Modern SRS has been practiced for more than half a century and is the internationally recognized treatment to treat gender dysphoria in transsexual persons.  A thorough analysis of available research conducted in 1990 concluded that SRS is an effective treatment for gender dysphoria because it drastically reduced the distress of patients with gender dysphoria.  In 2007 a review of multiple studies on SRS was conducted. Special attention was paid to the effects of SRS on gender dysphoria, sexuality, and regret. The researchers concluded that SRS is an effective treatment for gender dysphoria and the only treatment that has been evaluated empirically with large clinical case series.

32.     A 2009 study aimed at evaluating the results of surgical reassignment of genitalia

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 254

in transgender women concluded that surgical conversion of the genitalia is a safe and important phase of the treatment of transgender women.

33.     In a study published in 2010 on outcomes of individuals following sex reassignment almost all patients were satisfied with the sex reassignment and 86% were assessed by clinicians at follow-up as stable or improved in global functioning.

34.     Another study conducted in 2010 with 247 transgender women indicated surgical treatments are associated with improved mental health-related quality of life.

35.     Nearly every study to date has concluded SRS is an effective treatment for gender dysphoria.

36.     Research also has confirmed that hormone therapy alone is insufficient to treat certain cases of gender dysphoria.  For example, one study compared gender dysphoria patient groups before treatment, during hormone therapy and after SRS and showed that a bigger improvement occurs after SRS than after simply changing the gender role.

III.     **DEFENDANTS DENIED PLAINTIFF MEDICALLY NECESSARY SURGERY**

37.     On September 16, 2012, Plaintiff filed a Patient/Inmate Health Care Appeal seeking SRS as a medically necessary treatment for her gender dysphoria, because the extensive feminizing hormone therapy and chemical castration treatments she had received over the course of the prior thirteen years were unsuccessful in reducing the extreme distress Plaintiff suffers as a result of her gender dysphoria.  Plaintiff ultimately was denied SRS at three levels of review, despite the explicit finding by Dr. Reese – Plaintiff's treating mental health care professional – that SRS is medically necessary to treat Plaintiff's gender dysphoria and Plaintiff's well-documented mental anguish – including anxiety and depression – resulting from being forced to retain her male genitalia.

38.     The first level of review was performed by Defendant Newton.  Defendant Newton denied Plaintiff's appeal for SRS on or around September 28, 2012 despite Plaintiff's well-documented case of serious gender dysphoria and the resulting mental anguish, including anxiety and depression that only SRS would effectively treat.  Plaintiff's medical records make clear that Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 255

1  castration treatments for over twelve years but still experienced significant distress and anxiety as

2  a result of the discrepancy between her remaining male sex characteristics, including non-

3  functioning male genitalia, and her female gender identity.  In fact, Plaintiff's mental anguish is

4  intensified by the fact – repeatedly established in her medical records – that Plaintiff is a

5  "biological female" based upon her hormone levels and chemical castration, yet is being forced to

6  live every minute of every day in a body with male genitalia that does not match her biology or

7  deeply rooted identity.  It thus was clear under prevailing Standards of Care and medical research

8  that SRS was medically necessary and that Plaintiff fully met the requirements for sex

9  reassignment surgery.

10      39.     Defendant Newton thus was fully aware that Plaintiff faces a serious medical need

11  for SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to

12  Plaintiff's medical need for SRS and denied her appeal.  Defendant Newton failed to take any

13  reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her

14  gender dysphoria, which is not fully addressed by the feminizing hormone therapy and chemical

15  castration treatments that Plaintiff has been receiving for the past 14 years.  Defendant Newton's

16  denial of Plaintiff's request for medically necessary SRS was unreasonable and manifested a

17  wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history

18  documented in her medical records and the prudent professional standards embodied by the

19  WPATH Standards of Care.  Defendant Newton's deliberate indifference is further evidenced by

20  unreasonable reliance upon Newton's own non-specialized conclusions rather than those of a

21  qualified, experienced medical provider.

22      40.     Following Defendant Newton's denial of Plaintiff's request, Plaintiff appealed to

23  the second level of review on October 1, 2012.  In appealing to the second level of review,

24  Plaintiff explained that she "suffers greatly w/out gender reassignment surgery," and indicated

25  that her suffering would be substantially relieved through SRS.  Plaintiff's second level appeal

26  was denied by Defendant Adams on or around November 27, 2012.

27      41.     In the denial, Defendant Adams writes that "[o]ver the past year and a half, neither

28  your mental health [provider] nor your [Primary Care Provider] has recommended SRS as a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 256

1    treatment for any of your medical conditions," and while "[Plaintiff's] mental health team is well

2    aware [of her] needs," "[t]hey have not recommended SRS as a treatment which would help any

3    of [Plaintiff's] mental health conditions."  Notably, Defendant Adams' denial of the appeal does

4    not state that either Plaintiff's mental health provider or primary care provider opposed SRS or

5    that Defendant Adams ever expressly asked Plaintiff's mental health provider or primary care

6    physician if Plaintiff needed SRS.  Moreover, there is no indication that Plaintiff's request for

7    SRS was ever reviewed by a health care provider with sufficient experience or knowledge

8    regarding gender dysphoria.

9            42.     Instead, Defendant Adams relies only on Adams' own, non-specialized conclusion

10   that SRS is not necessary solely because the medical records purportedly did not explicitly state

11   that SRS was recommended.  Had Defendant Adams inquired, Adams would have discovered that

12   Plaintiff's mental health provider did, in fact, recommend SRS as medically necessary treatment

13   for Plaintiff's gender dysphoria.  Indeed, only two days later, on November 29, 2012, Dr.

14   Reese—Plaintiff's treating mental health care professional—specifically prescribed SRS as

15   medically necessary to treat Plaintiff's gender dysphoria, writing that "[a]s a female person, and

16   one for the last 13 years, with the diagnoses given and awarded 13 years ago, it is clear that

17   clinical necessity suggest and mandate a sex change medical operation before normal mental

18   health can be achieved for this female patient."

19           43.     Regardless, even if none of Plaintiff's health care providers explicitly included in

20   their reports a recommendation for SRS, Plaintiff's medical records make clear that Plaintiff had

21   been living as a female and receiving feminizing hormone therapy and chemical castration

22   treatments for over twelve years but still experienced (and continues to experience) significant

23   distress and anxiety as a result of the discrepancy between her remaining male sex characteristics,

24   including non-functioning male genitalia, and her female gender identity and thus that SRS is

25   medically necessary treatment for her.  Defendant Adams was fully aware that Plaintiff faces a

26   serious medical need for SRS in order to treat her diagnosed gender dysphoria but was

27   deliberately indifferent to Plaintiff's medical need for SRS when Adams denied Plaintiff's appeal.

28   Defendant Adams failed to take any reasonable measures to address the ongoing mental anguish

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 257

1   that Plaintiff suffers as a result of her gender dysphoria, which is not fully addressed by the

2   feminizing hormone therapy and chemical castration treatments that Plaintiff has been receiving

3   for the past 14 years.  Defendant Adams' denial of Plaintiff's request for medically necessary

4   SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's

5   gender dysphoria based upon her history documented in her medical records and the prudent

6   professional standards embodied by the WPATH Standards of Care.  Defendant Adams'

7   deliberate indifference is further evidenced by unreasonable reliance upon Adams' own non-

8   specialized conclusions rather than those of a qualified, experienced medical provider.

9           44.     Despite Dr. Reese's clear prescription of SRS as treatment for Plaintiff's gender

10  dysphoria, no official moved to schedule or otherwise provide SRS to Plaintiff.  Plaintiff

11  therefore appealed to the third level of review on December 4, 2012.

12          45.     In response to Plaintiff's third appeal, Defendant Coffin was assigned to create a

13  report.  Defendant Coffin interviewed Plaintiff for the report on or around July 1, 2013 and he

14  submitted the report on or around October 10, 2013.  Upon information and belief, Defendant

15  Coffin has no significant experience or training in the treatment of transsexual patients and is not

16  qualified to make a determination with regard to the medical necessity of SRS.

17          46.     In his report, Defendant Coffin reconfirms Plaintiff's diagnosis of gender

18  dysphoria, agreeing that she legitimately suffers as a result of the discrepancy between the gender

19  assigned to her at birth and her own female gender identity and that Plaintiff does not identify as

20  female for any perceived cultural advantage, or to otherwise reap any benefits from a female

21  classification.  Defendant Coffin confirms that Plaintiff had an "extended period of gender

22  identity confusion" which was consolidated in the mid-1990s, and her behavior "appears to

23  confirm the accuracy of [Dr. Carl Viesti's 2000] diagnosis [of gender dysphoria]."  Defendant

24  Coffin also acknowledges that, despite 14 years of feminizing hormone therapy and chemical

25  castration, Plaintiff's gender dysphoria continues to "create distress for [Plaintiff] related to [her]

26  gender identity," including living a "miserable existence" because Plaintiff is "not happy with

27  who [she] is."

28          47.     Defendant Coffin even acknowledges that Plaintiff likely meets the requirements

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 258**

1  for SRS, yet self-servingly concludes:  "While it appears likely that [Norsworthy's] medical

2  consultants would approve [her] as a candidate for SRS as an *elective* procedure, in the opinion of

3  this evaluator the available documentation does not establish SRS as medically necessary at this

4  time."  Defendant Coffin fails to explain why Plaintiff's treating psychotherapist Dr. Reese's

5  findings that SRS is medically necessary should not be followed, other than to state that "the

6  available evidence does not clearly document that the necessary recommendations have been

7  made or approved consistent with Department policy," as "[t]here does not appear to be evidence

8  on the record that the gender and endocrinology specialists involved in [Plaintiff's] care have

9  made a specific recommendation regarding SRS."  Thus, rather than making an assessment of

10  what treatment actually is medically necessary for Plaintiff based upon her medical records, his

11  own evaluation of Plaintiff, and standards of care in the field, Defendant Coffin solely bases his

12  recommendation on his self-serving conclusion that "the available evidence" does not explicitly

13  include a recommendation for SRS from "gender and endocrinology specialists."

14         48.    Notably, similar to Defendant Adams, Defendant Coffin does not state that any

15  gender or endocrinology specialist ever recommended against SRS or that he actually ever even

16  consulted with a gender or endocrinology specialist regarding Plaintiff's treatment.  Nor does

17  Defendant Coffin offer any explanation for why the recommendation of a gender or

18  endocrinology specialist is required or why, if required, a gender or endocrinology specialist was

19  not charged with providing the report for the third level of review.

