15-15712

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

MICHELLE-LAEL B. NORSWORTHY,

Plaintiff-Appellee,

v.

JEFFREY BEARD, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

No. C 14-00695 JST (PR)
The Honorable Jon S. Tigar, Judge

## DEFENDANTS-APPELLANTS'

## OPENING BRIEF

KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
THOMAS S. PATTERSON
Supervising Deputy Attorney General
JOSE A. ZELIDON-ZEPEDA
Deputy Attorney General
State Bar No. 227108
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone: (415) 703-5781
 Fax: (415) 703-5843
 Email:  Jose.ZelidonZepeda@doj.ca.gov
*Attorneys for Defendants-Appellants*
*Beard, Spearman, Coffin, Lozano,*
*Adams, Newton, Van Leer, and Zamora*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Statement of Jurisdiction ............................................................................ 3

Statement of the Issues ............................................................................... 4

Statement of the Case ................................................................................. 5

    I.     Procedural history. .................................................................. 5

    II.    Prison authorities have treated Ms. Norsworthy's gender
         dysphoria since 1999. ............................................................. 6

    III.   After a full evaluation, CDCR's psychologist concluded
         in 2013 that Ms. Norsworthy's current treatment was
         appropriate. ........................................................................... 10

    IV.   Defendants' expert consultant concluded that sex-
         reassignment surgery is not medically necessary for this
         inmate. .................................................................................. 11

    V.    Ms. Norsworthy's expert declarants do not establish a
         basis for immediate surgery. .................................................. 15

    VI.   Providing sex-reassignment surgery to this inmate will
         pose new and complex safety issues. ..................................... 17

    VII.  The district court granted Ms. Norsworthy's request for a
         mandatory preliminary injunction, ordering immediate
         sex-reassignment surgery. ...................................................... 19

Standard of Review .................................................................................. 20

Summary of Argument .............................................................................. 22

Argument .................................................................................................. 23

    I.     The district court misapplied the deliberate-indifference
         standard, instead substituting the WPATH standards of
         care. ...................................................................................... 23

         A.    Defendants are providing constitutional treatment
             to Ms. Norsworthy. ...................................................... 23

# TABLE OF CONTENTS
## (continued)

B.    The district court erroneously substituted the WPATH standards of care for the Eighth Amendment standard. ................................................... 26

II.    The district court erroneously ordered immediate surgery without proof that Ms. Norsworthy urgently requires it. ........ 32

A.    Ms. Norsworthy did not clearly demonstrate the need for urgent mandatory injunctive relief. ................ 33

B.    The district court erred by making credibility findings without an evidentiary hearing. ...................... 36

C.    The district court erred by finding that Defendants will not be irreparably injured by its order. .................. 38

III.    The district court abused its discretion by disregarding important security considerations. .......................................... 39

Conclusion ................................................. 41

Statement of Related Cases ........................................................ 43

Certificate of Compliance .......................................................... 44

# TABLE OF AUTHORITIES

**Page**

**C**ASES

*Arc of Cal. v. Douglas*
    757 F.3d 975 (9th Cir. 2014) .................................................................. 21

*Broughton v. Cutter Labs.*
    622 F.2d 458 (9th Cir. 1980) .................................................................. 23

*Caribbean Marine Serv. Co., Inc. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) ............................................................ 32, 34

*Dahl v. HEM Pharm. Corp.*
    7 F.3d 1399 (9th Cir. 1993) .................................................................. 21

*Direx Israel, Ltd. v. Breakthrough Med. Grp.*
    952 F.2d 802 (4th Cir. 1991) .................................................................. 34

*Dymo Indus., Inc. v. Tapeprinter, Inc.*
    326 F.2d 141 (9th Cir. 1964) (per curiam) ........................................... 20

*Estelle v. Gamble*
    429 U.S. 97 (1976) .................................................................................. 23

*Forbes v. Edgar*
    112 F.3d 262 (7th Cir. 1997) .................................................................. 25

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) .................................................................. 21

*Jackson v. Fair*
    846 F.2d 811 (1st Cir. 1988) .................................................................. 25

*Jeffers v. Gomez*
    267 F.3d 895 (9th Cir. 2001) .................................................................. 39

# TABLE OF AUTHORITIES
## (continued)

Page

*Kosilek v. Spencer*
774 F.3d 63, 86-89 (1st Cir. 2014) (en banc), *cert. denied*,
2015 WL 1206262 (May 4, 2015) ................................................... *passim*

*Kosilek v. Spencer*
889 F. Supp. 2d 190 (D. Mass. 2012) ................................................ 12, 30

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*
571 F.3d 873 (9th Cir. 2009) ................................................................... 21

*Meriwether v. Faulkner*
821 F.2d 408 (7th Cir. 1987) ................................................................... 25

*O'Donnabhain v. C.I.R.*
134 T.C. 34, 89 (U.S. Tax Ct. 2010) ................................................ 27, 28

*Plata v. Schwarzenegger*
No. C01-1351-TEH (N.D. Cal.) ................................................................. 8

*Sanchez v. Vild*
891 F.2d 240 (9th Cir. 1989) ................................................................... 23

*Sanders v. Monsanto Co.*
574 F.2d 198 (5th Cir. 1978) ................................................................... 37

*Stanley v. Univ. of S. Cal.*
13 F.3d 1313 (9th Cir. 1994) ..................................................... 21, 32, 36

*Toguchi v. Chung*
391 F.3d 1051 (9th Cir. 2004) ................................................................. 23

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.*
962 F.2d 853 (9th Cir. 1992) ................................................................... 36

*United States v. Ridgway*
300 F.3d 1153 (9th Cir. 2002) ................................................................. 37

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Univ. of Tex. v. Camenisch*
   451 U.S. 390 (1981)........................................................................ 32, 39

*Wilson v. Seiter*
   501 U.S. 294 (1991)............................................................................. 23

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)...................................................................... 20, 32, 39

**STATUTES**

United States Code, Title 18
   § 3626(a)(2) ........................................................................................ 39

United States Code, Title 28
   § 1292(a)(1) ..........................................................................................4
   § 1331 ..................................................................................................3

Prison Litigation Reform Act (PLRA) ......................................................... 39

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ............................................................................. *passim*

**COURT RULES**

Federal Rules of Appellate Procedure
   Rule 4(a)(1)(A) ....................................................................................4

Federal Rules of Civil Procedure
   Rule 43 ............................................................................................... 36
   Rule 43(c) ........................................................................................... 37

U.S. District Court, Northern District of California, Civil Local
   Rules
      Rule 7-3(c) .....................................................................................6

OTHER AUTHORITIES

California Code of Regulations, Title 15
    § 3350-3359.7 ............................................................8
    §  3350.1 ...................................................................7
    § 3350.1(b)...............................................................8
    § 3350.1(d)........................................................... 7, 8

8 James Wm. Moore, *Moore's Federal Practice- Civil*
    § 43.05[2] (3ed. 2012) ............................................ 37

American Psychiatric Association, "About APA and
    Psychiatry"
     http://www.psychiatry.org/about-apa--psychiatry (last
    visited May 7, 2015). ............................................. 27

National Institutes of Health, "American Medical Association
    Membership Woes Continue"
     http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3153537/
    (last visited Jan. 30, 2014) .................................... 27

World Professional Association for Transgender Health,
    "Mission Statement"
    http://www.wpath.org/site_page.cfm?pk_association_webpa
    ge_menu=1347&pk_association_webpage=3910................................. 27

World Professional Association for Transgender Health,
    "WPATH Clarification on Medical Necessity of Treatment,
    Sex Reassignment, and Insurance Coverage in the U.S.A."
    http://www.wpath.org/uploaded_files/140/files/Med%20Nec
    %20on%202008%20Letterhead.pdf (last visited May 7,
    2015) ..................................................................... 26

# INTRODUCTION

This case presents an issue of first impression, namely whether a federal court can enter a preliminary injunction ordering prison officials to provide an inmate-patient with immediate and irreversible sex-reassignment surgery that no treating physician has found is medically necessary. The district court ordered Defendants to provide such surgery to Plaintiff-Appellee Michelle Norsworthy, a male-to-female transgender state prisoner.