20         49.    Under these circumstances, it is clear that the rationale for Defendant Coffin's

21  recommendation against SRS was merely a pretext.  Plaintiff's medical records make clear that

22  Plaintiff had been living as a female and receiving feminizing hormone therapy and chemical

23  castration treatments for over 13 years but still experienced (and continues to experience)

24  significant distress and anxiety as a result of the discrepancy between her remaining male sex

25  characteristics, including non-functioning male genitalia, and her female gender identity and thus

26  that SRS is medically necessary treatment.  Defendant Coffin thus was fully aware that Plaintiff

27  faces a serious medical need for SRS in order to treat her diagnosed gender dysphoria but was

28  deliberately indifferent to Plaintiff's medical need for SRS in recommending against SRS.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 259

1   Defendant Coffin failed to take any reasonable measures to address the ongoing mental anguish

2   that Plaintiff suffers as a result of her gender dysphoria, which he acknowledged is not fully

3   addressed by the feminizing hormone therapy and chemical castration treatments that Plaintiff has

4   been receiving for the past 14 years.  Defendant Coffin's denial of Plaintiff's request for

5   medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate

6   treatment of Plaintiff's gender dysphoria based upon her history documented in her medical

7   records and the prudent professional standards embodied by the WPATH Standards of Care.

8   Defendant Coffin's deliberate indifference is further evidenced by Coffin's unreasonable reliance

9   upon his own non-specialized conclusions rather than those of a qualified, experienced medical

10  provider.

11       50.     On October 25, 2013, based upon Defendant Coffin's recommendation Plaintiff's

12  third and final appeal was denied by Defendant Zamora, Chief of the CDCR Office of Third

13  Level Appeals-Health Care because "[Plaintiff's] current providers have documented the

14  determination that the subject surgery is not medically necessary for [her]," and Plaintiff's

15  "appeal of that determination does not include a showing that the subject surgery is medically

16  necessary."  Defendant Zamora's decision is wholly unsupported by Plaintiff's medical records.

17  Defendant Zamora failed to address Dr. Reese's opinion that SRS was medically necessary in the

18  denial, failed to obtain the recommendation of any other qualified health care provider, and failed

19  to offer any measures to address Plaintiff's ongoing mental anguish resulting from her gender

20  dysphoria.

21       51.     Defendant Zamora was fully aware that Plaintiff faces a serious medical need for

22  SRS in order to treat her diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's

23  medical need for SRS in denying her SRS.  Defendant Zamora failed to take any reasonable

24  measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender

25  dysphoria, which Zamora acknowledged is not fully addressed by the feminizing hormone

26  therapy and chemical castration treatments that Plaintiff has been receiving for the past 14 years.

27  Defendant Zamora's denial of Plaintiff's request for medically necessary SRS was unreasonable

28  and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14                                FIRST AMENDED COMPLAINT
                                          3:14-cv-00695-JST

ER 260

1  upon her history documented in her medical records and the prudent professional standards

2  embodied by the WPATH Standards of Care.  Defendant Zamora's deliberate indifference is

3  further evidenced by Zamora's unreasonable reliance upon the conclusions of non-specialized,

4  inexperienced health care providers rather than those of a qualified, experienced health care

5  professional.

6      52.    Defendant Zamora's denial exhausted Plaintiff's administrative remedies within

7  the CDCR.

8      53.    Defendant Beard has ultimate authority for whether or not Plaintiff is provided

9  SRS and for the implementation of CDCR policy with regard to medically necessary medical

10  treatment.  Defendant Beard has endorsed and affirmed the discriminatory and deliberately

11  indifferent conduct of Defendants Newton, Adams, Coffin and Zamora by failing to intercede and

12  grant Plaintiff medically necessary SRS and by failing to ensure that CDCR's policies

13  surrounding the provision of medical treatment are implemented in a fair and non-discriminatory

14  manner and/or that inmates receive medically necessary treatment for gender dysphoria, including

15  SRS in appropriate cases.  Defendant Beard's deliberate indifference is further evidenced by

16  Beard's unreasonable reliance upon the conclusions of non-specialized, inexperienced health care

17  providers rather than those of a qualified, experienced health care professional.

18  **IV.    CALIFORNIA CODE OF REGULATIONS TITLE 15, SECTION 3350.1 IS**

19  **DISCRIMINATORY AND DOES NOT IMMUNIZE DEFENDANTS'**

20  **UNCONSTITUTIONAL DENIAL OF SRS**

21      54.    Defendants' refusal to provide SRS to Plaintiff is not justified by California Code

22  of Regulations ("C.C.R.") Title 15, Section 3350.1, which identifies vaginoplasty as a "[s]urgery

23  not medically necessary [that] shall not be provided" except for cystocele or rectocele (conditions

24  involving damages to the vaginal wall) unless the patient's attending physician prescribes the

25  treatment and "[t]he service is approved by the medical authorization review committee and the

26  health care review committee."  15 C.C.R. § 3350.1(b)(2); 15 C.C.R. § 3350.1(d).

27      55.    As a preliminary matter, this regulatory scheme is facially discriminatory against

28  transsexual women inmates by making vaginoplasty *de facto* unavailable for such inmates but

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 261**

1    allowing the treatment for non-transgender female inmates with certain conditions such as

2    cystocele.  The regulation singles out inmates assigned male at birth, and transgender women

3    inmates in particular, by placing onerous, significant barriers to obtaining vaginoplasty even

4    when, as here, it is medically necessary.

5         56.    Moreover, the regulation was applied by each of the Defendants in a manner that

6    discriminated against Plaintiff on the basis of her status as an inmate assigned male at birth, and a

7    transsexual woman in particular.  Each of the Defendants failed to give proper consideration to

8    whether or not SRS was a medical necessity for the treatment of Plaintiff's gender dysphoria and

9    based their conclusions on different factors and processes than they would have in determining

10   the appeal of a non-transgender inmate's request for medically-necessary surgery.  Each

11   Defendant regarded and applied the regulation as a *de facto* bar to Plaintiff's request for SRS –

12   and vaginoplasty in particular – solely as the result of Plaintiff being assigned male at birth, and

13   status as a transgender woman in particular.

14        57.    Finally, each of the Defendants discriminated against Plaintiff and manifested

15   deliberate indifference to the mental anguish and suffering still resulting from her gender

16   dysphoria by failing to prescribe SRS and refer Plaintiff's SRS for approval by the medical

17   authorization review committee and the health care review committee pursuant to 15 C.C.R. §

18   3350.1(d).

19        58.    Plaintiff continues to suffer deep anxiety and distress as a result of the discrepancy

20   between her female gender identity and her remaining male sex characteristics, including non-

21   functioning male genitalia.  Plaintiff's mental anguish is intensified by the fact – repeatedly

22   established in her medical records – that Plaintiff is a biological female based upon her hormone

23   levels and chemical castration, yet is being forced to live every minute of every day in a body

24   with male genitalia that does not match her biology.

25   **V.   PLAINTIFF'S REQUEST FOR A NAME CHANGE**

26        59.    Plaintiff identifies and has been living as a woman since the 1990s.  As part of her

27   treatment for gender dysphoria and to militate against the effects caused by the discrepancy

28   between Plaintiff's female gender identity and the male sex assigned to her at birth, Plaintiff

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 262

changed her name from the normatively masculine Jeffrey Bryan Norsworthy, to the normatively feminine name Michelle-Lael Bryanna Norsworthy.  Plaintiff has been using the name "Michelle" – in all settings in which she had the ability to do so – since the mid-1990s.

60.     Use of the name "Jeffrey" is a painful reminder to Plaintiff of the discrepancy between Plaintiff's female gender identity and the male sex assigned to her at birth and causes Plaintiff severe distress and anxiety each time it is used.  WPATH's Standards of Care recognize "changes in name and gender markers on identity documents" as an important part of the treatment for gender dysphoria.  Standards of Care at 171-72.  In a statement issued by the WPATH Board of Directors in 2008, they made it clear that SRS "is not required for social gender recognition, and such surgery should not be a prerequisite for document or record changes."  Instead, "[c]hanges to documentation are important aids to social functioning, and are a necessary component of the pre-surgical process; delay of document changes may have a deleterious impact on a patient's social integration and personal safety."

61.     Consistent with the Standards of Care, Plaintiff's treating doctors generally refer to her as "Michelle" not "Jeffrey."

62.     With very few exceptions, California law permits any person to obtain a change of name from a California Superior Court.  Cal. Code Civ. Proc. §§ 1275, 1279.5.  For a transgender person seeking a change of name to better conform the name to the person's gender identity, the law provides that a name change petition must be granted without the necessity of a hearing if no opposition is raised.

63.     Persons under the supervision of CDCR, however, are required to obtain the permission of the warden of the facility in which he or she is housed in order to submit documentation to the Superior Court for approval of a requested name change. Cal. Code Civ. Proc. § 1279.5.

64.     In furtherance of her treatment for gender dysphoria and to minimize the use of the name "Jeffrey" and the pain and distress associated therewith, Plaintiff submitted a request for approval for a legal name change to the warden of the CDCR facility to which she was assigned at the time – Defendant Spearman of the Correctional Training Facility.  However, her request for

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 263

1    a name change was denied.

2         65.    The formal appeal at the first level was bypassed by the appeals coordinator and

3    Plaintiff's appeal was accepted at the second level of review.  Defendant Spearman denied the

4    appeal, however, because although Spearman "acknowledge[d] the appellant is in the process of

5    'trans-sexualism'" he determined "that it would not be appropriate to approve a name change to

6    the feminine until the appellant is determined to meet the criteria to be assigned to an institution

7    for female offenders."  Defendant Spearman presented no justification or reasoning for this

8    position.

9         66.    Defendant Spearman's decision explicitly discriminates against Plaintiff on the

10   basis of her gender – refusing to allow Plaintiff a feminine name because Plaintiff was assigned

11   the male sex at birth and has not yet been provided medically necessary SRS treatment.

12   Defendant Spearman's decision further discriminated against Plaintiff because she is a

13   transsexual woman, treating Plaintiff's request differently and subjecting it to different criteria

14   than he would the name change request of an inmate who was not transgender.

15        67.    In addition to being discriminatory, Defendant Spearman's denial of Plaintiff's

16   request to pursue a legal name change was deliberately indifferent to Plaintiff's gender dysphoria

17   and the mental anguish and suffering caused by not being able to legally change her name.

18   Defendant Spearman was fully aware that Plaintiff suffers from gender dysphoria, even

19   acknowledging her condition in the decision, but failed to take any reasonable measures to

20   address the ongoing mental anguish that Plaintiff unnecessarily suffers as a result of not being

21   able to change her name or to offer any legitimate justification for refusing to allow her to pursue

22   a legal name change.