The district court rested its ruling on a purported violation of the Eighth Amendment's proscription against cruel and unusual punishment, but it did so by substituting a professional association's treating guidelines for the constitutional standard. Under the proper deliberate-indifference standard, there is no clear showing of a constitutional violation that could justify the preliminary injunction issued here. Indeed, the record shows that Ms. Norsworthy has received extensive medical and mental-health treatment for her gender dysphoria for over 15 years, including hormone therapy, counseling, and access to brassieres and other female clothing—all of which has transformed her physical appearance and helped her to successfully consolidate her gender identity. This 15-year treatment history in no way evinces indifference—much less deliberate indifference—to Ms. Norsworthy's medical and psychological needs.

The district court's ruling is remarkable for several reasons. It comes less than a year after the case was filed, on the sparse and imperfect record of a preliminary-injunction motion without the benefit of live testimony from any witness or the deposition of any medical expert in this case. And the evidence presented by Ms. Norsworthy did not show a medical necessity for such surgery, let alone any sudden or dramatic deterioration in her medical or mental-health condition warranting such extraordinary relief. Moreover, the district court rejected unrebutted evidence from prison officials that complying with the court's order would pose significant safety and administrative concerns. In short, the court departed from the well-established rule that Eighth Amendment deliberate-indifference claims cannot rest on differences of opinion about an inmate's medical treatment, and that prison administrators' reasonable judgments balancing security and health concerns must be accorded deference.

The district court also misapplied the rigorous standard for issuing a mandatory injunction under this Court's jurisprudence, which states that such relief should not issue unless the facts and law clearly favor the moving party and the relief is necessary to prevent extreme or very serious damage. The injunction issued by the district court would not maintain the status quo pending trial on the merits or an appeal. In fact, it would *cause* irreparable

harm to the State by arguably mooting the case, providing Ms. Norsworthy with irreversible sex-reassignment surgery without any final determination that she is legally entitled to that relief in the absence of a treating physician's determination that the procedure is medically necessary. This is the first time any court has directed prison officials to provide this treatment on the thin record of a preliminary-injunction proceeding. And although another district court issued a similar order after extensive trial proceedings, which included live testimony from at least nine doctors and various prison officials and security experts, that decision was reversed by the First Circuit Court of Appeals sitting en banc.

Because the district court misapplied the deliberate-indifference standard and erroneously ordered immediate surgery without proof that Ms. Norsworthy urgently requires it, this Court should reverse the district court's preliminary injunction and remand the matter for a full development of the record on the merits.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. On April 2, 2015, the district court granted Ms. Norsworthy's motion for a preliminary injunction. (CD 94, ER 38.) Defendants appealed on April 10, 2015. (CD

98, ER 49-50.) This appeal was timely. Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. A difference of opinion between medical professionals about the appropriateness of treatment does not establish deliberate indifference to a medical need under the Eighth Amendment. Did the district court err by finding that Ms. Norsworthy's 15-year treatment history for gender dysphoria was not only medically unacceptable, but chosen in conscious disregard of an excessive risk to her health?

2. Under the stringent mandatory preliminary-injunction standard, did the district court err by granting Ms. Norsworthy's request for immediate sex-reassignment surgery, where no evidence was presented that her medical condition will drastically deteriorate absent immediate surgery and the record instead shows her gender dysphoria has been successfully treated with hormone therapy and mental-health counseling for over 15 years?

3. In light of the deference owed to prison administrators under federal law, did the district court err by rejecting unrebutted evidence that the court's order would pose serious safety and administrative concerns?

///

///

# STATEMENT OF THE CASE

## I.   PROCEDURAL HISTORY.

Ms. Norsworthy filed this action pro se on February 14, 2014.  (CD 1.)
On April 2, 2014, the district court appointed counsel and dismissed the
complaint without prejudice.  (CD 7, 8.)  On July 2, 2014, through counsel,
Ms. Norsworthy filed the operative First Amended Complaint.  (CD 10, ER
246.)  The district court set a compressed schedule for Ms. Norsworthy's
motion for a preliminary injunction, including discovery cut-off and expert
disclosures solely on the preliminary-injunction issues.  (CD 48, ER 45-48.)
Although the scheduling order permitted Ms. Norsworthy to submit a "reply
expert report," it did not provide for expert depositions or for an evidentiary
hearing.  (*Id.* ER 46.)  Shortly thereafter, the district court granted in part
and denied in part Defendants' motion to dismiss.  (CD 38.)  The remaining
claims alleged a claim for deliberate indifference to medical needs and an
equal-protection violation.  (CD 10, ER 266-268.)

Ms. Norsworthy moved for a preliminary injunction on February 26,
2015, supported by three expert witness declarations.  (CD 62, ER 224; CD
63-65, ER 185-223.)  Defendants opposed the motion on March 12, 2015,
submitting an expert report by Dr. Stephen Levine.  (CD 73, ER 136.3.)  Ms.
Norsworthy did not file a rebuttal expert report, instead filing a 15-page

motion to strike portions of Dr. Levine's expert report and making

evidentiary objections, in contravention of Northern District of California's

Civil Local Rule 7-3(c). (CD 80.) Although the district court considered

Ms. Norsworthy's motion and overruled her objections, it did not offer

Defendants the same opportunity to file evidentiary objections to Ms.

Norsworthy's expert reports. (CD 83, ER 43-44.) Further, the court's

credibility findings relied substantially on these evidentiary objections. (CD

94, ER 19-23.)

On April 2, 2015, the district court granted Ms. Norsworthy's motion

for a mandatory preliminary injunction directing Defendants to provide Ms.

Norsworthy with "sex reassignment surgery as promptly as possible." (CD

94, ER 38.)

## II. PRISON AUTHORITIES HAVE TREATED MS. NORSWORTHY'S GENDER DYSPHORIA SINCE 1999.

Ms. Norsworthy has been in state prison since 1987 for second degree

murder. (CD 10, ER 247 ¶ 2.) In 1999, prison officials referred Ms.

Norsworthy to Dr. Carl Viesti, a psychologist, for assessment of issues

relating to her gender identity. (CD 10, ER 250-51 ¶ 18.) Per the

Diagnostic and Statistical Manual IV (DSM-IV), Dr. Viesti diagnosed Ms.