23        68.    Plaintiff appealed to the third level of review, where the appeals examiners,

24   Defendants Van Leer and Lozano, found the Warden's denial of Plaintiff's name change request

25   "appropriate as the appellant is still incarcerated in an institution for men."

26        69.    The decision of Defendants Van Leer and Lozano to deny Plaintiff access to

27   pursue a name change – just like that of Defendant Spearman – clearly discriminates against

28   Plaintiff by treating Plaintiff's request differently than those of other inmates solely on the basis

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 264

of Plaintiff's gender and gender dysphoria.  In addition to being discriminatory, Defendants Van Leer and Lozano were deliberately indifferent to Plaintiff's gender dysphoria and the mental anguish and suffering caused by not being able to legally change her name.

70.    The final denial by Defendants Van Leer and Lozano exhausted Plaintiff's administrative remedies available to her within the CDCR.  Because Plaintiff is incarcerated, she is unable to petition the California Superior Court for a name change without first obtaining approval from the Warden and ultimately Defendant Beard, the Secretary of the CDCR.  Cal. Code Civ. Proc. § 1279.5.

71.    Defendant Beard thus has ultimate authority for whether or not Plaintiff is allowed to pursue a legal name change and for the implementation of CDCR policy with regard to inmate name changes.  Defendant Beard has endorsed and affirmed the discriminatory and deliberately indifferent conduct of Defendants Spearman, Van Leer and Lozano by failing to intercede and grant Plaintiff's request to pursue a legal name change and by failing to ensure that the name change policy is implemented in a fair and non-discriminatory manner and/or that inmates receive medically necessary treatment for gender dysphoria, including the ability to change one's legal name.

72.    Plaintiff seeks permission for a legal name change as a further step toward minimizing the discrepancy between her gender identity and the sex she was assigned at birth and as a fundamental aspect of expression of her true, female identity.  As a transsexual woman, Plaintiff suffers severe emotional and psychological stress and anxiety when she is referred to by the normatively masculine name given to her at birth.

73.    This distress can be alleviated by a simple name change that will aid in the treatment of Plaintiff's gender dysphoria and allow Plaintiff to express herself authentically in accordance with her female gender identity.  The repeated refusal to provide Plaintiff with this treatment for gender dysphoria serves no government objective, and there is no rational basis under which to deny her requested name change. The only explanation offered (that Plaintiff does not qualify for placement in a women's facility) is wholly unsupported by the medical literature regarding the treatment of gender dysphoria and clearly discriminates against Plaintiff based upon

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 265**

1    her gender and gender dysphoria.

2                                **COUNT ONE**

3                  VIOLATION OF 42 U.S.C. § 1983 BASED UPON
     DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING FROM
4             FAILURE TO PROVIDE MEDICALLY NECESSARY SURGERY

5           (against Defendants Beard, Newton, Adams, Zamora, and Coffin)

6          74.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 73 as if fully

7    set forth herein.

8          75.    Plaintiff has been diagnosed with the serious medical condition of gender

9    dysphoria which, despite 14 years of feminizing hormone therapy and chemical castration,

10   continues to cause Plaintiff serious mental distress, and requires treatment in the form of SRS as

11   prescribed by Plaintiff's former treating mental health provider, Dr. Reese, and supported by

12   prevailing medical standards of care.

13         76.    Each Defendant – acting in his/her official capacity and under color of state law –

14   was and remains deliberately indifferent to Plaintiff's medical need for SRS.  Each Defendant

15   knew of Plaintiff's serious medical need for SRS and disregarded Plaintiff's need and failed to

16   take any reasonable measures to address Plaintiff's continued pain and suffering resulting from

17   her gender dysphoria.  The deliberate indifference of each Defendant is further demonstrated by

18   that Defendant's unreasonable reliance on their own conclusions or those of other non-specialized

19   individuals rather than the conclusions and recommendations of a health care professional with

20   sufficient training and/or experience in the treatment of gender dysphoria.

21         77.    Defendants' continued denial of SRS is causing irreparable harm to Plaintiff,

22   including severe anxiety and distress as a result of the discrepancy between her remaining male

23   sex characteristics, including non-functioning male genitalia, and her female gender identity.

24   Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records

25   – that Plaintiff is a "biological female" based upon her hormone levels and chemical castration,

26   yet is being forced to live every minute of every day in a body with male genitalia that does not

27   match her biology.  The denial of SRS also unreasonably and recklessly places Plaintiff at

28   increased risk for heart and vascular conditions and certain types of cancer, particularly given that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 266**

1    she is afflicted with Hepatitis C, which risks could be substantially reduced as a result of the

2    substantially reduced hormone treatments that would be required following SRS.

3         78.    By failing to provide SRS to Plaintiff while incarcerated, Defendants have

4    deprived Plaintiff of her right to medically necessary treatment guaranteed by the Eighth

5    Amendment to the United States Constitution.

6                                      **COUNT TWO**

7    VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF FOURTEENTH
     AMENDMENT RIGHT TO EQUAL PROTECTION BY REFUSING PLAINTIFF SRS ON
8                 THE BASIS OF GENDER AND TRANSGENDER STATUS

9             (against Defendants Beard, Newton, Adams, Zamora, and Coffin)

10        79.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 78 as if fully

11   set forth herein.

12        80.    California Code of Regulations ("C.C.R.") Title 15, Section 3350.1 identifies

13   vaginoplasty as a "[s]urgery not medically necessary [that] shall not be provided" except for

14   cystocele or rectocele unless the patient's attending physician prescribes the treatment and "[t]he

15   service is approved by the medical authorization review committee and the health care review

16   committee."  15 C.C.R. § 3350.1(b)(2); 15 C.C.R. § 3350.1(d).

17        81.    This regulatory scheme discriminates against transsexual women inmates by

18   making vaginoplasty *de facto* unavailable for such inmates but allowing the treatment for non-

19   transgender female inmates with certain conditions such as cystocele.  The statute singles out

20   inmates assigned male at birth, and transgender women inmates in particular, by placing onerous,

21   significant barriers to obtaining vaginoplasty even when, as here, it is medically necessary.

22        82.    Each of the Defendants applied the statute in a manner that discriminated against

23   Plaintiff on the basis of her gender and transgender status.  In considering Plaintiff's need for

24   SRS, each Defendant failed to give proper consideration to the specific circumstances of

25   Plaintiff's gender dysphoria and need for SRS but instead based their conclusions on factors and

26   processes that they would not have considered in determining the medical necessity of a treatment

27   for a non-transgender inmate's request for medically-necessary surgery.  Each Defendant

28   regarded and applied the statute as a *de facto* bar to Plaintiff's request for SRS – and vaginoplasty

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 267**

1    in particular – solely as the result of Plaintiff being assigned male at birth, and a transsexual

2    woman in particular.

3         83.    Finally, each Defendant discriminated against Plaintiff and manifested deliberate

4    indifference to the mental anguish and suffering still resulting from her gender dysphoria by

5    failing to prescribe SRS and refer Plaintiff's SRS for approval by the medical authorization

6    review committee and the health care review committee pursuant to 15 C.C.R. § 3350.1(d)

7         84.    Defendants intentionally treat Plaintiff differently from non-transgender female

8    inmates seeking vaginoplasty due to her gender and transgender status.

9         85.    Due to the difference in treatment, similarly situated non-transgender women with

10   serious medical needs are able to receive adequate medical care, including medically necessary

11   vaginoplasty, but inmates assigned male at birth and transgender inmates requiring such treatment

12   are either barred from receiving it or, at a minimum, held to a more onerous standard.

13        86.    The difference in treatment between transgender women and non-transgender

14   women does not further any important government interest in a way that is substantially related to

15   that interest, nor is it rationally related to any legitimate government interest.

16        87.    Defendants' discriminatory denial of SRS is causing irreparable harm to Plaintiff,

17   including severe anxiety and distress as a result of the discrepancy between her remaining male

18   sex characteristics, including non-functioning male genitalia, and her female gender identity.

19   Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records

20   – that Plaintiff is a "biological female" based upon her hormone levels and chemical castration,

21   yet is being forced to live every minute of every day in a body with male genitalia that does not

22   match her biology.  The denial of SRS also unreasonably and recklessly places Plaintiff at

23   increased risk for heart and vascular conditions and certain types of cancer, particularly given that

24   she is afflicted with Hepatitis C, which risks could be substantially reduced as a result of the

25   substantially reduced hormone treatments that would be required following SRS.

26        88.    By failing to provide SRS to Plaintiff while incarcerated, Defendants have

27   deprived Plaintiff of her right to equal protection under the laws guaranteed by the Fourteenth

28   Amendment to the United States Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 268**

## COUNT THREE

VIOLATION OF 42 U.S.C. § 1983 BASED UPON
DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING FROM
FAILURE TO ALLOW PLAINTIFF LEGAL NAME CHANGE

(against Defendants Beard, Spearman, Van Leer and Lozano)

89.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 88 as if fully set forth herein.

90.     Plaintiff has been diagnosed with the serious medical condition of gender dysphoria and the continued use of Plaintiff's normatively masculine legal name causes Plaintiff serious mental distress that would be significantly reduced by allowing Plaintiff to change her legal name to her preferred normatively feminine name, Michelle-Lael Bryanna Norsworthy.

91.     Each Defendant – acting in his/her official capacity and under color of state law – was and remains deliberately indifferent to Plaintiff's medical need for a legal name change, in spite of Plaintiff's well-documented condition and widely recognized Standards of Care recognizing the need for a name change.  Each Defendant knew of Plaintiff's serious medical need for the name change and deliberately disregarded Plaintiff's need and failed to take any reasonable measures to address Plaintiff's continued pain and suffering resulting from her inability to legally change her name.  The deliberate indifference of each Defendant is further demonstrated by that Defendant's unreasonable reliance on their own conclusions or those of other non-specialized individuals rather than the conclusions and recommendations of a health care professional with sufficient training and/or experience in the treatment of gender dysphoria.

92.     Defendants' continued denial of the request to pursue a legal name change is causing irreparable harm to Plaintiff, including severe anxiety and distress.

93.     By failing to provide permission for Plaintiff to petition the California Superior Court for a name change while incarcerated, Defendants have deprived Plaintiff of her right to medically necessary treatment guaranteed by the Eighth Amendment to the United States Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 269**

**COUNT FOUR**

VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION BY REFUSING PLAINTIFF PERMISSION TO PURSUE A LEGAL NAME CHANGE ON THE BASIS OF GENDER AND TRANSGENDER STATUS

(against Defendants Beard, Spearman, Van Leer and Lozano)

94.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 93 as if fully set forth herein.