Norsworthy with the condition of gender identity disorder (the DSM-5 now

refers to this condition as gender dysphoria).  (*Id.*)  Following the diagnosis,

prison doctors recommended hormone therapy and mental-health treatment,

which Ms. Norsworthy sought and received.  (CD 76, ER 117:9-21.)

Ms. Norsworthy has received hormone therapy for her gender

dysphoria since 2000, and continues to receive this and other forms of

treatment, including counseling and constant medical and psychological

monitoring.  (CD 94, ER 5-6.)  Her endocrinologist, Dr. Iqbal Munir,

monitors and adjusts her hormone prescriptions as needed so that they safely

provide an appropriate therapeutic benefit.  (CD 78, ER 308; CD 74, ER

136.2 ¶¶ 4-5.)  Prison officials have also afforded Ms. Norsworthy other

accommodations, including access to brassieres and the option to grow her

hair long.  (CD 76, ER 120:11-18.)  This cumulative treatment has

transformed Ms. Norsworthy's physical appearance and substantially

improved her condition.  (*Id.* at ER 118-19.)  In her own words, the officials

"have facilitated and they have made it possible for [her] to come to terms

with who [she] really [is]."  (*Id.* at ER 124:2-9.)

Under California law, vaginoplasty is provided only on the basis of

medical need.  Cal. Code Regs. tit. 15, § 3350.1(d).  (CD 77, ER 91-92.)

Section 3350.1 was enacted to ensure that all inmates receive consistent and

standardized health-care services based on medical necessity.[1] (CD 77, ER 91-93.) The regulations do not deny any inmate access to an evaluation, diagnosis, or essential treatment because of gender or transgender status. (*Id*.) Although section 3350.1(b) states that the California Department of Corrections and Rehabilitation (CDCR) will not provide vaginoplasty (or other procedures such as vasectomy and tubal ligation) if not based on a medical need, even these medical procedures "may be provided" under section 3350.1(d) if prescribed by a treating physician, and authorized as "clinically necessary" by a utilization management committee.

California law provides a process for inmate-patients to access medical care based on individual medical need. *See* Cal. Code Regs. tit. 15, § 3350-3359.7. Inmates begin the process of requesting non-prescribed medical care by submitting a "Request for Medical Services" form. Although Ms. Norsworthy has followed this procedure when seeking various treatments before this litigation commenced, she did not formally request sex-reassignment surgery through this form until after this litigation was filed. (CD 76, ER 130:17-131:5.)

---

[1] These regulations were approved by the federal court in *Plata v. Schwarzenegger*, No. C01-1351-TEH (N.D. Cal.), as part of its oversight of CDCR's medical care and to ensure the necessary regulatory authority for constitutionally adequate medical treatment. (CD 77, ER 91-93.)

In 2012, Ms. Norsworthy began treatment with Dr. Reese, a prison psychologist, regarding her ongoing mental-health issues, primarily Post Traumatic Stress Disorder. On November 29, 2012, Dr. Reese opined that if Ms. Norsworthy were not released on parole at an upcoming parole hearing, she should be scheduled for sex-reassignment surgery.[2] (CD 68, ER 157.) Dr. Reese did not explain his reasoning for determining that Ms. Norsworthy was an appropriate candidate for surgery, or state that it was medically necessary as a treatment for her gender dysphoria. (*Id.*) He simply asserted in cursory progress notes that, in his opinion, "health, safety, fairness and justice mandate" sex-reassignment surgery for Ms. Norsworthy's "continued well-being." (*Id.* at ER 139.)

///

///

///

---

[2] Over the past year, Ms. Norsworthy has been scheduled for several parole hearings to determine her suitability for release from prison. (CD 76, ER 99-102; CD 92, ER 51.9-51.10.) On March 25, 2015—one week before the hearing on her preliminary-injunction motion—Ms. Norsworthy's counsel postponed her parole hearing, claiming insufficient time to prepare for the hearing after being appointed five weeks earlier. (Id. at ER 102.) Her next parole hearing has been scheduled for May 20, 2015. (CD 92, ER 51.9.)

### III. AFTER A FULL EVALUATION, CDCR'S PSYCHOLOGIST CONCLUDED IN 2013 THAT MS. NORSWORTHY'S CURRENT TREATMENT WAS APPROPRIATE.

On September 16, 2012, Ms. Norsworthy submitted an inmate grievance regarding her gender dysphoria.  (CD 76, ER 104-106.)  She asserted that she had not received "adequate and sufficient medical care as it relates to [her] Gender Identity Disorder."  (*Id*. ER 104.)  The impetus for this grievance was Ms. Norsworthy's recent knowledge that a federal district court had ordered sex-reassignment surgery for a Massachusetts inmate, Michelle Kosilek  (*Id.* ER 106; CD 76, ER 128:20-129:22.) —a ruling that would later be overturned by the First Circuit en banc, *Kosilek v. Spencer*, 774 F.3d 63, 86-89 (1st Cir. 2014) (en banc), *cert. denied*, 2015 WL 1206262 (May 4, 2015).  Prison officials reviewed this grievance, as well as Ms. Norsworthy's medical-treatment file, at multiple levels.  (CD 76, ER 108-111.)

As part of this inmate-grievance review, Ms. Norsworthy was referred to a licensed psychologist, Dr. Raymond Coffin, who thoroughly evaluated her condition and treatment on July 1, 2013.  (CD 66, ER 164-184.)  After reviewing Ms. Norsworthy's central file and complete medical record, as well as meeting with her, Dr. Coffin concluded that she had received appropriate clinical treatment.  (CD 66, ER 180-184.)  Dr. Coffin also found

that she did not meet the criteria for sex-reassignment surgery because she had not been fully evaluated, recommended, and approved for sex-reassignment surgery by the appropriate medical and psychological staff. (CD 66, ER 180-182.)  He noted that Dr. Reese's earlier progress notes did not point to anything supporting his conclusion that Ms. Norsworthy "has not achieved 'normal mental health,' nor evidence supporting his recommendation that a sex change operation would be the appropriate effective intervention."  (CD 66, ER 181.)  Dr. Coffin recommended that Ms. Norsworthy continue her current hormone therapy and medical treatment, and focus her mental-health treatment on improving coping mechanisms and addressing concerns raised by the parole board in previous eligibility hearings.  (*Id.* ER 183-184.)

No treating physician has determined that sex-reassignment surgery is medically necessary for Ms. Norsworthy.  (CD 76, ER 125:14-19.)

## IV.  DEFENDANTS' EXPERT CONSULTANT CONCLUDED THAT SEX-REASSIGNMENT SURGERY IS NOT MEDICALLY NECESSARY FOR THIS INMATE.

Defendants' expert consultant, Dr. Stephen Levine, is a licensed psychiatrist who received his medical degree in 1967 from the Case Western Reserve University School of Medicine.  (CD 78, ER 288.)  He has been a member of the American Psychiatric Association (APA) since 1971, and has

written extensively on psychiatric issues and sexual functioning. (*Id.*) Dr. Levine was previously a member of the Harry Benjamin International Gender Dysphoria Association, the precursor to the World Professional Association for Transgender Health (WPATH). *Kosilek v. Spencer*, 889 F. Supp. 2d 190, 227 (D. Mass. 2012). In this capacity, he was the chairman of the Standards of Care Committee in 1997-98. (*Id.*) Dr. Levine was retained as the district court's independent expert in the seminal case involving transgender inmate care, *Kosilek v. Spencer*, discussed *infra* at 24-26.