95.     California Code of Regulations, Title 15, section 3294.5 explicitly allows inmates to request legal name changes.

96.     Each Defendant – acting in his/her official capacity and under color of state law – discriminated against Plaintiff by refusing to permit her to seek a legal name change as a result of her gender and transgender status.  In particular, each Defendant refused Plaintiff's request to change her name to a normatively feminine name solely because Plaintiff was assigned male at birth.  Upon information and belief, similarly situated non-transgender female inmates are permitted to change their names to normatively feminine names and similarly situated non-transgender male inmates are permitted to change their names to desired normatively masculine names.

97.     This difference in treatment with regard to name changes based upon gender and transgender status does not further any important government interest in a way that is substantially related to that interest, nor is it rationally related to any legitimate government interest.

98.     Defendants' discriminatory denial of Plaintiff's request to petition the California Superior Court for a name change is causing irreparable harm to Plaintiff, including severe anxiety and distress.

99.     By failing to provide permission for Plaintiff to petition the California Superior Court for a name change while incarcerated, Defendants have deprived Plaintiff of her right to equal protection under the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

ER 270

1

**PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff prays for judgment against Defendants Beard, Newton, Adams,

3   Zamora, Coffin, Spearman, Van Leer and Lozano, and Does 1-30 as follows:

4      100.   Enter injunctive relief enjoining Defendants from interfering with the discretion of

5   the mental health and other medical professionals involved in Plaintiff's care;

6      101.   Enter injunctive relief declaring California Code of Regulations, Title 15, Section

7   3350.1(b)(2) unconstitutional on its face and as applied;

8      102.   Enter injunctive relief enjoining Defendants to provide Plaintiff with adequate

9   medical care, including SRS;

10      103.   Enter injunctive relief requiring Defendants to allow Plaintiff to seek a legal name

11   change in the Superior Court of California pursuant  to California Code of Regulations, Title 15,

12   section 3294.5; California Code of Civil Procedure sections 1279.5, 1276 and 1277;

13      104.   Award reasonable attorneys fees and costs to Plaintiff pursuant to 42 U.S.C. §

14   1988; and

15      105.   Such other relief as the Court finds appropriate in the interests of justice.

16

17   Dated: July 2, 2014                    MORGAN, LEWIS & BOCKIUS LLP

18

19                                 By    /s/ - Herman J. Hoying

20                                    HERMAN J. HOYING
                                      MORGAN, LEWIS & BOCKIUS LLP
21                                    One Market, Spear Street Tower
                                      San Francisco, California  94105-1126
22                                    Telephone:     415.442.1000
                                      Facsimile:     415.442.1001
23                                    hhoying@morganlewis.com

24

25                                    Attorneys for Plaintiff

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

FIRST AMENDED COMPLAINT
3:14-cv-00695-JST

**ER 271**

LexisNexis CourtLink - Show Docket        https://courtlink.lexisnexis.com/ControlSupport/UserControls/ShowDock...

# US District Court Civil Docket

## U.S. District - California Northern
## (San Francisco)

### 3:14cv695

### Norsworthy v. Beard et al

This case was retrieved from the court on Sunday, April 19, 2015

| | |
|---|---|
| **Date Filed:** 02/14/2014 | **Class Code:** OPEN |
| **Assigned To:** Honorable Jon S. Tigar | **Closed:** |
| **Referred To:** | **Statute:** 42:1983 |
| **Nature of suit:** Prisoner - Civil Rights (555) | **Jury Demand:** None |
| **Cause:** Prisoner Civil Rights | **Demand Amount:** $0 |
| **Lead Docket:** None | **NOS Description:** Prisoner - Civil Rights |
| **Other Docket:** USCA #:15-15712 | |
| **Jurisdiction:** Federal Question | |

### Litigants

Michelle-Lael B. Norsworthy
#:D-54100
Mule Creek State Prison (MCSP)
(a/k/a: Jeffrey B. Norsworthy)
P.O. Box 409099
Ione, CA 95640
also known as
Jeffrey B. Norsworthy
Plaintiff

### Attorneys

Herman Joseph Hoying
LEAD ATTORNEY; ATTORNEY TO BE NOTICED
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco , CA 94105
USA
415-442-1359
Fax: 415-442-1001
Email: Hhoying@morganlewis.Com

Christopher J. Banks
ATTORNEY TO BE NOTICED
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco , CA 94105
USA
415-442-1000
Email: Cbanks@morganlewis.Com

Ian Thompson Long
[Term: 02/26/2015]
Gibson, Dunn & Crutcher LLP
555 Mission St.
Ste. 3000
San Francisco , CA 94105
USA
415-393-8269
Fax: 415-393-8306
Email: Ilong@gibsondunn.Com

**ER 272**

Ilona Margaret Turner
ATTORNEY TO BE NOTICED
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland , CA 94612
USA
415-865-0176
Fax: 877-847-1278
Email: Iturner@nclrights.Org

Jennifer Orthwein
ATTORNEY TO BE NOTICED
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland , CA 94612
USA
415-865-0176
Email: Jennifer.Orthwein@gmail.Com

Megan Dy Lin
ATTORNEY TO BE NOTICED
Morgan Lewis and Bockius LLP
One Market, Spear Tower
San Francisco , CA 94105
USA
415-442-1137
Fax: 415-442-1001
Email: Mlin@morganlewis.Com

Shawn Thomas Meerkamper
ATTORNEY TO BE NOTICED
Transgender Law Center
1629 Telegraph Avenue, Suite 400
Oakland , CA 94612
USA
415-865-0176
Fax: 877-847-1278
Email: Shawn@transgenderlawcenter.Org

Jeffrey Beard
CDCR Secretary
Defendant

Preeti Kaur Bajwa
LEAD ATTORNEY; ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA 94102
USA
415-703-1621
Fax: 415-703-5843
Email: Preeti.Bajwa@doj.Ca.Gov

Edward Rheem Fluet
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Correctional Law Section 455 Golden Gate Avenue,
Suite 11000
San Francisco , CA 94102-7004
USA
415-703-5836
Fax: 415-703-5843
Email: Ned.Fluet@doj.Ca.Gov

https://courtlink.lexisnexis.com/ControlSupport/UserControls/ShowDock...

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA
415-703-5781
Fax: 415-703-5843
Email: Jose.Zelidonzepeda@doj.Ca.Gov

Clark Kelso
Medical Receiver
[Term: 07/02/2014]
Defendant

M. E. Spearman                          Edward Rheem Fluet
CTF Warden                              LEAD ATTORNEY; ATTORNEY TO BE NOTICED
Defendant                               California State Attorney General's Office
                                        Correctional Law Section 455 Golden Gate Avenue,
                                        Suite 11000
                                        San Francisco , CA  94102-7004
                                        USA
                                        415-703-5836
                                        Fax: 415-703-5843
                                        Email: Ned.Fluet@doj.Ca.Gov

                                        Preeti Kaur Bajwa
                                        LEAD ATTORNEY; ATTORNEY TO BE NOTICED
                                        California State Attorney General's Office
                                        455 Golden Gate Avenue, Suite 11000
                                        San Francisco , CA  94102
                                        USA
                                        415-703-1621
                                        Fax: 415-703-5843
                                        Email: Preeti.Bajwa@doj.Ca.Gov

                                        Jose Alfonso Zelidon-Zepeda
                                        ATTORNEY TO BE NOTICED
                                        California State Attorney General's Office
                                        Department Of Justice 455 Golden Gate Avenue, Suite
                                        11000
                                        San Francisco , CA  94102-7004
                                        USA
                                        415-703-5781
                                        Fax: 415-703-5843
                                        Email: Jose.Zelidonzepeda@doj.Ca.Gov

A. Adams                                 Edward Rheem Fluet
Chief Medical Executive of CTF, Soledad, CA   LEAD ATTORNEY; ATTORNEY TO BE NOTICED
Defendant                                California State Attorney General's Office
                                        Correctional Law Section 455 Golden Gate Avenue,
                                        Suite 11000
                                        San Francisco , CA  94102-7004
                                        USA
                                        415-703-5836
                                        Fax: 415-703-5843
                                        Email: Ned.Fluet@doj.Ca.Gov

4/20/2015 1:54 PM

**ER 274**

Preeti Kaur Bajwa
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA  94102
USA
415-703-1621
Fax: 415-703-5843
Email:Preeti.Bajwa@doj.Ca.Gov

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA
415-703-5781
Fax: 415-703-5843
Email:Jose.Zelidonzepeda@doj.Ca.Gov

L.D. Zamora
CDCR Appeals Chief, Sacramento, CA
Defendant

Edward Rheem Fluet
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
Correctional Law Section 455 Golden Gate Avenue,
Suite 11000
San Francisco , CA  94102-7004
USA
415-703-5836
Fax: 415-703-5843
Email:Ned.Fluet@doj.Ca.Gov

Preeti Kaur Bajwa
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA  94102
USA
415-703-1621
Fax: 415-703-5843
Email:Preeti.Bajwa@doj.Ca.Gov

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA
415-703-5781
Fax: 415-703-5843
Email:Jose.Zelidonzepeda@doj.Ca.Gov

A. Newton
Defendant

Preeti Kaur Bajwa
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA  94102

USA
415-703-1621
Fax: 415-703-5843
Email: Preeti.Bajwa@doj.Ca.Gov

Edward Rheem Fluet
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Correctional Law Section 455 Golden Gate Avenue,
Suite 1000
San Francisco , CA  94102-7004
USA
415-703-5836
Fax: 415-703-5843
Email: Ned.Fluet@doj.Ca.Gov

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA
415-703-5781
Fax: 415-703-5843
Email: Jose.Zelidonzepeda@doj.Ca.Gov

Raymond J. Coffin
Defendant

Edward Rheem Fluet
LEAD ATTORNEY; ATTORNEY TO BE NOTICED
California State Attorney General's Office
Correctional Law Section 455 Golden Gate Avenue,
Suite 1000
San Francisco , CA  94102-7004
USA
415-703-5836
Fax: 415-703-5843
Email: Ned.Fluet@doj.Ca.Gov

Preeti Kaur Bajwa
LEAD ATTORNEY; ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA  94102
USA
415-703-1621
Fax: 415-703-5843
Email: Preeti.Bajwa@doj.Ca.Gov

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA
415-703-5781
Fax: 415-703-5843
Email: Jose.Zelidonzepeda@doj.Ca.Gov