Dr. Levine reviewed Dr. Coffin's report, and concluded that Dr. Coffin is qualified to opine on the medical necessity of sex-reassignment surgery. (CD 78, ER 296.) Dr. Levine agreed with the assessment that sex-reassignment surgery was not medically necessary for Ms. Norsworthy in 2012-13. (*Id.* ER 298-99.) He concluded that this decision "was a conservative and prudent one," in part because there are "other ways to diminish the inmate's gender dysphoria short of this irreversible surgery." (*Id.* ER 299.) "Rather than viewing sex reassignment surgery as the ultimate treatment for the pain of gender dysphoria, it should be viewed as a weighty step with social, psychological, medical, and environmental consequences." (*Id.*)

Dr. Levine also conducted an independent mental examination of Ms. Norsworthy.  (CD 78, ER 299.)  He met with her for over two hours to discuss her gender dysphoria, and reviewed reports prepared by psychologists in connection with her parole hearings in 2009, 2012, and 2014.  (*Id.*)  He also reviewed Dr. Reese's progress notes pertaining to his meetings with Ms. Norsworthy, and her medical records and endocrine reports for the past three years.  (*Id.*)  Based on this review, Dr. Levine concluded that Ms. Norsworthy's situation does not present a case where *immediate* sex-reassignment surgery is medically necessary.  (CD 78, ER 308-310.)  First, he concluded that surgery is not medically necessary to save Ms. Norsworthy's life—"her life is not in danger because of the condition of Gender Dysphoria."  (*Id.* ER 308.)  Second, "sex reassignment surgery is not medically necessary to prevent a major psychological or medical decompensation."  (*Id.*)  He explained that although Ms. Norsworthy will likely be disappointed by not receiving immediate sex-reassignment surgery, any resulting depression can be addressed through the mental-health services available in prison.  (*Id.*)

Dr. Levine also found that Dr. Reese's progress notes did not provide the requisite detailed explanation supporting his recommendation for sex-reassignment surgery.  (CD 78, ER 300.)  Dr. Levine observed that there was

"no detailed psychological explanation for [Ms. Norsworthy's] readiness other than the consistent statements that the inmate's estrogen and testosterone levels have [Ms. Norsworthy] as biologically female as possible." (*Id.*) Further, "there is no mention of [Dr. Reese] having explored in detail the deeper motives for sex reassignment surgery—that is, nothing was recorded in the notes." (*Id.*) As Dr. Levine concluded, "Prison officials are wise to not simply accept one clinician's opinion without articulated compelling reasoning." (*Id.* ER 299.)

During this litigation, Ms. Norsworthy has cited her liver disease as a basis for needing surgery because high levels of hormones exacerbate her liver problems. Dr. Levine concluded that Ms. Norsworthy's "liver disease [is not] a reason to perform sex reassignment surgery" because any deterioration of her liver function can and has been reversed and managed by adjusting her hormone dosage. (CD 78, ER 308.) Ms. Norsworthy did not submit any evidence rebutting this conclusion.

Dr. Levine explained that in medicine, a "medical necessity" for immediate surgery means that, absent surgical intervention, "a serious worsening of the patient's physiological state is inevitable." (CD 78, ER 312.) By contrast, sex-reassignment surgery "is not a response to an acute situation. Patients wait until they can gather the funds for the procedure,

have post operative support system in place and have mastered the expected pre-surgical second thoughts." (*Id.*) He noted that "WPATH and experienced clinicians recognize that many individuals make adaptations to their Gender Dysphoria symptoms without sex reassignment surgery." (*Id.* ER 309.) And the evidence shows that Ms. Norsworthy has greatly benefitted from the treatment that she has already received. Dr. Levine concluded that although surgery "would diminish her gender dysphoria," Ms. Norsworthy has lived with this dysphoria for 15 years, and this dysphoria "does not constitute a necessity for immediate sex reassignment surgery." (*Id.*)

## V. MS. NORSWORTHY'S EXPERT DECLARANTS DO NOT ESTABLISH A BASIS FOR IMMEDIATE SURGERY.

Ms. Norsworthy submitted three expert declarations supporting her motion. Dr. Marci Bowers, a medical doctor, opined that sex-reassignment surgery is a medically necessary treatment for gender dysphoria *generally*, but could not opine about Ms. Norsworthy's specific circumstances because she did not meet with Ms. Norsworthy or review any of her medical records. (CD 65, ER 187 ¶ 2.) Dr. Bowers did not opine that sex-reassignment surgery is medically necessary for Ms. Norsworthy. (*Id.* ER 185-189.)

Dr. Nick Gorton is a medical doctor, trained in emergency medicine. (CD 64, ER 191 ¶ 2.) He reviewed portions of Ms. Norsworthy's medical record and deposition testimony, and concluded that sex-reassignment surgery was urgently required for Ms. Norsworthy. (*Id.* ER 199-200.) Because Ms. Norsworthy's hormone therapy was paused over a three month period to assess her liver functioning, Dr. Gorton concluded this placed Ms. Norsworthy at risk of emotional or physical harm. (CD 64, ER 194 ¶ 24.) This testimony lacks a factual basis: Dr. Gorton has never met with Ms. Norsworthy, is not trained to make psychological evaluations, and has not pointed to any evidence that a modulation in Ms. Norsworthy's hormone treatment had any impact on her mental well-being. (*Id.* ER 191-192 ¶¶ 2-14.) On the contrary, Ms. Norsworthy's treating endocrinologist, Dr. Iqbal Munir, testified that her hormone medications provide an appropriate therapeutic benefit. (CD 74, ER 136.1-136.2.)

Dr. Randi Ettner, a psychologist, reviewed Ms. Norsworthy's medical records and interviewed her. (CD 63, ER 203-204.) Notably, Dr. Ettner concluded that Ms. Norsworthy currently experiences at most "mild symptoms of depression" and "generalized anxiety." (CD 63, ER 216 ¶¶ 69-70.) While Dr. Ettner opined that gender dysphoria can lead to emotional decompensation and "externalizing behaviors such as suicide or surgical

self-treatment," she does not describe any such concerns specific to Ms. Norsworthy herself. (CD 63, ER 217 ¶ 75.) Nevertheless, Dr. Ettner concluded that surgery was appropriate for Ms. Norsworthy. (*Id.* ER 218 ¶ 79.)

The district court's scheduling order did not allow for Defendants to depose these proffered experts, and Defendants were never given the opportunity to file separate evidentiary objections to their testimony. Nor was testimony taken from these witnesses or their opinions subjected to cross-examination. Instead, the district court made credibility determinations based solely on the untested written statements of these proffered experts, without prior indication that the court intended to resolve disputed factual issues or assess credibility on the papers alone.

## VI. PROVIDING SEX-REASSIGNMENT SURGERY TO THIS INMATE WILL POSE NEW AND COMPLEX SAFETY ISSUES.

Defendants submitted an unrebutted declaration from the Director of Adult Institutions describing serious safety and administrative concerns that would arise from the district court's order. (CD 75, ER 133-136.) If sex-reassignment surgery is performed on Ms. Norsworthy, housing her as an anatomically female inmate in an all-male facility would increase the

potential that she would be targeted for violence, including assault and rape. (*Id.* ER 135 ¶ 7.)