**ER 276**

David Van Leer
Defendant

Preeti Kaur Bajwa
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA  94102
USA
415-703-1621
Fax: 415-703-5843
Email: Preeti.Bajwa@doj.Ca.Gov

Edward Rheem Fluet
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Correctional Law Section 455 Golden Gate Avenue,
Suite 11000
San Francisco , CA  94102-7004
USA
415-703-5836
Fax: 415-703-5843
Email: Ned.Fluet@doj.Ca.Gov

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA
415-703-5781
Fax: 415-703-5843
Email: Jose.Zelidonzepeda@doj.Ca.Gov

Jared Lozano
Defendant

Edward Rheem Fluet
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
Correctional Law Section 455 Golden Gate Avenue,
Suite 11000
San Francisco , CA  94102-7004
USA
415-703-5836
Fax: 415-703-5843
Email: Ned.Fluet@doj.Ca.Gov

Preeti Kaur Bajwa
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
California State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco , CA  94102
USA
415-703-1621
Fax: 415-703-5843
Email: Preeti.Bajwa@doj.Ca.Gov

Jose Alfonso Zelidon-Zepeda
ATTORNEY TO BE NOTICED
California State Attorney General's Office
Department Of Justice 455 Golden Gate Avenue, Suite
11000
San Francisco , CA  94102-7004
USA

415-703-5781
Fax: 415-703-5843
Email:Jose.Zelidonzepeda@doj.Ca.Gov

| Date | # | Proceeding Text | Source |
|------|---|-----------------|--------|
| 02/14/2014 | 1 | COMPLAINT Under The Civil Rights Act (42 U.S.C. Section 1983) - [No Summons Issued] against A. Adams, Jeffrey Beard, Clark Kelso, M. E. Spearman &amp; L.D. Zamora, [Filing Fee: Ifpp entered on 2/14/2014] Filed by Jeffrey B. Norsworthy.(tnS) (Filed on 2/14/2014) (tnS, ). (Additional attachment(s) added on 2/18/2014: # 1 Points &amp; Authorities) (tnS, ). (Additional attachment(s) added on 2/18/2014: # 2 Exhibit A) (tnS, ). (Additional attachment(s) added on 2/18/2014: # 3 Exhibit B - (part 1)) (tnS, ). (Additional attachment(s) added on 2/18/2014: # 4 Exhibit B - (part 2)) (tnS, ). (Additional attachment(s) added on 2/18/2014: # 5 Exhibit C) (tnS, ). (Additional attachment(s) added on 2/18/2014: # 6 Exhibit D) (tnS, ). (Entered: 02/18/2014) | |
| 02/14/2014 | 2 | Prisoner's Application for Leave to Proceed in Forma Pauperis iled by Jeffrey B. Norsworthy. (tnS) (Filed on 2/14/2014) (Entered: 02/18/2014) | |
| 03/14/2014 | 3 | ORDER GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS by Judge Jon S. Tigar, granting 2 Motion for Leave to Proceed in forma pauperis. (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 3/14/2014) (Entered: 03/14/2014) | |
| 03/25/2014 | 5 | MOTION for Appointment of Counsel filed by Jeffrey B. Norsworthy.(tnS) (Filed on 3/25/2014) (Entered: 03/26/2014) | |
| 03/26/2014 | 4 | ORDER OF DISMISSAL WITH LEAVE TO AMEND; REFERRING MATTER TO FEDERAL PRO BONO PROJECT AND STAYING PROCEEDINGS PENDING APPOINTMENT OF COUNSEL. Signed by Judge Jon S. Tigar on March 26, 2014. (Attachments: # 1 Certificate/Proof of Service)(wsn, COURT STAFF) (Filed on 3/26/2014) (Entered: 03/26/2014) | |
| 03/26/2014 | | Copy of re 4 Order of Dismissal with Leave to Amend, re 1 Civil Rights Complaint &amp; a Docket Entries Forwarded to the Federal Pro Bono Project. (tnS) (Filed on 3/26/2014) (Entered: 03/26/2014) | |
| 03/26/2014 | 6 | NOTICE of Change of Address filed by Jeffrey B. Norsworthy. (tnS) (Filed on 3/26/2014) (Entered: 03/27/2014) | |
| 04/02/2014 | 7 | ORDER APPOINTING COUNSEL. Signed by Judge Jon S. Tigar on April 2, 2014. (Attachments: # 1 Certificate/Proof of Service)(wsn, COURT STAFF) (Filed on 4/2/2014) (Entered: 04/02/2014) | |
| 04/03/2014 | | Copy of re 7 Order Appointing Counsel forwarded to the Federal Pro Bono Project. (tnS) (Filed on 4/3/2014) (Entered: 04/03/2014) | |
| 04/15/2014 | 8 | ORDER OF DISMISSAL WITHOUT PREJUDICE re: 3:14-cv-00345-JST Norsworthy v. Beard et al. Signed by Judge Jon S. Tigar on April 15, 2014. (wsn, COURT STAFF) (Filed on 4/15/2014) (Entered: 04/15/2014) | |
| 04/16/2014 | 9 | REQUEST filed by Jeffrey B. Norsworthy. (tnS) (Filed on 4/16/2014) (Entered: 04/16/2014) | |
| 04/21/2014 | | Copy of docket mailed to Plaintiff. Remark (dljsec, COURT STAFF) (Filed on 4/21/2014) (Entered: 04/21/2014) | |
| 07/02/2014 | 10 | FIRST AMENDED COMPLAINT; First Amended Complaint against A. Adams, Jeffrey Beard, M. E. Spearman, L.D. Zamora, A. Newton, Raymond J. Coffin, David Van Leer, Jared Lozano. Filed by Jeffrey B. Norsworthy. (Attachments: # 1 Exhibit 1)(Hoying, Herman) (Filed on 7/2/2014) (Entered: 07/02/2014) | |
| 07/02/2014 | 11 | Certificate of Interested Entities filed by Jeffrey B. Norsworthy. -Certification of Interested Entities or Persons (Hoying, Herman) (Filed on 7/2/2014) (Entered: 07/02/2014) | |

**ER 278**

| | | |
|---|---|---|
| 07/09/2014 | 12 | ORDER REQUIRING MARSHAL TO ISSUE AND SERVE PROCESS re 10 Amended Complaint, filed by Jeffrey B. Norsworthy. Signed by Judge Jon S. Tigar on July 9, 2014. (wsn, COURT STAFF) (Filed on 7/9/2014) (Entered: 07/09/2014) |
| 07/10/2014 | 13 | Summons Issued as to Defendants A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer &amp; L.D. Zamora.(tnS) (Filed on 7/10/2014) (Additional attachment(s) added on 7/10/2014: # 1 USM Form 285) (tnS, ). (Entered: 07/10/2014) |
| 07/24/2014 | 14 | Acknowledgment of Receipt from the United States Marshals Service of Summons and Complaint. (tnS) (Filed on 7/24/2014) (Entered: 07/25/2014) |
| 08/29/2014 | 15 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE. An Initial Case Management Conference is set for 10/15/2014 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco. This is a text only entry. There is no document associated with this notice. (wsn, COURT STAFF) (Filed on 8/29/2014) (Entered: 08/29/2014) |
| 09/26/2014 | 16 | MOTION for Administrative Relief to Continue Initial Case Management Conference filed by A. Adams, Raymond J. Coffin, Jared Lozano, M. E. Spearman, L.D. Zamora. Responses due by 10/10/2014. Replies due by 10/17/2014. (Fluet, Edward) (Filed on 9/26/2014) (Entered: 09/26/2014) |
| 09/26/2014 | 17 | Declaration of Edward R. Fluet in Support of 16 MOTION for Administrative Relief to Continue Initial Case Management Conference filed byA. Adams, Raymond J. Coffin, Jared Lozano, M. E. Spearman, L.D. Zamora. (Related document(s) 16 ) (Fluet, Edward) (Filed on 9/26/2014) (Entered: 09/26/2014) |
| 09/26/2014 | 18 | Proposed Order re 16 MOTION for Administrative Relief to Continue Initial Case Management Conference by A. Adams, Raymond J. Coffin, Jared Lozano, M. E. Spearman, L.D. Zamora. (Fluet, Edward) (Filed on 9/26/2014) (Entered: 09/26/2014) |
| 09/29/2014 | | Set/Reset Deadlines as to 16 MOTION for Administrative Relief to Continue Initial Case Management Conference. Responses due by 9/30/2014. No Reply due. (Civil Local Rule 7-11). (wsn, COURT STAFF) (Filed on 9/29/2014) (Entered: 09/29/2014) |
| 09/30/2014 | 19 | RESPONSE (re 16 MOTION for Administrative Relief to Continue Initial Case Management Conference ) Opposition to Motion for Administrative Relief to Continue Initial Case Management Conference filed byJeffrey B. Norsworthy. (Attachments: # 1 Proposed Order [Proposed] Order Denying Defendants' Motion for Administrative Relief to Continue Initial Case Management Conference)(Hoying, Herman) (Filed on 9/30/2014) (Entered: 09/30/2014) |
| 09/30/2014 | 20 | MOTION to Dismiss Plaintiff's First Amended Complaint filed by A. Adams, Raymond J. Coffin, Jared Lozano, M. E. Spearman, L.D. Zamora. Responses due by 10/28/2014. Replies due by 11/12/2014. (Attachments: # 1 Proposed Order, # 2 Certificate/Proof of Service)(Fluet, Edward) (Filed on 9/30/2014) (Entered: 09/30/2014) |
| 09/30/2014 | | Set/Reset Deadlines as to 20 MOTION to Dismiss Plaintiff's First Amended Complaint. Responses due by 10/14/2014. Replies due by 10/21/2014. Motion Hearing set for 11/6/2014 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 9/30/2014) (Entered: 09/30/2014) |
| 09/30/2014 | 21 | JOINT CASE MANAGEMENT STATEMENT Joint Case Management Statement filed by Jeffrey B. Norsworthy. (Hoying, Herman) (Filed on 9/30/2014) (Entered: 09/30/2014) |
| 10/01/2014 | 22 | ORDER DENYING DEFENDANTS' MOTION FOR ADMINISTRATIVE RELIEF TO CONTINUE INITIAL CASE MANAGEMENT CONFERENCE by Judge Jon S. Tigar denying 16 Motion to Continue Initial Case Management Conference. (wsn, COURT STAFF) (Filed on 10/1/2014) (Entered: 10/01/2014) |