On the other hand, transferring Ms. Norsworthy to an all-female facility poses its own challenges because of her criminal history. Before her conviction for murder, Ms. Norsworthy threatened her then-girlfriend with bodily harm and was arrested for threatening to bomb her girlfriend's home. (CD 75, ER 134 ¶ 4.) This prior history raises concerns about housing Ms. Norsworthy in a female institution, where many female inmates have been victims of domestic violence and abuse. Ms. Norsworthy could be targeted for assault or victimization by other inmates, or conversely, Ms. Norsworthy might pose a threat to other inmates. (*Id.* ER 136 ¶ 8.) Defendants have already experienced similar challenges with another male-to-female transgender inmate who received emergency sex-reassignment surgery before that inmate was incarcerated in California—including threats and assaults involving the transgender inmate and other female inmates, and frequent transfers between women's institutions and to administrative segregation. (*Id.* ER 135 ¶ 6.)

In short, attempting to house Ms. Norsworthy in a manner consistent with a post-surgery correctional classification, while at the same time

keeping her and other inmates in CDCR's institutions safe and secure, would raise significant administrative and security concerns.

## VII. THE DISTRICT COURT GRANTED MS. NORSWORTHY'S REQUEST FOR A MANDATORY PRELIMINARY INJUNCTION, ORDERING IMMEDIATE SEX-REASSIGNMENT SURGERY.

The district court held argument on Ms. Norsworthy's motion for a preliminary injunction on April 1, 2015, and, one day later, granted the motion.  (CD 94, ER 1.)  The district court did not hear testimony, allow expert depositions, or otherwise hold an evidentiary hearing—despite defense counsel's statements that live testimony would help to resolve several questions that the district court had concerning Dr. Levine's expert report.  (CD 92, ER 51.3:24-51.4:19; ER 51.5:18-51.6:17; 51.11:12-24; *see also* CD 73, ER 136.4:10-13.)

The court concluded that Ms. Norsworthy had established a likelihood of success on the merits of her deliberate-indifference claim because "notwithstanding years of treatment in the form of hormone therapy and counseling, she continues to experience severe symptoms of gender dysphoria."  (CD 94, ER 25.)  The court expressed concern that this "psychological and emotional pain" prevents Ms. Norsworthy from "complet[ing]" her "existence."  (*Id.*)  Despite evidence of her 15-year treatment history, the court found that Defendants "deliberately ignored her

continuing symptoms of gender dysphoria and the recognized standard of care," and disregarded the recommendations of her "treating health care provider," presumably Dr. Reese. (*Id.* ER 30.)

Rejecting Defendants' arguments that no evidence in the record warranted the extraordinary relief of immediate surgery, the district court found that Ms. Norsworthy's subjective "psychological and emotional pain" constituted irreparable harm warranting a mandatory preliminary injunction. (CD 94, ER 34-35.) Lastly, the court rejected uncontested evidence that providing sex-reassignment surgery will create significant safety and administrative concerns. (*Id.* ER 36-37.)

Defendants appealed the district court's mandatory injunction on April 10, 2015. (CD 98, ER 49-50.) At the same time, Defendants moved in the district court for a stay pending appeal. (CD 99.) The district court denied the motion on April 27, 2014. (CD 116.) Defendants then moved for a stay from this Court on May 4, 2015, and that motion is currently pending.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (per curiam). Moreover, a *mandatory* preliminary injunction of the sort that

Ms. Norsworthy sought "goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citation and brackets omitted). "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party,'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994), and "unless extreme or very serious damage will result," *Marlyn*, 571 F.3d at 879; *see also Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (holding that "'mandatory preliminary relief' is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").

This Court reviews the district court's decision granting preliminary injunctive relief for abuse of discretion. *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015). The underlying legal principles are reviewed de novo. *Id.* The district court abuses its discretion when it applies the wrong legal standard or bases its decision on factual predicates that are clearly erroneous or legally irrelevant. *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).

## SUMMARY OF ARGUMENT

The district court ordered sex-reassignment surgery for Ms. Norsworthy in the preliminary-injunction context, without holding a bench trial or evidentiary hearing, or allowing adequate examination of Ms. Norsworthy's evidence and expert opinions.  In so doing, the district court disregarded the governing deliberate-indifference standard, and substituted its own judgment about medical necessity for that of Defendants' medical professionals.  The district court also erred by substituting the WPATH Standards of Care for the governing test under the Eighth Amendment.

As the record shows, the evidence at best presents a mixed question about whether sex-reassignment surgery is medically necessary for Ms. Norsworthy.  Ms. Norsworthy did not establish that she requires this surgery on an urgent basis, and thus there was no reason for the district court to rush to judgment, without allowing adequate factual development.  Lastly, the district court misapplied the rigorous standard for issuing a mandatory injunction under this Court's caselaw.  This Court should reverse the district court's grant of preliminary-injunctive relief.

///

///

///

## ARGUMENT

### I. THE DISTRICT COURT MISAPPLIED THE DELIBERATE-INDIFFERENCE STANDARD, INSTEAD SUBSTITUTING THE WPATH STANDARDS OF CARE.

The district court misapplied the Eighth Amendment's deliberate-indifference standard, relying instead on its interpretation of WPATH's Standards of Care. This legal error warrants reversal.

### A. Defendants Are Providing Constitutional Treatment to Ms. Norsworthy.

Under the Eighth Amendment's deliberate-indifference standard, an inmate must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quotation marks and citation omitted). And the alleged indifference "must be substantial." *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980). A difference of medical opinion between physicians does not establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Here, the record shows that Defendants have provided Ms. Norsworthy with appropriate and continuous treatment for gender dysphoria for the past 15 years, including referral to a psychologist for transsexual assessment, consultation with various endocrinologists, mental-health treatment and counseling, hormone therapy, and clothing accommodations. This treatment has markedly altered her physical appearance and helped Ms. Norsworthy successfully consolidate her gender identity. (*See, e.g.,* CD 10, ER 251 ¶¶ 19-20; CD 76, ER 118:15-119:3; ER 124:4-5.) Moreover, her mental distress has been alleviated, and her own experts find that she presently experiences at most "mild" depression and "generalized anxiety." (CD 63, ER 216 ¶¶ 69-70.) This 15-year treatment history is not indifference— much less deliberate indifference—to Ms. Norsworthy's medical and psychological needs.

In fact, other courts have found similar care to be constitutional. For example, in the only other case where a district court initially ordered sex-reassignment surgery, the First Circuit Court of Appeals reversed the ruling that prison officials were deliberately indifferent to her gender dysphoria by not providing such surgery, given that they provided "such alleviative measures as psychotherapy, hormones, electrolysis, and the provision of female garb and accessories." *Kosilek v. Spencer*, 774 F.3d 63, 86-89 (1st

Cir. 2014) (en banc), *cert. denied*, 2015 WL 1206262 (May 4, 2015). The district court rejected the comparison to *Kosilek*, comparing Ms. Norsworthy's medical treatment instead to a situation where prison officials treat an inmate suffering from a serious fall with mere painkillers. (CD 94, ER 27.) But the extensive and compassionate treatment Ms. Norsworthy has received can hardly be likened to the proverbial aspirin. While a complete denial of treatment to a transgender inmate might violate the Eighth Amendment, "[i]t is important to emphasize … that [the plaintiff] does not have a right to any particular type of treatment." *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987).