**ER 279**

| | | |
|---|---|---|
| 10/02/2014 | 23 | MOTION to Stay Discovery filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, L.D. Zamora. Motion hearing set for 11/6/14 at 2:00 pm. Responses due by 10/30/2014. Replies due by 11/13/2014. (Attachments: # 1 Declaration of Edward R. Fluet in Support, # 2 Proposed Order, # 3 Certificate/Proof of Service)(Fluet, Edward) (Filed on 10/2/2014) Modified on 10/3/2014 (mclS, COURT STAFF). (Entered: 10/02/2014) |
| 10/02/2014 | 24 | Joinder To Defendants' 20 Motion to Dismiss Plaintiff's First Amended Complaint filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, L.D. Zamora. (Fluet, Edward) (Filed on 10/2/2014) Modified on 10/3/2014 (wsn, COURT STAFF). (Entered: 10/02/2014) |
| 10/03/2014 | 25 | CLERK'S NOTICE Correcting Motion Briefing Schedule as to 23 MOTION to Stay Discovery. Per Local Rule 7-3, briefing for this motion is set as follows: Responses due by 10/16/2014. Replies due by 10/23/2014. The Motion Hearing remains set for 11/6/14 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. This is a text only entry. There is no document associated with this notice. (wsn, COURT STAFF) (Filed on 10/3/2014) (Entered: 10/03/2014) |
| 10/08/2014 | 26 | Joinder in Defendants' 20 Motion to Dismiss Plaintiff's First Amended Complaint filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Fluet, Edward) (Filed on 10/8/2014) Modified on 10/9/2014 (wsn, COURT STAFF). (Entered: 10/08/2014) |
| 10/14/2014 | 27 | RESPONSE to (re 20 MOTION to Dismiss Plaintiff's First Amended Complaint); Opposition to Defendants' Motion to Dismiss filed by Jeffrey B. Norsworthy. (Attachments: #(1) Proposed Order)(Hoying, Herman) (Filed on 10/14/2014) (Entered: 10/14/2014) |
| 10/15/2014 | 28 | Minute Entry: Initial Case Management Conference held on 10/15/2014 before Judge Jon S. Tigar (Date Filed: 10/15/2014). (Court Reporter: Not reported.) (wsn, COURT STAFF) (Date Filed: 10/15/2014) (Entered: 10/15/2014) |
| 10/16/2014 | 29 | RESPONSE to (re 23 MOTION to Stay Discovery): Opposition to Motion for Protective Order to Stay Discovery filed by Jeffrey B. Norsworthy. (Attachments: #(1) Proposed Order)(Hoying, Herman) (Filed on 10/16/2014) (Entered: 10/16/2014) |
| 10/21/2014 | 30 | REPLY (re 20 MOTION to Dismiss Plaintiff's First Amended Complaint ) filed byA. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Fluet, Edward) (Filed on 10/21/2014) (Entered: 10/21/2014) |
| 10/22/2014 | 31 | REPLY (re 23 MOTION to Stay Discovery) filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Fluet, Edward) (Filed on 10/22/2014) (Entered: 10/22/2014) |
| 11/06/2014 | 32 | Minute Entry: Motion Hearing held on 11/6/2014 before Judge Jon S. Tigar (Date Filed: 11/6/2014) re 23 MOTION to Stay Discovery filed by Jared Lozano, A. Newton, A. Adams, M. E. Spearman, L.D. Zamora, Raymond J. Coffin, 20 MOTION to Dismiss Plaintiff's First Amended Complaint filed by Jared Lozano, A. Adams, M. E. Spearman, L.D. Zamora, Raymond J. Coffin. (Court Reporter: Kelly Polvi.) (wsn, COURT STAFF) (Date Filed: 11/6/2014) (Entered: 11/06/2014) |
| 11/06/2014 | 33 | SCHEDULING ORDER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION. Motion Hearing set for 3/4/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Signed by Judge Jon S. Tigar on November 6, 2014. (wsn, COURT STAFF) (Filed on 11/6/2014) (Entered: 11/06/2014) |
| 11/14/2014 | 34 | Summons Returned Unexecuted as to Defendant Jeffrey Beard. (tnS) (Filed on 11/14/2014) (Entered: 11/14/2014) |
| 11/14/2014 | 35 | SUMMONS Returned Executed Upon Defendants A. Newton &amp; David Van Leer, Served on 10/10/2014, and Notice and Acknowledgment of Receipt of Summons and Complaint by Mail. (tnS) (Filed on 11/14/2014) (Entered: |

| | | 11/14/2014) |
|---|---|---|
| 11/14/2014 | 36 | SUMMONS Returned Executed Upon Defendants Raymond J. Coffin, Jared Lozano &amp; L.D. Zamora, Served on 8/21/2014, and Notice and Acknowledgment of Receipt of Summons and Complaint by Mail. (tnS) (Filed on 11/14/2014) (Entered: 11/14/2014) |
| 11/14/2014 | 37 | SUMMONS Returned Executed Upon Defendants A. Adams &amp; M. E. Spearman, Served on 8/21/2014, and Notice and Acknowledgment of Receipt of Summons and Complaint by Mail. (tnS) (Filed on 11/14/2014) (Entered: 11/14/2014) |
| 11/18/2014 | 38 | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND DENYING MOTION TO STAY DISCOVERY by Judge Jon S. Tigar; denying 23 Motion to Stay; granting in part and denying in part 20 Motion to Dismiss. (wsn, COURT STAFF) (Filed on 11/18/2014) (Entered: 11/18/2014) |
| 11/18/2014 | 41 | "Document Filed Under Seal". (tnS) (Filed on 11/18/2014) (tnS, ). (Entered: 11/25/2014) |
| 11/24/2014 | 39 | CERTIFICATE OF SERVICE by Michelle-Lael B. Norsworthy re 10 Amended Complaint, 13 Summons Issued (Hoying, Herman) (Filed on 11/24/2014) (Entered: 11/24/2014) |
| 11/24/2014 | 40 | "Document Filed Under Seal". (tnS) (Filed on 11/24/2014) (tnS, ). (Entered: 11/25/2014) |
| 12/10/2014 | 42 | STIPULATION WITH [PROPOSED] ORDER to Permit Deposition of Plaintiff filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Fluet, Edward) (Filed on 12/10/2014) (Entered: 12/10/2014) |
| 12/10/2014 | 43 | STIPULATION AND ORDER re 42 STIPULATION WITH PROPOSED ORDER to Permit Deposition of Plaintiff filed by Jared Lozano, A. Newton, A. Adams, M. E. Spearman, Jeffrey Beard, L.D. Zamora, Raymond J. Coffin, David Van Leer. Signed by Judge Jon S. Tigar on December 10, 2014. (wsn, COURT STAFF) (Filed on 12/10/2014) (Entered: 12/10/2014) |
| 12/15/2014 | 44 | ORDER. Signed by Judge Jon S. Tigar on December 15, 2014. (Attachments: # 1 Email sent to Court 12/11/2014)(wsn, COURT STAFF) (Filed on 12/15/2014) (Entered: 12/15/2014) |
| 12/16/2014 | 45 | DOCUMENT FILED UNDER SEAL. (tnS) (Filed on 12/16/2014) (tnS, ). (Entered: 12/16/2014) |
| 12/18/2014 | 46 | Defendants' ANSWER to First Amended Complaint filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Fluet, Edward) (Filed on 12/18/2014) (Entered: 12/18/2014) |
| 12/31/2014 | 47 | STIPULATION WITH [PROPOSED] ORDER Revising Schedule for Plaintiff's Motion for Preliminary Injunction filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 12/31/2014) (Entered: 12/31/2014) |
| 01/02/2015 | 48 | STIPULATION AND ORDER re 47 STIPULATION WITH PROPOSED ORDER Revising Schedule for Plaintiff's Motion for Preliminary Injunction filed by Michelle-Lael B. Norsworthy. Signed by Judge Jon S. Tigar on January 2, 2015. (wsn, COURT STAFF) (Filed on 1/2/2015) (Entered: 01/02/2015) |
| 01/02/2015 | | Set Deadlines/Hearings: Motion Hearing set for 4/1/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 1/2/2015) (Entered: 01/02/2015) |
| 01/02/2015 | 49 | ASSOCIATION of Counsel for Defendants by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Zelidon-Zepeda, Jose) (Filed on 1/2/2015) (Entered: 01/02/2015) |
| 01/15/2015 | 50 | MOTION for a Mental Examination of Plaintiff Under Federal Rule of Civil Procedure 35; REQUEST that the Court Decide this MOTION on Shortened Time Under Local Rule 6-3 filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, |