The core of Ms. Norsworthy's complaint is that Defendants have not provided the particular treatment she wants—sex-reassignment surgery and unspecified treatment. (CD 62, ER 227.) But the Constitution "does not guarantee to a prisoner the treatment of his choice." *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988). The Eighth Amendment requires that an inmate be afforded "reasonable measures to meet a substantial risk of serious harm to her," not that she be given the specific care she demands. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). The "essential test is one of *medical necessity* and not one simply of desirability." *Id.* (emphasis added; citation omitted); *see also Kosilek*, 774 F.3d at 82 (noting that the deliberate-

indifference standard "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing"). This standard is easily met in this case. In the sex-reassignment-surgery context, the federal court that most recently confronted this issue found this principle determinative: "The law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to 'second guess medical judgments'. . . ." *Kosilek*, 774 F.3d at 90.

## B. The District Court Erroneously Substituted the WPATH Standards of Care for the Eighth Amendment Standard.

The district court did not apply Eighth Amendment jurisprudence and instead relied on the WPATH Standards of Care. (CD 94, ER 26-28.) The WPATH is a small medical organization comprising over 300 members—including physicians, mental-health professionals, social scientists, and attorneys—who are dedicated to studying and treating persons with gender-identity disorder.[3] By comparison, the American Medical Association has over 200,000 members, the American College of Surgeons has about 77,000

---

[3] WPATH, "WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.," *available at* http://www.wpath.org/uploaded_files/140/files/Med%20Nec%20on%202008%20Letterhead.pdf (last visited May 7, 2015).

members, and the American Psychiatric Association has over 33,000 members.[4]  As one federal judge has pointed out, "WPATH is also quite candid that it is an advocate for transsexual persons, and not just interested in studying or treating them."  *O'Donnabhain v. C.I.R.*, 134 T.C. 34, 89 (U.S. Tax Ct. 2010) (noting that the WPATH website includes a downloadable statement to persuade insurers and governmental agencies to cover sex-reassignment surgery) (Holmes, J., concurring).[5]  And the psychiatric textbooks that discuss WPATH's Standards of Care merely treat them as guidelines rather than clearly endorsing sex-reassignment surgery. *Id*. at 88-89.  As Judge Holmes noted in his concurrence in *O'Donnabhain*, "The textbooks do not say that [sex-reassignment surgery] 'should' or 'must' be used as treatment for GID, but only that it 'may' or 'can' be used." *Id*.  Thus, while the Standards reflect the consensus of WPATH, the

---

[4] *See* National Institutes of Health, "American Medical Association Membership Woes Continue," *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3153537/ (last visited Jan. 30, 2014); American Psychiatric Association, "About APA and Psychiatry," *available at* http://www.psychiatry.org/about-apa--psychiatry (last visited May 7, 2015).

[5] *See also* WPATH, "Mission Statement," *available at* http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1347&pk_association_webpage=3910 ("As an international multidisciplinary professional Association the mission of [WPATH] is to promote evidence based care, education, research, advocacy, public policy and respect in transgender health.") (last visited May 7, 2015).

organization's views on surgery do not necessarily reflect the consensus of the entire medical community. *Id*. at 88, *see id*. at 86-90, 92 (explaining why the Standards are "questionable," "contestable," and controversial). For example, while gender surgery was originally done by research hospitals and university-based clinics, these clinics either closed or ended their university affiliation. *Id.* at 95. This includes Johns Hopkins and Stanford Universities. *Id.* These closings were in part due to a 1979 study that "found no significant difference in adjustment between those who had [sex-reassignment surgery] and those who didn't." *Id.*

Importantly, the Standards of Care "themselves admit [] significant flexibility in their interpretation and application." *Kosilek*, 774 F.3d at 87. In *Kosilek*, the district court erred by concluding that a prison doctor's decision not to "follow" the Standards of Care in his treatment of an inmate-patient with gender identity disorder was "medically imprudent" and therefore amounted to constitutionally deficient treatment. *Id.* at 87. The Court of Appeals reversed, holding that "this finding . . . ignored significant contrary evidence regarding the breadth and variety of acceptable treatments for GID [gender identity disorder] within the medical community." *Id.* at 89.

The district court in *Kosilek* also erred by discounting expert testimony that a real-life experience—an important precursor to sex-reassignment surgery—could not be obtained in a prison environment. The en banc court concluded: "We find no support for the district court's conclusion that no reasonable medical expert could opine that [the inmate-plaintiff] lacked real-life experience, particularly in light of the contrary testimony from medical experts concerning the range of social, environmental, and professional considerations that are necessary to constitute a real-life experience under the Standards of Care." *Id.* at 88; *see id.* at 89 n.10.

Similar errors were committed by the district court below. Although Defendants' expert psychiatrist, Dr. Levine, and CDCR psychologist, Dr. Coffin, determined that sex-reassignment surgery is not medically necessary for Ms. Norsworthy, the district court concluded that "these opinions are inconsistent with the Standards of Care . . . and convincingly refuted by Plaintiff's experts." (CD 94, ER 34.)[6] The district court also dismissed Dr.

---

[6] Although the district court concluded that Defendants' actions conflicted with the WPATH Standards of Care, the record actually establishes that while some of the criteria for sex-reassignment surgery under the WPATH guidelines were met, others were not. (CD 78, ER 310-311.) And the district court disagreed with Dr. Levine's interpretation of the WPATH Standards, (CD 78, ER 28), even though Dr. Levine was a member of the precursor to WPATH, and participated in drafting a previous iteration

(continued…)

Levine's testimony that Ms. Norsworthy "does not have any time, let alone 12 months, of continuous living in a female gender role in society," finding that this view "misrepresents" and deviates from the most recent version of the Standards of Care.  (*Id.* ER 28.)

But as discussed above, the WPATH's Standards of Care are not the constitutional litmus test for Eighth Amendment deliberate-indifference claims.  The appropriate legal test is whether the treatment afforded to Ms. Norsworthy—including transgender evaluation, mental-health treatment, and hormone therapy—was deliberately indifferent to a substantial risk of harm. As the First Circuit explained in *Kosilek*, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  774 F.3d at 89 (citation omitted).  In other words, the key question is whether Ms. Norsworthy's prison doctors were deliberately indifferent to a serious risk of harm that would result from her not receiving the surgery.

---

(…continued)
of the Standards.  *Kosilek*, 889 F. Supp. 2d at 227 ("Dr. Levine was the chairman of the Harry Benjamin International Gender Dysphoria Association committee for the fifth version of the Standards of Care.").

Here, Ms. Norsworthy did not establish that a serious risk of harm would result absent surgery.  As the record reflects, "sex reassignment surgery is not medically necessary to prevent a major psychological or medical decompensation" to Ms. Norsworthy.  (CD 78, ER 308.)  And there is no indication that Ms. Norsworthy will suffer significant mental or physical injury without immediate surgery.  (*Id.*)  Any psychological effects resulting from Ms. Norsworthy's disappointment can be addressed through the prison's mental-health system, which has provided her support throughout her incarceration.  *See Kosilek*, 774 F.3d at 90 (rejecting Eighth Amendment claim for sex-reassignment surgery in part because the prison officials "stand[] ready to protect [the inmate-plaintiff] from the potential for self-harm by employing its standard and accepted methods of treating any prisoner exhibiting suicidal ideation").