**ER 281**

| | | |
|---|---|---|
| | | Jared Lozano, A. Newton, David Van Leer, L.D. Zamora. Responses due by 1/29/2015. Replies due by 2/5/2015. (Zelidon-Zepeda, Jose) (Filed on 1/15/2015) (Entered: 01/15/2015) |
| 01/15/2015 | 51 | Declaration of Jose A. Zelidon-Zepeda in Support of 50 MOTION for a Mental Examination of Plaintiff Under Federal Rule of Civil Procedure 35; REQUEST that the Court Decide this MOTION on Shortened Time Under Local Rule 6-3, with Exhibit 1 filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, David Van Leer, L.D. Zamora. (Related document(s) 50 ) (Zelidon-Zepeda, Jose) (Filed on 1/15/2015) (Entered: 01/15/2015) |
| 01/15/2015 | 52 | [Proposed] Order Granting re 50 MOTION for a Mental Examination of Plaintiff Under Federal Rule of Civil Procedure 35; REQUEST that the Court Decide this MOTION on Shortened Time Under Local Rule 6-3 filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, David Van Leer, L.D. Zamora. (Zelidon-Zepeda, Jose) (Filed on 1/15/2015) (Entered: 01/15/2015) |
| 01/15/2015 | 53 | STIPULATION WITH [PROPOSED] ORDER for Rule 35 Independent Medical Examination of Plaintiff filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Fluet, Edward) (Filed on 1/15/2015) (Entered: 01/15/2015) |
| 01/16/2015 | 54 | STIPULATION AND ORDER re 53 STIPULATION WITH PROPOSED ORDER for Rule 35 Independent Medical Examination of Plaintiff filed by Jared Lozano, A. Newton, A. Adams, M. E. Spearman, Jeffrey Beard, L.D. Zamora, Raymond J. Coffin, David Van Leer. Signed by Judge Jon S. Tigar on January 16, 2015. (wsn, COURT STAFF) (Filed on 1/16/2015) (Entered: 01/16/2015) |
| 02/11/2015 | 55 | CLERK'S NOTICE SETTING TELEPHONIC CASE MANAGEMENT CONFERENCE. A telephonic case management conference is set for 2/13/2015 at 2:00 PM. No later than 24 hours prior to the conference, the parties shall provide the Courtroom Deputy Clerk a single number at which all counsel can be reached. Please email the contact information to: jstcrd@cand.uscourts.gov. This is a text only entry. There is no document associated with this notice. (wsn, COURT STAFF) (Filed on 2/11/2015) (Entered: 02/11/2015) |
| 02/11/2015 | 56 | NOTICE of Appearance by Preeti Kaur Bajwa (Attachments: # 1 Certificate/Proof of Service)(Bajwa, Preeti) (Filed on 2/11/2015) (Entered: 02/11/2015) |
| 02/13/2015 | 57 | Minute Entry for proceedings held before Hon. Jon S. Tigar: Telephonic Case Management Conference held on 2/13/2015. Court Reporter: Not reported. (wsn, COURT STAFF) (Date Filed: 2/13/2015) (Entered: 02/13/2015) |
| 02/18/2015 | 58 | DISCOVERY ORDER. Signed by Judge Jon S. Tigar on February 18, 2015. (Attachments: # 1 Exhibit A)(wsn, COURT STAFF) (Filed on 2/18/2015) (Entered: 02/18/2015) |
| 02/25/2015 | 59 | STIPULATION WITH [PROPOSED] ORDER: Stipulation and [Proposed] Order to Extend Page Limits for Motions Regarding Preliminary Injunction filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 2/25/2015) (Entered: 02/25/2015) |
| 02/26/2015 | 60 | STIPULATION AND ORDER re 59 STIPULATION WITH PROPOSED ORDER Stipulation and [Proposed] Order to Extend Page Limits for Motions Regarding Preliminary Injunction filed by Michelle-Lael B. Norsworthy. Signed by Judge Jon S. Tigar on February 26, 2015. (wsn, COURT STAFF) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 61 | NOTICE of Change In Counsel by Ian Thompson Long (Long, Ian) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 62 | MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof filed by Michelle-Lael B. Norsworthy. Motion Hearing set for 4/1/2015 02:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Responses due by 3/12/2015. Replies due by 3/19/2015. (Attachments: #(1) Proposed Order)(Hoying, Herman) (Filed on 2/26/2015) (Entered: |

|  |  |  |
|---|---|---|
|  |  | 02/26/2015) |
| 02/26/2015 | 63 | Declaration of Dr. Randi C. Ettner in Support of 62 MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof filed by Michelle-Lael B. Norsworthy. (Related document(s) 62 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 64 | Declaration of Dr. R. Nick Gorton in Support of 62 MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof filed by Michelle-Lael B. Norsworthy. (Related document(s) 62 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 65 | Declaration of Dr. Marci L. Bowers in Support of 62 MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof filed by Michelle-Lael B. Norsworthy. (Related document(s) 62 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 66 | Declaration of Herman J. Hoying in Support of 62 MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof filed by Michelle-Lael B. Norsworthy. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Related document(s) 62 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 67 | EXHIBITS re 66 Declaration in Support, Exhibits E, F to Declaration of Herman J. Hoying filed byMichelle-Lael B. Norsworthy. (Related document(s) 66 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 68 | EXHIBITS re 66 Declaration in Support, Exhibits G-H to Declaration of Herman J. Hoying filed byMichelle-Lael B. Norsworthy. (Related document(s) 66 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 69 | EXHIBITS re 66 Declaration in Support, Exhibits I through L part 1 to Declaration of Herman J. Hoying filed byMichelle-Lael B. Norsworthy. (Related document(s) 66 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 70 | EXHIBITS re 66 Declaration in Support, Exhibits L part 2 through N to Declaration of Herman J. Hoying filed byMichelle-Lael B. Norsworthy. (Related document(s) 66 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 02/26/2015 | 71 | EXHIBITS re 66 Declaration in Support, Exhibits O through W to Declaration of Herman J. Hoying filed byMichelle-Lael B. Norsworthy. (Related document(s) 66 ) (Hoying, Herman) (Filed on 2/26/2015) (Entered: 02/26/2015) |
| 03/12/2015 | 72 | Administrative Motion to File Under Seal Exhibit G to Bajwa Declaration (Levine Report) filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, David Van Leer, L.D. Zamora. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Certificate/Proof of Service, # 4 Exhibit)(Bajwa, Preeti) (Filed on 3/12/2015) (Entered: 03/12/2015) |
| 03/12/2015 | 73 | RESPONSE to (re 62 MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof) filed byA. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Bajwa, Preeti) (Filed on 3/12/2015) (Entered: 03/12/2015) |
| 03/12/2015 | 74 | Declaration of Dr. I. Munir in Support of 73 Opposition/Response to Motion filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Related document(s) 73 ) (Bajwa, Preeti) (Filed on 3/12/2015) (Entered: 03/12/2015) |

**ER 283**

| | | |
|---|---|---|
| 03/12/2015 | 75 | Declaration of Kelly Harrington in Support of 73 Opposition/Response to Motion filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Related document(s) 73 ) (Bajwa, Preeti) (Filed on 3/12/2015) (Entered: 03/12/2015) |
| 03/12/2015 | 76 | Declaration of Preeti K. Bajwa in Support of 73 Opposition/Response to Motion, filed byA. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit H)(Related document(s) 73 ) (Bajwa, Preeti) (Filed on 3/12/2015) (Entered: 03/12/2015) |
| 03/12/2015 | 77 | Request for Judicial Notice in Support of re 73 Opposition/Response to Motion filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Attachments: # 1 Exhibit A, # 2 Exhibit B - PART 1 OF 2, # 3 Exhibit B - PART 2 OF 2)(Related document(s) 73 ) (Bajwa, Preeti) (Filed on 3/12/2015) (Entered: 03/12/2015) |
| 03/19/2015 | 78 | Administrative Motion to File Under Seal Plaintiff's Unredacted Evidentiary Objection and Motion to Strike Portions of Expert Declaration of Dr. Stephen Levine and Appendix A thereto filed by Michelle-Lael B. Norsworthy. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Redacted Objections and Motion to Strike, # 4 Unredacted Objections and Motion to Strike, # 5 Appendix A to Objections and Motion to Strike, # 6 Certificate/Proof of Service) (Hoying, Herman) (Filed on 3/19/2015) (Entered: 03/19/2015) |
| 03/19/2015 | 79 | REPLY (re 62 MOTION for Preliminary Injunction; Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof); -Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 3/19/2015) (Entered: 03/19/2015) |
| 03/19/2015 | 80 | OBJECTIONS to re 62 MOTION for Preliminary Injunction; -Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof; -Redacted Evidentiary Objection and Motion to Strike Portions of Expert Declaration of Dr. Stephen Levine in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction filed by Michelle-Lael B. Norsworthy. (Attachments: # 1 Notice of Filing Under Seal, Appendix A, # 2 Declaration, # 3 Proposed Order)(Hoying, Herman) (Filed on 3/19/2015) (Entered: 03/19/2015) |
| 03/23/2015 | 81 | NOTICE OF MOTION &amp; MOTION to Strike PLAINTIFFS EVIDENTIARY OBJECTIONS AND MOTION TO STRIKE PORTIONS OF EXPERT DECLARATION OF DR. STEPHEN LEVINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. Motion Hearing set for 4/1/2015 02:00 PM in Courtroom 7, 19th Floor, San Francisco before Hon. Jon S. Tigar. Responses due by 4/6/2015. Replies due by 4/13/2015. (Attachments: #(1) Proposed Order)(Bajwa, Preeti) (Filed on 3/23/2015) (Entered: 03/23/2015) |
| 03/24/2015 | 82 | RESPONSE to (re 81 MOTION to Strike; PLAINTIFFS EVIDENTIARY OBJECTIONS; ETC); -Plaintiff's Opposition to Defendants' Motion to Strike Plaintiff's Evidentiary Objections and Motion to Strike Portions of Expert Declaration of Dr. Stephen Levine filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 3/24/2015) (Entered: 03/24/2015) |
| 03/25/2015 | 83 | ORDER DENYING MOTION TO STRIKE EVIDENTIARY OBJECTIONS AND GRANTING REQUEST FOR ADDITIONAL BRIEFING by Judge Jon S. Tigar; denying 81 Motion to Strike. (wsn, COURT STAFF) (Filed on 3/25/2015) (Entered: 03/25/2015) |
| 03/26/2015 | 84 | ORDER GRANTING ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL by Judge Jon S. Tigar; granting 72 Administrative Motion to File Under Seal; granting 78 Administrative Motion to File Under Seal. (wsn, COURT STAFF) (Filed on 3/26/2015) (Entered: 03/26/2015) |