The issue before the district court was not whether Defendants complied with a particular course of treatment suggested by the WPATH Standards of Care, but whether Ms. Norsworthy's consistent and ongoing treatment constituted deliberate indifference under the Eighth Amendment. In reaching this determination, the district court erred by substituting its own opinion for that of Defendants' medical professionals.  *Kosilek*, 774 F.3d at 92 (in assessing a deliberate-indifference claim, "it is not the district court's

own belief about medical necessity that controls, but what was known and understood by prison officials in crafting their policy").

## II. THE DISTRICT COURT ERRONEOUSLY ORDERED IMMEDIATE SURGERY WITHOUT PROOF THAT MS. NORSWORTHY URGENTLY REQUIRES IT.

As this Court has made clear, "a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Serv. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Ms. Norsworthy did not demonstrate through the evidence submitted with her preliminary-injunction motion that she faces immediate threatened injury warranting urgent preliminary relief. (CD 79, ER 51.16-51.17.) "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and the law clearly favor the moving party.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citation omitted).

### A. Ms. Norsworthy Did Not Clearly Demonstrate the need for Urgent Mandatory Injunctive Relief.

Notably, Ms. Norsworthy did not even argue in her papers that she will suffer immediate irreparable injury absent urgent relief, instead arguing that "sudden urgency" was not required for interim relief. (CD 79, ER 51.16-51.17.) Nonetheless, the district court concluded that Ms. Norsworthy's allegations that she continues to suffer without the surgery is sufficient to warrant urgent injunctive relief. (CD 94, ER 35-36.) In fact, there was no evidence that Ms. Norsworthy's psychological distress differs in kind or degree from what she has experienced since she was diagnosed with gender dysphoria over 15 years ago. And there is no evidence that her condition has worsened or will worsen in any appreciable way if this case is allowed to proceed to a full trial on the merits while these weighty legal and factual issues are decided.

The district court summarily dismissed these concerns, concluding that "irreparable injury does not have to be new to be relevant." (CD 94, ER 36.) This statement misses the point. Ms. Norsworthy had to show a clear need for immediate relief because she sought immediate relief. Indeed, the only factor that seemed to show any type of urgency for Ms. Norsworthy's request was her scheduled parole hearing, which she postponed and might

have led to her release, rendering her constitutional claims moot. (CD 92, ER 51.9:19-51.10:5.)

In *Caribbean Marine Services*, this Court reversed an injunction prohibiting state agencies from placing female observers on board certain commercial tuna boats, finding that "the district court did not require a showing that the harms alleged by the owners and crew were imminent or likely." *Id.* at 675. Instead, the movant's purported injury was speculative at best. *Id.* Preliminary injunctions should be granted only in cases that "clearly demand" such interim relief. *Direx Israel, Ltd. v. Breakthrough Med. Grp.*, 952 F.2d 802, 811 (4th Cir. 1991).

Although Ms. Norsworthy presented conclusory expert testimony that she needed "immediate" surgery, this testimony lacked a factual basis. First, Dr. Ettner, a psychologist who cannot authorize surgery, failed to explain why surgery was urgently required for Ms. Norsworthy's condition, which she described as "mild symptoms of depression" and "generalized anxiety." (CD 63, ER 216 ¶¶ 69-70.) Ms. Norsworthy's other expert, Dr. Gorton, opined that urgent surgery was necessary, but apparently based his conclusion on the supposition that a three-month pause in Ms. Norsworthy's hormone therapy posed a risk of emotional or physical harm. (CD 64, ER 198-199.) But Dr. Gorton did not meet with or examine Ms. Norsworthy

before rendering his opinion, is not trained to make psychological evaluations, and has not pointed to any evidence that a modulation in hormone treatment had any impact on her mental well-being. (*Id.* ER 191-192.)

Dr. Stephen Levine, Defendants' expert witness and a Board-certified medical doctor, licensed psychiatrist, and national expert in transgender issues, explained that sex-reassignment surgery was not medically necessary, much less *immediately* medically necessary. Based on an independent mental examination of Ms. Norsworthy, he concluded that prison officials' actions were prudent, and that "sex reassignment surgery" was not medically necessary in this case. (CD 78, ER 298-299.) He also explained that sex-reassignment surgery must be viewed in light of its weighty "social, psychological, medical, and environmental consequences." (*Id.* ER 299.) Specifically addressing concerns about Ms. Norsworthy's liver, Dr. Levine concluded that this issue did not warrant surgery, noting that "no treatment is indicated for her Hepatitis C based on her normal echo and liver biopsy," and that "her liver disease [is not] a reason to perform" sex-reassignment surgery. (*Id.* ER 308.) And Ms. Norsworthy did not rebut Dr. Levine's testimony.

At best, the record regarding medical necessity is mixed; the record on *immediate* necessity, however, is not, and "the district court should deny such [mandatory] relief 'unless the facts and the law clearly favor the moving party.'" *Stanley*, 13 F.3d at 1320 (citation omitted). Given this heavy burden, and the irreversible nature of the surgery, this Court should reverse the mandatory preliminary injunction.

### B. The District Court Erred by Making Credibility Findings Without an Evidentiary Hearing.

Despite the paucity of evidence that Ms. Norsworthy required injunctive relief on an urgent basis, the district court set an expedited briefing and discovery schedule, and ultimately ruled without allowing Defendants a chance to file separate evidentiary objections to Ms. Norsworthy's experts, depose them, or otherwise test their testimony and expertise in an evidentiary hearing. (CD 48, ER 45-48.)

Although trial courts normally have wide latitude under Federal Rule of Civil Procedure 43 in deciding whether to take oral testimony, courts should take testimony when "factual questions are not readily ascertainable from the declarations of witnesses or questions of credibility predominate." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 858 (9th Cir. 1992). "Historical experience has taught us that testimonial

evidence has the highest reliability because the credibility of the witness can be evaluated, and the factual issues narrowed by cross-examination." *Sanders v. Monsanto Co.*, 574 F.2d 198, 200 (5th Cir. 1978). In the criminal context, this Court has held that a district court judge cannot disregard a magistrate judge's credibility findings in connection with a motion to suppress without holding an evidentiary hearing. *United States v. Ridgway*, 300 F.3d 1153, 1157 (9th Cir. 2002); *see also* 8 James Wm. Moore, *Moore's Federal Practice- Civil* § 43.05[2] (3d ed. 2012) ("A district court has considerable discretion to decide Rule 43(c) motions solely on the basis of affidavits or to take oral testimony at a hearing, but when questions of fact or credibility predominate, the district court should hear oral testimony; a failure to do so is likely to be considered an abuse of discretion.").