**ER 284**

| 03/27/2015 | 85 | MOTION for Administrative Relief for Oral Argument and to Bring Into the Federal Courthouse Certain Electronic Equipment and Materials, and [Proposed] Order filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 3/27/2015) (Entered: 03/27/2015) |
|---|---|---|
| 03/30/2015 | 86 | ORDER RE MOTION FOR ADMINISTRATIVE RELIEF re 85 MOTION for Leave to Appear Motion for Administrative Relief for Oral Argument and to Bring Into the Federal Courthouse Certain Electronic Equipment and Materials filed by Michelle-Lael B. Norsworthy. Signed by Judge Jon S. Tigar on March 30, 2015. (wsnS, COURT STAFF) (Filed on 3/30/2015) (Entered: 03/30/2015) |
| 03/30/2015 | 87 | Response to re 86 Order; -Defendants' Opposition to Plaintiffs Motion for Administrative Relief for Oral Argument and to Bring into the Federal Courthouse Certain Electronic Equipment and Materials filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Bajwa, Preeti) (Filed on 3/30/2015) (Entered: 03/30/2015) |
| 03/30/2015 | 88 | Response to re 83 Order on Motion to Strike; -Defendants' Opposition to Plaintiff's Motion to Strike Expert Report of Dr. Stephen Levine filed by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Bajwa, Preeti) (Filed on 3/30/2015) (Entered: 03/30/2015) |
| 03/31/2015 | 89 | AMENDED ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND DENYING MOTION TO STAY DISCOVERY re 23 MOTION to Stay Discovery filed by Jared Lozano, A. Newton, A. Adams, M. E. Spearman, L.D. Zamora, Raymond J. Coffin; 20 MOTION to Dismiss Plaintiff's First Amended Complaint filed by Jared Lozano, A. Adams, M. E. Spearman, L.D. Zamora, Raymond J. Coffin. Signed by Judge Jon S. Tigar on March 31, 2015. (wsn, COURT STAFF) (Filed on 3/31/2015) (Entered: 03/31/2015) |
| 03/31/2015 | 90 | RESPONSE to re 86 Order; -Response to Court's Order Re Motion for Administrative Relief filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 3/31/2015) (Entered: 03/31/2015) |
| 03/31/2015 | 91 | ORDER GRANTING MOTION FOR PERMISSION TO BRING CERTAIN ELECTRONIC EQUIPMENT AND MATERIALS INTO THE FEDERAL COURTHOUSE re 85 MOTION for Leave to Appear Motion for Administrative Relief for Oral Argument and to Bring Into the Federal Courthouse Certain Electronic Equipment and Materials filed by Michelle-Lael B. Norsworthy. Signed by Judge Jon S. Tigar on March 31, 2015. (wsn, COURT STAFF) (Filed on 3/31/2015) (Entered: 03/31/2015) |
| 04/01/2015 | 92 | Minute Entry for proceedings held before Hon. Jon S. Tigar: Motion Hearing held on 4/1/2015 re 62 MOTION for Preliminary Injunction Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof filed by Michelle-Lael B. Norsworthy, 78 Motion to Strike Portions of Expert Declaration of Dr. Stephen Levine and Appendix A thereto filed by Michelle-Lael B. Norsworthy. Court Reporter: Kathy Sullivan. (wsn, COURT STAFF) (Date Filed: 4/1/2015) (Entered: 04/01/2015) |
| 04/02/2015 | 93 | TRANSCRIPT ORDER by Michelle-Lael B. Norsworthy for Court Reporter Katherine Sullivan. (Lin, Megan) (Filed on 4/2/2015) (Entered: 04/02/2015) |
| 04/02/2015 | 94 | ORDER Granting Motion for Preliminary Injunction, Granting Request for Judicial Notice, and Denying Motion to Strike Signed by Judge Jon S. Tigar; granting 62 Motion for a Preliminary Injunction; granting 77 Request for Judicial Notice; denying 80 Evidentiary Objection and Motion to Strike; Joint Case Management Statement due 5/6/2015 &amp; Further Case Management Conference set for 5/13/2015 at 2:00 p.m.. (tnS) (Filed on 4/2/2015) (Entered: 04/02/2015) |
| 04/02/2015 | 95 | TRANSCRIPT ORDER by A. Adams, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora for Court Reporter Katherine Sullivan. (Bajwa, Preeti) (Filed on 4/2/2015) (Entered: 04/02/2015) |

**ER 285**

| | | |
|---|---|---|
| 04/03/2015 | | Set Deadlines/Hearings: Case Management Statement due by 5/6/2015. Further Case Management Conference set for 5/13/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco. (wsn, COURT STAFF) (Filed on 4/3/2015) (Entered: 04/03/2015) |
| 04/06/2015 | 96 | Transcript of Proceedings held on 4/1/15, before Judge Jon S. Tigar. Court Reporter/Transcriber Katherine Sullivan, Telephone number 415-794-6659. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 93 Transcript Order ) Redaction Request due 4/27/2015. Redacted Transcript Deadline set for 5/7/2015. Release of Transcript Restriction set for 7/6/2015. (Related documents(s) 93 ) (Sullivan, Katherine) (Filed on 4/6/2015) (Entered: 04/06/2015) |
| 04/06/2015 | 97 | Declaration of Herman J. Hoying Regarding Transcripts of Deposition Excerpts Played at Hearing on Plaintiff's Motion for Preliminary Injunction filed by Michelle-Lael B. Norsworthy. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Hoying, Herman) (Filed on 4/6/2015) (Entered: 04/06/2015) |
| 04/10/2015 | 98 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. Appeal of Order on Motion for Preliminary Injunction 94 ; (Appeal Fee of $505.00, receipt number 0971-9434272 paid) (Zelidon-Zepeda, Jose) (Filed on 4/10/2015) (Entered: 04/10/2015) |
| 04/10/2015 | 99 | MOTION to Stay re 94 Order on Motion for Preliminary Injunction, filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. Responses due by 4/24/2015. Replies due by 5/1/2015. (Zelidon-Zepeda, Jose) (Filed on 4/10/2015) (Entered: 04/10/2015) |
| 04/10/2015 | 100 | [Proposed] Order Granting re 99 MOTION to Stay re 94 Order on Motion for Preliminary Injunction filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Zelidon-Zepeda, Jose) (Filed on 4/10/2015) (Entered: 04/10/2015) |
| 04/10/2015 | 101 | ADMINISTRATIVE MOTION to Shorten Time under Local Rule 6-3 on re 99 Defendants' Motion for a Stay of the Order Granting a Preliminary Injunction filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Zelidon-Zepeda, Jose) (Filed on 4/10/2015) (Entered: 04/10/2015) |
| 04/10/2015 | 102 | Declaration of Preeti K. Bajwa in Support of 101 ADMINISTRATIVE MOTION to Shorten Time under Local Rule 6-3 on re 99 Defendants' Motion for a Stay of the Order Granting a Preliminary Injuction filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Related document(s) 101 ) (Zelidon-Zepeda, Jose) (Filed on 4/10/2015) (Entered: 04/10/2015) |
| 04/10/2015 | 103 | [Proposed] Order Granting re 101 ADMINISTRATIVE MOTION to Shorten Time under Local Rule 6-3 on re 99 Defendants' Motion for a Stay of the Order Granting a Preliminary Injuction filed by A. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Zelidon-Zepeda, Jose) (Filed on 4/10/2015) (Entered: 04/10/2015) |
| 04/10/2015 | 104 | ORDER RE DEFENDANTS' MOTION FOR ORDER SHORTENING TIMEPlaintiff is ordered to file a Response to the Defendants' Motion to Shorten Time, ECF No. 102, if she opposes that relief, by Monday, April 13, 2015. The response should address solely the question of an appropriate schedule for Defendants' stay motion, and not the propriety of a stay itself. (Entered by Judge Jon S. Tigar) (Filed on 4/10/2015) (Entered: 04/10/2015) |

**ER 286**

| 04/13/2015 | 105 | RESPONSE to (re 101 ADMINISTRATIVE MOTION to Shorten Time under Local Rule 6-3 on re 99 Defendants' Motion for a Stay of the Order Granting a Preliminary Injuction) ; Plaintiff's Response to Defendants' Motion for an Order Shortening Time on Their Motion for a Stay of the Order Granting a Preliminary Injunction filed by Michelle-Lael B. Norsworthy. (Hoying, Herman) (Filed on 4/13/2015) (Entered: 04/13/2015) |
|---|---|---|
| 04/13/2015 | 106 | TRANSCRIPT ORDER by Michelle-Lael B. Norsworthy for Court Reporter Kelly Polvi. (Lin, Megan) (Filed on 4/13/2015) (Entered: 04/13/2015) |
| 04/13/2015 | 107 | ORDER re 101 ADMINISTRATIVE MOTION to Shorten Time under Local Rule 6-3 on re 99 Defendants' Motion for a Stay of the Order Granting a Preliminary Injuction filed by Jared Lozano, A. Newton, A. Adams, M. E. Spearman, Jeffrey Beard, L.D. Zamora, Raymond J. Coffin, David Van Leer. Based upon the complexity of the issues raised in Defendants' motion to stay, ECF No. 99, the Court concludes that the Plaintiff's proposed schedule, ECF No. 105, is the more reasonable. Plaintiff's response to Defendants' motion to stay is due on April 22, 2015. At that time, the motion will be under submission. Signed by Judge Jon S. Tigar on April 13, 2015. This is a text-only order; there is no document associated with this entry. (jstlc3S, COURT STAFF) (Filed on 4/13/2015) (Entered: 04/13/2015) |
| 04/14/2015 | 108 | MOTION for Extension of Time; -Plaintiff's Administrative Motion to Enlarge Time to File Motion for Costs and Attorney's Fees filed by Michelle-Lael B. Norsworthy. (Attachments: #(1) Declaration Declaration of Herman J. Hoying in Support of Plaintiff's Motion to Enlarge Time, #(2) [Proposed] Order) (Hoying, Herman) (Filed on 4/14/2015) (Entered: 04/14/2015) |
| 04/14/2015 | 109 | ORDER RE PLAINTIFF'S REQUEST TO ENLARGE TIME TO FILE MOTION FOR ATTORNEY'S FEES AND COSTSThe Court is in receipt of Plaintiff's Administrative Motion to Enlarge Time to File Motion for Costs and Attorney's Fees, ECF No. 108. So that the Court has the opportunity to rule on Plaintiff's administrative motion to enlarge time before the underlying motion for fees might otherwise be due, Defendants are ordered to file either an opposition or a statement of non-opposition to the motion by April 15, 2015 at 4:00 p.m.(Entered by Judge Jon S. Tigar) (Filed on 4/14/2015) (Entered: 04/14/2015) |
| 04/15/2015 | 110 | Statement of Non-Opposition re 108 MOTION for Extension of Time to File Plaintiff's Administrative Motion to Enlarge Time to File Motion for Costs and Attorney's Fees filed byA. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Attachments: # 1 Certificate/Proof of Service)(Related document(s) 108 ) (Bajwa, Preeti) (Filed on 4/15/2015) (Entered: 04/15/2015) |
| 04/15/2015 | 111 | Declaration of Preeti K. Bajwa in Support of 110 Statement of Non-Opposition, filed byA. Adams, Jeffrey Beard, Raymond J. Coffin, Jared Lozano, A. Newton, M. E. Spearman, David Van Leer, L.D. Zamora. (Attachments: # 1 Exhibit A)(Related document(s) 110 ) (Bajwa, Preeti) (Filed on 4/15/2015) (Entered: 04/15/2015) |
| 04/15/2015 | 112 | ORDER GRANTING ADMINISTRATIVE MOTION TO ENLARGE TIME TO FILE MOTION FOR COSTS AND ATTORNEY'S FEES by Judge Jon S. Tigar: granting 108 Motion for Extension of Time to File. (wsn, COURT STAFF) (Filed on 4/15/2015) (Entered: 04/15/2015) |
| 04/17/2015 | 113 | USCA Case Number 15-15712 for re 98 Notice of Appeal filed by Jared Lozano, A. Newton, A. Adams, M. E. Spearman, Jeffrey Beard, L.D. Zamora, Raymond J. Coffin &amp; David Van Leer. (tnS) (Filed on 4/17/2015) (Entered: 04/17/2015) | Events since last full update |

Copyright © 2015 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**ER 287**