Here, the district court rushed to issue a preliminary injunction on a sparse record and made adverse credibility findings about Dr. Levine without allowing testimony that could have clarified any perceived inconsistencies in his testimony. (CD 94, ER 28-30.) The district court also made credibility determinations about Ms. Norsworthy's proffered experts, despite serious questions about the factual basis for many of their conclusions or their expertise in opining on certain matters. This error was compounded by the fact that the compressed preliminary-injunction

schedule did not anticipate the depositions of any proposed expert, which might have allowed the parties and court to address issues of credibility at the preliminary-injunction stage.  And while the district court entertained Ms. Norsworthy's motion to strike portions of Dr. Levine's report and offering evidentiary objections, (CD 94, ER 19-23), Defendants were not offered the same opportunity to file evidentiary objections to Ms. Norsworthy's expert reports.  As Defendants pointed out during argument on Ms. Norsworthy's motion, further factual development could have addressed the purported inconsistencies in Dr. Levine's report, or afforded an opportunity to assess the rationale for Ms. Norsworthy's expert opinions. The court committed reversible error.

## C.    The District Court Erred by Finding that Defendants Will Not Be Irreparably Injured by Its Order.

As set forth above, there is no evidence that irreversible treatment is immediately necessary on the limited record in this case.  In fact, the record demonstrates that the Defendants will be irreparably injured if the district court's order stands and surgery goes forward without deciding the merits of Ms. Norsworthy's constitutional claim on a full record.

When the terms of a preliminary injunction are "irrevocably carried out," it becomes impossible to undo what has already been done, regardless

of whether a careful examination of the evidence and law would dictate that the relief should not have been granted in the first instance. *Camenisch*, 451 U.S. at 398 (finding mootness where an injunction was "fully and irrevocably carried out"). Here, if Defendants provide irreversible surgery to Ms. Norsworthy in compliance with the district court's order, the pressing factual and legal issues on appeal will likely be rendered moot. These issues should not escape review on a full record, which can be accomplished by providing a trial and appellate review while Ms. Norsworthy continues to receive extensive and effective medical and mental-health treatment.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY DISREGARDING IMPORTANT SECURITY CONSIDERATIONS.

"[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Moreover, the Prison Litigation Reform Act requires that courts "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the preliminary relief." 18 U.S.C. § 3626(a)(2); *Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001) (noting that prison officials are accorded "wide-ranging deference in the adoption and execution of policies and

practices to further institutional order and security") (internal citation omitted).

Here, providing sex-reassignment surgery to Ms. Norsworthy will pose serious safety and administrative challenges concerning Ms. Norsworthy's housing placement post-operation. Housing Ms. Norsworthy as an anatomically female inmate in an all-male facility would increase the potential that she would be targeted for violence, including assault and rape. (CD 75, ER 135 ¶ 7.) On the other hand, housing Ms. Norsworthy in an all-female institution, given her prior history of assaultive behavior against her then-girlfriend also presents significant concerns. Ms. Norsworthy could be targeted for assault or victimization by other inmates, or conversely, Ms. Norsworthy might pose a threat to other inmates. (*Id.* ER 135-136 ¶ 8.)

Defendants have already experienced similar challenges with another male-to-female transgender inmate who received sex-reassignment surgery before that inmate was incarcerated in California. (*Id.* ER 135 ¶ 6.) That inmate has been involved in several threats and assaults with other female inmates, and has been frequently transferred between women's institutions as well as to administrative segregation. (*Id.*)

The district court downplayed these safety concerns, deeming them unpersuasive despite no evidence submitted in rebuttal. (CD 94, ER 36-37.)

The court essentially brushed aside safety concerns inherent in housing a male-to-female transgender individual with a history of criminal assaultive conduct against women in an all-female prison. (*Id.*) As the First Circuit held in *Kosilek*, a federal court should not substitute its judgment for prison officials' good-faith balancing of security and health concerns. *Kosilek*, 774 F.3d at 92 (holding that district court failed to give appropriate consideration to the security concerns raised by prison officials regarding the consequences of sex-reassignment surgery). Ultimately, "the appropriate inquiry was not whether the court believed that [Ms. Norsworthy] could be housed safely, but whether the [CDCR] has a reasoned basis for its stated concerns." *Id.* Here, the district court did not adequately consider the unrebutted declaration of the Director of Adult Institutions, describing these serious concerns, (CD 75, ER 133-36), and did not offer an opportunity for live testimony on these issues. This, too, was error.

## CONCLUSION

Sex-reassignment surgery is a weighty step with significant consequences for the person involved. These consequences are even more complicated when it has been ordered to be performed in a correctional setting. Sex-reassignment surgery should not be ordered by a district court as a mandatory preliminary injunction, particularly absent a need for

expedited consideration and the lack of a complete factual record.  This

Court should reverse the district court's preliminary injunction.


Dated:  May 8, 2015                    Respectfully submitted,


                                       KAMALA D. HARRIS
                                       Attorney General of California
                                       JONATHAN L. WOLFF
                                       Senior Assistant Attorney General
                                       THOMAS S. PATTERSON
                                       Supervising Deputy Attorney General


                                       */s/ Jose A. Zelidon-Zepeda*
                                       JOSE A. ZELIDON-ZEPEDA
                                       Deputy Attorney General
                                       *Attorneys for Defendants-Appellants Beard,*
                                       *Spearman, Coffin, Lozano, Adams, Newton,*
                                       *Van Leer, and Zamora*

SF2015401239
20733195.doc

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**MICHELLE-LAEL B. NORSWORTHY,**

Plaintiff-Appellee,

**v.**

**JEFFREY BEARD, et al.,**

Defendants-Appellants.

**STATEMENT OF RELATED CASES**

The following related case is pending: *Rosati v. Igbinoso*, No. 13-

15984 (9th Cir.).

Dated: May 8, 2015               Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
THOMAS S. PATTERSON
Supervising Deputy Attorney General

*/s/ Jose A. Zelidon-Zepeda*
JOSE A. ZELIDON-ZEPEDA
Deputy Attorney General
*Attorneys for Defendants-Appellants Beard,*
*Spearman, Coffin, Lozano, Adams, Newton,*
*Van Leer, and Zamora*

15-15712

# CERTIFICATE OF COMPLIANCE

## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1

I certify that: (check (x) appropriate option(s))

**[X]** 1. Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **DEFENDANTS-APPELLANTS' OPENING BRIEF** is

**[X]** Proportionately spaced, has a typeface of 14 points or more and contains **8,243** words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

**[ ]** Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

**[ ]** 2. The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a(7)(B) because

**[ ]** This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

**[ ]** This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

**[ ]** Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

**[ ]** Monospaced, has 10.5 or fewer characters per inch and contains __ pages or __ words or __ lines of text.

**[ ]** 3. Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

☐ Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

☐ Monospaced, has 10.5 or fewer characters per inch and contains __ words or __ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐ 4. **Amicus Briefs**.

☐ Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐ Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐ Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

| | |
|---|---|
| May 8, 2015 | */s/ Jose A. Zelidon-Zepeda* |
| Dated | Jose A. Zelidon-Zepeda<br>Deputy Attorney General |

# CERTIFICATE OF SERVICE

Case Name:  **Michelle-Lael Norsworthy v.**          No.     **15-15712**
            **Jeffrey Beard, et al.**

I hereby certify that on <u>May 8, 2015</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS-APPELLANTS' OPENING BRIEF.**


I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>May 8, 2015</u>, at San Francisco, California.


|        C. Look        |        /s/ C.  Look        |
|:---------------------:|:--------------------------:|
|       Declarant       |         Signature          |

SF2015401239
20733121.doc